# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES MAGISTRATE JUDGE
# U.S. DISTRICT COURT BUILDING
# WASHINGTON, D.C.

PLEASE ISSUE: ☐ Arrest  ☑ Search  ☑ Seizure

warrant for:  IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FOURTEEN TWITTER PROFILES WITH USERNAMES STORED AT PREMISES CONTROLLED BY TWITTER PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1001(a)(2)

Violation: ☐ D.C.C.  ☑ U.S.C.  Title: 18

Section(s): 1343, 1001(a)(2), 1623

/s/ _____  4/3/2020 _____
Tejpal S. Chawla                     Date
Assistant United States Attorney
(202) 252-7

COMPLETE FOR ALL ARREST WARRANTS:

*The following information __must__ be provided for __ALL__ arrest warrants and an **original** and **duplicate** of this form must be submitted to the Clerk's Office with the warrant papers.*

██████████████████████████

Agency / Unit:  FBI/Joint Terrorism Task Force

24 Hour Telephone Number: ████████████
 (For officer/agent)

Cellular Number: ████████████
 (For officer/agent)

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*
IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH
FOURTEEN TWITTER PROFILES WITH USERNAMES STORED AT
PREMISES CONTROLLED BY TWITTER PURSUANT TO 18 U.S.C. § 2703
FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1001(a)(2)

)
)
)
)
)
)
)

Case No. 20-sc-00731

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

located in the _____ **Northern** _____ District of _____ **California** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1001(a)(2) | Material False Statements in an Investigation Involving International Terrorism |
| 18 U.S.C. § 1623 | False Declaration Before a Grand Jury |

The application is based on these facts:

**See Attached Affidavit**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set f███████████████████

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ **telephone** _____ *(specify reliable electronic means)*.

Date: _____ **04/03/2020** _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

_____
Deborah A. Robinson
*Printed name and title*

❏ Original　　❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  20-sc-00731 |
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH | ) |
| FOURTEEN TWITTER PROFILES WITH USERNAMES STORED ■ | ) |
| PREMISES CONTROLLED BY TWITTER PURSUANT TO 18 U.S.C. § 2703 | ) |
| FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1001(a)(2) | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:　　Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ___Northern___ District of ___California___ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before ___April 17, 2020___ *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.　　☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Deborah A. Robinson___ .

*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for ___ days *(not to exceed 30)*　　❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: ___04/03/2020___

City and state:　___Washington, D.C.___　　　　_____
*Judge's signature*

U.S. Magistrate Judge Deborah A. Robinson
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 20-sc-00731 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Twitter accounts identified by username and User IDs



that are stored at the premises owned, maintained, controlled, or operated by Twitter, a company headquartered in San Francisco, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be disclosed by Twitter to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of Twitter, including any messages, records, files, logs, or information that have been deleted but are still available to Twitter, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the government for each account listed in Attachment A:

a.  All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers;

b.  All past and current usernames, account passwords, and names associated with the account;

c.  The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.  All IP logs and other documents showing the IP address, date, and time of each login to the account;

e.  All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

f.  All "Tweets" and Direct Messages sent, received, "favorited," or retweeted by the account, and all photographs or images included in those Tweets and Direct Messages;

1

g.  All information from the "Connect" tab for the account, including all lists of Twitter users who have favorited or retweeted Tweets posted by the account, as well as a list of all Tweets that include the username associated with the account (*i.e.*, "mentions" or "replies");

h.  All photographs and images in the user gallery for the account;

i.  All location data associated with the account, including all information collected by the "Tweet With Location" service;

j.  All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

k.  All data and information that has been deleted by the user;

l.  A list of all of the people that the user follows/followed on Twitter and all people who are/were following the user (*i.e.*, the user's "following" list and "followers" list);

m.  A list of all users that the account has "unfollowed" or blocked;

n.  All "lists" created by the account;

o.  All information on the "Who to Follow" list for the account;

p.  All privacy and account settings;

q.  All records of Twitter searches performed by the account, including all past searches saved by the account;

r.  All information about connections between the account and third-party websites and applications;

2

s.   All records pertaining to communications between Twitter and any person regarding the user or the user's Twitter account, including contacts with support services, and all records of actions taken, including suspensions of the account.

**t.   All information pertaining to account deactivation or suspension, where applicable, and any Terms of Service which were violated.**

Within **14 days** of the issuance of this warrant, Twitter shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



## II. Information to be seized by the government

All information from January 1, 2014 until the present, described above in Section I, that constitutes evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. §1343, Wire Fraud, and Title 18 U.S.C. § 1001(a)(2), Material False Statements involving international terrorism, and Title 18 U.S.C. §1623, Perjury, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated about matters relating to ISIS, S-1, Dawla, or the criminal activity under investigation, including records that help reveal their whereabouts;

(c) All financial records of information;

(d) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(e) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(f) Information that constitutes evidence concerning fundraising, transfer of money, conversion of money, concealing information about transactions, wire fraud or

4

other financial fraud by the Account user, persons communicating with the Account user, or others connected to S-1;

(g) Any records, communications, photographs, videos, documents, logs, or attachments relating to statements made to or from the Account user regarding ISIS, on-line chat rooms, fundraising, S-1 ███████, S-3, ███████, ███████, W-3, and persons linked to S-1, ███████, ███████, ███████, and W-3;

(h) Records, communications, drafts, videos, photographs and other material that is communicated through on-line chat rooms, social media platforms, or video-sharing websites;

(i) Records, communications or other material that discuss a pending grand jury, criminal investigations by the FBI, and/or the identity or location of potential witnesses;

(j) All records, communications, drafts, or other material that discuss ISIS; any FTOs; terrorist attacks, actions, communications, or planning; foreign terrorist organizations, or persons who have ever sought to travel to ISIS territory;

(k) All records, communications, documents, material, videos, and posters related to operation of S-1's on-line chat room, social media platforms, and the communications of all administrators;

(l) All financial, bank, money transmitting service, purchase or sales records, documents, accounts, ledgers, notes, receipts, and evidence of solicitation and/or receipt and/or distribution of money or credits or digital currency (e.g. Bitcoin), including drafts;

.

(m) All communications, notes, videos, photographs, drafts, and records relating to ISIS, on-line chat rooms, or S-1's communications with others using the internet;

(n) Records, communications, drafts, or other material that discuss ISIS, terrorist attacks, actions, communications, or planning; foreign terrorist organizations, or persons who have ever sought to travel to ISIS territory;

(o) Records, communications, drafts, photographs, videos, or other material that discuss traveling overseas to live in a country where ISIS was present, join a foreign terrorist organization, or avoid detection by law enforcement;

(p) Records, communications, drafts, videos, photographs and other material that is communicated through on-line chat rooms, social media platforms, or video-sharing websites that host or contain content produced by S-1, ISIS-affiliated organizations, or any other foreign terrorist organization;

(q) Information related to financial information, accounts, ledgers, and access to monetary instruments, goods, and funds, including use of intermediaries to disperse or collect funds and goods;

(r) Evidence related to the Account user's deletion of electronic information, including emails, documents, receipts, and transactions related to S-1 or any person connected with S-1; and,

(s) Evidence related to the Service Provider's deactivation of accounts, where applicable, and the Terms of Service which were violated.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

6

or typing); draft or deleted records; and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

### III.  Government procedures for warrant execution

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, analysts, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF
## EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Twitter, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Twitter. The attached records consist of:

_____

**[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.

I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Twitter, and they were made by Twitter as a regular practice; and

b.       such records were generated by Twitter electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Twitter in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by Twitter, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                   Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FOURTEEN TWITTER PROFILES WITH USERNAMES STORED AT PREMISES CONTROLLED BY TWITTER PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1001(a)(2)** | Case No. 20-sc-731<br><br><br>**Filed Under Seal** |



## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ▮▮▮▮▮▮ a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information which is associated with fourteen accounts – that is, Twitter Accounts ▮▮▮

███████████████████████████████████ – stored at the premises owned, maintained, controlled, or operated by Twitter, a social networking company headquartered in San Francisco, CA. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Twitter to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.



applications, and metadata associated therewith.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1001(a)(2) (material false statements in an investigation involving international terrorism) have been committed by ███████████ ("███████"); violations of 18 U.S.C. § 1001(a)(2) (material false statements in an investigation involving international terrorism) have been committed by ███████████ ("████████"); and, violation of 18 U.S.C. § 1623 (false declarations before a grand jury) have been committed by ██████████████████ ("██████"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

4.    Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

5.    This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below,

acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC, *see* 18 U.S.C. § 3237, and the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238.

6.    When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

## STATUTORY VIOLATIONS

### Wire Fraud

7.    Title 18, United States Code Section 1343 criminalizes knowingly devising a scheme for obtaining money by means of false pretenses or causes to be transmitted by means of wire in interstate commerce any signals for the purpose of executing such scheme. 18 U.S.C. § 1343.

### Material False Statements Involving International Terrorism

8.    Title 18, United States Code Section 1001 criminalizes knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the executive branch of the United States.  18 U.S.C. § 1001(a)(2).  If the

matter involves domestic or international terrorism, the maximum penalty is eight years incarceration.

**Perjury**

9. Title 18, United States Code Section 1623 criminalizes knowingly making any false material declarations in any proceeding before a grand jury of the United States.

## PROBABLE CAUSE

### Background on ISIS and Its Internet Recruitment Efforts

10. The FBI has been investigating the use of the Internet and social media by foreign terrorist groups, including the Islamic State and al-Sham ("ISIS"). On or about October 15, 2004, the U.S. Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawhid wa'al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the INA and as a SDGT entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added a number of aliases to the ISIL listing, including: The Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production (collectively referred to herein as "ISIS"). On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. ISIS remains a designated FTO.

11. Based on your affiant's training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, traveled to Syria and Iraq to join

ISIS, an act they commonly refer to as "hijrah"[1]; (b) foreign fighters commonly entered Syria by crossing the border from Turkey or Jordan; (c) foreign fighters from Western countries traveled to locations in Turkey, including Istanbul, and then traveled to towns closer to the border where they were brought into Syria to join ISIS; (d) Abu Bakr al-Baghdadi was the leader (or "Caliph") of ISIS before he was killed by U.S. forces on or about October 26, 2019; (e) since on or about September 22, 2014, ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and its leadership gave blanket approval for this indiscriminate killing by individuals residing in these countries.

12.     To gain supporters, recruit fighters, and raise funds, ISIS spreads its message of violent jihad[2] using social media platforms, such as Twitter, Facebook, YouTube, Instagram, and Paltalk. On these platforms, ISIS advocates post audio and video files that include recruitment messages and updates of events in Syria and Iraq. Online chat rooms controlled by ISIS advocates further effectuate this support.

13.     One such online community was a pro-ISIS Paltalk chat room called ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ which contained audio of speeches made by SUSPECT 1 ("S-1"). ▮▮▮▮



S-1 continued to encourage violence and terrorist acts in speeches posted on the Internet or in Paltalk chat rooms. S-1 has also recorded numerous statements inciting violence and supporting ISIS, its former leader al-Baghdadi, al-Qaeda, and

---

[1] Based on my training and experience, I know "hijrah" generally means migrations, and in this context refers to travel to engage in jihad.

[2] Based on my training and experience, I know "jihad" is an Arabic word which literally means striving or struggling, but in this context it refers to a holy war, fight, or struggle against the enemies of Islam.

Osama bin Laden. ▮ contained recorded lectures of S-1 proselytizing on behalf of and in support of ISIS. I have viewed the ▮ site and am familiar with its contents and organization.

14. S-1 is not a U.S. person and is currently ▮▮▮▮▮▮▮ ▮▮▮▮



15. On or about December 5, 2017, the United States Office of Foreign Assets Control ("OFAC") designated S-1 as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, ISIS.



**▮▮▮ Role as an ▮▮▮**

16. On or about March 20, 2014, ▮▮▮ received an email welcoming her as a new ▮ Administrator and assigning her the moniker ▮▮▮▮ (▮▮).[3] During a voluntary interview with FBI Agents ▮ the Charlotte Douglas International Airport on January 25, 2018, ▮▮▮ was advised that lying to the FBI would constitute a violation of federal law,

---

[3] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Google accounts used by or associated with S-1 and/or ▮▮▮. In response to the warrant, Google provided this email among others.

7

and in that interview she initially told the FBI Agents that, "I was not an Administrator ███████ ███████ later acknowledged she would sometimes help in the class and login with an Administrator account. Later in the interview, ███████ admitted that she was an Administrator often over the past year, and that her involvement varied prior to that. As an Administrator, she stated that she would take notes and post them on the ██ website, post Quranic verses and find hadith[4] during lectures, as well as, advertise the lectures on social media for S-1.

17.     On April 22, 2014, ███████ sent an email to an individual using the nickname ███████████ with a subject line reading, "Admin Rules." The email indicated it was a "follow-up" to a prior conversation between ███████ and S-1 and included a document titled, "RULES FOR ██ June 2014," as an attachment. The document contained information addressed to all the brothers and sisters who were "admining" for the ███ chat room. It proceeded to outline the mission of the ███ chat room which included, "[t]o play a significant role in the battle of hearts and minds that is happening all over the world, by supporting the mujahideen and their actions…" The document further explained that loyalty and commitment were expected, and it reminded Administrators that they were "representing the ███████████████" when using ███ usernames. Under the "Rules for Chat Room (Admins and Guests)" section, the document explained that the chat room would play material from speakers such as Shaikh Awlaki[6], S-1,

---

4 "Hadith" is a collection of traditions containing sayings and actions of the Prophet Muhammad. Hadith are one of the major sources of guidance for Muslims.



6 Your affiant believes the "Shaikh Awlaki" referenced here is Anwar al-Awlaki, a key leader for al-Qa'ida in the Arabian Peninsula (AQAP), who was designated by the United States Department of Treasury in July 2010. Al-Awlaki was involved in numerous aspects of terrorism including recruitment, training, operational planning, and

Shaikh Bakri, and others. They would also play "Qur'an recitations, Jihad nasheeds, and Mujahideen releases." Also included in the document was guidance on S-1's donation details, which included standard language to be used in soliciting donations from followers.

18.    On October 26th, 2018, the United States District Court for the District of Columbia authorized a search warrant for a Seagate Backup Plus 2TB Portable Drive, Model Number ██████████████████████████ containing a digital copy/forensic image of a Macbook Pro laptop (hereafter referred to as "Macbook Pro") and an iPhone 6S Plus (hereafter referred to as "iPhone 6S Plus") which belonged to ██████████.

19.    FBI review of ██████████ Macbook Pro revealed various archived email correspondence in which ██████████ was granted permission to create content advertising S-1's lectures and subsequently post them on Facebook. Prior to posting new publicity flyers and advertising, ██████████ would request review and feedback from S-1 and/or another ██ Administrator. For example, on July 1, 2014, S-1 instructed ██████████ via email to change the topic of the lecture in the publicity flyer to Abu Bakr al-Baghdadi's Ramadan message. S-1 stated that he just received the CD to translate, and ██████████ responded to S-1 with a publicity poster. ██████████ noted that she also posted it to Facebook. On July 5, 2014, S-1 emailed ██████████ instructing her to use an ██████ as your logo" in the poster. On December 24, 2014, ██████████ emailed herself a communication with the subject "fb", with details on an ████████████████ ██████████████████ This conference featured prominent jihadist preachers, S-1, Anjem Choudary, and Abu Baraa[7]. FBI review of ██████████ communications from this source

_____

actively sought to encourage his supporters to provide money for terrorist causes. Al-Awlaki was a prominent propagandist for English- and Arabic-speaking audiences, and his material has continued to inspire terrorist attacks, oftentimes targeting the United States and/or its interests. On September 30, 2011, al-Awlaki was killed by United States forces in Yemen.
[7] Following ISIS's declaration of a caliphate in June 2014, Anjem Choudary (Choudary) and Mohammed Mizanur Rahman aka Abu Baraa (Baraa) allegedly pledged allegiance to ISIS's leader, Abu Bakr al-Baghdadi, and began to

indicated she was also responsible for reviewing Facebook messages that were directed to S-1, and forwarding them to S-1 for responses.

20.      W-2[8] indicated that it visited the online ████ chat room. W-2 advised that in or around July 2015, W-2 suggested to S-1 that W-2 conduct a lecture in the ████ chat room. S-1 was receptive to W-2's suggestion. W-2 indicated it believed S-1's purpose in having W-2 speak in the ████ chat room was to radicalize others.

21.     In preparation for conducting the lecture W-2 began to interact with the ████  Administrators. W-2 reported that the primary ████ Administrator used the kunya,[9] ████ ████ ████ stated in an interview with FBI Agents that ████████ was a name she used on social media and/or communication accounts. Service provider records confirmed this fact. As such, your affiant believes that ████ used the moniker ████ ████ when serving as an ████ Administrator for S-1.

