# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES MAGISTRATE JUDGE
# U.S. DISTRICT COURT BUILDING
# WASHINGTON, D.C.

PLEASE ISSUE: ☐ Arrest  ☑ Search  ☑ Seizure

warrant for:    IN THE MATTER OF THE SEARCH OF INFORMATION
                ASSOCIATED WITH FIVE ACCOUNTS STORED AT PREMISES
                CONTROLLED BY FACEBOOK PURSUANT TO 18 U.S.C. § 2703
                FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1512

Violation:  ☐ D.C.C.  ☑ U.S.C.     Title:  18

Section(s):  1343, 1001(a)(2), 1512

_____/s/_____        ___4/3/2020_____
Tejpal S. Chawla                     Date
Assistant United States Attorney
(202) 252-7

═══════════════════════════════════════════════════════════════

COMPLETE FOR ALL ARREST WARRANTS:

*The following information **must** be provided for **ALL** arrest warrants and an **original** and **duplicate** of this form must be submitted to the Clerk's Office with the warrant papers.*

Officer / Agent Name:  ███████████████████

Badge Number:  ████████████

Agency / Unit:  ████████████████████

24 Hour Telephone Number:  ██████████████████
 (For officer/agent)

Cellular Number:  ████████████
 (For officer/agent)

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH<br>FIVE ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK<br>PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF<br>18 U.S.C. § 1512 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 20-sc-00732 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, hereby incorporated by reference

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1001(a)(2) | Material False Statements in an Investigation Involving International Terrorism |
| 18 U.S.C. § 1512 | Obstruction of Justice- Witness Tampering |

The application is based on these facts:

See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is ████████████████████████

████████████████████████

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 04/03/2020 _____

_____
*Judge's signature*

City and state: Washington, D.C.

Deborah A. Robinson
*Printed name and title*

Case 1:22-gc-00739-BAH *SEALED* Document 1 Filed 04/03/20 Page 4 of 31

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  20-sc-00732 |
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH | ) |
| FIVE ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK | ) |
| PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF | ) |
| 18 U.S.C. § 1512 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____April 17, 2020_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Deborah A. Robinson_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    04/03/2020_____

City and state:    Washington, D.C._____        U.S. Magistrate Judge Deborah A. Robinson
*Judge's signature*
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

<table>
<tr><td colspan="3" align="center">**Return**</td></tr>
<tr><td>Case No.:<br> 20-sc-00732</td><td>Date and time warrant executed:</td><td>Copy of warrant and inventory left with:</td></tr>
<tr><td colspan="3">Inventory made in the presence of :</td></tr>
<tr><td colspan="3">Inventory of the property taken and name(s) of any person(s) seized:<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br></td></tr>
</table>

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

                    _____
*Executing officer's signature*

                    _____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Facebook, Inc. accounts identified by Facebook User IDs  ██████████, ██████████, ██████████, ██████████, *and Instagram Account* ██████████ *User ID* ██████, and which is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.   **Information to be disclosed by Facebook, Inc. ("Facebook") to facilitate execution
of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any records that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.   For the time period **from May 16, 2019 to the Present**: The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all Facebook services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.   For the time period **from May 16, 2019 to the Present**:  All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.      Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d.      For the time period **from May 16, 2019 to the Present**:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e.      For the time period **from May 16, 2019 to the Present**:  All "check ins" and other location information;

f.    For the time period **from May 16, 2019 to the Present**:  All records pertaining to communications between Facebook and any person regarding the Account, including contacts with support services and records of actions taken;

g.    All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN").

h.    All information held by Facebook related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-Facebook based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.    All information held by Facebook related to any financial transactions, financial records, or documentation, including credit card information, account information, receipts, notes, and ledgers.

Within **14 days** of the issuance of this warrant, Facebook shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



## II. Information to be seized by the government

All information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of **Title 18 U.S.C. §1343, Wire Fraud, Title 18 U.S.C. § 1001, Material False Statements involving international terrorism, Title 18 U.S.C. §1512, Obstruction - Witness Tampering**, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Any records, discussion, records, photographs, or information related to support of designated foreign terrorist organizations and entities (FTOs), including, but not limited to, ISIS and S-1;

(d) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(e) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(f) Any records, communications, photographs, documents, logs, media files, or attachments made or sent by the Account user regarding Grand Jury testimony or information provided by witnesses to the Government;

(g) Any records, communications, photographs, documents, logs, media files, or attachments relating to statements made by the Account user regarding on-line chat

███████████████████████████████████████████████████

(h) Records, communications, drafts, videos, photographs and other material that is communicated through on-line chat rooms, social media platforms, or video-sharing websites;

(i) Records, communications or other material that discuss a pending grand jury, criminal investigations by the FBI, and/or the identity or location of potential witnesses;

(j) All records, communications, drafts, or other material that discuss ISIS; any FTOs; terrorist attacks, actions, communications, or planning; foreign terrorist organizations, or persons who have ever sought to travel to ISIS territory;

(k) All records, communications, documents, material, videos, and posters related to operation of S-1's on-line chat room, social media platforms, and the communications of all administrators;

(l) Evidence of solicitation of money or re-distribution of solicited money;

(m) Information that constitutes evidence concerning fundraising, transfer of money, conversion of money, concealing information about transactions, wire fraud or

other financial fraud by the Account user, persons communicating with the Account user, or others connected to S-1;

(n) Evidence related to the deletion, removal or destruction of possible evidence of possible criminal activity, including electronic information (including user-generated content and content which the user received), phones, computers, files, documents, photographs or other media;

(o) Records of or information about Internet Protocol addresses associated with the Account and its activity;

(p) Records, communications, drafts, photographs, videos, or other material that discuss traveling overseas to live in a country where ISIS was present, join a foreign terrorist organization, or avoid detection by law enforcement;

(q) Records, communications, drafts, videos, photographs and other material that is communicated through on-line chat rooms, social media platforms, or video-sharing websites that host or contain content produced by S-1, ISIS-affiliated organizations, or any other foreign terrorist organization;

(r) Information related to financial information, accounts, ledgers, and access to monetary instruments, goods, and funds, including use of intermediaries to disperse or collect funds and goods;

(s) Evidence related to the Account user's deletion of electronic information, including emails, documents, receipts, and transactions related to S-1 or any person connected with S-1; and,

(t) Evidence related to the Service Provider's deactivation of accounts, where applicable, and the Terms of Service which were violated.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); draft or deleted records; and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## III.  Government procedures for warrant execution

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.  The review of electronic data produced by Facebook in response to this warrant may be conducted by any government personnel assisting the investigation, who may include, in addition to law enforcement officers and agents, analysts, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody, control of attorneys for the government and their support staff for their independent review.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.       such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                            Signature

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FIVE ACCOUNTS STORED AT
PREMISES CONTROLLED BY
FACEBOOK, INC. PURSUANT TO 18
U.S.C. § 2703 FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. § 1512

Case No. 20-sc-00732

**Filed Under Seal**

*Reference: USAO* ███████ *Subject Accounts: Facebook User IDs* █████████,
████████, █████████, *and Instagram Account
with User ID* █████████

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, ████████████████████████████████ being

first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with four Facebook accounts – that is, User IDs ████████,

████████, ████████, and ████████ – stored at the premises owned,

maintained, controlled, or operated by Facebook, Inc., an electronic communications services

provider and/or remote computing services provider which is headquartered at / which accepts

service at 1601 Willow Road, Menlo Park, California.  Additionally, this application for a search

warrant requests information associated with the Instagram account ████████ **User ID**

████████) that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc.

The information to be searched is described in the following paragraphs and in Attachment A.

This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),

2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook, Inc. ("Facebook" or the "Provider") to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that ███████████████ ████████ has committed violations of 18 U.S.C. §1343 (Wire Fraud), 18 U.S.C. §1001(a)(2) (material false statements in an investigation involving international terrorism); and violations of 18 U.S.C. § 1512 (Obstruction of Justice—Witness Tampering) have been committed by ████████████████████████████████████████████████████ ██████████ There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## **JURISDICTION**

5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C., *see* 18 U.S.C. § 3237. Additionally, ████████████████████████████, and the

3

criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district.  *See* 18 U.S.C. § 3238.

7.     When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

## STATUTORY VIOLATIONS

### Wire Fraud

8.     Title 18, United States Code Section 1343 criminalizes knowingly devising a scheme for obtaining money by means of false pretenses or causes to be transmitted by means of wire in interstate commerce any signals for the purpose of executing such scheme. 18 U.S.C. §1343.

### Material False Statements Involving International Terrorism

9.     Title 18, United States Code Section 1001 criminalizes knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the executive branch of the United States.  18 U.S.C. §1001(a)(2).  If the matter involves domestic or international terrorism, the maximum penalty is eight years incarceration.

### Obstruction -- Witness Tampering

4

10.     Title 18, United States Code Section 1512 criminalizes knowingly and corruptly persuading another person, or attempting to do so, with the intent to cause the person to withhold testimony from an official proceeding. 18 U.S.C. § 1512.

## PROBABLE CAUSE

### Background on ISIS and Its Internet Recruitment Efforts

11.     The FBI has been investigating the use of the Internet and social media by foreign terrorist groups, including the Islamic State and al-Sham ("ISIS").  On or about October 15, 2004, the U.S. Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawhid wa'al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under section 1(b) of Executive Order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the INA and as a SDGT entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added a number of aliases to the ISIL listing, including: The Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production (collectively referred to herein as "ISIS").  On September 21, 2015, the Secretary added the following aliases to the FTO listing:  Islamic State, ISIL, and ISIS. ISIS remains a designated FTO.