22.     W-2 further indicated that  was essentially S-1's secretary and was aware of S-1's activities. W-2 also described ████ as the lead Administrator in the ████ chat room. W-2 explained that ████ handled all of S-1's correspondence, designed online posters to advertise ████ lectures, facilitated lectures, coordinated the posting of hadith and Quranic

---

support ISIS over various social media platforms. Choudary and Baraa were convicted in the United Kingdom in July 2016 for inviting support of a proscribed organization, namely the Islamic State, and were each sentenced to five years and six months in prison. On or about March 30, 2017, the U.S. Department of State designated Choudary as a SDGT under Executive Order 13224.



[9] "Kunya" is a term that can be used to describe a nickname or an honorary Islamic name for someone.

verses in the chat room, monitored ██ chat room discussions, and posted audio of ██ lectures to the ██ website.

**██████ and S-1's Fundraising Efforts**

23.     ██████ was also actively involved with S-1 in fundraising and collecting donations for the operation of the ██ enterprise.  On January 5, 2016, a local law enforcement agency advised the FBI that during an ██ discussion on December 21, 2015, a user name known to be associated with S-1 posted the following: "according to Shariah we kill apostates" and "If they turn back from Islam then kill them.  Surah 4:89".  Later in the same chat room, an individual believed to be another ██ Administrator posted the following solicitation for funding, "DONATE TO THE DAWAH[10] OF [S-1]- EMAIL TO:::: [Email Address 1] - TO ASK FOR DIRECTIONS ON HOW TO USE [MONEY TRANSMITTING SERVICE 1 ("MTS1")] OR [MONEY TRANSMITTING SERVICE 2 ("MTS2")]:::::JZK[11]".

24.     Further, on January 25, 2016, a local law enforcement agency advised the FBI that on January 18, 2016, ████████████████████ engaged in a private online conversation with an account believed to be used by S-1.  During this conversation S-1 asked ██ to send money to ████████ using a specific money transmitting service, hereafter referred to as "MTS1," under S-1's ████ name, which S-1 identified as "█████████ Excerpts of the conversation are as follows:

UCE: shaikh i would like to make donation for the dawa what is the best way?

S-1: the best way is via [MTS1]

---

[10] "Dawah" (variation "dawa") means the proselytizing or preaching of Islam.
[11] "JZK" is often used as an abbreviation for *JazakAllah Khair"*, which is an Arabic phrase meaning "May God reward you."

S-1: send it to my wife's name

S-1: her name is:

S-1: ███████████

UCE: okay insh Allah

S-1: ███████████

S-1: how much u are planning to send

UCE: do i need an account number or just send it in her name insh Allha?

S-1: no account no needed

25.     Your affiant is aware that similar solicitations for donations occurred regularly in the ███ chat room.  In fact, shortly after becoming an administrator in March 2014, ███████ sought to expand the funding base of ███ to include other social media platforms.  On June 7, 2014, ███████ sent an email to S-1 suggesting they begin posting for donations on Facebook, Twitter, the blog, and in the Paltalk chatroom.  ███████ acknowledged in the email that in a separate conversation, another ███ Administrator advised her she would need S-1's permission to make this expansion because he believed the public solicitation for donations could cause the freezing of S-1's latest MTS1 and MTS2 accounts. A review of ███████ emails identified an earlier email on June 3, 2014 in which this ███ Administrator advised ███████ that she would need "Shaikh's" approval prior to publically soliciting for donations due to concerns that the Shaikh's "latest" accounts may get frozen. ███████ responded to the other ███ Administrator that it was "a dilemma."

*MTS1 and MTS2 Financial Records for* ███████

26.    Since April 2, 2012, S-1 has been blocked or interdicted by MTS1 from using its services.[12]  The FBI's review of records provided by MTS1 in January 2018 indicated that from in or about November 2014 to December 2016, ███████ appeared to have received approximately $24,000 through approximately 97 separate transactions via MTS1 while residing in █████ with S-1.  These payments were from various senders in the United States, United Kingdom, and Canada, among other countries.  MTS1 records indicated that ██████ utilized approximately three different forms of her own identification at approximately 16 different locations throughout Jamaica to pick up these funds.  Your affiant believes based on S-1's online fundraising efforts and ████████ role as an ███ Administrator and █████████ the wire transfers sent to ███████ were sent to, or on behalf of, S-1.  MTS1 indicated that it "interdicted," or blocked, ████████ from using its money transfer services in or around December 2016 because MTS1 assessed ███████ activity to be consistent with terrorist financing.

27.    MTS2's records revealed that S-1 was blocked from using its services following the OFAC's designation of S-1 in or around December 2017.  MTS2 indicated S-1 was put on a watch list maintained by a third party vendor in 2004 as a result of S-1's prosecution in the United Kingdom on terrorism-related charges; however, MTS2 did not subscribe to this watch list at the time.  The FBI's review of records provided by MTS2 indicated that from in or about August 2014 to December 2016, █████████ appeared to have received approximately $1,250, via MTS2. These payments were from senders in different countries.  MTS2 records further indicated that the

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

recipient (█████) utilized three different forms of her own personal identification to receive these payments.

*FBI Interview of S-4 about money transfers to █████*

28.     The FBI conducted voluntary interviews of S-4 in July and August 2017.  In those interviews, S-4 was asked about its contacts and financial support of S-1, and S-4 made numerous false statements about its contacts with S-1, and denied providing any money to S-1 directly or indirectly through other persons.  ████████████████████████ ████████████████████████████████████████ S-4 is one of the individuals who sent money to █████ using MTS1.  During a subsequent interview with FBI Agents and Assistant United States Attorneys on July 30, 2018, ███████ ██████████ S-4 stated that it contacted S-1 in 2016 and asked if it could send money to S-1.  S-4 stated that S-1 instructed it to send money to █████ using MTS1 because ██████████ name was "clean."  S-4 understood the term "clean" to mean that █████ was not a terrorist and the transaction to S-1 would be completed successfully if sent through █████.

29.     A review of S-1 email records obtained from legal process revealed that on June 5, 2016, S-4 emailed S-1: "Salaam, I would like to give donation of 50 dollars whichever way possible. Its what I can afford to do as of now, I know its not much. How would I go about doing so?" On June 5, 2016, S-1 responded: "wa alaikum salam wrwb. You may send it via [MTS1] to ███████████████████████████████████████ Pls use your real name to send it in case of a hiccup u can claim your money back. █████s name is clean so you shud be fine insha allah. What city do u live in I forgot?"

30.     The FBI's review of records provided by MTS1 in January 2018 revealed two transactions in June 2016 and December 2016, in which S-4 sent by wire approximately $50 and $300, respectively, to ███████.

31.     S-4 stated it did not know if S-1 was being watched by law enforcement authorities, and indicated that it also communicated directly with ███████ via a messaging application (hereinafter "MA1"), which utilizes a mobile electronic device and the internet.  S-4 also told the FBI that it sent MA1 messages to ███████ what it believed to be ███████ cellular phone.  Your affiant is aware that persons who engage in criminal activity will often attempt to hide or obscure their financial transactions through friends, confidants, or family members to avoid detection by law enforcement.  MTS1 also indicated that it blocked another attempted transaction with S-4 to S-1, through ███████ on April 6, 2017.

*FBI Interview of* ███████ *about financial transactions on January 25, 2018*

32.     During ███████ voluntary interview with FBI Agents at the Charlotte Douglas International Airport on January 25, 2018, ███████ stated that S-1 had a bank account in Jamaica, but "they closed it down."  When asked if ███████ ever had a bank account closed or a financial transaction blocked, ███████ responded, "No because I don't do any weird transactions, my stuff is legit."  When asked about accepting donations on S-1's behalf, ███████ initially indicated that she accepted money on S-1's behalf approximately two years prior for Eid, an Islamic holiday.  ███████ was directly asked if she ever accepted any donations or any contributions from anyone in the world other than that Eid.  ███████ responded that there may have been a few other times.  When asked if there were more or less than ten other instances outside of Eid in which she accepted money, ███████ responded, "Less than, maybe even five times. I'm-it was probably less than that 'cuz I didn't like that

15



whole business." ███████ again reiterated that she did not accept money on S-1's behalf outside of those few occasions.

*FBI Interview of* ███████ *about financial transactions on October 25, 2019*

33.     On October 25, 2019, ███████ was interviewed by FBI Agents ███████ ███████████████████████████. FBI Agents again advised ███████ that lying was a crime under Title 18 U.S. Code 1001, and ███████ acknowledged that she understood. ███████ stated that she only accepted a miniscule amount of money and it was not to support S-1's activities or the ██ dawah. ███████ explained that she was "leery" about receiving money because it could hurt her account, and her standing. ███████ later stated that S-1 made money that was basically for their living, but she was not familiar with his money because she had no part in it.

34.     Your affiant believes ███████ knowingly made false statements to FBI Agents about her involvement in collecting funds on behalf of S-1 during an interview at the Charlotte Douglas International Airport on January 25, 2018 and at ██████████████████ ███████ on October 25, 2019.  As discussed above, ███████ received approximately 100 wire transfers via MTS1 and MTS2 between August 2014 and December 2016, and at least five of these transfers were identified by S-4 and S-5 as having been intended for S-1.

35.     Based on the information discussed herein, your affiant believes ███████ and S-1 devised a scheme to defraud MTS1 and MTS2 wherein S-1 directed ██ followers to wire funds via MTS1 and MTS2 to ███████ instead of directly to S-1.  Through this scheme, your affiant believes ███████ and S-1 obtained money wired through MTS1 and MTS2 under false pretenses: that funds were being wired through MTS1 and MTS2 for persons other than S-1, namely ███████, when in truth the money was intended for, and provided to, S-1.  Your

16

affiant believes this scheme was executed by S-1 and ███████ because ███████ name was "clean" and S-1 and ███████ believed ███████ name had not yet been blocked by MTS1 or MTS2.

36.     Furthermore, your affiant believes ███████ visited numerous MTS1 and MTS2 branch locations in ███████ collected funds from wire transfers using multiple forms of identification, and lied to FBI agents about her activity because she was attempting to conceal her involvement in the scheme.  Your affiant notes that ███████ acknowledged she "...didn't like that whole business" in the context of collecting funds on behalf of S-1 and was "leery" of it, but your affiant believes ███████ nonetheless participated in this scheme despite the possible legal ramifications.

**FBI Investigation of other members of the ███████**

37.     In September of 2014, a cooperating witness, W-1, reported to the FBI that ████████████████████████████████████████████████████████ ███████████████████, were vocal supporters of ISIS and espoused their desire to join the terrorist organization.  W-1 reported that ████████████████████████████ ███████ as ███████ and accepted his and ███████ views pertaining to ISIS. [14]  W-1 indicated that ███████ and ███████ watched ISIS-related videos in the living room



while ██████ cooked. W-1 recalled one particular instance in 2014, during Ramadan, when ██████ and ██████ viewed a video depicting the killing of a Shia male and praised the methodical manner in which ISIS killed people. Notably, this was around the time that ██████ married S-1. W-1 further indicated that both ██████ and ██████ would get excited about the videos and both stated that killing people was the right way to do things.



██████, **W-3, and the** ██████

39. As discussed above, in August 2014, ██████ and S-1 ██████

---

[15] Your affiant is aware the term "nasheed" can refer to vocal music that is popular in the Islamic world and generally makes reference to Islamic beliefs, history, religion, and current events. Your affiant is further aware that many ISIS productions utilize nasheeds.



41.    The group, which included W-3, ████, ████, ████, ████, and other tenants in ████ participated together in social activities and in practicing Islam.  W-3 indicated that since it was new to the religion, it obtained much of its religious guidance from ████, ████, ████, and ████.  Some of the earliest material W-3 was shown by the ████ included the Light Revelations series[17] on YouTube.  Your affiant knows this series to include a number of videos supportive of ISIS, but less provocative than many produced by the terrorist group.   W-3 also reported that the group showed S-1's lectures to W-3, and these became one of W-3's primary sources of information on Islam.

42.    In August 2014, W-3 traveled with ████, ████, ████, ████, W-4, and S-7[18] ████ on the aforementioned trip where ████ ████

---

[17] The Light Revelations series was listed in the "Must Watch Videos" section of a publication titled, "The Revived Caliphate," a 106-page ISIS-aligned pdf booklet shared amongst the group members.  "The Revived Caliphate" booklet described the Light Revelations series as videos that "…summarise all events about the Caliphate in Syria in a positive light. Quality and dramatic, Highly Recommended. Links to videos can be found █: https://twitter.com/EnterTheTruthCo".  The booklet provided references to numerous other ISIS-produced or ISIS-aligned media products.

[18] For consistency with other legal processes, witnesses and suspects may not be identified in sequential order.

S-1.  W-3 indicated that during this trip, the group discussed the topic of ISIS with S-1.  According to W-3, S-1 provided the group with justification that ISIS was legitimate and that Muslims owed their allegiance to Abu Bakr al-Baghdadi and the Islamic State.  W-3 also stated that S-1 further instructed the group that in order to be considered Muslim, they needed to make hijrah to ISIS territory because it was the only acceptable location.  Furthermore, W-3 stated the group discussed the requirements for men to engage in jihad – women could choose whether or not they wanted to fight, and ███████ explained what life would be like for a woman living in ISIS-controlled territory.[19]

43.    W-3 testified that W-3 and ███████ had not yet had their child, and ███████ indicated they may get pregnant in ISIS territory and W-3 could just do its work out there.[20]  W-3 understood ███████ to be encouraging her to continue with the plan to make hijrah.  W-3 reported, however, that its intention was to fight when the group arrived in ISIS territory.

44.    Similarly, in October 2014 in Group Chat 1 among ███████, ███████, ███████, and W-4, using Messaging Application 2 (MA2), the group engaged in a discussion about life in dawla[21].  ███████ explained that some women acted as security; there were no taxes or bills for muslims; and, housing, food, and electricity were free.  ███████ indicated that they would have to be in the dawla for these benefits.  W-4 confirmed that in conversations with these persons, that when the term dawla was used, the person meant ISIS or ISIS territory.

---

[19] ███████ and W-4 were interviewed about their discussions with S-1 while i███████ and they both denied or did not recall discussing ISIS with S-1.  W-4 noted, however, that the group's view towards ISIS became more amplified over time beginning in 2014.

[20] Your affiant is aware that W-3 had been working in the District of Columbia as an early education teacher since in or around June 2014.

[21] "Dawla" is a term that can be translated to mean "state." In 2014, ISIS re-named itself using the term *ad-Dawla al-Islamiyya* which can be translated to mean the "Islamic State." Your affiant is aware that "Dawla" is regularly used by ISIS supporters to reference the terrorist organization and its self-proclaimed caliphate.

45.    The aforementioned group conversation on MA2 continued into December 2014, and on December 24, 2014,  requested W-4's assistance in upgrading S-1's Paltalk account.  After W-4 helped ▊ and S-1, ▊ indicated that S-1 intended to speak to W-4 in Arabic when S-4 visited again.  W-4 responded that its Arabic was rusty, and ▊ replied, "U spoke well alh. But u'll bcm fluent in the dawla."



## Preparations to Join ISIS

47.    W-3 reported that after returning to the United States from ▊ in August 2014, the group agreed they should travel together to make hijrah to ISIS territory.[22]  W-3 indicated the group discussed the preparations they would need to undertake before making hijrah, including: saving money, preparing physically, and gaining more knowledge about Islam.  The group also shared and practiced online security measures in an attempt to avoid detection by law enforcement authorities.

48.    W-3 indicated that W-3 and ▊ began saving money and tracked their savings on an envelope.  On or about August 18, 2019, W-3 provided the FBI with the savings envelope, which included numerous handwritten entries and a note on the cover that read, "*Started on 8-

---

[22] W-4 also confirmed the group discussed making hijrah to ISIS territory, but W-4 was not intending to go with them if they ever decided to attempt to travel.

16-14." The earliest recorded entry was "$555" on October 25, 2014; however, it was accompanied by a small note indicating other dates were on previous envelopes.[23] The latest recorded entry was December 11, 2017.

49. W-3 also testified that the group discussed how they could prepare physically in the United States before traveling overseas. These discussions involved learning how to use a gun and practicing paintball for "training." When going to the gun range, ███████ advised W-3 and the group not to say anything about being Muslim or things like, "Allahu Akbar," because that would draw unnecessary attention. ███████ and ██████ agreed with ███████. W-3 reported that ███████ and ██████ also referred to paintball as practice or training. The group tried to go paintballing once a month, but it would be more like once every two months because of scheduling conflicts. W-3 played paintball approximately three times with the group and also went to the gun range approximately three times. While at the gun range, W-3 fired a Glock pistol, a revolver, and a rifle.[24]

50. Similarly, W-4 testified that ███████ continued to go paintballing after he began talking about wanting to fight for ISIS. W-4 agreed that ███████ continued to go paintballing and to the gun range in part for preparation to go to the Islamic State. W-4 noted that it had concerns about ███████ paintballing, but W-4 still thought he would not actually go to ISIS-controlled territory.