12.     Based on your affiant's training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, traveled to Syria and Iraq to join

ISIS, an act they commonly refer to as "hijrah"[1]; (b) foreign fighters commonly entered Syria by crossing the border from Turkey or Jordan; (c) foreign fighters from Western countries traveled to locations in Turkey, including Istanbul, and then traveled to towns closer to the border where they were brought into Syria to join ISIS; (d) Abu Bakr al-Baghdadi was the leader (or "Caliph") of ISIS before he was killed by U.S. forces on or about October 26, 2019; (e) since on or about September 22, 2014, ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and its leadership gave blanket approval for this indiscriminate killing by individuals residing in these countries.

13.    To gain supporters, recruit fighters, and raise funds, ISIS spreads its message of violent jihad[2] using social media platforms, such as Twitter, Facebook, YouTube, Instagram, and Paltalk. On these platforms, ISIS advocates post audio and video files that include recruitment messages and updates of events in Syria and Iraq. Online chat rooms controlled by ISIS advocates further effectuate this support.

14.    One such online community was  which contained audio of speeches made by SUSPECT 1 ("S-1").  S-1 was

---

[1] Based on my training and experience, I know "hijrah" generally means migrations, and in this context refers to travel to engage in jihad.

[2] Based on my training and experience, I know "jihad" is an Arabic word which literally means striving or struggling, but in this context it refers to a holy war, fight, or struggle against the enemies of Islam.

numerous statements inciting violence and supporting ISIS, its former leader al-Baghdadi, al-Qaeda, and Osama bin Laden. contained recorded lectures of S-1 proselytizing on behalf of and in support of ISIS. I have viewed the ████ site and am familiar with its contents and organization.

15.    S-1 is not a U.S. person

---

[3] Your affiant understands this document to be an official marriage registration in ████.



**Role as an ▮▮▮ Administrator**

18.     On or about March 20, 2014 ▮▮▮▮▮ received an email welcoming her as a new AT Administrator and assigning her the moniker ▮▮▮▮▮▮▮▮▮).[4] ▮▮▮▮▮▮

▮▮▮▮▮▮▮ was advised that lying to the FBI would constitute a violation of federal law, and in that interview she initially told the FBI Agents that, "I was not an Administrator ▮▮▮

▮▮▮▮ later acknowledged she would sometimes help in the class and login with an ▮▮

Administrator account.   Later in the interview, ▮▮▮▮ admitted that she was an ▮▮

Administrator often over the past year, and that her involvement varied prior to that.  As an

Administrator, she stated that she would take notes and post them on the ▮▮ website, post Quranic

verses and find hadith[5] during lectures, as well as, advertise the lectures on social media for S-1.

19.     ▮▮▮▮▮▮▮▮▮▮▮ W-2[6] indicated that it visited the online

AT chat room. ▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Google accounts used by or associated with S-1 and/or ▮▮▮▮. In response to the warrant, Google provided this email among others.

[5] "Hadith" is a collection of traditions containing sayings of the Prophet Muhammad that is one of the major sources of guidance for Muslims.



A ████████ W-2 reported that the primary AT Administrator used the kunya,[7] ████████ ████████ ████████ stated in an interview with FBI Agents that ████████████ was a name she used on social media and/or communication accounts. Service provider records confirmed this fact. As such, your affiant believes that ████████ used the moniker ████████ ████████ when serving as an ██ Administrator for S-1.

21. W-2 further indicated that ████████ was essentially S-1's secretary and was aware of S-1's activities. W-2 also described ████████ as the lead Administrator in the ██ chat room. W-2 explained that ████████ handled all of S-1's correspondence, designed online posters to advertise ██ lectures, facilitated lectures, coordinated the posting of hadith and Quranic verses in the chat room, monitored ██ chat room discussions, and posted audio of ██ lectures to the ████ website.

22. ████████ was also actively involved in fundraising and collecting donations for the operation of the ██ enterprise. On January 5, 2016, a local law enforcement agency advised the FBI that during an ██ discussion on December 21, 2015, a user name known to be associated with S-1 posted the following: "according to Shariah we kill apostates" and "If they turn back from Islam then kill them. Surah 4:89". Later in the same chat room, an individual believed to be another AT Administrator posted the following solicitation for funding, "DONATE TO THE

---

[7] "Kunya" is a term that can be used to describe a nickname or an honorary Islamic name for someone.

DAWAH[8] OF [S-1]- EMAIL TO:::: [Email Address 1] - TO ASK FOR DIRECTIONS ON HOW TO USE [MONEY TRANSMITTING SERVICE 1 ("MTS1")] OR [MONEY TRANSMITTING SERVICE 2 ("MTS2")]::::::JZK[9]".

23.     Further, on January 25, 2016, a local law enforcement agency advised the FBI that on January 18, 2016, ███████████████████████████████████████████████ ████████████████████████████████████ During this conversation S-1 asked the ███████ to send money to ██████████ using a specific money transmitting service, hereafter referred to as "MTS1," under S-1's ██████ name, which S-1 identified as █████████████████ Excerpts of the conversation are as follows:

UCE: shaikh i would like to make donation for the dawa what is the best way?

S-1: the best way is via [MTS1]

S-1: send it to m█████████████

S-1: her name is:

okay insh Allah

S-1: how much u are planning to send

██████o i need an account number or just send it in her name insh Allha?

S-1: no account no needed

_____

[8] "Dawah" (variation "dawa") means the proselytizing or preaching of Islam.
[9] "JZK" is often used as an abbreviation for "*JazakAllah Khair*", which is an Arabic phrase meaning "May God reward you."

10

24.     Your affiant is aware that similar solicitations for donations occurred regularly in the ██████ chat room.  In fact, shortly after becoming an administrator in March 2014, ████████ sought to expand the funding base of AT to include other social media platforms.  On June 7, 2014, ████████ sent an email to an individual using the nickname ████████████████ ████████ suggested they begin posting for donations on Facebook, Twitter, the blog, and in the Paltalk chatroom.  ████████ acknowledged in the email that in a separate conversation, another ██ Administrator advised her she would need S-1's permission to make this expansion because he believed the public solicitation for donations could cause the freezing of S-1's latest MTS1 and MTS2 accounts.  A review of ████████ emails identified an earlier email on June 3, 2017, in which this ██ Administrator advised ████████ that she would need "Shaikh's" approval prior to publically soliciting for donations due to concerns that the Shaikh's "latest" accounts may get frozen.  ████████ responded to the other ████ administrator that it was "a dilemma".

*MTS1 and MTS2 Financial Records for* ████████.

25.     Since April 2, 2012, S-1 has been blocked or interdicted by MTS1 from using its services.[11]  The FBI's review of records provided by MTS1 in January 2018 indicated that from in or about November 2014 to December 2016, ████████ appeared to have received

---

[10] Your affiant is aware the term "Muqatil" can be translated to mean "fighter" or "combatant" and often refers to a combatant in the military context.  The nickname was associated with the email account, and email service provider records revealed multiple exchanges in which S-1 identified himself by name and instructed recipients to use this email address because he did not trust his other account, which your affiant believes is in reference to an account using an honorific and S-1's last name.



approximately $24,000 through approximately 97 separate transactions via MTS1 while residing in ███████ with S-1. These payments were from various senders in the United States, United Kingdom, and Canada, among other countries. MTS1 records indicated that ███████ utilized approximately three different forms of her own identification at approximately 16 different locations throughou ███████ to pick up these funds. Your affiant believes based on S-1's online fundraising efforts and ███████ role as an ███████ Administrator and S-1's ███████ the wire transfers sent to ███████ were sent to, or on behalf of, S-1. MTS1 indicated that it "interdicted," or blocked, ███████ from using its money transfer services in or around December 2016 because MTS1 assessed ███████ activity to be consistent with terrorist financing.

26.     MTS2's records revealed that S-1 was blocked from using its services following the OFAC's designation of S-1 in or around December 2017. MTS2 indicated S-1 was put on a watch list maintained by a third party vendor in 2004 as a result ████████████████████ ████████████████ however, MTS2 did not subscribe to this watch list at the time. The FBI's review of records provided by MTS2 indicated that from in or about August 2014 to December 2016, ███████ appeared to have received approximately $1,250, via MTS2. These payments were from senders in different countries. MTS2 records further indicated that the recipient (███████) utilized three different forms of her own personal identification to receive these payments.

*FBI Interview of S-4 about money transfers to* ███████

27.     The FBI conducted voluntary interviews of S-4 in July and August 2017. In those interviews, S-4 was asked about its contacts and financial support of S-1, and S-4 made numerous false statements about its contacts with S-1, and denied providing any money to S-1 directly or indirectly through other persons. ████████████████████████

12



███████████████████████████████████████████ S-4

is one of the individuals who sent money to ███████ using MTS1. During a subsequent

interview with FBI Agents and Assistant United States Attorneys ████████████████████

████████████ S-4 stated that it contacted S-1 in 2016 and asked if it could send money to S-

1. S-4 stated that S-1 instructed it to send money to ███████ using MTS1 because

███████ name was "clean." S-4 understood the term "clean" to mean that ███████ was

not a terrorist and the transaction to S-1 would be completed successfully if sent through

███████.