---

[23] In a subsequent interview of W-3 by FBI Agents, W-3 explained that it had used other envelopes to store its savings, but the savings outgrew the envelopes so W-3 moved the money to the above-referenced envelope. W-3 no longer had the earlier envelopes.

[24] ██████ testified that neither he nor anyone he knew ever went paintballing or to a gun range as preparation for fighting jihad. ██████ stated that he went paintballing approximately 15 times.

51.  On or about February 1, 2015, ██████ shared two links, ██████████████████████████ in Group Chat 2 that included ████████, ████████, ██████, W-3, W-5, and one other associate.[25]  A review of a cached version of ████████████████████ (and how it appeared on February 2, 2015) revealed an approximately 3-page long document that provided guidance on what supplies to bring that would be "of great use to you in al-Sham" and how to pack it.  When discussing electronic devices, the document instructed the reader to use software to "hide" all jihadi material.

52.  On or about February 6, 2015, ██████ shared a link ███████████████████████ in the same group message chat.  The link directed the user to what your affiant believes was a 50-page "HIJRAH to the ISLAMIC STATE" eBook.  The eBook detailed Turkey-Syria border crossing protocols, including how emigrants should be in contact with their Twitter contacts.  The eBook then provided Twitter contacts who were located in ISIS territory and could assist in individuals making hijrah.  The eBook also provided instructions on how to interact with security services if emigrants were stopped; what supplies to pack; and, various testimonials of individuals who had successfully traveled to ISIS-controlled territory.

53.  Shortly after receiving this link, ██████████ shared it in Group Chat 1 with ██████████, ██████████, and W-4.  ████████████ directed them to "[c]heck that out when u have a chance Inshallah."  W-4 did not recall reading this particular publication but did recall discussing it with ██████████.  W-4 explained that it was an argument in which ██████████ was attempting to show W-4 that there was actually a way to go and W-4 was arguing about its legitimacy.

---

[25] W-4 was not included in this group chat.

54.     On or about May 3, 2015, in the midst of coordinating who could make "class" and ████████ sending an archive.org link in Group Chat 2, W-3 suggested that they get together to plan everything out.  The discussion points would include what they would talk about, their main points, their proofs, and then they should practice debating and ask each other questions.  W-3 testified that it made this suggestion in the context of preparing to make hijrah.  W-3 explained that when arriving in ISIS, the group would have to be a certain kind of Muslim, and they would have to provide a certain response if asked a question about a controversial topic.  W-3 was concerned that if it did not have the right answer, it would be killed.

55.     W-3 testified that the group – in the context of wanting to go to ISIS territory – shared material on how to maintain anonymity online and not to get caught.  For example, on November 26, 2014, ████████ sent a justpaste.it link to an article about how to remain anonymous online.  The article discussed how intelligence agencies monitored the internet with the intention of "dismantling anti-colonial narratives and attacking those who postulate them."  After discussing the permissibility of lying to trick the kufar, the author explained that these people had an open war with Allah, his messenger, and their khilafah.  The article proceeded to explain virtual private networks (VPNs), TOR, encrypted email, and a secure operating system, called TAILS.  The writer then discussed social media and discouraged its use but also offered suggestions on how to create and manage a Twitter account in a way that nothing could be proven in a court of law.  The article closed with a discussion about encrypted instant messaging and an invocation to Allah to hasten their venturing to the lands of jihad and hijrah.  Your affiant believes that the use of Twitter accounts by persons in this investigation indicates an advanced level of operational security, including opening and closing of multiple accounts with different names.  You affiant believes this was done in an effort to avoid attribution and to circumvent Twitter's

deactivation of accounts for violations of terms of service, namely the dissemination of violent and/or terrorism-related material.

56.     During ▮▮▮▮▮ interview with FBI Agents on October 25, 2019, when asked if anyone in her family ever expressed a desire to make hijrah to ISIS, ▮▮▮▮▮ responded, "No, we don't- no." and proceeded to explain ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ again responded, "No" when asked if anyone in her family, to include ▮▮▮▮, ▮▮▮▮, S-7, and ▮▮▮▮ ever expressed an interest in making hijrah to ISIS territory.



**Dissemination of S-1's Lectures and ISIS Media**

58. In addition to the aforementioned preparations to make hijrah to ISIS-controlled territory, the group, which included ███████, ███████, ███████, ██████, W-3, and █ times, W-4, and W-5, were frequently sharing S-1's lectures – which ███████ helped administer – and other ISIS media.

59. On September 3, 2014, ███████ emailed ███████, ███████, W-3, W-4, and two other associates a poster advertising a conference titled, "Al Khilaafah; Allah's Governance on Earth" scheduled for September 6, 2014, and featuring S-1 and other jihadist preachers in the United Kingdom. ███████ directed recipients of the email to attend and invite others. ███████ further noted, "This conference is not to be missed." During the conference, S-1 and other speakers promoted ISIS and justified its leader, Abu Bakr Al Baghdadi.

60. On August 22, 2018, the United States District Court for the Eastern District of Virginia issued a search warrant for ███████ residence. During the execution of the search warrant on August 23, 2018, the FBI seized ███████ iPhone X and iPhone 5s devices. Contained on these devices were various group chats among ███████, ███████, ███████, W-3, W-5, and other associates exchanged for multiple years from 2014 through 2017. These group chats included but were not limited to Group Chat 2.

61. On September 19, 2014, ███████ shared a link in a different group chat, which included ███████, ███████, W-5 and another associate. [27] W-5 identified ███████

---

[27] ███████ testified he had no recollection █ all of his old phone number which was contained in their group SMS messages. ███████ also denied knowing if the phone number used to communicate with ███████, ███████, W-3, W-5, and others for multiple years was his phone number. Your affiant is aware that ███████ phone number, ███████ was used to register numerous social media and communications accounts in ███████' name, including but not limited to his Instagram account, two Facebook accounts, a Gmail account, and a Snapchat account. Additionally, service provider records revealed the subscriber for this number was W-3 until

linked media as Flames of War. Your affiant is aware that in September 2014, ISIS released a documentary-style video on Twitter titled, "Flames of War – Fighting Has Just Begun". The video, produced by ISIS's al-Hayat Media Center, was approximately 55-minutes in length and highlighted some of ISIS's major operations in Syria, including a battle at the Menagh Airbase near Allepo. The video is narrated by an English-speaker and the final shot in the production shows masked ISIS fighters executing kneeling men.



63. On October 28, 2014, in Group Chat 1 which included ███████, ███████, ███████, and W-4, and in the context of discussing a United States media entity, the group discussed a debate ███████ was having with a female associate about ISIS. ███████ posed several questions to the group about the condition of women living there, if women were required to wear the niqab, and if some women were fighting as well. ███████ responded to some of ███████ questions but was not sure if women were currently fighting. ███████ replied that he did not know how to refute other stuff about the abuse of women, their lack of

---

approximately October 24, 2018, at which point the subscriber became ███████ until approximately March 6, 2019, when it was disconnected by the Service Provider for non-payment.

rights, rape, "…and all that crap…"  responded that "they" had a sharia court and even the mujahideen were taken to court if rights were abused. They (ISIS) were enforcing Allah's law according to shariah. █████ replied that he needed "something to check and mate her lol." █████ directed █████ to material by S-1 and █████ and █████ suggested "The light series." Your affiant understands the light series to refer to the Light Revelations series.

64. As noted above, W-3 testified that the Light Revelations series was some of the first material shown to it by █████ W-3 explained that in order to become part of the group – or the trusted circle – █████ would ask questions about touchy subjects and observe the individual's reaction. If the individual agreed with them, they could be brought into the circle, but if not, then the individual could not be trusted. W-3 explained that discussions about ISIS were secretive and they would not discuss it with people outside of the circle of trust. Your affiant believes █████ was seeking advice on how to engage his associate in an attempt to radicalize her to adopt an ideology closer to that espoused by ISIS.

65. The group continued to give █████ advice, and █████ responded, "People who are weak in faith refute the dawla. Its real and they need to deal with it." █████ continued, "What muslim in their sane mind doesnt want to live inder laws set by Allah." █████ instructed █████ to use material from Twitter in his debate, noting that there was plenty of stuff on Twitter from women "there." █████ replied that she does not use Twitter, but █████ told her that was where she could access "pure" information. █████ said she would see what she could dig up but admonished █████ that they "don't know her – she can misconstrew [sic] what u say bcz [because] u pro dawla."

66. On November 13, 2014, █████ shared a download link and Twitter screenshot in Group Chat 2 of ISIS leader Abu Bakr al Baghdadi's speech in Arabic and English.

W-3 testified that it, and the group, regularly obtained and reviewed ISIS content on Twitter, and that they would regularly use Twitter accounts to follow known ISIS persons who were using Twitter, and that they would then redistribute media which was posted via Twitter. Your affiant is also aware that Twitter allows its users to directly communicate with other Twitter users through a private messaging system.

67.     On December 21, 2014, ███████ sent a message using MA1 to W-3 saying "New Twitter for [S-1] ATDawah." W-3 responded that it began following S-1 and that "…we're saving a lil every check." When W-3 asked why S-1 made a new Twitter, ███████ responded, "Kuffar closed it down." ███████ subsequently shared the same new Twitter handle for S-1 in an MA2 group message with ███████, ███████, and W-4 on the same day. Your affiant is aware that social networking services such as Twitter may shut down accounts when users violate their terms of service, which may include posting violent or terrorist content.

68.     On January 11, 2015, ███████ shared in Group Chat 2 a link to the ██ website, which appeared to be derived from his Twitter feed based on review of the URL. The link contained a lecture by S-1 on the "Evil Consequences for Insulting the Rasool (Saw)," which had been given the prior evening. Your affiant believes S-1 delivered this lecture following the attack at the Charlie Hebdo newspaper office in Paris, France, on January 7, 2015, by gunmen in response to the newspaper's cartoon depictions of the Prophet Muhammad. In response to a listener asking about an Islamic leader tweeting that the shooting was unacceptable, S-1 responded, "The brothers who died in France are in paradise insha Allah and they died on a Friday." S-1 continued, "[T]hey are heroes who died defending Islam."

69.     As previously noted, on February 6, 2015, ███████ shared a link in Group Chat 1 to an eBook titled, "HIJRAH to the ISLAMIC STATE." A few days later, ███████

responded with a Twitter link titled, "Damascus – The Base of Jihad on Earth."[28] ███████ thanked ███████ for sharing the video and responded with a link to another video, which your affiant believes was an ISIS-produced video showing what life was like in the ISIS-controlled territory of Halab.[29]

70.     On March 10, 2015, ███████ sent a message in Group Chat 1 saying she was back in Montego Bay and it was lovely there.  Approximately one hour later, ███████ sent the group a link to a video titled, "KILLING SPIES IN THE DAWLA."  The video was an official ISIS video produced by its al-Furqan Media arm and released on the same day it was sent by ███████.  The video shows a purported Israeli Mossad agent executed by a child who appears with a French-speaking jihadist.  ███████ then continued discussing waking up to the ocean and staying at a beachfront cabin.

71.     W-4 explained it was not unusual for ███████ to have casual conversations in the midst of sharing videos about killing. W-4 further indicated that ███████, ███████, and ███████ knew media links would come and go, so they shared material on a rolling basis and it would be inserted into any point in the conversation.

72.     On April 24, 2015, ███████ sent a message in Group Chat 2 which read, "This is it sulay watch it ASAP ███████████████████████████ ███████ The link directed the viewer to a video showing the execution of Ethiopian Christians by ISIS militants.  One group was executed by being shot in the heads and the other group was beheaded on a beach and their heads were placed on top of their bodies.  ███████

---

[28] The link sent by ███████ included the "t.co" Twitter shortener.  Twitter's developer website explains that all links submitted with Tweets and Direct Messages are eventually wrapped with a "t.co" shortener.  According to Twitter, this helps Twitter protect users from malicious content while offering useful insights on engagement.

[29] Your affiant is aware that "Halab" is another term for Aleppo, Syria.

commented, "All other English links keep getting taken down," and ███████ replied, "Allahu Akbar that was a tough video." W-5 added, "Thanks for providing the English sub ███████…Mashallah it was good." ███████ said, "Your dad [S-1] actually spoke about it after jumuah, Sulay." And ███████ responded, "And just like the Egyptians, the Ehiopian government does the exact same thing. So now I see why they did it."

73. On October 25, 2014, ███████ sent a message in Group Chat 2 which contained a screenshot of a tweet indicating someone died as a shaheed. ███████ commented, "I remember him from Twitter his name was familiar. Abu dujana. May Allah give him shahada Ameen!" ███████ responded, "No way man I've been Lookin for him." ███████ replied, "Yea man subhannallah I was surprised too." ███████ responded, "I used to follow his account everytime he'd make a new one then he just stopped Makin em. Ameen." In response to a question from ███████, ███████ sent another screenshot of what appeared to be Abu Dujana's last post on Twitter.

74. On December 13, 2014, ███████, ███████, and ███████ discussed in a group chat two individuals named ███████ whom they knew through a mutual friend. ███████ explained that he learned both had traveled overseas to Syria to fight and had been killed. ███████ and ███████ discuss how they hoped ███████ were both shaheeds, that Allah would join them together in Jannah (paradise), and that ███████ "beat us too [sic] it." ███████ followed with a prayer that Allah would shower them "with [the] patience we need to make it."

75. Your affiant is aware that ███████, ███████, ███████, ███████, W-3, W-4, W-5, and another associate participated in various group message chats using MA1, MA2, and text/multimedia message services for multiple years. The communications included regular

31

sharing of material produced by ISIS, S-1, and other ISIS-aligned media, the content of which ranged from propaganda videos and religious justifications to operational security and day-to-day updates from ISIS-controlled territory.

76. During an interview of ███████ on October 25, 2019 in the District of Columbia, ███████ initially stated that ISIS was not discussed in the ██ chatroom. ███████ followed up that S-1 never spoke about ISIS in offline, private sessions, or in meetings with people while ███████ was present. ███████ later clarified it was her understanding that when S-1 spoke about ISIS, it was to provide information and explain the purpose of having an Islamic State, not to support the violence that was occurring or the terrorist organization. ███████ said she did not recall if the ██ chatroom expressed support for people traveling to join ISIS or support for its leader, Abu Bakr al-Baghdadi. ███████ said she was not aware if S-1 had private conversations encouraging people to make hijrah to ISIS.

77. Furthermore, ███████ stated that she never shared ISIS-produced media nor did she know any media they produced. ███████ also stated she did not recall sharing ISIS videos among herself, ███████, and ███████ with the exception of what was on the news.

78. On July 24, 2018, ███████ was interviewed by FBI Agents at the Dulles International Airport in Dulles, Virginia. During the interview, in the context of discussing ISIS propaganda videos, ███████ said most of his friends were against it. ███████ clarified that his view of ISIS was "bad" and that they were "completely wrong." When asked if he had ever distributed ISIS propaganda videos, ███████ responded, "No, not to my knowledge." When asked if he had ever encouraged anyone to view propaganda or to support a foreign terrorist organization, ███████ again responded, "No."

79. On or about August 23, 2018, ███████ was again interviewed by FBI Agents ████████████████████████ ████████ reiterated that he did not remember ever sharing propaganda videos in support of ISIS and did not know anyone that had done that, including his "smallish circle of friends," which he explained included ███████ and W-5. ████████ again answered, "No" when asked if he had ever communicated with anyone who wanted to go to Syria to fight for ISIS. ████████ stated that he definitely understood the question and he believed he would definitely remember if he said it. When ████████ was asked if ████████ ever expressed a desire to fight jihad, ████████ said, "Uh, not really to my knowledge." ████████ was asked if ████████ ever expressed a desire to fight on behalf of ISIS, and ████████ said, "Not that I remember." ████████ continued that their goal was pretty much to learn the [Arabic] language and "live under Muslims or something like that."

80. Based on the foregoing, your affiant believes ████████, ████████, and ████████ have all knowingly made false statements regarding their dissemination and consumption of media produced by ISIS and S-1, as well as their knowledge of plans to make hijrah to join ISIS. As discussed above, these individuals, and other persons who were part of their ISIS sympathizing groups, had multiple Twitter accounts through which they regularly accessed Twitter accounts belonging to ISIS supporters, which they then used to view, share and distribute ISIS propaganda. Furthermore, based on the number of instances in which material derived from Twitter was shared among the group, your affiant believes the accounts which are the subjects of this search warrant will contain evidence to prove the violations of federal law as noted above.