28.     A review of S-1 email records obtained from legal process revealed that on June

5, 2016, S-4 emailed S-1: "Salaam, I would like to give donation of 50 dollars whichever way

possible. Its what I can afford to do as of now, I know its not much. How would I go about doing

so?" On June 5, 2016, S-1 responded: "wa alaikum salam wrwb. You may send it via [MTS1] to

my wife's name ███████████████████ w.i.. Pls use your real name to send it in

case of a hiccup u can claim your money back ███████████ name is clean so you shud be fine

insha allah. What city do u live in I forgot?"

29.     The FBI's review of records provided by MTS1 in January 2018 revealed two

transactions in June 2016 and December 2016, in which S-4 sent by wire approximately $50 and

$300, respectively, to ████████.

30.     S-4 stated it did not know if S-1 was being watched by law enforcement

authorities, and indicated that it also communicated directly with ███████ via a messaging

application (hereinafter "MA1"), which utilizes a mobile electronic device and the internet. S-4

also told the FBI that it sent MA1 messages to ███████ at what it believed to be ███████

cellular phone. Your affiant is aware that persons who engage in criminal activity will often

13



attempt to hide or obscure their financial transactions through friends, confidants, or family members to avoid detection by law enforcement.  MTS1 also indicated that it blocked another attempted transaction with S-4 to S-1, through ███████ on April 6, 2017.

*FBI Interview of* ███████ *about financial transactions on January 25, 2018*

  31. During ███████ voluntary interview with FBI Agents ███████████ ██████████████████████████████ ███████ stated that S-1 had a bank account in ██████, but "they closed it down."  When asked if ███████ ever had a bank account closed or a financial transaction blocked, ███████ responded, "No because I don't do any weird transactions, my stuff is legit."  When asked about accepting donations on S-1's behalf, ███████ initially indicated that she accepted money on S-1's behalf approximately two years ago for Eid, an Islamic holiday.  ███████ was directly asked if she ever accepted any donations or any contributions from anyone in the world other than that Eid.  ███████ responded that there may have been a few other times.  When asked if there were more or less than ten other instances outside of Eid in which she accepted money, ███████ responded, "Less than, maybe even five times. I'm-it was probably less than that 'cuz I didn't like that whole business."  ███████ again reiterated that she did not accept money on S-1's behalf outside of those few occasions.

*FBI Interview of* ███████ *about financial transactions on October 25, 2019*

  32. On October 25, 2019, ███████ was interviewed by FBI Agents at her ██████████████████████████████.  FBI Agents again advised ███████ that lying was a crime under Title 18 U.S. Code 1001, and ███████ acknowledged that she understood.  ███████ stated that she only accepted a miniscule amount of money and it was not to support

14

S-1's activities or the AT dawah.  explained that she was "leery" about receiving money because it could hurt her account, and her standing.  later stated that S-1 made money that was basically for their living, but she was not familiar with his money because she had no part in it.

33.     Your affiant believes  knowingly made false statements to FBI Agents about her involvement in collecting funds on behalf of S-1 during an interview  As discussed above,  received approximately 100 wire transfers via MTS1 and MTS2 between August 2014 and December 2016, and at least five of these transfers were identified by S-4 and S-5 as having been intended for S-1.

34.     Based on the information discussed herein, your affiant believes ████ and S-1 devised a scheme to defraud MTS1 and MTS2 wherein S-1 directed █ followers to wire funds via MTS1 and MTS2 to ████ instead of directly to S-1.  Through this scheme, your affiant believes ████ and S-1 obtained money wired through MTS1 and MTS2 under false pretenses: that funds were being wired through MTS 1 and MTS2 for persons other than S-1, namely ████, when in truth the money was intended for, and provided to, S-1.  Your affiant believes this scheme was executed by S-1 and ████ because ████ name was "clean" and S-1 and ████ believed ████ name had not yet been blocked by MTS1 or MTS2.

35.     Furthermore, your affiant believes ████ visited numerous MTS1 and MTS2 branch locations in ████, collected funds from wire transfers using multiple forms of identification, and lied to FBI agents about her activity because she was attempting to conceal her involvement in the scheme.  Your affiant notes that ████ acknowledged she "…didn't like

15

that whole business" in the context of collecting funds on behalf of S-1 and was "leery" of it, but your affiant believes ███████ nonetheless participated in this scheme despite the possible legal ramifications.

**FBI Investigation of other members of th**███████████████

36.    In September of 2014, ██████████████ W-1, reported to the FBI that ████████████████████████████ and SUSPECT 3 ("S-3")[12], both of whom are ████████ ████████, were vocal supporters of ISIS and espoused their desire to join the terrorist organization.  W-1 reported that ██████████ lived in the same residence ████████████████ ████████████ and accepted his and S-3's views pertaining to ISIS.[13]    W-1 indicated that ████████████ and S-3 watched ISIS-related videos in the living room while ██████████ cooked. W-1 recalled one particular instance in 2014, during Ramadan, when ██████████ and S-3 viewed a video depicting the killing of a Shia male and praised the methodical manner in which ISIS killed people.  Notably, this was around the time that █████████████████ W-1 further indicated that both ██████████ and S-3 would get excited about the videos and both stated that killing people was the right way to do things.





38.    As discussed above, in August 2014, ███████ and S-█ ███████████████

The ceremony occurred in ██████ and was attended by ████████████████████

████████████████████████████████████████████████████████████████████████

and W-3 were known close associates of ████████ and other members of t██

████████████████████████████████████████████████████████████████████████

39.    On  or  about  January 2, 2012, ████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████ While celebrating *Eid*, W-3 met ██████████.

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[14] Your affiant is aware the term "nasheed" can refer to vocal music that is popular in the Islamic world and generally makes reference to Islamic beliefs, history, religion, and current events.  Your affiant is further aware that many ISIS productions utilize nasheeds.

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

[16] For consistency with other legal processes, witnesses and suspects may not be identified in sequential order.

███████████████████████████████████████████████████

40.     The group, which included W-3, ██████████████████████ S-3, and ████████████████████ residence participated together in social activities and in practicing Islam.  W-3 indicated that since it was new to the religion, it obtained much of its religious guidance from ████████████████████ nd S-3.  Some of the earliest material W-3 was shown by th████████████ included the Light Revelations series[17] on YouTube.  Your affiant knows this series to include a number of videos supportive of ISIS, but less provocative than many produced by the terrorist group.   W-3 also reported that the group showed S-1's lectures to W-3, and these became one of W-3's primary sources of information on Islam.

41.     In August 2014, W-3 traveled with ████████████████████████ S-3, W-4, and S-7 to ██████, on the aforementioned trip where █████████████ W-3 indicated that during this trip, the group discussed the topic of ISIS with S-1.  According to W-3, S-1 provided the group with justification that ISIS was legitimate and that Muslims owed their allegiance to Abu Bakr al-Baghdadi and the Islamic State.  W-3 also stated that S-1 further instructed the group that in order to be considered Muslim, they needed to make hijrah to ISIS territory because it was the only acceptable location.  Furthermore, W-3 stated the group discussed the requirements for men

---

[17] The Light Revelations series was listed in the "Must Watch Videos" section of a publication titled, "The Revived Caliphate," a 106-page ISIS-aligned pdf booklet shared amongst the group members.  "The Revived Caliphate" booklet described the Light Revelations series as videos that "…summarise all events about the Caliphate in Syria in a positive light. Quality and dramatic, Highly Recommended." Links to videos can be found at: https://twitter.com/EnterTheTruthCo".  The booklet provided references to numerous other ISIS-produced or ISIS-aligned media products.

to engage in jihad – women could choose whether or not they wanted to fight, and ███████
explained what life would be like for a woman living in ISIS-controlled territory. [18]

42.     W-3 reported that after returning to the United States in August 2014, the group
agreed it should travel together to make hijrah to ISIS territory. [19]   W-3 indicated the group
discussed the preparations they would need to undertake before making hijrah, including: saving
money, preparing physically, and gaining more knowledge about Islam.  W-3 indicated that W-3
an██████ egan saving money for making hijrah to ISIS territory, and began using a savings
envelope to track their savings and expenditures.  W-3 and W-4 confirmed tha██████████
██████ S-3, W-3, and others watched ISIS-created propaganda videos such as "Flames of
War,"[20] which they viewed on multiple occasions, and talked about their desire to join ISIS in Iraq
or Syria and fight against its enemies.

43.     Evidence obtained during the investigation confirms that the group continued
listening to S-1's lectures and would regularly receive communications from ███████
advertising upcoming topics including those pertaining to ISIS.  For example, on September 3,
2014, ██████ emailed W-3███████████-3, and others a poster advertising a conference
titled, "Al Khilaafah; Allah's Governance on Earth" scheduled for September 6, 2014, and

---

██████ and W-4 were interviewed about their discussions with S-1 while in ██████, and they both denied or
did not recall discussing ISIS with S-1.  W-4 noted, however, that the group's view towards ISIS became more
amplified over time beginning in 2014.

[19] W-4 confirmed that the group discussed making hijrah to ISIS territory, but that W-4 was not intending to go with
them if they ever decided to attempt to travel.