## IDENTIFICATION OF TARGET ACCOUNTS

**Twitter User @Hijabi_z (ID**  **)**

81.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ██████ as ████████ and an account creation date of July 27, 2015.  The Twitter account was registered with email account ████████████, which itself was registered to an █████ ██████ using ████████ cell phone number and Gmail address.  FBI review of the ████████ Twitter page on or about December 18, 2019, revealed one public post on July 31, 2015, featuring an advertisement poster for a "Beware of Oxymorons" lecture by S-1.

82.     A few days later, on July 31, 2015, ████████ was communicating with ████████ via an online instant messaging service.  In response to ████████ asking if ████████ heard about the "events in afghanistan," ████████ responded that she had heard, and S-1 had made the announcement a long time ago on Twitter.  ████████ followed that she was now on Twitter and provided the URL link to her account. ████████████████ which features the same username identified in the aforementioned legal process, ████████

**Twitter User** ████████████████ **ID** ████████ **)**

83.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ██████ as ████████████ and an account creation date of April 4, 2014. The Twitter account was registered to an email account that is known to be used by S-1 [30].

84.     FBI review of files provided by Google in response to a search warrant revealed an email conversation between ████████ and SUSPECT 8 ("S-8").  The email contained a



---

[30] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Google accounts used by or associated with S-1 and/or ████████. The accounts included S-1's email address referenced here.

forwarded message of a conversation between S-8 and another ██ Administrator in which S-8 sent a link to the Twitter account, ████████████████████ S-8 explained that the Twitter account had been set up by "████", whom your affiant knows to be ████████, and that "Shaikhs [sic] been giving her quotes to tweet." S-8 further explained that the account was currently in her (████████) name and she wanted that changed. S-8 forwarded this conversation to ████████ on September 1, 2014, and ████████ responded with the email address registered for **Twitter User ID** ████████ and what your affiant believes was the password.[31]

85.     FBI review of the ████████████████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use. Public posts by users directed towards ████████████████ were still visible, however, and the content of the posts included questions about the khilafa, the situation in Sham and Iraq, and what appear to be quotations by ████████████████ such as "Allah has blessed us with a #caliphate to eradicate #shiites like u MB the way we erdicate cockroaches, rats and flies."

**Twitter User** ████████████ ***(ID*** ████████████***)***

86.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████████ as ████████████ and an account creation date of December 21, 2014. As noted above, ████████████ informed ████████████, ████████████, W-3, and W-4 about the new Twitter

---

[31] As discussed herein, in January 2018 ████████ told FBI Agents in an interview that she was an ██ Administrator over the prior year (2017), and her involvement varied prior that. Your affiant believes ████████ was instrumental in establishing and maintaining multiple social media accounts as an Administrator for the ██ chatroom, and this activity began occurring in ██ least 2014.

account on the same day it was opened. When W-3 asked why S-1 made a new Twitter, ███████ responded, "Kuffar closed it down."

87.     FBI review of the ██████████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use. Public posts by users directed towards ███████ were still visible, however, and included comments about S-1's account having been shut down again, al-Baghdadi not being the true Khalifa, and what your affiant believes to be a discussion about Boko Haram pledging bayat to ISIS.

**Twitter User ███████████ (*ID ████████*)**

88.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** █████ as ██████████ and an account creation date of August 7, 2010.

89.     FBI review of the ████████████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use. Public posts by users directed towards ███████████ were still visible, however, and included comments about the legitimacy of the khalifa, a greeting to S-1, and a call for Twitter to shut down the ████████████ account for posting beheading pictures and calling for the murder of homosexuals.

90.     Search records provided by Google indicated that ██████████ account accessed this Twitter page, ████████████████ on October 21, 2016. Your affiant notes that this webpage was accessed within a few minutes of searching for instructions on signing up for Paltalk, and your affiant believes ███████ may have been working on Administrator activities associated with Paltalk and Twitter accounts. Shortly after accessing the Twitter page, the ████████ account began searches for "how much does the taliban control in Afghanistan" and "abu musab al-zarqawi". Your affiant believes there will be evidence on this account related

36

to false statements made by ████████ to law enforcement about whether she was aware that S-1's statements about ISIS were limited solely to explaining the purpose of having an Islamic State.

**Twitter User** ████████████████ *(ID* ████████*)*

91.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as ████████████████ and an account creation date of March 9, 2015.  The account was registered to an email address belonging to S-1, using S-1's honorific and last name.

92.     On April 21, 2016, S-1 sent ████████ an email with the subject line reading "the notes" and appeared to be the notes from a recent lecture, which were "typed live by ████". Following the Question and Answer section, a link to the ██ chatroom's Twitter account was posted, ████████████████████████ Shortly after the link to the Twitter page, the notes contained numerous references to resources associated with Abdullah Azzam, whom your affiant notes was a teacher and mentor of Osama bin Laden, Abu Muhammad al-Maqdisi, who mentored Abu Musab al-Zarqawi (the leader of al-Qaida in Iraq, the progenitor to ISIS),[32] and Anwar al-Awlaki.

93.     FBI review of the ████████████████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use.  Public posts by users directed towards ████████████ were still visible, however, and included a question

---

[32] Your affiant notes that despite a later ideological split between Abu Muhammad al-Maqdisi and Abu Musab al-Zarqawi, al-Maqdisi remained a powerful voice in promoting jihad.  Your affiant further notes that in a two-part lecture series in February 2015 titled, "Debunking the Letter of the Wicked Scholars to Amirul Muhmineen" (discussed below), S-1 called al-Maqdisi a "broken idol" for not supporting the dawla. The notes for this lecture, which were typed by ████, stated simply, "If you don't support the jihad of the Dawla, you do not support the dawla."

about "Sharee'ah" law in ▮▮▮▮▮ a reference on June 21, 2015 to "evil scholars,"[33] and a comment referencing S-1 by name.

94.     Based on ▮▮▮▮▮ past activity in administering social media profiles on behalf of the ▮▮ chatroom and a likely reference to a lecture which ▮▮▮▮▮ directly assisted in producing, your affiant believes there will be evidence on this account relating to false statements made by ▮▮▮▮▮. Namely, ▮▮▮▮▮ told FBI Agents that S-1 did not speak in the ▮▮ chatroom about support for ISIS nor its leader, Abu Bakr al-Baghdadi.

**Twitter User ▮▮▮▮▮▮▮▮ (ID ▮▮▮▮▮)**

95.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ▮▮▮▮▮ as ▮▮▮▮▮▮▮ and an account creation date of June 23, 2015. The account was registered to the same email address listed by S-1 as a recovery email for his ▮▮▮▮▮▮▮ email account, which was the subject of a search warrant issued by this Court on August 2, 2019, referenced above.

96.     FBI review of search warrant returns for Facebook account Authentic Tawheed and UID ▮▮▮▮▮▮ (registered to ▮▮▮▮▮▮▮[34] and Telephone number +▮▮▮▮▮, both known to have been used by ▮▮▮▮) revealed that on or about June 23,

---

[33] On or about February 14 and 16, 2015, S-1 delivered a two-part lecture series titled, "Debunking the Letter of the Wicked Scholars to Amirul Muhmineen." During the lecture, S-1 refuted a letter written by Islamic scholars in September 2014 in which they condemned ISIS and Abu Bakr al-Baghdadi. S-1 discussed how these scholars' character was not Islamic and if someone rejects the dawla because he thinks the tawheed (belief in the oneness of Allah) is wrong, he is a kaafir (disbeliever). The notes were typed live by ▮▮▮.

[34] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Facebook accounts used by or associated with S-1 and/or ▮▮▮▮. In response to the warrant, Facebook provided this post among others.

[35] Google provided records for ▮▮▮▮ ▮▮▮▮▮▮▮ account pursuant to the aforementioned search and seizure warrant issued by the Honorable G. Michael Harvey of the United States District Court for the District of Columbia on August 2, 2019.

2015 the following message was posted to the Authentic Tawheed Facebook page: "The latest Tweets from [S-1's title and last name] ███████████ AS SALAAMU ALAIKUM YOU CAN NOW FIND [S-1's title and last name] ON TWITTER HERE >> ███████████OLD ACCOUNT WAS DISABLED. PLEASE FOLLOW NEW TWITTER ACCOUNT." Additionally, FBI review of search warrant returns for a Facebook username containing S-1's first and middle names and correlating UID revealed that on or about June 24, 2015 the following message was posted to that aforementioned Facebook page: "The latest Tweets from [S-1's title and last name] ███████████" FBI review of the ███████████ Twitter page on or about January 8, 2020, revealed the account was suspended by the site, potentially for violating terms of use.

**Twitter User** ███████████ **(ID** ███████████**)**

97.     Subscriber records provided by Twitter identified the screen name of **User ID** ███████████ as ███████████ and an account creation date of January 5, 2016. The account was registered to ███████████ email address ███████████

98.     FBI review of search warrant returns for Facebook account ███████████ and UID ███████████ (registered to ███████████ and Telephone number +███████████, both known to have been used by ███████████ revealed that on or about January 5, 2016 the following message was posted to the Authentic Tawheed Facebook page:

> *The latest Tweets from [S-1's title and last name]* ███████████*raised in* ███ *embraced Islam at the age of 16. Graduate of the* ███████████*Follow [S-1's title and last name] on Twitter:* ███████████ *[S-1's title and last name] Twitter."*

99.     FBI review of the ███████████ Twitter page on or about January 9, 2020, revealed the account was suspended by the site, potentially for violating terms of use.

39

**Twitter User** ██████████ **(ID** ██████████**) and** ██████████████████████████

100.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ██████████ as '██████████ and an account creation date of September 2, 2014.  The account was registered to ██████████ Google email address.

101.     Similarly, subscriber records provided by Twitter identified the screen name of Twitter **User ID**████████████████ as '██████████ and an account creation date of June 9, 2017.  The account was registered to ██████████ telephone number + ██████████.  Your affiant notes that "Abu" is a term used to signify the "father of…", and ████ is the name of ██████████████████████.

102.     As noted above, ██████████ suggested associates access Twitter for information about ISIS and also shared some of this material himself.  FBI review of the ██████████████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use.  FBI review of the ██████████ Twitter page on or about February 24, 2020, revealed an account with a profile picture of a roaring lion with the quote, "May the eyes of cowards never sleep" which was attributed to Khalid Ibn al-Walid, a famous 7th century Arab military general.  The account had five followers and followed 56 others, including various news organizations, terrorism researchers and journalists, ██████████ account ██████████████ and an account dedicated to the teachings of Abdullah Azzam.  As discussed above, ██████████, ██████████, and ██████████ regularly shared ISIS media on numerous occasions with each other and their associates, and a significant volume of this material this material was derived from Twitter.  Given this history, your affiant believes ██████████ Twitter accounts will contain

evidence related to the false statements made by ███████ and ███████, that they did not, nor did they known of anyone, to distribute, ISIS materials and propaganda.

**Twitter User** ███████████ **(User ID** ███████████

103.    Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as ████████ and an account creation date of July 15, 2016. The account was registered to ████████ email address and telephone number.

104.    FBI review of the ████████ Twitter page on or about February 24, 2020 revealed an account with a profile picture of a lion. The cover photo of the account included the quote, "We don't surrender, We win or die" which was attributed to Omar al-Mukhtar, an early 20th century Arab general who led an Arab resistance movement against European colonial powers in Libya, Chad, and Egypt. The account had approximately seven visible tweets, including a Retweet of a user on October 19, 2016, stating, "O Allah, grant victory to Ahl-us-Sunnah in Iraq, empower them with the truth and empower the truth with them." #MosulAid #Mosul_Offensive. Your affiant is aware that in or around this time, coalition forces had launched an offensive to recapture positions of ISIS in Mosul and the surrounding region. ████████ ████████ Twitter page had six followers (including ████████ ████████ and ████████ ████████ accounts) and followed 68 others.

**Twitter User** ████████ **(ID** ████████**)**

105.    Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as ████████ and an account creation date of December 13, 2011. The account was registered to an email address your affiant believes to be used by W-5. This same email address was used to register W-5's Facebook account and was stored in W-4's phone as W-5's email address. As noted above, W-5 was involved in group messages with ████████,

██████, █████, W-3 and another associate, which included its members, including W-5, disseminating ISIS-related material which was derived from Twitter. Evidence of the use of W-5 Twitter account, including ISIS-related material that may have sent and/or received from this Twitter account, is therefore directly relevant to whether █████ and █████ were aware of persons (W-5) who distributed ISIS material and propaganda when they made their statements to grand jury (██████) and law enforcement (█████████).

**Twitter User** ████████ (***ID*** █████████)

106.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as ████████████████████████████ The account had an account creation date of December 13, 2011, and was registered to W-4's email address.



Your affiant believes W-4's Twitter account may contain ISIS material sent to it by others, including █████████ and █████████, which directly relate to their false statements to law enforcement.

**Twitter User** ████████████ (***ID*** █████████)

107.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as a ██████████████████████████ The account had an account creation date of January 22, 2016. The account was registered to an email address used by W-3. As noted above, W-3 was involved in group messages with █████████, █████████, █████████, W-5 and another associate, which included the dissemination of ISIS-related material,

some of which was derived from Twitter. W-3 also confirmed it used its Twitter account to find ISIS propaganda, and that it sent links of this propaganda to the group, including ████████. Your affiant believes W-3's Twitter account will contain evidence and records of the distribution of ISIS material.

**Twitter User ████████ (ID ████████**

108.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as ████████ and an account creation date of October 28, 2016. The account was registered to ████████ Google email address. As discussed above, your affiant is aware that members of the group, including ████████, distributed ISIS propaganda that they obtained from Twitter, and this account will likely contain records of such dissemination. This evidence is directly relevant to ████████ and ████████ false statements.

109.     On September 4, 2019, Twitter was served with a preservation request letter under 18 U.S.C. § 2703(f) related to Twitter accounts with User IDs: ████████████████ ████████ ; ████████ ; ████████ ; ████████ ; ████████ ; ████████ ; ████████ ; ████████ ; ████████ The preservation request letter was re-submitted on December 5, 2019.

110.     On December 12, 2019, Twitter was served with a preservation request letter under 18 U.S.C. § 2703(f) related to Twitter account with Username ████████.

111.     On January 3, 2020, Twitter was served with a preservation request letter under 18 U.S.C. § 2703(f) related to Twitter account with Username ████████.

112.     On January 8, 2020, Twitter was served with a preservation request letter under 18 U.S.C. § 2703(f) related to Twitter accounts with Username ████████.

## BACKGROUND CONCERNING TWITTER

113.    Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users create and read 140-character messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve. These features are described in more detail below.

114.    Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

115.    Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

116.    A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

117.     Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

118.     As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's own Tweets, as well as a list of all Tweets that include the user's username (i.e., a list of all "mentions" and "replies" for that username).

119.     Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

120.     Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

121.     When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

122.     A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are

45

following that user (i.e., the user's "followers" list) and a list of people whom that user follows (i.e., the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

123. In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

124. Twitter users can configure the settings for their Twitter accounts in numerous ways. For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

125. Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

126. Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

127.     If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

128.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

129.     As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the

account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner. Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation. For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

130. Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

131. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Tejpal S. Chawla, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

132.   Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is a court of competent jurisdiction as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court has jurisdiction over the offense(s) being investigated 18 U.S.C. 1343, 18 U.S.C. 1001(a)(2) and 18 U.S.C. § 1623. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

133.   The government will execute this warrant by serving the warrant on Twitter. Because the warrant will be served on Twitter, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

134.   The government further requests to share the information obtained from this search (to include copies of digital media) with any government agency investigating, or aiding in the investigation of this case or related matters.

Respectfully submitted,



Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 3, 2020.

_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

49

# *UNITED STATES MAGISTRATE JUDGE*
# *U.S. DISTRICT COURT BUILDING*
# *WASHINGTON, D.C.*

PLEASE ISSUE:  ☐ Arrest  ☑ Search  ☑ Seizure

warrant for:  IN THE MATTER OF THE SEARCH OF INFORMATION
ASSOCIATED WITH FOURTEEN TWITTER PROFILES WITH
USERNAMES STORED AT PREMISES CONTROLLED BY TWITTER
PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. § 1001(a)(2)

Violation:  ☐ D.C.C.  ☑ U.S.C.    Title:  18

Section(s):   1343, 1001(a)(2), 1623

| /s/ | 4/3/2020 |
|---|---|
| Tejpal S. Chawla | Date |
| Assistant United States Attorney | |
| (202) 252-7 | |

COMPLETE FOR ALL ARREST WARRANTS:

*The following information __must__ be provided for __ALL__ arrest warrants and an **original** and*
***duplicate** of this form must be submitted to the Clerk's Office with the warrant papers.*

██████████████████

Agency / Unit:   FBI/Joint Terrorism Task Force

24 Hour Telephone Number:  ████████
 (For officer/agent)

Cellular Number:  ████████
 (For officer/agent)

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 20-sc-00731 |
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FOURTEEN TWITTER PROFILES WITH USERNAMES STORED AT PREMISES CONTROLLED BY TWITTER PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1001(a)(2) | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1001(a)(2) | Material False Statements in an Investigation Involving International Terrorism |
| 18 U.S.C. § 1623 | False Declaration Before a Grand Jury |

The application is based on these facts:

See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 04/03/2020 _____

City and state: Washington, D.C.