[20] In September 2014, ISIS released a documentary-style video on Twitter titled, "Flames of War – Fighting Has
Just Begun". The video, produced by ISIS's al-Hayat Media Center, was approximately 55-minutes in length and
highlighted some of ISIS's major operations in Syria, including a battle at the Menagh Airbase near Allepo.  The
video is narrated by an English-speaker and the final shot in the production shows masked ISIS fighters executing
kneeling men.

featuring S-1 and other jihadist preachers in the United Kingdom. ███████ directed recipients of the email to attend and invite others. ███████ further noted, "This conference is not to be missed." During the conference, S-1 and other speakers promoted ISIS and justified its leader, Abu Bakr Al Baghdadi. From 2014-2017, ███████ regularly sent private messages containing promotional materials for S-1's lectures to W-3, ███████████████ and others in the group.

44.     In May 2015, ███████ provided instructions to W-3 on how to donate to the ██ dawah, which involved sending money via MTS1 in ███████ name. W-3 understood the purpose of the donation was to keep the ████ website running, and that W-3 should send the money in ███████ name because the transaction might be blocked if it was sent to S-1.

45.     In April 2016, ███████ also requested W-3's assistance in translating S-1's lecture notes into a different language. W-3 understood ███████ and S-1 were attempting to grow their audience. ███████ and S-1 suggested W-3 not use W-3's real name when publishing translations online to make it more difficult to identify him/her.





48.     During ████████ interview with FBI Agents in the District of Columbia on October 25, 2019, she declined to identify anyone with whom she had discussed the ongoing legal proceedings. ████████ denied having conversations with individuals who received "notices" about what they should say, or whether to answer questions by falsely stating one does not remember or does not recall. ████████ stated she had told people who got notices that they

---

[23] *See supra* Footnote 5.

should answer questions honestly because they had done nothing wrong, but that if the person did

not recall something, they should not speak on the topic.



53.　　 W-3 reported that ⬛⬛⬛⬛⬛, ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ also contacted W-3 over social media.[25] ⬛⬛⬛⬛ sent W-3 a Facebook message from her ⬛⬛⬛⬛⬛ account claiming that ⬛⬛⬛⬛ neighbor was looking for a bilingual babysitter and asking if W-3 was interested. As discussed further herein, ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛ Facebook account is associated with Facebook User ID ⬛⬛⬛⬛⬛. W-3 interpreted this message as a pretext to engage her/him in conversation about cooperation with the FBI because it was aware that ⬛⬛⬛⬛ never talked to her neighbors. After W-3 did not respond, ⬛⬛⬛⬛ followed up with another Facebook message containing a long audio lecture by an unknown man. After listening to only a short portion of it, W-3 deleted the message and could not recall its contents, however, W-3 believed ⬛⬛⬛⬛ sent this lecture to intimidate W-3 and discourage it from cooperating with authorities.

---

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

23

54.     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ W-3 reported that ▆▆▆▆▆▆▆▆▆
contacted W-3 over Instagram and asked how W-3 was doing.  After a short exchange, W-3
ignored ▆▆▆▆▆▆▆▆▆ follow-up message asking about W-3's employment.  ▆▆▆▆▆▆▆▆
▆▆▆▆ also reached out to W-3, which W-3 believed was unusual.  W-3 reported that it had only
talked to ▆▆▆▆▆▆▆▆▆ once before when W-3 was at ▆▆▆▆▆▆ residence and
▆▆▆▆▆▆▆ was speaking to her on FaceTime.

55.     Based on the foregoing, your affiant believes there is probable cause to believe that
▆▆▆▆▆, ▆▆▆▆▆▆▆▆▆▆▆ are using social media to harass W-3, obstruct justice, and
obtain information related to the investigation.

## SUMMARY OF TARGET ACCOUNTS

*Facebook User ID* ▆▆▆▆▆▆▆▆▆

56.     As noted above, ▆▆▆▆▆ used her "▆▆▆▆▆ account to contact W-3
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ FBI review of publically-available information
revealed a Facebook account with profile name ▆▆▆▆▆" and a profile picture of ▆▆▆▆
wearing a pink and white hijab.  The account was associated with User ID ▆▆▆▆▆▆▆ and
registered to ▆▆▆▆" and ▆▆▆▆▆ phone number, + ▆▆▆▆▆.  Records provided
by Facebook pursuant to a 2703(d) court order revealed ▆▆▆▆ sent W-3 private messages on
August 1, 2019 and again on October 9, 2019.

*Facebook User IDs* ▆▆▆▆▆▆▆▆ *and* ▆▆▆▆▆▆▆

57.     FBI review of publically-available information revealed two Facebook accounts
associated with ▆▆▆▆▆ both of which featured profile pictures of ▆▆▆▆ and were associated
with Facebook User IDs ▆▆▆▆▆▆ and ▆▆▆▆▆▆.  Records provided by
Facebook revealed the registered names for Facebook accounts ▆▆▆▆▆▆ and

 were ████████████ respectively, and were registered using ████████ email address, ████████████, and telephone number, +████████. According to records provided to the FBI from a 2703(d) court order ████████ sent W-3 numerous private messages from these accounts between May 16, 2019 and October 9, 2019.

*Facebook User ID* ████████████████

58.     FBI review of publically-available information revealed a Facebook account with W-3's name as the profile name, a profile picture showing W-3, and W-3's known date of birth listed in the timeline.  This account was associated with Facebook User ID ████████████ and was registered to W-3's real name and current phone number.  Records provided by Facebook pursuant to a 2703(d) court order revealed W-3 received messages from both of ████████████ accounts between May 16, 2019 and October 9, 2019.  There were no messages exchanged with ████████████████ account, which your affiant believes is because W-3 deleted those messages as previously communicated to FBI Agents, and they were not retained by Facebook.

*Instagram Account* ████████████████ **(User ID ████████)**

59.     FBI review of publically-available information revealed an Instagram account with a profile picture of ████████, and various photos of ████████  The account was named ████████████ and associated with User ID ████████.  Records provided by Instagram indicated the account was registered to ████████ email address, ████████████, and phone number, +████████.  Furthermore, records provided by Instagram pursuant to a 2703(d) court order revealed three messages between ████████ and W-3 from July 23, 2019 to July 25, 2019.

60. On or about September 1, 2019, Facebook was served with a records preservation request under 18 U.S.C. § 2703(f) related to Facebook User IDs  and ███████████. On July 22, 2019, Facebook was served with a records preservation request related to Facebook User IDs ███████████ and ███████████. On November 7, 2019, Facebook was served with a records preservation request related to Instagram User ID ███████.

### BACKGROUND CONCERNING FACEBOOK'S ACCOUNTS

61. Facebook is the provider of the internet-based account(s) identified by User IDs ███████████, ███████████, ███████████, *and* ███████████.

62. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com ("Facebook"). The website is owned and operated by Facebook. Facebook allows users to establish accounts with Facebook, and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

63. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user-identification number ("user ID") to each account. Facebook identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

64. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group

26

identification number to each Facebook group. A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request. If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

65. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

66. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

67. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

68. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

69. In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a Facebook account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on Facebook's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Facebook's servers for a certain period of time.

70. A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked". Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

71. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

72. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

73. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

74. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend". The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

75. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

76. In addition to the applications described above, Facebook also provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

29

77.     Facebook also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

78.     Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

79.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

80.     Based on my training and experience, I know that providers such as Facebook also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a

particular user account for cellular data or voice services, and some identifiers are actually assigned by Facebook in order to track what devices are using Facebook's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Facebook accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Facebook account.

81.     Facebook also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's Facebook account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as Facebook) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure

this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of Facebook are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's Facebook account via the mobile application.

82. Based on my training and experience, I know that providers such as Facebook use cookies and similar technologies to track users visiting Facebook's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Facebook. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Facebook may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Facebook account and determine the scope of criminal activity.

83. Based on my training and experience, I know that Facebook maintains records that can link different Facebook accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Facebook accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Facebook account.

32

84. Based on my training and experience, I know that subscribers can communicate directly with Facebook about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

85. In summary, based on my training and experience in this context, I believe that the computers of Facebook are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Facebook subscribers), as well as Facebook-generated information about its subscribers and their use of Facebook services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide Facebook with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

86. As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion. From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user

33

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described above, Facebook logs the IP addresses from which Facebook users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its Facebook services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user. Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[26]

---

[26] At times, social media providers such as Facebook can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of Facebook's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

87.    Based on my training and experience, I know that evidence of who controlled, used, and/or created a Facebook account may be found within the user-generated content created or stored by the Facebook subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar Facebook accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

### BACKGROUND CONCERNING INSTAGRAM'S ACCOUNTS

88.    Instagram is the provider of the internet-based account(s) identified by User ID █████████████ *User ID* ███████).

89.    Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com. Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other

information. Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

90.     Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user made add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information. A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos.

91.     Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

92.     Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

93.     Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may

come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

94. Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block the, which prevents the blocked user from following that user.

95. Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

96. Instagram users may send photos and videos to select individuals or groups via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

97. Users on Instagram may also search Instagram for other users or particular types of photos or other content.

98. For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

99. Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram. For example, Instagram

uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

100.    Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

101.    Instagram also collects other data associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

102.    Instagram also may communicate with the user, by email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

103.    As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively to exclude the innocent from further suspicion. In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time. Further, Instagram account activity can show how and when the account was

accessed or used. For example, as described herein, Instagram logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation. Additionally, Instagram builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner. Last, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation. For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

104.    Based on the information above, the computers of Instagram are likely to contain all the material described above with respect to Instagram account ██████████████ (*User ID* ██████), including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

105.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Tejpal S. Chawla, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

106.    Based on the foregoing, I request that the Court issue the proposed search warrant based on probable cause to believe that the accounts contain evidence of criminal activity or themselves are instrumentalities, or fruits of these crimes. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

107.    The government further requests to share the information obtained from this search (to include copies of digital media) with any government agency investigating, or aiding in the investigation of this case or related matters.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 3, 2020

_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

41

# UNITED STATES MAGISTRATE JUDGE
# U.S. DISTRICT COURT BUILDING
# WASHINGTON, D.C.

PLEASE ISSUE: ☐ Arrest  ☑ Search  ☑ Seizure

warrant for:    IN THE MATTER OF THE SEARCH OF INFORMATION
ASSOCIATED WITH FIVE ACCOUNTS STORED AT PREMISES
CONTROLLED BY FACEBOOK PURSUANT TO 18 U.S.C. § 2703
FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1512

Violation:  ☐ D.C.C.  ☑ U.S.C.      Title:  18

Section(s):   1343, 1001(a)(2), 1512

_/s/_____        4/3/2020_____
Tejpal S. Chawla                          Date
Assistant United States Attorney
(202) 252-7

---

COMPLETE FOR ALL ARREST WARRANTS:

*The following information __must__ be provided for __ALL__ arrest warrants and an **original** and*
**duplicate** *of this form must be submitted to the Clerk's Office with the warrant papers.*

Officer / Agent Name: ███████████████

Badge Number: ██████

Agency / Unit: ████████████

24 Hour Telephone ████████████
 (For officer/agent)

Cellular Number: ████████████
 (For officer/agent)

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH | ) Case No. 20-sc-00732 |
| FIVE ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK | ) |
| PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF | ) |
| 18 U.S.C. § 1512 | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1001(a)(2) | Material False Statements in an Investigation Involving International Terrorism |
| 18 U.S.C. § 1512 | Obstruction of Justice- Witness Tampering |

The application is based on these facts:

See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: _____04/03/2020_____

Judge's signature

Deborah A. Robinson
2020.04.03 12:50:40 -04'00'

City and state: Washington, D.C.

Deborah A. Robinson

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH<br>FIVE ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK<br>PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF<br>18 U.S.C. § 1512 | )<br>)<br>)<br>)  Case No.  20-sc-00732<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____April 17, 2020_____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Deborah A. Robinson_____.

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   04/03/2020

City and state:   Washington, D.C.

Deborah A. Robinson
2020.04.03 12:52:37 -04'00'

*Judge's signature*

U.S. Magistrate Judge Deborah A. Robinson

*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 20-sc-00732 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information which is associated with the Facebook, Inc. accounts identified by Facebook User IDs , ████████, ████████, ████████, *and Instagram Account* ████████ *User ID* ████, and which is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

## **ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.   Information to be disclosed by Facebook, Inc. ("Facebook") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any records that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.    For the time period **from May 16, 2019 to the Present**: The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all Facebook services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.    For the time period **from May 16, 2019 to the Present**:  All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

      c.      Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

      d.      For the time period **from May 16, 2019 to the Present**:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

      e.      For the time period **from May 16, 2019 to the Present**:  All "check ins" and other location information;

f.      For the time period **from May 16, 2019 to the Present**:  All records pertaining to communications between Facebook and any person regarding the Account, including contacts with support services and records of actions taken;

g.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN").

h.      All information held by Facebook related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-Facebook based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.      All information held by Facebook related to any financial transactions, financial records, or documentation, including credit card information, account information, receipts, notes, and ledgers.

Within **14 days** of the issuance of this warrant, Facebook shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



## II. Information to be seized by the government

All information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of **Title 18 U.S.C. §1343, Wire Fraud, Title 18 U.S.C. § 1001, Material False Statements involving international terrorism, Title 18 U.S.C. §1512, Obstruction - Witness Tampering**, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Any records, discussion, records, photographs, or information related to support of designated foreign terrorist organizations and entities (FTOs), including, but not limited to, ISIS and S-1;

(d) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(e) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(f) Any records, communications, photographs, documents, logs, media files, or attachments made or sent by the Account user regarding Grand Jury testimony or information provided by witnesses to the Government;

(g) Any records, communications, photographs, documents, logs, media files, or attachments relating to statements made by the Account user regarding on-line chat rooms, social media platforms, S-1, ███████, S-3, ██████, ██████, W-3, and persons linked to S-1, ██████, ███████, ██████, and W-3;

(h) Records, communications, drafts, videos, photographs and other material that is communicated through on-line chat rooms, social media platforms, or video-sharing websites;

(i) Records, communications or other material that discuss a pending grand jury, criminal investigations by the FBI, and/or the identity or location of potential witnesses;

(j) All records, communications, drafts, or other material that discuss ISIS; any FTOs; terrorist attacks, actions, communications, or planning; foreign terrorist organizations, or persons who have ever sought to travel to ISIS territory;

(k) All records, communications, documents, material, videos, and posters related to operation of S-1's on-line chat room, social media platforms, and the communications of all administrators;

(l) Evidence of solicitation of money or re-distribution of solicited money;

(m) Information that constitutes evidence concerning fundraising, transfer of money, conversion of money, concealing information about transactions, wire fraud or

other financial fraud by the Account user, persons communicating with the Account user, or others connected to S-1;

(n) Evidence related to the deletion, removal or destruction of possible evidence of possible criminal activity, including electronic information (including user-generated content and content which the user received), phones, computers, files, documents, photographs or other media;

(o) Records of or information about Internet Protocol addresses associated with the Account and its activity;

(p) Records, communications, drafts, photographs, videos, or other material that discuss traveling overseas to live in a country where ISIS was present, join a foreign terrorist organization, or avoid detection by law enforcement;

(q) Records, communications, drafts, videos, photographs and other material that is communicated through on-line chat rooms, social media platforms, or video-sharing websites that host or contain content produced by S-1, ISIS-affiliated organizations, or any other foreign terrorist organization;

(r) Information related to financial information, accounts, ledgers, and access to monetary instruments, goods, and funds, including use of intermediaries to disperse or collect funds and goods;

(s) Evidence related to the Account user's deletion of electronic information, including emails, documents, receipts, and transactions related to S-1 or any person connected with S-1; and,

(t) Evidence related to the Service Provider's deactivation of accounts, where applicable, and the Terms of Service which were violated.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); draft or deleted records; and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## III. Government procedures for warrant execution

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States. The review of electronic data produced by Facebook in response to this warrant may be conducted by any government personnel assisting the investigation, who may include, in addition to law enforcement officers and agents, analysts, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody, control of attorneys for the government and their support staff for their independent review.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.	all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.	such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.	the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.	the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                    Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FIVE ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1512 | Case No.  20-sc-00732 <br><br> **Filed Under Seal** |



*Reference:  USAO #█████████ Subject Accounts:  Facebook User IDs ███████████, █████████, ███████████, and Instagram Account with User ID ██████████*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████████████████████████████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with four Facebook accounts – that is, User IDs ███████████, ███████████, ███████████, and ██████████ – stored at the premises owned, maintained, controlled, or operated by Facebook, Inc., an electronic communications services provider and/or remote computing services provider which is headquartered at / which accepts service at 1601 Willow Road, Menlo Park, California.  Additionally, this application for a search warrant requests information associated with the Instagram account ██████████ **(User ID** ████████**)** that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),

2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook, Inc. ("Facebook" or the "Provider") to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that ███████████ ("████████") has committed violations of 18 U.S.C. §1343 (Wire Fraud), 18 U.S.C. §1001(a)(2) (material false statements in an investigation involving international terrorism); and violations of 18 U.S.C. § 1512 (Obstruction of Justice—Witness Tampering) have been committed by ████████████████████████████████████████████████████ ("████████"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C., *see* 18 U.S.C. § 3237. Additionally, ████████████████████████████ and the

3

criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district. *See* 18 U.S.C. § 3238.

7.     When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

**STATUTORY VIOLATIONS**

**Wire Fraud**

8.     Title 18, United States Code Section 1343 criminalizes knowingly devising a scheme for obtaining money by means of false pretenses or causes to be transmitted by means of wire in interstate commerce any signals for the purpose of executing such scheme. 18 U.S.C. §1343.

**Material False Statements Involving International Terrorism**

9.     Title 18, United States Code Section 1001 criminalizes knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the executive branch of the United States. 18 U.S.C. §1001(a)(2). If the matter involves domestic or international terrorism, the maximum penalty is eight years incarceration.

**Obstruction -- Witness Tampering**

4

10.     Title 18, United States Code Section 1512 criminalizes knowingly and corruptly persuading another person, or attempting to do so, with the intent to cause the person to withhold testimony from an official proceeding. 18 U.S.C. § 1512.

## PROBABLE CAUSE

### Background on ISIS and Its Internet Recruitment Efforts

11.     The FBI has been investigating the use of the Internet and social media by foreign terrorist groups, including the Islamic State and al-Sham ("ISIS").  On or about October 15, 2004, the U.S. Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawhid wa'al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under section 1(b) of Executive Order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the INA and as a SDGT entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added a number of aliases to the ISIL listing, including: The Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production (collectively referred to herein as "ISIS").  On September 21, 2015, the Secretary added the following aliases to the FTO listing:  Islamic State, ISIL, and ISIS. ISIS remains a designated FTO.