Deborah A. Robinson
2020.04.03 12:41:21 -04'00'

*Judge's signature*

Deborah A. Robinson

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❏ Original  ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH | ) |
| FOURTEEN TWITTER PROFILES WITH USERNAMES STORED AT | ) |
| PREMISES CONTROLLED BY TWITTER PURSUANT TO 18 U.S.C. § 2703 | ) |
| FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1001(a)(2) | ) |

Case No.  20-sc-00731

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____April 17, 2020_____ *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Deborah A. Robinson_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____04/03/2020_____

Deborah A. Robinson
2020.04.03 12:40:36 -04'00'

*Judge's signature*

City and state:  Washington, D.C.

U.S. Magistrate Judge Deborah A. Robinson
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-00731 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Twitter accounts identified

by username and User IDs



that are stored at the premises owned, maintained, controlled, or operated by Twitter, a

company headquartered in San Francisco, California.

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be disclosed by Twitter to facilitate execution of the warrant

To the extent that the information described in Attachment A is within the possession, custody, or control of Twitter, including any messages, records, files, logs, or information that have been deleted but are still available to Twitter, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the government for each account listed in Attachment A:

a. All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers;

b. All past and current usernames, account passwords, and names associated with the account;

c. The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d. All IP logs and other documents showing the IP address, date, and time of each login to the account;

e. All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

f. All "Tweets" and Direct Messages sent, received, "favorited," or retweeted by the account, and all photographs or images included in those Tweets and Direct Messages;

1

g.  All information from the "Connect" tab for the account, including all lists of Twitter users who have favorited or retweeted Tweets posted by the account, as well as a list of all Tweets that include the username associated with the account (*i.e.*, "mentions" or "replies");

h.  All photographs and images in the user gallery for the account;

i.  All location data associated with the account, including all information collected by the "Tweet With Location" service;

j.  All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

k.  All data and information that has been deleted by the user;

l.  A list of all of the people that the user follows/followed on Twitter and all people who are/were following the user (*i.e.*, the user's "following" list and "followers" list);

m.  A list of all users that the account has "unfollowed" or blocked;

n.  All "lists" created by the account;

o.  All information on the "Who to Follow" list for the account;

p.  All privacy and account settings;

q.  All records of Twitter searches performed by the account, including all past searches saved by the account;

r.  All information about connections between the account and third-party websites and applications;

2

s.      All records pertaining to communications between Twitter and any person regarding the user or the user's Twitter account, including contacts with support services, and all records of actions taken, including suspensions of the account.

**t.      All information pertaining to account deactivation or suspension, where applicable, and any Terms of Service which were violated.**

Within **14 days** of the issuance of this warrant, Twitter shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



3

## II. Information to be seized by the government

All information from January 1, 2014 until the present, described above in Section I, that constitutes evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. §1343, Wire Fraud, and Title 18 U.S.C. § 1001(a)(2), Material False Statements involving international terrorism, and Title 18 U.S.C. §1623, Perjury, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

    (a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

    (b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated about matters relating to ISIS, S-1, Dawla, or the criminal activity under investigation, including records that help reveal their whereabouts;

    (c) All financial records of information;

    (d) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

    (e) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

    (f) Information that constitutes evidence concerning fundraising, transfer of money, conversion of money, concealing information about transactions, wire fraud or

4

other financial fraud by the Account user, persons communicating with the Account user, or others connected to S-1;

(g) Any records, communications, photographs, videos, documents, logs, or attachments relating to statements made to or from the Account user regarding ISIS, on-line chat rooms, fundraising, S-1 ████████, S-3, ████████, ████████, W-3, and persons linked to S-1, ████████, ████████, ████████, and W-3;

(h) Records, communications, drafts, videos, photographs and other material that is communicated through on-line chat rooms, social media platforms, or video-sharing websites;

(i) Records, communications or other material that discuss a pending grand jury, criminal investigations by the FBI, and/or the identity or location of potential witnesses;

(j) All records, communications, drafts, or other material that discuss ISIS; any FTOs; terrorist attacks, actions, communications, or planning; foreign terrorist organizations, or persons who have ever sought to travel to ISIS territory;

(k) All records, communications, documents, material, videos, and posters related to operation of S-1's on-line chat room, social media platforms, and the communications of all administrators;

(l) All financial, bank, money transmitting service, purchase or sales records, documents, accounts, ledgers, notes, receipts, and evidence of solicitation and/or receipt and/or distribution of money or credits or digital currency (e.g. Bitcoin), including drafts;

.

(m) All communications, notes, videos, photographs, drafts, and records relating to ISIS, on-line chat rooms, or S-1's communications with others using the internet;

(n) Records, communications, drafts, or other material that discuss ISIS, terrorist attacks, actions, communications, or planning; foreign terrorist organizations, or persons who have ever sought to travel to ISIS territory;

(o) Records, communications, drafts, photographs, videos, or other material that discuss traveling overseas to live in a country where ISIS was present, join a foreign terrorist organization, or avoid detection by law enforcement;

(p) Records, communications, drafts, videos, photographs and other material that is communicated through on-line chat rooms, social media platforms, or video-sharing websites that host or contain content produced by S-1, ISIS-affiliated organizations, or any other foreign terrorist organization;

(q) Information related to financial information, accounts, ledgers, and access to monetary instruments, goods, and funds, including use of intermediaries to disperse or collect funds and goods;

(r) Evidence related to the Account user's deletion of electronic information, including emails, documents, receipts, and transactions related to S-1 or any person connected with S-1; and,

(s) Evidence related to the Service Provider's deactivation of accounts, where applicable, and the Terms of Service which were violated.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

6

or typing); draft or deleted records; and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

III.     **Government procedures for warrant execution**

     This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, analysts, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Twitter, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Twitter. The attached records consist of:

_____
**[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Twitter, and they were made by Twitter as a regular practice; and

b.      such records were generated by Twitter electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Twitter in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Twitter, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____      _____
Date                                    Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FOURTEEN TWITTER PROFILES WITH USERNAMES STORED AT PREMISES CONTROLLED BY TWITTER PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1001(a)(2)** | Case No. 20-sc-731<br><br><br>**Filed Under Seal** |



## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ▮▮▮▮▮▮ a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information which is associated with fourteen accounts – that is, Twitter Accounts ▮▮▮▮▮

 – stored at the premises owned,

maintained, controlled, or operated by Twitter, a social networking company headquartered in San

Francisco, CA. The information to be searched is described in the following paragraphs and in

Attachment A. This affidavit is made in support of an application for a search warrant under 18

U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Twitter to disclose to the

government copies of the information (including the content of communications) further described

in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment

B, government-authorized persons will review that information to locate the items described in

Section II of Attachment B.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.  Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1001(a)(2) (material false statements in an investigation involving international terrorism) have been committed by ███████  ██████  ("████████"); violations of 18 U.S.C. § 1001(a)(2) (material false statements in an investigation involving international terrorism) have been committed by ███████  ████  ("████████"); and, violation of 18 U.S.C. § 1623 (false declarations before a grand jury) have been committed by ████████████████████ ("████"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

4.    Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

5.    This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i). As discussed more fully below,

3

acts or omissions in furtherance of the offenses under investigation occurred within Washington,

DC, *see* 18 U.S.C. § 3237, and the criminal offenses under investigation began or were committed

upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no

offender is known to have, or have had, residence within any United States district.  *See* 18 U.S.C.

§ 3238.

6.      When the Government obtains records under § 2703 pursuant to a search warrant,

the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C.

§ 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding

the Provider from notifying the subscriber or any other person of the warrant, for such period as

the Court deems appropriate, where there is reason to believe that such notification will seriously

jeopardize an investigation.  18 U.S.C. § 2705(b).

## STATUTORY VIOLATIONS

### Wire Fraud

7.      Title 18, United States Code Section 1343 criminalizes knowingly devising a

scheme for obtaining money by means of false pretenses or causes to be transmitted by means of

wire in interstate commerce any signals for the purpose of executing such scheme. 18 U.S.C.

§ 1343.

### Material False Statements Involving International Terrorism

8.      Title 18, United States Code Section 1001 criminalizes knowingly and willfully

making any materially false, fictitious, or fraudulent statement or representation in any matter

within the jurisdiction of the executive branch of the United States.  18 U.S.C. § 1001(a)(2).  If the

matter involves domestic or international terrorism, the maximum penalty is eight years incarceration.

**Perjury**

9.      Title 18, United States Code Section 1623 criminalizes knowingly making any false material declarations in any proceeding before a grand jury of the United States.

## PROBABLE CAUSE

### Background on ISIS and Its Internet Recruitment Efforts

10.      The FBI has been investigating the use of the Internet and social media by foreign terrorist groups, including the Islamic State and al-Sham ("ISIS").  On or about October 15, 2004, the U.S. Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawhid wa'al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under section 1(b) of Executive Order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the INA and as a SDGT entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added a number of aliases to the ISIL listing, including: The Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production (collectively referred to herein as "ISIS").  On September 21, 2015, the Secretary added the following aliases to the FTO listing:  Islamic State, ISIL, and ISIS. ISIS remains a designated FTO.

11.      Based on your affiant's training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, traveled to Syria and Iraq to join

ISIS, an act they commonly refer to as "hijrah"[1]; (b) foreign fighters commonly entered Syria by crossing the border from Turkey or Jordan; (c) foreign fighters from Western countries traveled to locations in Turkey, including Istanbul, and then traveled to towns closer to the border where they were brought into Syria to join ISIS; (d) Abu Bakr al-Baghdadi was the leader (or "Caliph") of ISIS before he was killed by U.S. forces on or about October 26, 2019; (e) since on or about September 22, 2014, ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and its leadership gave blanket approval for this indiscriminate killing by individuals residing in these countries.

12.     To gain supporters, recruit fighters, and raise funds, ISIS spreads its message of violent jihad[2] using social media platforms, such as Twitter, Facebook, YouTube, Instagram, and Paltalk. On these platforms, ISIS advocates post audio and video files that include recruitment messages and updates of events in Syria and Iraq. Online chat rooms controlled by ISIS advocates further effectuate this support.

13.     One such online community was a pro-ISIS Paltalk chat room called ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ which contained audio of speeches made by SUSPECT 1 ("S-1"). ▮▮▮▮



▮▮▮▮▮▮▮▮. S-1 continued to encourage violence and terrorist acts in speeches posted on the Internet or in Paltalk chat rooms. S-1 has also recorded numerous statements inciting violence and supporting ISIS, its former leader al-Baghdadi, al-Qaeda, and

---

[1] Based on my training and experience, I know "hijrah" generally means migrations, and in this context refers to travel to engage in jihad.

[2] Based on my training and experience, I know "jihad" is an Arabic word which literally means striving or struggling, but in this context it refers to a holy war, fight, or struggle against the enemies of Islam.

Osama bin Laden.  contained recorded lectures of S-1 proselytizing on behalf of and in support of ISIS. I have viewed the ▮ site and am familiar with its contents and organization.

15. On or about December 5, 2017, the United States Office of Foreign Assets Control ("OFAC") designated S-1 as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, ISIS.

▮▮▮▮ Role as an ▮ Administrator

16. On or about March 20, 2014, ▮▮▮▮ received an email welcoming her as a new ▮ Administrator and assigning her the moniker ▮▮▮▮▮ During a voluntary interview with FBI Agents at the Charlotte Douglas International Airport on January 25, 2018, ▮▮▮ was advised that lying to the FBI would constitute a violation of federal law,

---

[3] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Google accounts used by or associated with S-1 and/or ▮▮▮. In response to the warrant, Google provided this email among others.

and in that interview she initially told the FBI Agents that, "I was not an Administrator [of ██]." ██████ later acknowledged she would sometimes help in the class and login with an Administrator account. Later in the interview, ██████ admitted that she was an Administrator often over the past year, and that her involvement varied prior to that. As an Administrator, she stated that she would take notes and post them on the ██ website, post Quranic verses and find hadith[4] during lectures, as well as, advertise the lectures on social media for S-1.

17. On April 22, 2014, ██████ sent an email to an individual using the nickname "Muqaatil muhammad"[5] with a subject line reading, "Admin Rules." The email indicated it was a "follow-up" to a prior conversation between ██████ and S-1 and included a document titled, "RULES FOR ██ June 2014," as an attachment. The document contained information addressed to all the brothers and sisters who were "admining" for the ██ chat room. It proceeded to outline the mission of the ██ chat room which included, "[t]o play a significant role in the battle of hearts and minds that is happening all over the world, by supporting the mujahideen and their actions…" The document further explained that loyalty and commitment were expected, and it reminded Administrators that they were "representing the █████████████████ when using ██ usernames. Under the "Rules for Chat Room (Admins and Guests)" section, the document explained that the chat room would play material from speakers such as Shaikh Awlaki[6], S-1,

---

[4] "Hadith" is a collection of traditions containing sayings and actions of the Prophet Muhammad. Hadith are one of the major sources of guidance for Muslims.



[6] Your affiant believes the "Shaikh Awlaki" referenced here is Anwar al-Awlaki, a key leader for al-Qa'ida in the Arabian Peninsula (AQAP), who was designated by the United States Department of Treasury in July 2010. Al-Awlaki was involved in numerous aspects of terrorism including recruitment, training, operational planning, and

Shaikh Bakri, and others.  They would also play "Qur'an recitations, Jihad nasheeds, and Mujahideen releases."  Also included in the document was guidance on S-1's donation details, which included standard language to be used in soliciting donations from followers.

18.     On October 26th, 2018, the United States District Court for the District of Columbia authorized a search warrant for a Seagate Backup Plus 2TB Portable Drive, Model Number  containing a digital copy/forensic image of a Macbook Pro laptop (hereafter referred to as "Macbook Pro") and an iPhone 6S Plus (hereafter referred to as "iPhone 6S Plus") which belonged to ██████.

19.     FBI review of ██████ Macbook Pro revealed various archived email correspondence in which ██████ was granted permission to create content advertising S-1's lectures and subsequently post them on Facebook.  Prior to posting new publicity flyers and advertising, ██████ would request review and feedback from S-1 and/or another ██ Administrator.  For example, on July 1, 2014, S-1 instructed ██████ via email to change the topic of the lecture in the publicity flyer to Abu Bakr al-Baghdadi's Ramadan message.  S-1 stated that he just received the CD to translate, and ██████ responded to S-1 with a publicity poster. ██████ noted that she also posted it to Facebook.  On July 5, 2014, S-1 emailed ██████ instructing her to use an "AK47 as your logo" in the poster.  On December 24, 2014, ██████ emailed herself a communication with the subject "fb", with details on a ██████████ ████████████████████.  This conference featured prominent jihadist preachers, S-1, Anjem Choudary, and Abu Baraa[7].  FBI review of ██████ communications from this source

---

actively sought to encourage his supporters to provide money for terrorist causes.  Al-Awlaki was a prominent propagandist for English- and Arabic-speaking audiences, and his material has continued to inspire terrorist attacks, oftentimes targeting the United States and/or its interests.  On September 30, 2011, al-Awlaki was killed by United States forces in Yemen.

[7] Following ISIS's declaration of a caliphate in June 2014, Anjem Choudary (Choudary) and Mohammed Mizanur Rahman aka Abu Baraa (Baraa) allegedly pledged allegiance to ISIS's leader, Abu Bakr al-Baghdadi, and began to

indicated she was also responsible for reviewing Facebook messages that were directed to S-1, and forwarding them to S-1 for responses.

20.  W-2[8] indicated that it visited the online ▇ chat room. W-2 advised that in or around July 2015, W-2 suggested to S-1 that W-2 conduct a lecture in the ▇ chat room. S-1 was receptive to W-2's suggestion. W-2 indicated it believed S-1's purpose in having W-2 speak in the ▇ chat room was to radicalize others.

21. In preparation for conducting the lecture W-2 began to interact with the ▇ Administrators. W-2 reported that the primary ▇ Administrator used the kunya,[9] ▇ ▇ ▇ stated in an interview with FBI Agents that ▇ was a name she used on social media and/or communication accounts. Service provider records confirmed this fact. As such, your affiant believes that ▇ used the moniker ▇ ▇ when serving as an ▇ Administrator for S-1.

22. W-2 further indicated that ▇ was essentially S-1's secretary and was aware of S-1's activities. W-2 also described ▇ as the lead Administrator in the ▇ chat room. W-2 explained that ▇ handled all of S-1's correspondence, designed online posters to advertise ▇ lectures, facilitated lectures, coordinated the posting of hadith and Quranic

---

support ISIS over various social media platforms. Choudary and Baraa were convicted in the United Kingdom in July 2016 for inviting support of a proscribed organization, namely the Islamic State, and were each sentenced to five years and six months in prison. On or about March 30, 2017, the U.S. Department of State designated Choudary as a SDGT under Executive Order 13224.