12.     Based on your affiant's training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, traveled to Syria and Iraq to join

ISIS, an act they commonly refer to as "hijrah"[1]; (b) foreign fighters commonly entered Syria by crossing the border from Turkey or Jordan; (c) foreign fighters from Western countries traveled to locations in Turkey, including Istanbul, and then traveled to towns closer to the border where they were brought into Syria to join ISIS; (d) Abu Bakr al-Baghdadi was the leader (or "Caliph") of ISIS before he was killed by U.S. forces on or about October 26, 2019; (e) since on or about September 22, 2014, ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and its leadership gave blanket approval for this indiscriminate killing by individuals residing in these countries.

13.     To gain supporters, recruit fighters, and raise funds, ISIS spreads its message of violent jihad[2] using social media platforms, such as Twitter, Facebook, YouTube, Instagram, and Paltalk. On these platforms, ISIS advocates post audio and video files that include recruitment messages and updates of events in Syria and Iraq. Online chat rooms controlled by ISIS advocates further effectuate this support.

14.     One such online community was ████████████████████ ████████ which contained audio of speeches made by SUSPECT 1 ("S-1").  S-1 was



_____

[1] Based on my training and experience, I know "hijrah" generally means migrations, and in this context refers to travel to engage in jihad.

[2] Based on my training and experience, I know "jihad" is an Arabic word which literally means striving or struggling, but in this context it refers to a holy war, fight, or struggle against the enemies of Islam.

numerous statements inciting violence and supporting ISIS, its former leader al-Baghdadi, al-Qaeda, and Osama bin Laden.  contained recorded lectures of S-1 proselytizing on behalf of and in support of ISIS. I have viewed the site and am familiar with its contents and organization.

15. S-1 is not a U.S. person and

---

[3] Your affiant understands this document to be an official marriage registration in

7



**Role as an ████ Administrator**

18.     On or about March 20, 2014, ████████ received an email welcoming her as a new AT Administrator and assigning her the moniker ████████ ████. ████████████████████████████████ ████ was advised that lying to the FBI would constitute a violation of federal law, and in that interview she initially told the FBI Agents that, "I was not an Administrator." ████ ████ later acknowledged she would sometimes help in the class and login with an Administrator account.    Later in the interview, ████████ admitted that she was an Administrator often over the past year, and that her involvement varied prior to that.  As an Administrator, she stated that she would take notes and post them on the ██ website, post Quranic verses and find hadith[5] during lectures, as well as, advertise the lectures on social media for S-1.

19.     ████████████████████████████ W-2[6] indicated that it visited the online AT chat room.  ████████████████████████████████

---

[4] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Google accounts used by or associated with S-1 and/or ████████. In response to the warrant, Google provided this email among others.

[5] "Hadith" is a collection of traditions containing sayings of the Prophet Muhammad that is one of the major sources of guidance for Muslims.



W-2 reported that the primary AT Administrator used the kunya,[7] ████████ ████████ stated in an interview with FBI Agents that ████████' was a name she used on social media and/or communication accounts. Service provider records confirmed this fact. As such, your affiant believes that ████████ used the moniker ████████ when serving as an ██ Administrator for S-1.

21. W-2 further indicated that ████████ was essentially S-1's secretary and was aware of S-1's activities. W-2 also described ████████ as the lead Administrator in the ██ chat room. W-2 explained that ████████ handled all of S-1's correspondence, designed online posters to advertise ██ lectures, facilitated lectures, coordinated the posting of hadith and Quranic verses in the chat room, monitored ██ chat room discussions, and posted audio of ██ lectures to th ████ website.

22. ████████ was also actively involved in fundraising and collecting donations for the operation of the ██ enterprise. On January 5, 2016, a local law enforcement agency advised the FBI that during an ██ discussion on December 21, 2015, a user name known to be associated with S-1 posted the following: "according to Shariah we kill apostates" and "If they turn back from Islam then kill them. Surah 4:89". Later in the same chat room, an individual believed to be another AT Administrator posted the following solicitation for funding, "DONATE TO THE

---

[7] "Kunya" is a term that can be used to describe a nickname or an honorary Islamic name for someone.

DAWAH[8] OF [S-1]- EMAIL TO:::: [Email Address 1] - TO ASK FOR DIRECTIONS ON HOW TO USE [MONEY TRANSMITTING SERVICE 1 ("MTS1")] OR [MONEY TRANSMITTING SERVICE 2 ("MTS2")]::::::JZK[9]".

     23.     Further, on January 25, 2016, a local law enforcement agency advised the FBI that on January 18, 2016, ███████████████████████████████████████████████████████ ████████████████████████████████████████████ During this conversation S-1 asked the ██████ to send money to ███████████████ using a specific money transmitting service, hereafter referred to as "MTS1," under S-1's ████████'s name, which S-1 identified as "████████ ████████." Excerpts of the conversation are as follows:

     ████████ shaikh i would like to make donation for the dawa what is the best way?

     S-1: the best way is via [MTS1]

     S-1: send it to m████████████

     S-1: her name is:

     S-1: ████████ ████████

     ████ okay insh Allah

     S-1: ████████████████

     S-1: how much u are planning to send

     ████████ do i need an account number or just send it in her name insh Allha?

     S-1: no account no needed

---

[8] "Dawah" (variation "dawa") means the proselytizing or preaching of Islam.

[9] "JZK" is often used as an abbreviation for "*JazakAllah Khair"*, which is an Arabic phrase meaning "May God reward you."

24.     Your affiant is aware that similar solicitations for donations occurred regularly in the ▇▇ chat room.  In fact, shortly after becoming an administrator in March 2014, ▇▇▇▇ sought to expand the funding base of AT to include other social media platforms.  On June 7, 2014, ▇▇▇▇ sent an email to an individual using the nickname ▇▇▇▇▇▇▇▇. ▇▇▇▇ suggested they begin posting for donations on Facebook, Twitter, the blog, and in the Paltalk chatroom. ▇▇▇▇ acknowledged in the email that in a separate conversation, another ▇ Administrator advised her she would need S-1's permission to make this expansion because he believed the public solicitation for donations could cause the freezing of S-1's latest MTS1 and MTS2 accounts. A review of ▇▇▇▇ emails identified an earlier email on June 3, 2017, in which this ▇ Administrator advised ▇▇▇▇ that she would need "Shaikh's" approval prior to publically soliciting for donations due to concerns that the Shaikh's "latest" accounts may get frozen. ▇▇▇▇ responded to the other ▇ Administrator that it was "a dilemma".

*MTS1 and MTS2 Financial Records for* ▇▇▇▇.

25.     Since April 2, 2012, S-1 has been blocked or interdicted by MTS1 from using its services.[11]  The FBI's review of records provided by MTS1 in January 2018 indicated that from in or about November 2014 to December 2016, ▇▇▇▇ appeared to have received

---

[10] Your affiant is aware the term "Muqatil" can be translated to mean "fighter" or "combatant" and often refers to a combatant in the military context.  The nickname was associated with the email account, and email service provider records revealed multiple exchanges in which S-1 identified himself by name and instructed recipients to use this email address because he did not trust his other account, which your affiant believes is in reference to an account using an honorific and S-1's last name.



approximately $24,000 through approximately 97 separate transactions via MTS1 while residing in ███████ with S-1. These payments were from various senders in the United States, United Kingdom, and Canada, among other countries. MTS1 records indicated that ████████ utilized approximately three different forms of her own identification at approximately 16 different locations throughout ███████ to pick up these funds. Your affiant believes based on S-1's online fundraising efforts and ████████ role as an ████ Administrator and S-1's ██████ the wire transfers sent to ███████ were sent to, or on behalf of, S-1. MTS1 indicated that it "interdicted," or blocked, ███████ from using its money transfer services in or around December 2016 because MTS1 assessed ████████ activity to be consistent with terrorist financing.

26. MTS2's records revealed that S-1 was blocked from using its services following the OFAC's designation of S-1 in or around December 2017. MTS2 indicated S-1 was put on a watch list maintained by a third party vendor in 2004 as a result ███████████████████████ ████████████████████████ however, MTS2 did not subscribe to this watch list at the time. The FBI's review of records provided by MTS2 indicated that from in or about August 2014 to December 2016, ███████ appeared to have received approximately $1,250, via MTS2. These payments were from senders in different countries. MTS2 records further indicated that the recipient (███████) utilized three different forms of her own personal identification to receive these payments.

*FBI Interview of S-4 about money transfers to ███████*

27. The FBI conducted voluntary interviews of S-4 in July and August 2017. In those interviews, S-4 was asked about its contacts and financial support of S-1, and S-4 made numerous false statements about its contacts with S-1, and denied providing any money to S-1 directly or indirectly through other persons. ████████████████████████

12



**S-4** is one of the individuals who sent money to ▇▇▇▇ using MTS1. During a subsequent interview with FBI Agents and Assistant United States Attorneys ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ S-4 stated that it contacted S-1 in 2016 and asked if it could send money to S-1. S-4 stated that S-1 instructed it to send money to ▇▇▇▇ using MTS1 because ▇▇▇▇▇▇ name was "clean." S-4 understood the term "clean" to mean that ▇▇▇▇ was not a terrorist and the transaction to S-1 would be completed successfully if sent through ▇▇▇▇.

28.     A review of S-1 email records obtained from legal process revealed that on June 5, 2016, S-4 emailed S-1: "Salaam, I would like to give donation of 50 dollars whichever way possible. Its what I can afford to do as of now, I know its not much. How would I go about doing so?" On June 5, 2016, S-1 responded: "wa alaikum salam wrwb. You may send it via [MTS1] to my wife's name ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Pls use your real name to send it in case of a hiccup u can claim your money back. ▇▇▇▇▇s name is clean so you shud be fine insha allah. What city do u live in I forgot?"