[9] "Kunya" is a term that can be used to describe a nickname or an honorary Islamic name for someone.

verses in the chat room, monitored ▇ chat room discussions, and posted audio of ▇ lectures to the ▇ website.

**▇ and S-1's Fundraising Efforts**

23.     ▇ was also actively involved with S-1 in fundraising and collecting donations for the operation of the ▇ enterprise.  On January 5, 2016, a local law enforcement agency advised the FBI that during an ▇ discussion on December 21, 2015, a user name known to be associated with S-1 posted the following: "according to Shariah we kill apostates" and "If they turn back from Islam then kill them.  Surah 4:89".  Later in the same chat room, an individual believed to be another ▇ Administrator posted the following solicitation for funding, "DONATE TO THE DAWAH[10] OF [S-1]- EMAIL TO:::: [Email Address 1] - TO ASK FOR DIRECTIONS ON HOW TO USE [MONEY TRANSMITTING SERVICE 1 ("MTS1")] OR [MONEY TRANSMITTING SERVICE 2 ("MTS2")]::::::JZK[11]".

24.     Further, on January 25, 2016, a local law enforcement agency advised the FBI that on January 18, 2016, ▇ for the agency engaged in a private online conversation with an account believed to be used by S-1.  During this conversation S-1 asked ▇ to send money to ▇ using a specific money transmitting service, hereafter referred to as "MTS1," under S-1' ▇ name, which S-1 identified as "▇ ▇." Excerpts of the conversation are as follows:

UCE: shaikh i would like to make donation for the dawa what is the best way?

S-1: the best way is via [MTS1]

---

[10] "Dawah" (variation "dawa") means the proselytizing or preaching of Islam.
[11] "JZK" is often used as an abbreviation for *JazakAllah Khair"*, which is an Arabic phrase meaning "May God reward you."



S-1: send it to my wife's name

S-1: her name is:

S-1: ███ ███

UCE: okay insh Allah

S-1 ██████████

S-1: how much u are planning to send

UCE: do i need an account number or just send it in her name insh Allha?

S-1: no account no needed

25.     Your affiant is aware that similar solicitations for donations occurred regularly in the ██ chat room. In fact, shortly after becoming an administrator in March 2014, █████ sought to expand the funding base of ██ to include other social media platforms. On June 7, 2014, █████ sent an email to S-1 suggesting they begin posting for donations on Facebook, Twitter, the blog, and in the Paltalk chatroom. █████ acknowledged in the email that in a separate conversation, another ██ Administrator advised her she would need S-1's permission to make this expansion because he believed the public solicitation for donations could cause the freezing of S-1's latest MTS1 and MTS2 accounts. A review of █████ emails identified an earlier email on June 3, 2014 in which this ██ Administrator advised █████ that she would need "Shaikh's" approval prior to publically soliciting for donations due to concerns that the Shaikh's "latest" accounts may get frozen. █████ responded to the other ██ Administrator that it was "a dilemma."

*MTS1 and MTS2 Financial Records for* █████

26.     Since April 2, 2012, S-1 has been blocked or interdicted by MTS1 from using its services.[12]  The FBI's review of records provided by MTS1 in January 2018 indicated that from in or about November 2014 to December 2016, █████████ appeared to have received approximately $24,000 through approximately 97 separate transactions via MTS1 while residing i█████ with S-1.  These payments were from various senders in the United States, United Kingdom, and Canada, among other countries.  MTS1 records indicated that ████████ utilized approximately three different forms of her own identification █ approximately 16 different locations throughout ██████ to pick up these funds.  Your affiant believes based on S-1's online fundraising efforts and ███████ role as an ███ Administrator and ██████████ he wire transfers sent to ████████ were sent to, or on behalf of, S-1.  MTS1 indicated that it "interdicted," or blocked, █████████ from using its money transfer services in or around December 2016 because MTS1 assessed █████████ activity to be consistent with terrorist financing.

27.     MTS2's records revealed that S-1 was blocked from using its services following the OFAC's designation of S-1 in or around December 2017.  MTS2 indicated S-1 was put on a watch list maintained by a third party vendor in 2004 as a result of S-1's prosecution in the United Kingdom on terrorism-related charges; however, MTS2 did not subscribe to this watch list █ the time.  The FBI's review of records provided by MTS2 indicated that from in or about August 2014 to December 2016, █████████ appeared to have received approximately $1,250, via MTS2. These payments were from senders in different countries.  MTS2 records further indicated that the

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

recipient (███████) utilized three different forms of her own personal identification to receive these payments.

*FBI Interview of S-4 about money transfers to* ████████

28.     The FBI conducted voluntary interviews of S-4 in July and August 2017.  In those interviews, S-4 was asked about its contacts and financial support of S-1, and S-4 made numerous false statements about its contacts with S-1, and denied providing any money to S-1 directly or indirectly through other persons ███████████████████████████████████████ ████████████████████████████████████████████████████ S-4 is one of the individuals who sent money to ██████████ using MTS1.  During a subsequent interview with FBI Agents and Assistant United States Attorneys on July 30, 2018, while ██████ ████████████ S-4 stated that it contacted S-1 in 2016 and asked if it could send money to S-1.  S-4 stated that S-1 instructed it to send money to ██████████ using MTS1 because ██████████ name was "clean."  S-4 understood the term "clean" to mean that ██████████ was not a terrorist and the transaction to S-1 would be completed successfully if sent through ██████████.

29.     A review of S-1 email records obtained from legal process revealed that on June 5, 2016, S-4 emailed S-1: "Salaam, I would like to give donation of 50 dollars whichever way possible. Its what I can afford to do as of now, I know its not much. How would I go about doing so?" On June 5, 2016, S-1 responded: "wa alaikum salam wrwb. You may send it via [MTS1] to ████████████████████████████████████████. Pls use your real name to send it in case of a hiccup u can claim your money back. ██████████ name is clean so you shud be fine insha allah. What city do u live in I forgot?"

30.     The FBI's review of records provided by MTS1 in January 2018 revealed two transactions in June 2016 and December 2016, in which S-4 sent by wire approximately $50 and $300, respectively, to ██████ .

31.     S-4 stated it did not know if S-1 was being watched by law enforcement authorities, and indicated that it also communicated directly with ██████ via a messaging application (hereinafter "MA1"), which utilizes a mobile electronic device and the internet. S-4 also told the FBI that it sent MA1 messages to ██████ what it believed to be ██████ cellular phone. Your affiant is aware that persons who engage in criminal activity will often attempt to hide or obscure their financial transactions through friends, confidants, or ██████ members to avoid detection by law enforcement. MTS1 also indicated that it blocked another attempted transaction with S-4 to S-1, through ██████ on April 6, 2017.

*FBI Interview of ██████ about financial transactions on January 25, 2018*

32.     During ██████ voluntary interview with FBI Agents at the Charlotte Douglas International Airport on January 25, 2018, ██████ stated that S-1 had a bank account in ██████ , but "they closed it down." When asked if ██████ ever had a bank account closed or a financial transaction blocked, ██████ responded, "No because I don't do any weird transactions, my stuff is legit." When asked about accepting donations on S-1's behalf, ██████ initially indicated that she accepted money on S-1's behalf approximately two years prior for Eid, an Islamic holiday. ██████ was directly asked if she ever accepted any donations or any contributions from anyone in the world other than that Eid. ██████ responded that there may have been a few other times. When asked if there were more or less than ten other instances outside of Eid in which she accepted money, ██████ responded, "Less than, maybe even five times. I'm-it was probably less than that 'cuz I didn't like that

whole business." ▇▇▇▇▇ again reiterated that she did not accept money on S-1's behalf outside of those few occasions.

*FBI Interview of ▇▇▇▇ about financial transactions on October 25, 2019*

33.    On October 25, 2019, ▇▇▇▇ was interviewed by FBI Agents ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ FBI Agents again advised ▇▇▇▇ that lying was a crime under Title 18 U.S. Code 1001, and ▇▇▇▇ acknowledged that she understood. ▇▇▇▇ stated that she only accepted a miniscule amount of money and it was not to support S-1's activities or the ▇ dawah. ▇▇▇▇ explained that she was "leery" about receiving money because it could hurt her account, and her standing. ▇▇▇▇ later stated that S-1 made money that was basically for their living, but she was not familiar with his money because she had no part in it.

34.    Your affiant believes ▇▇▇▇ knowingly made false statements to FBI Agents about her involvement in collecting funds on behalf of S-1 during an interview at the Charlotte Douglas International Airport on January 25, 2018 and a ▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇ on October 25, 2019.  As discussed above, ▇▇▇▇ received approximately 100 wire transfers via MTS1 and MTS2 between August 2014 and December 2016, and at least five of these transfers were identified by S-4 and S-5 as having been intended for S-1.

35.    Based on the information discussed herein, your affiant believes ▇▇▇▇ and S-1 devised a scheme to defraud MTS1 and MTS2 wherein S-1 directed ▇ followers to wire funds via MTS1 and MTS2 to ▇▇▇▇ instead of directly to S-1.  Through this scheme, your affiant believes ▇▇▇▇ and S-1 obtained money wired through MTS1 and MTS2 under false pretenses: that funds were being wired through MTS1 and MTS2 for persons other than S-1, namely ▇▇▇▇, when in truth the money was intended for, and provided to, S-1.  Your

16

affiant believes this scheme was executed by S-1 and ██████ because ██████ name was "clean" and S-1 and ██████ believed ██████ name had not yet been blocked by MTS1 or MTS2.

36.     Furthermore, your affiant believes ██████ visited numerous MTS1 and MTS2 branch locations in ██████ collected funds from wire transfers using multiple forms of identification, and lied to FBI agents about her activity because she was attempting to conceal her involvement in the scheme.  Your affiant notes that ██████ acknowledged she "…didn't like that whole business" in the context of collecting funds on behalf of S-1 and was "leery" of it, but your affiant believes ██████ nonetheless participated in this scheme despite the possible legal ramifications.

**FBI Investigation of other members of the ██████**

37.     In September of 2014, a cooperating witness, W-1, reported to the FBI that ██████ ██████ ("██████"), an ██████████████████ both of whom are sons of ██████, were vocal supporters of ISIS and espoused their desire to join the terrorist organization.  W-1 reported that ████████████████████████ ██████████ and accepted his and ██████ views pertaining to ISIS. [14]  W-1 indicated that ██████ and ██████ watched ISIS-related videos in the living room



while ███████ cooked. W-1 recalled one particular instance in 2014, during Ramadan, when ███████ and ███████ viewed a video depicting the killing of a Shia male and praised the methodical manner in which ISIS killed people. Notably, this was around the time that ███████ married S-1. W-1 further indicated that both ███████ and ███████ would get excited about the videos and both stated that killing people was the right way to do things.



███████, W-3, and the ███████ ███████

---

15 Your affiant is aware the term "nasheed" can refer to vocal music that is popular in the Islamic world and generally makes reference to Islamic beliefs, history, religion, and current events. Your affiant is further aware that many ISIS productions utilize nasheeds.



41.     The group, which included W-3, ██████, ██████, ██████, ██████, and ██████████████████████ participated together in social activities and in practicing Islam.  W-3 indicated that since it was new to the religion, it obtained much of its religious guidance from ██████, ██████, ██████, and ██████.  Some of the earliest material W-3 was shown by the ██████ included the Light Revelations series[17] on YouTube.  Your affiant knows this series to include a number of videos supportive of ISIS, but less provocative than many produced by the terrorist group.   W-3 also reported that the group showed S-1's lectures to W-3, and these became one of W-3's primary sources of information on Islam.

42.     In August 2014, W-3 traveled with ██████, ██████, ██████, ██████, W-4, and S-7[18] to  n the aforementioned trip ██████████████

---

[17] The Light Revelations series was listed in the "Must Watch Videos" section of a publication titled, "The Revived Caliphate," a 106-page ISIS-aligned pdf booklet shared amongst the group members.  "The Revived Caliphate" booklet described the Light Revelations series as videos that "…summarise all events about the Caliphate in Syria in a positive light. Quality and dramatic, Highly Recommended. Links to videos can be found ██: https://twitter.com/EnterTheTruthCo".  The booklet provided references to numerous other ISIS-produced or ISIS-aligned media products.

[18] For consistency with other legal processes, witnesses and suspects may not be identified in sequential order.

███  W-3 indicated that during this trip, the group discussed the topic of ISIS with S-1. According to W-3, S-1 provided the group with justification that ISIS was legitimate and that Muslims owed their allegiance to Abu Bakr al-Baghdadi and the Islamic State. W-3 also stated that S-1 further instructed the group that in order to be considered Muslim, they needed to make hijrah to ISIS territory because it was the only acceptable location. Furthermore, W-3 stated the group discussed the requirements for men to engage in jihad – women could choose whether or not they wanted to fight, and ███ explained what life would be like for a woman living in ISIS-controlled territory.[19]

43.    W-3 testified that W-3 and ███ had not yet had their child, and ███ indicated they may get pregnant in ISIS territory and W-3 could just do its work out there.[20] W-3 understood ███ to be encouraging her to continue with the plan to make hijrah. W-3 reported, however, that its intention was to fight when the group arrived in ISIS territory.

44.    Similarly, in October 2014 in Group Chat 1 among ███, ███, ███, and W-4, using Messaging Application 2 (MA2), the group engaged in a discussion about life in dawla[21]. ███ explained that some women acted as security; there were no taxes or bills for muslims; and, housing, food, and electricity were free. ███ indicated that they would have to be in the dawla for these benefits. W-4 confirmed that in conversations with these persons, that when the term dawla was used, the person meant ISIS or ISIS territory.

---

[19] ███ and W-4 were interviewed about their discussions with S-1 while in ███ and they both denied or did not recall discussing ISIS with S-1. W-4 noted, however, that the group's view towards ISIS became more amplified over time beginning in 2014.

[20] Your affiant is aware that W-3 had been working in the District of Columbia as an early education teacher since in or around June 2014.

[21] "Dawla" is a term that can be translated to mean "state." In 2014, ISIS re-named itself using the term *ad-Dawla al-Islamiyya* which can be translated to mean the "Islamic State." Your affiant is aware that "Dawla" is regularly used by ISIS supporters to reference the terrorist organization and its self-proclaimed caliphate.

45.     The aforementioned group conversation on MA2 continued into December 2014, and on December 24, 2014, <span style="background:black">████</span> requested W-4's assistance in upgrading S-1's Paltalk account.  After W-4 helped <span style="background:black">████</span> and S-1, <span style="background:black">████</span> indicated that S-1 intended to speak to W-4 in Arabic when S-4 visited again.  W-4 responded that its Arabic was rusty, and <span style="background:black">████</span> replied, "U spoke well alh. But u'll bcm fluent in the dawla."



**Preparations to Join ISIS**

47.     W-3 reported that after returning to the United States from <span style="background:black">████</span> in August 2014, the group agreed they should travel together to make hijrah to ISIS territory.[22]  W-3 indicated the group discussed the preparations they would need to undertake before making hijrah, including: saving money, preparing physically, and gaining more knowledge about Islam.  The group also shared and practiced online security measures in an attempt to avoid detection by law enforcement authorities.

48.     W-3 indicated that W-3 and <span style="background:black">████</span> began saving money and tracked their savings on an envelope.  On or about August 18, 2019, W-3 provided the FBI with the savings envelope, which included numerous handwritten entries and a note on the cover that read, "*Started on 8-

---

[22] W-4 also confirmed the group discussed making hijrah to ISIS territory, but W-4 was not intending to go with them if they ever decided to attempt to travel.

16-14." The earliest recorded entry was "$555" on October 25, 2014; however, it was accompanied by a small note indicating other dates were on previous envelopes.[23] The latest recorded entry was December 11, 2017.

49. W-3 also testified that the group discussed how they could prepare physically in the United States before traveling overseas. These discussions involved learning how to use a gun and practicing paintball for "training." When going to the gun range, ▓▓▓▓▓ advised W-3 and the group not to say anything about being Muslim or things like, "Allahu Akbar," because that would draw unnecessary attention. ▓▓▓▓▓ and ▓▓▓▓ agreed with ▓▓▓▓▓. W-3 reported that ▓▓▓▓▓ and ▓▓▓▓ also referred to paintball as practice or training. The group tried to go paintballing once a month, but it would be more like once every two months because of scheduling conflicts. W-3 played paintball approximately three times with the group and also went to the gun range approximately three times. While at the gun range, W-3 fired a Glock pistol, a revolver, and a rifle.[24]

50. Similarly, W-4 testified that ▓▓▓▓▓ continued to go paintballing after he began talking about wanting to fight for ISIS. W-4 agreed that ▓▓▓▓▓ continued to go paintballing and to the gun range in part for preparation to go to the Islamic State. W-4 noted that it had concerns about ▓▓▓▓▓ paintballing, but W-4 still thought he would not actually go to ISIS-controlled territory.