29.     The FBI's review of records provided by MTS1 in January 2018 revealed two transactions in June 2016 and December 2016, in which S-4 sent by wire approximately $50 and $300, respectively, to ▇▇▇▇.

30.     S-4 stated it did not know if S-1 was being watched by law enforcement authorities, and indicated that it also communicated directly with ▇▇▇▇ via a messaging application (hereinafter "MA1"), which utilizes a mobile electronic device and the internet. S-4 also told the FBI that it sent MA1 messages to ▇▇▇▇ at what it believed to be ▇▇▇▇ cellular phone. Your affiant is aware that persons who engage in criminal activity will often

13

attempt to hide or obscure their financial transactions through friends, confidants, or family members to avoid detection by law enforcement.  MTS1 also indicated that it blocked another attempted transaction with S-4 to S-1, through ▆▆▆▆▆ on April 6, 2017.

*FBI Interview of* ▆▆▆▆▆ *about financial transactions on January 25, 2018*

31.    During ▆▆▆▆▆ voluntary interview with FBI Agents ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ stated that S-1 had a bank account in ▆▆▆, but "they closed it down."  When asked if ▆▆▆▆▆ ever had a bank account closed or a financial transaction blocked, ▆▆▆▆▆ responded, "No because I don't do any weird transactions, my stuff is legit."  When asked about accepting donations on S-1's behalf, ▆▆▆▆▆ initially indicated that she accepted money on S-1's behalf approximately two years ago for Eid, an Islamic holiday.  ▆▆▆▆▆ was directly asked if she ever accepted any donations or any contributions from anyone in the world other than that Eid. ▆▆▆▆▆ responded that there may have been a few other times.  When asked if there were more or less than ten other instances outside of Eid in which she accepted money, ▆▆▆▆▆ responded, "Less than, maybe even five times. I'm-it was probably less than that 'cuz I didn't like that whole business." ▆▆▆▆▆ again reiterated that she did not accept money on S-1's behalf outside of those few occasions.

*FBI Interview of* ▆▆▆▆▆ *about financial transactions on October 25, 2019*

32.    On October 25, 2019, ▆▆▆▆▆ was interviewed by FBI Agents at her ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ FBI Agents again advised ▆▆▆▆▆ that lying was a crime under Title 18 U.S. Code 1001, and ▆▆▆▆▆ acknowledged that she understood. ▆▆▆▆▆ stated that she only accepted a miniscule amount of money and it was not to support

14

S-1's activities or the AT dawah.  explained that she was "leery" about receiving money because it could hurt her account, and her standing. ▇▇▇▇▇ later stated that S-1 made money that was basically for their living, but she was not familiar with his money because she had no part in it.

33.    Your affiant believes ▇▇▇▇▇ knowingly made false statements to FBI Agents about her involvement in collecting funds on behalf of S-1 during an intervie As discussed above, ▇▇▇▇▇ received approximately 100 wire transfers via MTS1 and MTS2 between August 2014 and December 2016, and at least five of these transfers were identified by S-4 and S-5 as having been intended for S-1.

34.    Based on the information discussed herein, your affiant believes ▇▇▇▇▇ and S-1 devised a scheme to defraud MTS1 and MTS2 wherein S-1 directed ▇ followers to wire funds via MTS1 and MTS2 to ▇▇▇▇▇ instead of directly to S-1.  Through this scheme, your affiant believes ▇▇▇▇▇ and S-1 obtained money wired through MTS1 and MTS2 under false pretenses: that funds were being wired through MTS 1 and MTS2 for persons other than S-1, namely ▇▇▇▇▇, when in truth the money was intended for, and provided to, S-1.  Your affiant believes this scheme was executed by S-1 and ▇▇▇▇▇ because ▇▇▇▇▇ name was "clean" and S-1 and ▇▇▇▇▇ believed ▇▇▇▇▇ name had not yet been blocked by MTS1 or MTS2.

35.    Furthermore, your affiant believes ▇▇▇▇▇ visited numerous MTS1 and MTS2 branch locations in ▇▇▇▇▇, collected funds from wire transfers using multiple forms of identification, and lied to FBI agents about her activity because she was attempting to conceal her involvement in the scheme.  Your affiant notes that ▇▇▇▇▇ acknowledged she "…didn't like

15

that whole business" in the context of collecting funds on behalf of S-1 and was "leery" of it, but your affiant believes ███████ nonetheless participated in this scheme despite the possible legal ramifications.

### FBI Investigation of other members of the ████████

36.    In September of 2014, ██████████████ W-1, reported to the FBI that ████████ ████████ ("███████████"), and SUSPECT 3 ("S-3")[12], both of whom are ███████ ████████, were vocal supporters of ISIS and espoused their desire to join the terrorist organization.  W-1 reported that ████████ lived in the same residence ████████████ as ██████████ and accepted his and S-3's views pertaining to ISIS.[13]  W-1 indicated that ████████ and S-3 watched ISIS-related videos in the living room while ████████ cooked. W-1 recalled one particular instance in 2014, during Ramadan, when ████████ and S-3 viewed a video depicting the killing of a Shia male and praised the methodical manner in which ISIS killed people.  Notably, this was around the time that ████████████████ W-1 further indicated that both ████████ and S-3 would get excited about the videos and both stated that killing people was the right way to do things.



38.    As discussed above, in August 2014, ██████ and S-1 were ██████ ████ The ceremony occurred in ██████ and was attended by ████████████████████ ████████████████████████████████████████████████████ and W-3 were known close associates of ██████ and other members of ████████ ████████████████████████████████████████████████████████

39.    On or about January 2, 2012, W-3 ██████████████████████████ ████████████████████████████████████ While celebrating *Eid*, W-3 met ██████, ████████████████████████████████████████████████████████

---

[14] Your affiant is aware the term "nasheed" can refer to vocal music that is popular in the Islamic world and generally makes reference to Islamic beliefs, history, religion, and current events. Your affiant is further aware that many ISIS productions utilize nasheeds.

██████████████████████████████████████████████████████████████

[16] For consistency with other legal processes, witnesses and suspects may not be identified in sequential order.



40.     The group, which included W-3, ██████, ████████, ████████, S-3, and other tenants in ████████ residence participated together in social activities and in practicing Islam.  W-3 indicated that since it was new to the religion, it obtained much of its religious guidance from ████████, ████████, ████████, and S-3.  Some of the earliest material W-3 was shown by the ████████ included the Light Revelations series[17] on YouTube.  Your affiant knows this series to include a number of videos supportive of ISIS, but less provocative than many produced by the terrorist group.   W-3 also reported that the group showed S-1's lectures to W-3, and these became one of W-3's primary sources of information on Islam.

41.     In August 2014, W-3 traveled with ████████, ████████, ████████, S-3, W-4, and S-7 to ████████, on the aforementioned trip where ████████████████ W-3 indicated that during this trip, the group discussed the topic of ISIS with S-1.  According to W-3, S-1 provided the group with justification that ISIS was legitimate and that Muslims owed their allegiance to Abu Bakr al-Baghdadi and the Islamic State.  W-3 also stated that S-1 further instructed the group that in order to be considered Muslim, they needed to make hijrah to ISIS territory because it was the only acceptable location.  Furthermore, W-3 stated the group discussed the requirements for men

---

[17] The Light Revelations series was listed in the "Must Watch Videos" section of a publication titled, "The Revived Caliphate," a 106-page ISIS-aligned pdf booklet shared amongst the group members.  "The Revived Caliphate" booklet described the Light Revelations series as videos that "…summarise all events about the Caliphate in Syria in a positive light. Quality and dramatic, Highly Recommended. Links to videos can be found at: https://twitter.com/EnterTheTruthCo".  The booklet provided references to numerous other ISIS-produced or ISIS-aligned media products.

to engage in jihad – women could choose whether or not they wanted to fight, and ████████ explained what life would be like for a woman living in ISIS-controlled territory.[18]

42.    W-3 reported that after returning to the United States in August 2014, the group agreed it should travel together to make hijrah to ISIS territory.[19]  W-3 indicated the group discussed the preparations they would need to undertake before making hijrah, including: saving money, preparing physically, and gaining more knowledge about Islam.  W-3 indicated that W-3 and ████████ began saving money for making hijrah to ISIS territory, and began using a savings envelope to track their savings and expenditures.  W-3 and W-4 confirmed that ████████, ████████, S-3, W-3, and others watched ISIS-created propaganda videos such as "Flames of War,"[20] which they viewed on multiple occasions, and talked about their desire to join ISIS in Iraq or Syria and fight against its enemies.

43.    Evidence obtained during the investigation confirms that the group continued listening to S-1's lectures and would regularly receive communications from ████████ advertising upcoming topics including those pertaining to ISIS.  For example, on September 3, 2014, ████████ emailed W-3, ████████, S-3, and others a poster advertising a conference titled, "Al Khilaafah; Allah's Governance on Earth" scheduled for September 6, 2014, and

---

[18] ████████ and W-4 were interviewed about their discussions with S-1 while in ████████, and they both denied or did not recall discussing ISIS with S-1.  W-4 noted, however, that the group's view towards ISIS became more amplified over time beginning in 2014.

[19] W-4 confirmed that the group discussed making hijrah to ISIS territory, but that W-4 was not intending to go with them if they ever decided to attempt to travel.