---

[23] In a subsequent interview of W-3 by FBI Agents, W-3 explained that it had used other envelopes to store its savings, but the savings outgrew the envelopes so W-3 moved the money to the above-referenced envelope. W-3 no longer had the earlier envelopes.

[24] ▓▓▓▓ testified that neither he nor anyone he knew ever went paintballing or to a gun range as preparation for fighting jihad. ▓▓▓▓ stated that he went paintballing approximately 15 times.

51.    On  or  about  February  1,  2015,    shared  two  links, ███████████████████████████████████████ in  Group  Chat  2  that included ████████, ████████, ██████, W-3, W-5, and one other associate.[25]  A review of a cached version of ████████████████ (and how it appeared on February 2, 2015) revealed an approximately 3-page long document that provided guidance on what supplies to bring that would be "of great use to you in al-Sham" and how to pack it.  When discussing electronic devices, the document instructed the reader to use software to "hide" all jihadi material.

52.    On or about February 6, 2015, ██████ shared a link ████████████████████ in the same group message chat.  The link directed the user to what your affiant believes was a 50-page "HIJRAH to the ISLAMIC STATE" eBook.  The eBook detailed Turkey-Syria border crossing protocols, including how emigrants should be in contact with their Twitter contacts.  The eBook then provided Twitter contacts who were located in ISIS territory and could assist in individuals making hijrah.  The eBook also provided instructions on how to interact with security services if emigrants were stopped; what supplies to pack; and, various testimonials of individuals who had successfully traveled to ISIS-controlled territory.

53.    Shortly  after  receiving  this  link,  ██████████  shared  it  in  Group  Chat  1  with ██████████, ████████████, and W-4. ██████████  directed them to "[c]heck that out when u have a chance Inshallah."  W-4 did not recall reading this particular publication but did recall discussing it  with  ██████████.  W-4  explained  that  it  was  an  argument  in  which  ██████████  was attempting  to  show  W-4  that  there  was  actually  a  way  to  go  and  W-4  was  arguing  about  its legitimacy.

---

[25] W-4 was not included in this group chat.

54.    On or about May 3, 2015, in the midst of coordinating who could make "class" and ██████████ sending an archive.org link in Group Chat 2, W-3 suggested that they get together to plan everything out.  The discussion points would include what they would talk about, their main points, their proofs, and then they should practice debating and ask each other questions.  W-3 testified that it made this suggestion in the context of preparing to make hijrah.  W-3 explained that when arriving in ISIS, the group would have to be a certain kind of Muslim, and they would have to provide a certain response if asked a question about a controversial topic.  W-3 was concerned that if it did not have the right answer, it would be killed.

55.    W-3 testified that the group – in the context of wanting to go to ISIS territory – shared material on how to maintain anonymity online and not to get caught.  For example, on November 26, 2014, ██████████ sent a justpaste.it link to an article about how to remain anonymous online.  The article discussed how intelligence agencies monitored the internet with the intention of "dismantling anti-colonial narratives and attacking those who postulate them." After discussing the permissibility of lying to trick the kufar, the author explained that these people had an open war with Allah, his messenger, and their khilafah.  The article proceeded to explain virtual private networks (VPNs), TOR, encrypted email, and a secure operating system, called TAILS.  The writer then discussed social media and discouraged its use but also offered suggestions on how to create and manage a Twitter account in a way that nothing could be proven in a court of law.  The article closed with a discussion about encrypted instant messaging and an invocation to Allah to hasten their venturing to the lands of jihad and hijrah.  Your affiant believes that the use of Twitter accounts by persons in this investigation indicates an advanced level of operational security, including opening and closing of multiple accounts with different names. You affiant believes this was done in an effort to avoid attribution and to circumvent Twitter's

deactivation of accounts for violations of terms of service, namely the dissemination of violent and/or terrorism-related material.

56. During ▮▮▮▮▮▮ interview with FBI Agents on October 25, 2019, when asked if anyone in her ▮▮▮▮ ever expressed a desire to make hijrah to ISIS, ▮▮▮▮▮▮▮ responded, "No, we don't- no." and proceeded to explain ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ again responded, "No" when asked if anyone in her ▮▮▮▮, to include ▮▮▮▮▮▮, ▮▮▮▮▮▮, S-7, and ▮▮▮▮▮ ever expressed an interest in making hijrah to ISIS territory.



**Dissemination of S-1's Lectures and ISIS Media**

58.     In addition to the aforementioned preparations to make hijrah to ISIS-controlled territory, the group, which included ███████, ███████, ███████, ███████, W-3, and █ times, W-4, and W-5, were frequently sharing S-1's lectures – which ███████ helped administer – and other ISIS media.

59.     On September 3, 2014, ███████ emailed ███████, ███████, W-3, W-4, and two other associates a poster advertising a conference titled, "Al Khilaafah; Allah's Governance on Earth" scheduled for September 6, 2014, and featuring S-1 and other jihadist preachers in the United Kingdom.  ███████ directed recipients of the email to attend and invite others.  ███████ further noted, "This conference is not to be missed."  During the conference, S-1 and other speakers promoted ISIS and justified its leader, Abu Bakr Al Baghdadi.

60.     On August 22, 2018, the United States District Court for the Eastern District of Virginia issued a search warrant for ███████ residence.  During the execution of the search warrant on August 23, 2018, the FBI seized ███████ iPhone X and iPhone 5s devices.  Contained on these devices were various group chats among ███████, ███████, ███████, W-3, W-5, and other associates exchanged for multiple years from 2014 through 2017.  These group chats included but were not limited to Group Chat 2.

61.     On September 19, 2014, ███████ shared a link in a different group chat, which included ███████, ███████, W-5 and another associate. [27]  W-5 identified ███████

---

[27] ███████ testified he had no recollection at all of his old phone number which was contained in their group SMS messages. ███████ also denied knowing if the phone number used to communicate with ███████ ███████, W-3, W-5, and others for multiple years was his phone number.  Your affiant is aware that ███████ phone number, ███████, was used to register numerous social media and communications accounts in ███████' name, including but not limited to his Instagram account, two Facebook accounts, a Gmail account, and a Snapchat account.  Additionally, service provider records revealed the subscriber for this number was W-3 until

linked media as Flames of War. Your affiant is aware that in September 2014, ISIS released a documentary-style video on Twitter titled, "Flames of War – Fighting Has Just Begun". The video, produced by ISIS's al-Hayat Media Center, was approximately 55-minutes in length and highlighted some of ISIS's major operations in Syria, including a battle ▮ the Menagh Airbase near Allepo. The video is narrated by an English-speaker and the final shot in the production shows masked ISIS fighters executing kneeling men.



63.     On October 28, 2014, in Group Chat 1 which included ▮▮▮▮▮, ▮▮▮▮▮▮, ▮▮▮▮▮▮, and W-4, and in the context of discussing a United States media entity, the group discussed a debate ▮▮▮▮▮ was having with a female associate about ISIS. ▮▮▮▮▮▮ posed several questions to the group about the condition of women living there, if women were required to wear the niqab, and if some women were fighting as well. ▮▮▮▮▮ responded to some of ▮▮▮▮▮ questions but was not sure if women were currently fighting. ▮▮▮▮▮ replied that he did not know how to refute other stuff about the abuse of women, their lack of

_____

approximately October 24, 2018, ▮ which point the subscriber became ▮▮▮▮ until approximately March 6, 2019, when it was disconnected by the Service Provider for non-payment.

rights, rape, "…and all that crap…"  responded that "they" had a sharia court and even the mujahideen were taken to court if rights were abused. They (ISIS) were enforcing Allah's law according to shariah. ████████ replied that he needed "something to check and mate her lol." ████████ directed ████████ to material by S-1 and ████████ and ████████ suggested "The light series." Your affiant understands the light series to refer to the Light Revelations series.

64.   As noted above, W-3 testified that the Light Revelations series was some of the first material shown to it by the ████████. W-3 explained that in order to become part of the group – or the trusted circle – the ████████ would ask questions about touchy subjects and observe the individual's reaction. If the individual agreed with them, they could be brought into the circle, but if not, then the individual could not be trusted. W-3 explained that discussions about ISIS were secretive and they would not discuss it with people outside of the circle of trust. Your affiant believes ████████ was seeking advice on how to engage his associate in an attempt to radicalize her to adopt an ideology closer to that espoused by ISIS.

65.   The group continued to give ████████ advice, and ████████ responded, "People who are weak in faith refute the dawla. Its real and they need to deal with it." ████████ continued, "What muslim in their sane mind doesnt want to live inder laws set by Allah." ████████ instructed ████████ to use material from Twitter in his debate, noting that there was plenty of stuff on Twitter from women "there." ████████ replied that she does not use Twitter, but ████████ told her that was where she could access "pure" information. ████████ said she would see what she could dig up but admonished ████████ that they "don't know her – she can misconstrew [sic] what u say bcz [because] u pro dawla."

66.   On November 13, 2014, ████████ shared a download link and Twitter screenshot in Group Chat 2 of ISIS leader Abu Bakr al Baghdadi's speech in Arabic and English.

W-3 testified that it, and the group, regularly obtained and reviewed ISIS content on Twitter, and that they would regularly use Twitter accounts to follow known ISIS persons who were using Twitter, and that they would then redistribute media which was posted via Twitter. Your affiant is also aware that Twitter allows its users to directly communicate with other Twitter users through a private messaging system.

67.     On December 21, 2014, ██████ sent a message using MA1 to W-3 saying "New Twitter for [S-1] ATDawah." W-3 responded that it began following S-1 and that "…we're saving a lil every check." When W-3 asked why S-1 made a new Twitter, ██████ responded, "Kuffar closed it down." ██████ subsequently shared the same new Twitter handle for S-1 in an MA2 group message with ██████, ██████, and W-4 on the same day. Your affiant is aware that social networking services such as Twitter may shut down accounts when users violate their terms of service, which may include posting violent or terrorist content.

68.     On January 11, 2015, ██████ shared in Group Chat 2 a link to the ██ website, which appeared to be derived from his Twitter feed based on review of the URL. The link contained a lecture by S-1 on the "Evil Consequences for Insulting the Rasool (Saw)," which had been given the prior evening. Your affiant believes S-1 delivered this lecture following the attack ██ the Charlie Hebdo newspaper office in Paris, France, on January 7, 2015, by gunmen in response to the newspaper's cartoon depictions of the Prophet Muhammad. In response to a listener asking about an Islamic leader tweeting that the shooting was unacceptable, S-1 responded, "The brothers who died in France are in paradise insha Allah and they died on a Friday." S-1 continued, "[T]hey are heroes who died defending Islam."

69.     As previously noted, on February 6, 2015, ██████ shared a link in Group Chat 1 to an eBook titled, "HIJRAH to the ISLAMIC STATE." A few days later, ██████

29

responded with a Twitter link titled, "Damascus – The Base of Jihad on Earth."[28] ███████
thanked ███████ for sharing the video and responded with a link to another video, which your
affiant believes was an ISIS-produced video showing what life was like in the ISIS-controlled
territory of Halab.[29]

70.     On March 10, 2015, ███████ sent a message in Group Chat 1 saying she was
back in Montego Bay and it was lovely there.  Approximately one hour later, ███████ sent the
group a link to a video titled, "KILLING SPIES IN THE DAWLA."  The video was an official
ISIS video produced by its al-Furqan Media arm and released on the same day it was sent by
███████.  The video shows a purported Israeli Mossad agent executed by a child who appears
with a French-speaking jihadist.  ███████ then continued discussing waking up to the ocean
and staying █ a beachfront cabin.

71.     W-4 explained it was not unusual for the ███████ to have casual conversations in
the midst of sharing videos about killing. W-4 further indicated that ███████, ███████, and
███████ knew media links would come and go, so they shared material on a rolling basis
and it would be inserted into any point in the conversation.

72.     On April 24, 2015, ███████ sent a message in Group Chat 2 which read, "This
is it sulay watch it ASAP ████████████████████████
███████████ The link directed the viewer to a video showing the execution of Ethiopian
Christians by ISIS militants.  One group was executed by being shot in the heads and the other
group was beheaded on a beach and their heads were placed on top of their bodies.  ███████

---

[28] The link sent by ███████ included the "t.co" Twitter shortener.  Twitter's developer website explains that all
links submitted with Tweets and Direct Messages are eventually wrapped with a "t.co" shortener.  According to
Twitter, this helps Twitter protect users from malicious content while offering useful insights on engagement.

[29] Your affiant is aware that "Halab" is another term for Aleppo, Syria.

commented, "All other English links keep getting taken down," and ██████ replied, "Allahu Akbar that was a tough video." W-5 added, "Thanks for providing the English sub ██████…Mashallah it was good." ██████ said, "Your dad [S-1] actually spoke about it after jumuah, Sulay." And ██████ responded, "And just like the Egyptians, the Ehiopian government does the exact same thing. So now I see why they did it."

73. On October 25, 2014, ██████ sent a message in Group Chat 2 which contained a screenshot of a tweet indicating someone died as a shaheed. ██████ commented, "I remember him from Twitter his name was familiar. Abu dujana. May Allah give him shahada Ameen!" ██████ responded, "No way man I've been Lookin for him." ██████ replied, "Yea man subhannallah I was surprised too." ██████ responded, "I used to follow his account everytime he'd make a new one then he just stopped Makin em. Ameen." In response to a question from ██████, ██████ sent another screenshot of what appeared to be Abu Dujana's last post on Twitter.

74. On December 13, 2014, ██████, ██████, and ██████ discussed in a group chat two individuals named ██████ whom they knew through a mutual friend. ██████ explained that he learned both had traveled overseas to Syria to fight and had been killed. ██████ and ██████ discuss how they hoped ██████ were both shaheeds, that Allah would join them together in Jannah (paradise), and that ██████ "beat us too [sic] it." ██████ followed with a prayer that Allah would shower them "with [the] patience we need to make it."

75. Your affiant is aware that ██████, ██████, ██████, ██████, W-3, W-4, W-5, and another associate participated in various group message chats using MA1, MA2, and text/multimedia message services for multiple years. The communications included regular

31

sharing of material produced by ISIS, S-1, and other ISIS-aligned media, the content of which ranged from propaganda videos and religious justifications to operational security and day-to-day updates from ISIS-controlled territory.

76.     During an interview of ▓▓▓▓ on October 25, 2019 in the District of Columbia, ▓▓▓▓ initially stated that ISIS was not discussed in the ▓▓ chatroom. ▓▓▓▓ followed up that S-1 never spoke about ISIS in offline, private sessions, or in meetings with people while ▓▓▓▓ was present. ▓▓▓▓ later clarified it was her understanding that when S-1 spoke about ISIS, it was to provide information and explain the purpose of having an Islamic State, not to support the violence that was occurring or the terrorist organization. ▓▓▓▓ said she did not recall if the ▓▓ chatroom expressed support for people traveling to join ISIS or support for its leader, Abu Bakr al-Baghdadi. ▓▓▓▓ said she was not aware if S-1 had private conversations encouraging people to make hijrah to ISIS.

77.     Furthermore, ▓▓▓▓ stated that she never shared ISIS-produced media nor did she know any media they produced. ▓▓▓▓ also stated she did not recall sharing ISIS videos among herself, ▓▓▓▓, and ▓▓▓▓ with the exception of what was on the news.

78.     On July 24, 2018, ▓▓▓▓ was interviewed by FBI Agents ▓ the Dulles International Airport in Dulles, Virginia. During the interview, in the context of discussing ISIS propaganda videos, ▓▓▓▓ said most of his friends were against it. ▓▓▓▓ clarified that his view of ISIS was "bad" and that they were "completely wrong." When asked if he had ever distributed ISIS propaganda videos, ▓▓▓▓ responded, "No, not to my knowledge." When asked if he had ever encouraged anyone to view propaganda or to support a foreign terrorist organization, ▓▓▓▓ again responded, "No."

79. On or about August 23, 2018, ████████ was again interviewed by FBI Agents ████████████████████████████ ████████ reiterated that he did not remember ever sharing propaganda videos in support of ISIS and did not know anyone that had done that, including his "smallish circle of friends," which he explained included ██████ and W-5. ████████ again answered, "No" when asked if he had ever communicated with anyone who wanted to go to Syria to fight for ISIS. ████████ stated that he definitely understood the question and he believed he would definitely remember if he said it. When ████████ was asked if ████████ ever expressed a desire to fight jihad, ████████ said, "Uh, not really to my knowledge." ████████ was asked if ████████ ever expressed a desire to fight on behalf of ISIS, and ████████ said, "Not that I remember." ████████ continued that their goal was pretty much to learn the [Arabic] language and "live under Muslims or something like that."