[20] In September 2014, ISIS released a documentary-style video on Twitter titled, "Flames of War – Fighting Has Just Begun". The video, produced by ISIS's al-Hayat Media Center, was approximately 55-minutes in length and highlighted some of ISIS's major operations in Syria, including a battle at the Menagh Airbase near Allepo.  The video is narrated by an English-speaker and the final shot in the production shows masked ISIS fighters executing kneeling men.

featuring S-1 and other jihadist preachers in the United Kingdom. ███████ directed recipients of the email to attend and invite others. ███████ further noted, "This conference is not to be missed." During the conference, S-1 and other speakers promoted ISIS and justified its leader, Abu Bakr Al Baghdadi. From 2014-2017, ███████ regularly sent private messages containing promotional materials for S-1's lectures to W-3, ███████, S-3, ███████, and others in the group.

44. In May 2015, ███████ provided instructions to W-3 on how to donate to the dawah, which involved sending money via MTS1 in ███████ name. W-3 understood the purpose of the donation was to keep the ███ website running, and that W-3 should send the money in ███████ name because the transaction might be blocked if it was sent to S-1.

45. In April 2016, ███████ also requested W-3's assistance in translating S-1's lecture notes into a different language. W-3 understood ███████ and S-1 were attempting to grow their audience. ███████ and S-1 suggested W-3 not use W-3's real name when publishing translations online to make it more difficult to identify him/her.





48. During [REDACTED] interview with FBI Agents in the District of Columbia on October 25, 2019, she declined to identify anyone with whom she had discussed the ongoing legal proceedings. [REDACTED] denied having conversations with individuals who received "notices" about what they should say, or whether to answer questions by falsely stating one does not remember or does not recall. [REDACTED] stated she had told people who got notices that they

_____

[23] *See supra* Footnote 5.

21

should answer questions honestly because they had done nothing wrong, but that if the person did

not recall something, they should not speak on the topic.





53. ███████████████████████████ W-3 reported that ██████,
██████, and ███████████ also contacted W-3 over social media.[25] ████████ sent
W-3 a Facebook message from he██████████ account claiming that ████████ neighbor
was looking for a bilingual babysitter and asking if W-3 was interested. As discussed further
herein, ████████ "Rabiah Kok" Facebook account is associated with Facebook User ID
████████. W-3 interpreted this message as a pretext to engage her/him in conversation
about cooperation with the FBI because it was aware that ████████ never talked to her neighbors.
After W-3 did not respond, ████████ followed up with another Facebook message containing a
long audio lecture by an unknown man. After listening to only a short portion of it, W-3 deleted
the message and could not recall its contents, however, W-3 believed ████████ sent this lecture
to intimidate W-3 and discourage it from cooperating with authorities.

54.  ████████████████████████ W-3 reported that ████████
contacted W-3 over Instagram and asked how W-3 was doing. After a short exchange, W-3
ignored ████████ follow-up message asking about W-3's employment. ████████
████ lso reached out to W-3, which W-3 believed was unusual. W-3 reported that it had only
talked to ████████ fiancée once before when W-3 was at ████████ residence and
████████ was speaking to her on FaceTime.

55.  Based on the foregoing, your affiant believes there is probable cause to believe that
████████, ████████ and ████, are using social media to harass W-3, obstruct justice, and
obtain information related to the investigation.

## SUMMARY OF TARGET ACCOUNTS

*Facebook User ID* ████████

56.  As noted above, ████████ used her "Rabiah Kok" account to contact W-3
████████████████████████████████ FBI review of publically-available information
revealed a Facebook account with profile name ████████ and a profile picture of ████████
wearing a pink and white hijab. The account was associated with User ID ████████ and
registered to ████████ and ████████ phone number, +████████. Records provided
by Facebook pursuant to a 2703(d) court order revealed ████████ sent W-3 private messages on
August 1, 2019 and again on October 9, 2019.

*Facebook User IDs* ████████ *and* ████████

57.  FBI review of publically-available information revealed two Facebook accounts
associated with ████, both of which featured profile pictures of ████ and were associated
with Facebook User IDs ████████ and ████████. Records provided by
Facebook revealed the registered names for Facebook accounts ████████ and

24



█████████ wer ███████████████," respectively, and were registered using █████ email address, ████████████, and telephone number, +███████. According to records provided to the FBI from a 2703(d) court order, █████ sent W-3 numerous private messages from these accounts between May 16, 2019 and October 9, 2019.

*Facebook User ID* ███████████

58.    FBI review of publically-available information revealed a Facebook account with W-3's name as the profile name, a profile picture showing W-3, and W-3's known date of birth listed in the timeline.  This account was associated with Facebook User ID ███████████ and was registered to W-3's real name and current phone number.  Records provided by Facebook pursuant to a 2703(d) court order revealed W-3 received messages from both of ████████ accounts between May 16, 2019 and October 9, 2019.  There were no messages exchanged with ████████████ account, which your affiant believes is because W-3 deleted those messages as previously communicated to FBI Agents, and they were not retained by Facebook.

*Instagram Account* ████████████ **(User ID █████████)**

59.    FBI review of publically-available information revealed an Instagram account with a profile picture of ██████████ and various photos of ██████████.  The account was named ████████████ nd associated with User ID █████████.  Records provided by Instagram indicated    the    account    was    registered    to    ██████████    email    address, ██████████████, and phone number, +██████████.  Furthermore, records provided by Instagram pursuant to a 2703(d) court order revealed three messages between ██████████ and W-3 from July 23, 2019 to July 25, 2019.

25

60.     On or about September 1, 2019, Facebook was served with a records preservation request under 18 U.S.C. § 2703(f) related to Facebook User IDs ███████████ and ███████████. On July 22, 2019, Facebook was served with a records preservation request related to Facebook User IDs ███████████ and ███████████. On November 7, 2019, Facebook was served with a records preservation request related to Instagram User ID ███████.

## BACKGROUND CONCERNING FACEBOOK'S ACCOUNTS

61.     Facebook is the provider of the internet-based account(s) identified by User IDs ███████████, ███████████, ███████████, *and* ███████████.

62.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com ("Facebook"). The website is owned and operated by Facebook. Facebook allows users to establish accounts with Facebook, and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

63.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user-identification number ("user ID") to each account. Facebook identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

64.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group

identification number to each Facebook group. A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request. If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

65. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

66. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27

67.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

68.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

69.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a Facebook account can be indefinitely stored in connection with that account, unless the subscriber deletes the material.  Further, such user-generated content can remain on Facebook's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Facebook's servers for a certain period of time.

70.     A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked".  Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

71.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

72.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

73.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

74.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend".  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

75.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

76.     In addition to the applications described above, Facebook also provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

77.     Facebook also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

78.     Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

79.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

80.     Based on my training and experience, I know that providers such as Facebook also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a

30

particular user account for cellular data or voice services, and some identifiers are actually assigned by Facebook in order to track what devices are using Facebook's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Facebook accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Facebook account.

81.     Facebook also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's Facebook account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as Facebook) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure

31

this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of Facebook are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's Facebook account via the mobile application.

82.     Based on my training and experience, I know that providers such as Facebook use cookies and similar technologies to track users visiting Facebook's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Facebook. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Facebook may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Facebook account and determine the scope of criminal activity.

83.     Based on my training and experience, I know that Facebook maintains records that can link different Facebook accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Facebook accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Facebook account.

32

84.     Based on my training and experience, I know that subscribers can communicate directly with Facebook about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

85.     In summary, based on my training and experience in this context, I believe that the computers of Facebook are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Facebook subscribers), as well as Facebook-generated information about its subscribers and their use of Facebook services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide Facebook with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

86.     As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion. From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described above, Facebook logs the IP addresses from which Facebook users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its Facebook services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user. Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[26]

---

[26] At times, social media providers such as Facebook can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of Facebook's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

87.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a Facebook account may be found within the user-generated content created or stored by the Facebook subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar Facebook accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## BACKGROUND CONCERNING INSTAGRAM'S ACCOUNTS

88.     Instagram is the provider of the internet-based account(s) identified by User ID ▮▮▮▮▮▮▮▮▮▮ *(User ID ▮▮▮▮▮▮)*.

89.     Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com. Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other

information. Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

90.     Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user made add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information. A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos.

91.     Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

92.     Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

93.     Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may

36

come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

94.     Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block the, which prevents the blocked user from following that user.

95.     Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

96.     Instagram users may send photos and videos to select individuals or groups via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

97.     Users on Instagram may also search Instagram for other users or particular types of photos or other content.

98.     For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

99.     Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram. For example, Instagram

37

uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

100.    Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

101.    Instagram also collects other data associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

102.    Instagram also may communicate with the user, by email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

103.    As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time. Further, Instagram account activity can show how and when the account was

38

accessed or used. For example, as described herein, Instagram logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation. Additionally, Instagram builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner. Last, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation. For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

104. Based on the information above, the computers of Instagram are likely to contain all the material described above with respect to Instagram account ███████████ (*User ID* █████), including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

105.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Tejpal S. Chawla, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

106. Based on the foregoing, I request that the Court issue the proposed search warrant based on probable cause to believe that the accounts contain evidence of criminal activity or themselves are instrumentalities, or fruits of these crimes. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

107. The government further requests to share the information obtained from this search (to include copies of digital media) with any government agency investigating, or aiding in the investigation of this case or related matters.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 3, 2020

Deborah A.
Robinson
2020.04.03 12:53:21
-04'00'

_____

DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

41