80. Based on the foregoing, your affiant believes ████████, ████████, and ██████ have all knowingly made false statements regarding their dissemination and consumption of media produced by ISIS and S-1, as well as their knowledge of plans to make hijrah to join ISIS. As discussed above, these individuals, and other persons who were part of their ISIS sympathizing groups, had multiple Twitter accounts through which they regularly accessed Twitter accounts belonging to ISIS supporters, which they then used to view, share and distribute ISIS propaganda. Furthermore, based on the number of instances in which material derived from Twitter was shared among the group, your affiant believes the accounts which are the subjects of this search warrant will contain evidence to prove the violations of federal law as noted above.

## IDENTIFICATION OF TARGET ACCOUNTS

**Twitter User @*Hijabi_z* (ID ▮▮▮▮▮▮▮▮)**

81.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ▮▮▮▮▮▮ as "Hijabi_z" and an account creation date of July 27, 2015.  The Twitter account was registered with email account ▮▮▮▮▮▮▮▮▮, which itself was registered to an ▮▮▮▮ ▮▮▮▮▮▮ using ▮▮▮▮▮▮ cell phone number and Gmail address.  FBI review of the ▮▮▮▮▮▮ Twitter page on or about December 18, 2019, revealed one public post on July 31, 2015, featuring an advertisement poster for a "Beware of Oxymorons" lecture by S-1.

82.     A few days later, on July 31, 2015, ▮▮▮▮▮ was communicating with ▮▮▮▮▮▮ via an online instant messaging service.  In response to ▮▮▮▮▮ asking if ▮▮▮▮ heard about the "events in afghanistan," ▮▮▮▮▮ responded that she had heard, and S-1 had made the announcement a long time ago on Twitter.  ▮▮▮▮▮ followed that she was now on Twitter and provided the URL link to her account, ▮▮▮▮▮▮▮▮▮▮ which features the same username identified in the aforementioned legal process, "▮▮▮▮▮."

**Twitter User ▮▮▮▮▮▮▮▮▮ (*ID* ▮▮▮▮▮▮)**

83.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ▮▮▮▮▮▮ as ▮▮▮▮▮▮▮ and an account creation date of April 4, 2014. The Twitter account was registered to an email account that is known to be used by S-1 [30].

84.     FBI review of files provided by Google in response to a search warrant revealed an email conversation between ▮▮▮▮▮ and SUSPECT 8 ("S-8").  The email contained a

---

[30] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Google accounts used by or associated with S-1 and/or ▮▮▮▮. The accounts included S-1's email address referenced here.

34

forwarded message of a conversation between S-8 and another ███ Administrator in which S-8 sent a link to the Twitter account. ████████████████ S-8 explained that the Twitter account had been set up by "████", whom your affiant knows to be ████████, and that "Shaikhs [sic] been giving her quotes to tweet." S-8 further explained that the account was currently in her (████████) name and she wanted that changed. S-8 forwarded this conversation to ████████ on September 1, 2014, and ████████ responded with the email address registered for **Twitter User ID** ████████ and what your affiant believes was the password.[31]

85.     FBI review of the ████████████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use. Public posts by users directed towards ████████████ were still visible, however, and the content of the posts included questions about the khilafa, the situation in Sham and Iraq, and what appear to be quotations by ████████████ such as "Allah has blessed us with a #caliphate to eradicate #shiites like u MB the way we erdicate cockroaches, rats and flies."

**Twitter User** ████████████ **(ID** ████████**)**

86.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as ████████ and an account creation date of December 21, 2014. As noted above, ████████ informed ████████, ████████, W-3, and W-4 about the new Twitter

---

[31] As discussed herein, in January 2018 ████████ told FBI Agents in an interview that she was an ██ Administrator over the prior year (2017), and her involvement varied prior that. Your affiant believes ████████ was instrumental in establishing and maintaining multiple social media accounts as an Administrator for the ██ chatroom, and this activity began occurring in ██ least 2014.

account on the same day it was opened. When W-3 asked why S-1 made a new Twitter, ███████ responded, "Kuffar closed it down."

87. FBI review of the ███████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use. Public posts by users directed towards ███████ were still visible, however, and included comments about S-1's account having been shut down again, al-Baghdadi not being the true Khalifa, and what your affiant believes to be a discussion about Boko Haram pledging bayat to ISIS.

**Twitter User** ███████ (**ID** ███████)

88. Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ███████ as ███████ and an account creation date of August 7, 2010.

89. FBI review of the ███████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use. Public posts by users directed towards ███████ were still visible, however, and included comments about the legitimacy of the khalifa, a greeting to S-1, and a call for Twitter to shut down the ███████ account for posting beheading pictures and calling for the murder of homosexuals.

90. Search records provided by Google indicated that ███████ account accessed this Twitter page ███████ on October 21, 2016. Your affiant notes that this webpage was accessed within a few minutes of searching for instructions on signing up for Paltalk, and your affiant believes ███████ may have been working on Administrator activities associated with Paltalk and Twitter accounts. Shortly after accessing the Twitter page, the ███████ account began searches for "how much does the taliban control in Afghanistan" and "abu musab al-zarqawi". Your affiant believes there will be evidence on this account related

to false statements made by ████████ to law enforcement about whether she was aware that S-1's statements about ISIS were limited solely to explaining the purpose of having an Islamic State.

**Twitter User**████████████████ *(ID* ████████*)*

91.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as "Authentictawhed" and an account creation date of March 9, 2015.  The account was registered to an email address belonging to S-1, using S-1's honorific and last name.

92.     On April 21, 2016, S-1 sent ████████ an email with the subject line reading "the notes" and appeared to be the notes from a recent lecture, which were "typed live by ████".  Following the Question and Answer section, a link to the ██ chatroom's Twitter account was posted, ████████████████████████  Shortly after the link to the Twitter page, the notes contained numerous references to resources associated with Abdullah Azzam, whom your affiant notes was a teacher and mentor of Osama bin Laden, Abu Muhammad al-Maqdisi, who mentored Abu Musab al-Zarqawi (the leader of al-Qaida in Iraq, the progenitor to ISIS),[32] and Anwar al-Awlaki.

93.     FBI review of the ████████████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use.  Public posts by users directed towards ████████████ were still visible, however, and included a question

---

[32] Your affiant notes that despite a later ideological split between Abu Muhammad al-Maqdisi and Abu Musab al-Zarqawi, al-Maqdisi remained a powerful voice in promoting jihad.  Your affiant further notes that in a two-part lecture series in February 2015 titled, "Debunking the Letter of the Wicked Scholars to Amirul Muhmineen" (discussed below), S-1 called al-Maqdisi a "broken idol" for not supporting the dawla. The notes for this lecture, which were typed by ████, stated simply, "If you don't support the jihad of the Dawla, you do not support the dawla."



about "Sharee'ah" law in ████, a reference on June 21, 2015 to "evil scholars,"[33] and a

comment referencing S-1 by name.

94.     Based on ██████████ past activity in administering social media profiles on behalf

of the ███ chatroom and a likely reference to a lecture which ██████████ directly assisted in

producing, your affiant believes there will be evidence on this account relating to false statements

made by ██████████. Namely, ██████████ told FBI Agents that S-1 did not speak in the ███

chatroom about support for ISIS nor its leader, Abu Bakr al-Baghdadi.

**Twitter Use** ██████████████ **(ID** █████████**)**

95.     Subscriber records provided by Twitter identified the screen name of Twitter **User**

**ID** ████████ as ██████████████ and an account creation date of June 23, 2015.  The account

was registered to the same email address listed by S-1 as a recovery email for his

██████████████ email account, which was the subject of a search warrant issued by this

Court on August 2, 2019, referenced above.

96.     FBI review of search warrant returns for Facebook account Authentic Tawheed and

UID ████████████ (registered to ██████████████ and Telephone number

+████████, both known to have been used by ████████) revealed that on or about June 23,

---

[33] On or about February 14 and 16, 2015, S-1 delivered a two-part lecture series titled, "Debunking the Letter of the Wicked Scholars to Amirul Muhmineen."  During the lecture, S-1 refuted a letter written by Islamic scholars in September 2014 in which they condemned ISIS and Abu Bakr al-Baghdadi.  S-1 discussed how these scholars' character was not Islamic and if someone rejects the dawla because he thinks the tawheed (belief in the oneness of Allah) is wrong, he is a kaafir (disbeliever).  The notes were typed live by ███.

[34] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Facebook accounts used by or associated with S-1 and/or ████████. In response to the warrant, Facebook provided this post among others.

[35] Google provided records for ████████ ██████████████ account pursuant to the aforementioned search and seizure warrant issued by the Honorable G. Michael Harvey of the United States District Court for the District of Columbia on August 2, 2019.

2015 the following message was posted to the Authentic Tawheed Facebook page: "The latest Tweets from [S-1's title and last name] ███████████ AS SALAAMU ALAIKUM YOU CAN NOW FIND [S-1's title and last name] ON TWITTER HERE >> ████████████████ OLD ACCOUNT WAS DISABLED. PLEASE FOLLOW NEW TWITTER ACCOUNT." Additionally, FBI review of search warrant returns for a Facebook username containing S-1's first and middle names and correlating UID revealed that on or about June 24, 2015 the following message was posted to that aforementioned Facebook page: "The latest Tweets from [S-1's title and last name] (@████████████)." FBI review of the ███████████ Twitter page on or about January 8, 2020, revealed the account was suspended by the site, potentially for violating terms of use.

**Twitter User** ███████████ **(ID** ███████**)**

97.     Subscriber records provided by Twitter identified the screen name of **User ID** ███████ as ███████████" and an account creation date of January 5, 2016.  The account was registered to ███████ email address ███████████

98.     FBI review of search warrant returns for Facebook account ███████████ and UID ███████████ (registered to ███████████ and Telephone number +███████, both known to have been used by ███████ ███████) revealed that on or about January 5, 2016 the following message was posted to the Authentic Tawheed Facebook page:



99.     FBI review of the ███████████ Twitter page on or about January 9, 2020, revealed the account was suspended by the site, potentially for violating terms of use.

**Twitter Users @*Sulaymansk1 (ID* ████████*) and* ██████████████████████**

100.    Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as ████████████ and an account creation date of September 2, 2014.  The account was registered to ████████████ Google email address.

101.    Similarly, subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████████████████ and an account creation date of June 9, 2017.  The account was registered to ████████████ telephone number + ████████████.  Your affiant notes that "Abu" is a term used to signify the "father of…", and ████████████ ████████████.

102.    As noted above, ████████████ suggested associates access Twitter for information about ISIS and also shared some of this material himself.  FBI review of the ████████████ Twitter page on or about December 18, 2019, revealed the account was suspended, potentially for violating terms of use.  FBI review of the ████████████ Twitter page on or about February 24, 2020, revealed an account with a profile picture of a roaring lion with the quote, "May the eyes of cowards never sleep" which was attributed to Khalid Ibn al-Walid, a famous 7th century Arab military general.  The account had five followers and followed 56 others, including various news organizations, terrorism researchers and journalists, ████████████ account ████████████ and an account dedicated to the teachings of Abdullah Azzam.  As discussed above, ████████████, ████████████, and ████████████ regularly shared ISIS media on numerous occasions with each other and their associates, and a significant volume of this material this material was derived from Twitter.  Given this history, your affiant believes ████████████ Twitter accounts will contain

evidence related to the false statements made by ████████ and ████████, that they did not, nor did they known of anyone, to distribute, ISIS materials and propaganda.

**Twitter User** ████████████████████████████████

103.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████████████████████████ and an account creation date of July 15, 2016. The account was registered to ████████ email address and telephone number.

104.     FBI review of the ████████████ Twitter page on or about February 24, 2020 revealed an account with a profile picture of a lion. The cover photo of the account included the quote, "We don't surrender, We win or die" which was attributed to Omar al-Mukhtar, an early 20th century Arab general who led an Arab resistance movement against European colonial powers in Libya, Chad, and Egypt. The account had approximately seven visible tweets, including a Retweet of a user on October 19, 2016, stating, "O Allah, grant victory to Ahl-us-Sunnah in Iraq, empower them with the truth and empower the truth with them." #MosulAid #Mosul_Offensive. Your affiant is aware that in or around this time, coalition forces had launched an offensive to recapture positions of ISIS in Mosul and the surrounding region. ████████ ████████████ Twitter page had six followers (including ████████ ████████ and ████ @████████ accounts) and followed 68 others.

**Twitter User** ████████████ *(ID* ████████*)*

105.     Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████ as ████████ and an account creation date of December 13, 2011.  The account was registered to an email address your affiant believes to be used by W-5.  This same email address was used to register W-5's Facebook account and was stored in W-4's phone as W-5's email address.  As noted above, W-5 was involved in group messages with ████████,

██████, ██████, W-3 and another associate, which included its members, including W-5, disseminating ISIS-related material which was derived from Twitter. Evidence of the use of W-5 Twitter account, including ISIS-related material that may have sent and/or received from this Twitter account, is therefore directly relevant to whether ██████ and ██████ were aware of persons (W-5) who distributed ISIS material and propaganda when they made their statements to grand jury (██████) and law enforcement (██████).

**Twitter User** ██████ (***ID*** ██████)

106. Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ██████ as ████████████████████████████ The account had an account creation date of December 13, 2011, and was registered to W-4's email address. During W-4's appearance before the Grand Jury, W-4 explained that it was aware ██████ and ██████ were going to Twitter for information about the Islamic State. As discussed above, W-4 and ██████ were part of conversations that discussed W-4 moving to ISIS territory, and ██████ and ██████ both provided the group with Twitter links or references to material by S-1 and ISIS. Your affiant believes W-4's Twitter account may contain ISIS material sent to it by others, including ██████ and ██████, which directly relate to their false statements to law enforcement.

**Twitter User** ██████ (***ID*** ██████)

107. Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ██████ as a variation of W-3's first name followed by a number. The account had an account creation date of January 22, 2016. The account was registered to an email address used by W-3. As noted above, W-3 was involved in group messages with ██████, ██████, ██████, W-5 and another associate, which included the dissemination of ISIS-related material,

some of which was derived from Twitter. W-3 also confirmed it used its Twitter account to find ISIS propaganda, and that it sent links of this propaganda to the group, including ███████. Your affiant believes W-3's Twitter account will contain evidence and records of the distribution of ISIS material.

**Twitter User** ████████████████████

108.    Subscriber records provided by Twitter identified the screen name of Twitter **User ID** ████████████████ and an account creation date of October 28, 2016. The account was registered to ████████ Google email address. As discussed above, your affiant is aware that members of the group, including ██████, distributed ISIS propaganda that they obtained from Twitter, and this account will likely contain records of such dissemination. This evidence is directly relevant to ████████ and ████████████ false statements.

109.    On September 4, 2019, Twitter was served with a preservation request letter under 18 U.S.C. § 2703(f) related to Twitter accounts with User IDs: ████████████████████ ████████ ; ████████ ; ████████ ; ████████ ; ████████ ; ████████ ; ████████ ; ████████ ; ████████████████ The preservation request letter was re-submitted on December 5, 2019.

110.    On December 12, 2019, Twitter was served with a preservation request letter under 18 U.S.C. § 2703(f) related to Twitter account with Username ████████████.

111.    On January 3, 2020, Twitter was served with a preservation request letter under 18 U.S.C. § 2703(f) related to Twitter account with Username ████████████.

112.    On January 8, 2020, Twitter was served with a preservation request letter under 18 U.S.C. § 2703(f) related to Twitter accounts with Username ████████████.

## BACKGROUND CONCERNING TWITTER

113.    Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users create and read 140-character messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve. These features are described in more detail below.

114.    Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

115.    Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

116.    A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

117.    Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp ▮ the time the user accessed his or her profile.

118.    As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's own Tweets, as well as a list of all Tweets that include the user's username (i.e., a list of all "mentions" and "replies" for that username).

119.    Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

120.    Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations ▮ the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

121.    When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

122.    A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are

following that user (i.e., the user's "followers" list) and a list of people whom that user follows (i.e., the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

123.    In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

124.    Twitter users can configure the settings for their Twitter accounts in numerous ways. For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

125.    Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

126.    Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

127.    If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

128.    In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

129.    As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the

account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner. Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation. For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

130. Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

131. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Tejpal S. Chawla, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

132.    Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is a court of competent jurisdiction as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court has jurisdiction over the offense(s) being investigated 18 U.S.C. 1343, 18 U.S.C. 1001(a)(2) and 18 U.S.C. § 1623.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

133.    The government will execute this warrant by serving the warrant on Twitter. Because the warrant will be served on Twitter, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

134.    The government further requests to share the information obtained from this search (to include copies of digital media) with any government agency investigating, or aiding in the investigation of this case or related matters.

Respectfully submitted,

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 3, 2020.

Deborah A. Robinson
2020.04.03 12:42:03
-04'00'

DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

49