# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES MAGISTRATE JUDGE
# U.S. DISTRICT COURT BUILDING
# WASHINGTON, D.C.

PLEASE ISSUE: ☐ Arrest  ☑ Search  ☑ Seizure

warrant for:    IN THE MATTER OF THE SEARCH OF INFORMATION
ASSOCIATED WITH TWO ACCOUNTS STORED ▉ PREMISES
CONTROLLED BY FACEBOOK INC. PURSUANT TO 18 U.S.C. § 2703
FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1343

Violation: ☐ D.C.C.  ☑ U.S.C.     Title: 18

Section(s):  1343

/s/ Tejpal S. Chawla                  6/22/2020
_____       _____
Tejpal S. Chawla                      Date
Assistant United States Attorney
(202) 252-7

COMPLETE FOR ALL ARREST WARRANTS:

*The following information must be provided for ALL arrest warrants and an **original** and **duplicate** of this form must be submitted to the Clerk's Office with the warrant papers.*

Officer / Agent Name: ▉▉▉▉▉▉▉

Badge Number: ▉▉▉▉

Agency / Unit: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

24 Hour Telephone Number: ▉▉▉▉▉
 (For officer/agent)

Cellular Number:     Same as above
 (For officer/agent)

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH | ) Case No. 20-sc-01549 |
| TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK | ) |
| INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF | ) |
| VIOLATION OF 18 U.S.C. § 1343 | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1001(a)(2) | Material False Statements in an Investigation Involving International Terrorism |

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 06/22/2020 _____

_____
*Judge's signature*

City and state:  Washington, D.C. _____

U.S. Magistrate Judge Robin M. Meriweather
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❒ Original          ❒ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No.  20-sc-01549
IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH )
TWO ACCOUNTS STORED ▇ PREMISES CONTROLLED BY FACEBOOK )
INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF )
VIOLATION OF 18 U.S.C. § 1343 )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____July 6, 2020_____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ ▇ any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt ▇ the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*  ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:  06/22/2020 _____        _____
                                                                                      *Judge's signature*

City and state:  Washington, D.C. _____        U.S. Magistrate Judge Robin M. Meriweather
                                                                                      *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-01549 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date: _____                        _____<br>                                                                     *Executing officer's signature*<br><br>                                                                     _____<br>                                                                     *Printed name and title* |

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Facebook, Inc. accounts identified by Facebook User IDs ██████████ *(TARGET ACCOUNT 1)*, and ██████████ *(TARGET ACCOUNT 2)*, and which is stored █ premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process █ 1601 Willow Road, Menlo Park, California.

## ATTACHMENT B

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.   Information to be disclosed by Facebook, Inc. ("Facebook") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any records that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.   For the time period from October 1, 2013 to the Present:[27] The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all Facebook services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time █ which each message or other communication was sent, and the size and length of each message or other communication;

b.   For the time period from October 1, 2013 to the Present:  All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been

---

[27] This warrant seeks records to date out of an abundance of caution because although the accounts were previously deactivated by Facebook in 2015, the records were not preserved until 2018 and again in 2020, and storage records relevant to the accounts may have only have been recently stored/created by the provider.

"tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.       Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d.       For the time period from October 1, 2013 to the Present:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e. For the time period from October 1, 2013 to the Present: All "check ins" and other location information;

f. For the time period from October 1, 2013 to the Present: All records pertaining to communications between Facebook and any person regarding the Account, including contacts with support services and records of actions taken;

g. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN").

h. All information held by Facebook related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-Facebook based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i. Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.      All information held by Facebook related to any financial transactions, financial records, or documentation, including credit card information, account information, receipts, notes, and ledgers.

Within 14 days of the issuance of this warrant, Facebook shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



## II. Information to be seized by the government

All information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. §1343, Wire Fraud, and Title 18 U.S.C. § 1001, Material False Statements involving international terrorism, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(c) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(d) All records, communications, drafts, or other material related to support of designated foreign terrorist organizations and entities (FTOs), including, but not limited to, ISIS and S-1;

(e) All records, communications, drafts, or other material that discuss ISIS or any other FTOs; terrorist attacks, actions, communications, or planning; persons who have ever sought to travel to ISIS territory; or persons who have sought to provide material support to ISIS or any other FTO;

(f) All records, communications, drafts, or other material relating to statements made by the Account user regarding on-line chat rooms, social media platforms, the ███ website, relationship with S-1 and persons linked to S-1;

(g) All records, communications, drafts, or other material that is communicated through on-line chat rooms, social media platforms, video-sharing websites, or the ███ website;

(h) All records, communications, drafts, or other material related to operation of the ███ chat room, social media platforms, ███ website, and the communications of all administrators;

(i) All financial records of information;

(j) Evidence of solicitation of money or re-distribution of solicited money;

(k) Information that constitutes evidence concerning fundraising, transfer of money, conversion of money, concealing information about transactions, wire fraud or other financial fraud by the Account user, persons communicating with the Account user, or others connected to S-1;

(l) Information related to financial information, accounts, ledgers, and access to monetary instruments, goods, and funds, including use of intermediaries to disperse or collect funds and goods;

(m) Evidence related to the deletion, removal or destruction of possible evidence of possible criminal activity, including electronic information (including user-generated content and content which the user received), phones, computers, files, documents, photographs or other media;

(n) Records of or information about Internet Protocol addresses associated with the Account and its activity;

(o) Records and documents that identify co-conspirators, accomplices, and aiders and abettors to alleged criminal conduct, including in the commission of the above offenses;

(p) All records, communications, drafts, or other material concerning efforts to avoid detection by law enforcement or obfuscate evidence of criminal activity;

(q) Evidence related to the Account user's deletion of electronic information, including communications, documents, receipts, and transactions related to S-1 or any person connected with S-1; and,

(r) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) in the commission of the criminal activity under investigation; or (ii) communicated about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(s) Evidence related to the User's or Service Provider's deactivation of accounts, where applicable, and the Terms of Service which were violated.


As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); draft or deleted records; and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

### III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.  The review of electronic data produced by Facebook in response to this warrant may be conducted by any government personnel assisting the investigation, who may include, in addition to law enforcement officers and agents, analysts, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody, control of attorneys for the government and their support staff for their independent review.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication █ trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.　　all records attached to this certificate were made ▊ or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.　　such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.　　The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.　　The process or system is regularly verified by PROVIDER, and ▊ all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____　　_____

Date　　　　　　　　　　　　Signature

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED ███ PREMISES CONTROLLED BY FACEBOOK INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1343** | Case No.   20-sc-1549  <br><br> **Filed Under Seal** |

*Reference:  USAO* ███████  *Subject Accounts:  Facebook User IDs* ███████*, and* ███████

# AFFIDAVIT IN SUPPORT OF
# <u>AN APPLICATION FOR A SEARCH WARRANT</u>

I ████████████████████████████████████████

being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application for a search warrant for information associated with two Facebook accounts – that is, User IDs ███████ **(TARGET ACCOUNT 1),** and ███████ **(TARGET ACCOUNT 2)** – stored █ the premises owned, maintained, controlled, or operated by Facebook, Inc., an electronic communications services provider and/or remote computing services provider which is headquartered █ / which accepts service █ 1601 Willow Road, Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook, Inc. ("Facebook" or the "Provider") to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  I have also

2

reviewed other search warrants previously granted in this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that ███████ ████████ ("████████") has committed violations of 18 U.S.C. §1343 (Wire Fraud), and 18 U.S.C. §1001(a)(2) (material false statements in an investigation involving international terrorism). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C., *see* 18 U.S.C. § 3237. Additionally, ████████████████████████████ and the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district. *See* 18 U.S.C. § 3238.

3

7.      When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

## STATUTORY VIOLATIONS

### Wire Fraud

8.      Title 18, United States Code Section 1343 criminalizes knowingly devising a scheme for obtaining money by means of false pretenses or causes to be transmitted by means of wire in interstate commerce any signals for the purpose of executing such scheme. 18 U.S.C. §1343.

### Material False Statements Involving International Terrorism

9.      Title 18, United States Code Section 1001 criminalizes knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the executive branch of the United States.  18 U.S.C. §1001(a)(2).  If the matter involves domestic or international terrorism, the maximum penalty is eight years of incarceration.

## PROBABLE CAUSE

### Background on ISIS and Its Internet Recruitment Efforts

10.      The FBI has been investigating the use of the Internet and social media by foreign terrorist groups, including the Islamic State and al-Sham ("ISIS").  On or about October 15, 2004, the U.S. Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam ██ al Tawhid

4

wa'al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the INA and as a SDGT entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added a number of aliases to the ISIL listing, including: The Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production (collectively referred to herein as "ISIS"). On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. ISIS remains a designated FTO.

11. Based on your affiant's training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, traveled to Syria and Iraq to join ISIS, an act they commonly refer to as hijrah"[1]; (b) foreign fighters commonly entered Syria by crossing the border from Turkey or Jordan; (c) foreign fighters from Western countries traveled to locations in Turkey, including Istanbul, and then traveled to towns closer to the border where they were brought into Syria to join ISIS; (d) Abu Bakr al-Baghdadi was the leader (or "Caliph") of ISIS before he was killed by U.S. forces on or about October 26, 2019; (e) on or about October 31, 2019, Abu Ibrahim al-Hashimi al Qurayshi became the current leader of ISIS; (f) on or about March 24, 2020 Secretary of State Michael R. Pompeo designated al Qurayshi as a Specially

---

[1] Based on my training and experience, I know "hijrah" generally means migrations, and in this context refers to travel to engage in jihad.

Designated Global Terrorist; (g) since on or about September 22, 2014, ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and its leadership gave blanket approval for this indiscriminate killing by individuals residing in these countries.

12.     To gain supporters, recruit fighters, and raise funds, ISIS spreads its message of violent jihad[2] using social media platforms, such as Twitter, Facebook, YouTube, Instagram, and Paltalk. On these platforms, ISIS advocates post audio and video files that include recruitment messages and updates of events in Syria and Iraq. Online chat rooms controlled by ISIS advocates further effectuate this support.

13.     One such online community was a pro-ISIS Paltalk chat room called ████████, ████████████, which contained audio of speeches made by SUSPECT 1 ("S-1"). ████████ ████████████████████████ related to his encouragement of Muslims to fight and kill "kuffars" (non-believers): Americans, Jews, Christians, Hindus, and other non-Muslims. ████████████████████████████ S-1 continued to encourage violence and terrorist acts in speeches posted on the Internet or in ████ chat rooms. S-1 has also recorded numerous statements inciting violence and supporting ISIS, its former leader al-Baghdadi, al-Qaeda, and Osama bin Laden. ████ contained recorded lectures of S-1 proselytizing on behalf of and in support of ISIS.  I have viewed the ████ site and am familiar with its contents and organization.

_____

[2] Based on my training and experience, I know "jihad" is an Arabic word which literally means striving or struggling, but in this context it refers to a holy war, fight, or struggle against the enemies of Islam.

14.    S-1 is not a U.S. person 

**FBI Investigation of** ██████████

17.    In September of 2014, ██████████████████████ reported to the FBI that SUSPECT 2 ("S-2") and SUSPECT 3 ("S-3")[4], both of whom ████████████████, were vocal supporters of ISIS and espoused their desire to join the terrorist organization.  W-1 reported that ████████ lived ██████████████████████████████ as S-2 and accepted it and S-3's views pertaining to ISIS.[5]  W-1 indicated that S-2 and S-3 watched ISIS-related videos in the living room while ████████ cooked.  W-1 recalled one particular instance in 2014, during Ramadan, when S-2 and S-3 viewed a video depicting the killing of a Shia male and praised the methodical manner in which ISIS killed people.  Notably, this was around the time that ████████ ████████.  W-1 further indicated that both S-2 and S-3 would get excited about the videos and both stated that killing people was the right way to do things.



---

[6] Your affiant is aware the term "nasheed" can refer to vocal music that is popular in the Islamic world and generally makes reference to Islamic beliefs, history, religion, and current events.  Your affiant is further aware that many ISIS productions utilize nasheeds.



**██████ Role as ██ Administrator**

19.     On or about March 20, 2014, ████████ received an email welcoming her as a new ██ Administrator and assigning her the moniker ████████████ ████

████████████████████████████████████████

██ ████████ was advised that lying to the FBI would constitute a violation of federal law, and in that interview she initially told the FBI agents that "[she] was not an Administrator ████ ████████ later acknowledged she would sometimes help in the class and login with an Administrator account.   Later in the interview, ████████ admitted that she was an Administrator often over the past year, and that her involvement varied prior to that.  As an Administrator, she stated that she would take notes and post them on the ██ website, post Quranic verses and find hadith[8] during lectures, as well as, advertise the lectures on social media for S-1.

20.     ████████████████████ W-2[9] indicated that it visited the online ██ chat room. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[7] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Google accounts used by or associated with S-1 and/or ████████. In response to the warrant, Google provided this email among others.

[8] "Hadith" is a collection of traditions containing sayings of the Prophet Muhammad that is one of the major sources of guidance for Muslims.

████████████████████████████████████████



21. ███████████████████████████████████████████

██████████ W-2 reported that the primary ████ Administrator used the kunya,[10] ████

██████ ██████████ stated in an interview with FBI Agents that ██████████ was a

name she used on social media and/or communication accounts. Service provider records

confirmed this fact. As such, your affiant believes that ██████████ used the moniker ████

██████████ when serving as a ████ Administrator for S-1. ████

22. W-2 further indicated that ██████████ acted as S-1's secretary and was aware of S-

1's activities. W-2 also described ██████████ as the lead Administrator in the ████ chat room. W-2

explained that ██████████ handled all of S-1's correspondence, designed online posters to

advertise ████ lectures, facilitated lectures, coordinated the posting of hadith and Quranic verses in

the chat room, monitored ████ chat room discussions, and posted audio of ████ lectures to the

website.

23. Other evidence found in the investigation confirms that, upon becoming an ████

Administrator in or around March 2014, ██████████ assumed a prominent role in creating and

managing ████ social media accounts. Search warrant returns revealed that on or about April 2,

2014, ██████████ received an email from Facebook with the "latest insights about your Facebook

pages" for the week of March 24 through March 30. The Facebook email contained viewership

metrics for the page "████ [S-1] Posters" page (User ID ██████████).[11] The metrics

indicated that the Facebook page during that time period had obtained 11 "new likes," engaged

---

[10] "Kunya" is a term that can be used to describe a nickname or an honorary Islamic name for someone.

[11] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Facebook accounts used by or associated with S-1 and/or ██████████. In response to the warrant, Facebook provided records for this account among others.

with 53 people and had a weekly total reach of 405 users. Open source research showed that the "Weekly Total Reach" metric on Facebook reflects the number of unique users who navigated to the page.

24.     Further, a review of the aforementioned Google email search warrant returns revealed correspondence on or about June 8, 2014, between █████████ and another ███ Administrator, ████ who is known to the FBI, and in which █████████ asked about setting up a new fan web page. Seemingly in response to this inquiry, on or about June 9, 2014, this █████ Administrator responded to █████████, providing a new Facebook account, "██████████████████████" along with the login credentials and associated password for said account.

25.     Shortly thereafter, █████████ began receiving email updates from Facebook containing viewership metrics on additional ███-related pages. For example, on or about July 23, 2014, █████████ received an email from Facebook with "the latest insights about your Facebook Pages" from July 14, 2014 to July 20, 2014.  Notably, this email from Facebook was associated with **Facebook User ID** █████████ **(TARGET ACCOUNT 2)**.  Subsequent legal process identified the name of this account to be █████████ and registered to █████████ known email account, █████████████████  Additionally, records provided by Google revealed an instant message chat in March 2014 between S-3 and █████████ in which she explained to S-3




---

[12] Your affiant notes this email account, █████████████████, was the subject of a prior search warrant issued by the District Court for the District of Columbia on or about August 2, 2019.

[13] Legal process for **Facebook User ID** █████████ **(TARGET ACCOUNT 2)** also revealed the account was deactivated on September 2, 2015. Records preservation request letters under 18 U.S.C. § 2703(f) were served to Facebook for **TARGET ACCOUNT 2** on or about April 6, 2018; July 16, 2018; September 4, 2018; and April 8, 2020.

that she changed the name of the account to ██████████ because she posts "things on a website" and "didn't want ppl to know [her] name."

    26.    The Facebook pages mentioned in the "latest insights" email included the ████████████████ **page (User ID** ████████████**)**, or **TARGET ACCOUNT 1**. Notably, legal process for **TARGET ACCOUNT 1** revealed the page was registered using the aforementioned ████████████ email account on June 9, 2014.[14]

    27.    The email also mentioned the "████████████████████████████ page (User ID ████████)[15], and '██ [S-1] Posters'[16] page. A review of email records obtained from Google showed correspondence on or about May 21, 2014, between ██████ and the same ██ Administrator, ██ referenced above in which ██████ discussed merging the old "██ [S-1] Posters" page into the new Facebook page ████████████ or **TARGET ACCOUNT 1**.

    28.    Over the ensuing months, search warrant evidence has confirmed that ████████ continued to receive viewership emails from Facebook ██ her Google address, and web traffic to her Facebook pages increased significantly. For example, in a Facebook viewership email documenting insights for the July 14, 2014 to July 20, 2014 timeframe referenced above, "Weekly Total Reach" increased to 39,880 and Total Page Likes to 1,934 for **TARGET ACCOUNT 1**.

---

[14] Legal process for **Facebook User ID** ████████████ **(TARGET ACCOUNT 1)** also revealed the account was deactivated on April 21, 2015. A records preservation request letter under 18 U.S.C. § 2703(f) was served to Facebook for **TARGET ACCOUNT 1** on or about April 8, 2020.

[15] Legal process for the "~████████████████████████████" page (User ID ████████████) revealed no responsive records. Your affiant believes the page may have been deactivated and no records were retained by Facebook.

[16] *See supra footnote 11*

29.     Notably, your affiant is aware that between July 1, 2014, and July 20, 2014, S-1 – with ██████ assistance – delivered several lectures in support of ISIS and its recently-announced Caliph █ the time, Abu Bakr al-Baghdadi. Notes and audio for most of these lectures were posted to the ██ website. On July 1, 2014, shortly after Abu Bakr al-Baghdadi's sermon in Mosul announcing the establishment of the Islamic State, S-1 instructed ██████ via email to change the topic for the July 2, 2014 lecture to "A Ramadan Message from Ameerul Mu'mineen Abu Bakr al Baghdadi (translated by: [S-1])." Over the next two days, S-1 then forwarded ██████ several links, via email, pertaining to Abu Bakr al Baghdadi's speech and his biography, presumably to include in future lectures.

30.     Following the lecture, ██████ exchanged correspondence with an individual whom, despite operating without an "██" moniker, your affiant believes to be another ██ Administrator. In the email, ██████ detailed edits she wanted to make to the draft version of the notes for S-1's lecture which would be posted to the ██ website. The draft version of the notes listed ██████ as the note taker. Further, the notes contained the same links previously sent from S-1 to ██████, including "The biography of Khalifa Abu Bakr Al-Baghdadi, Amir Ul Mu'minin (Commander of the Believers)", ISIS's al-Hayat Media Center video, "This is the Promise of Allah," and an English version of Abu Bakr Al-Baghdadi's sermon.  The notes also included questions and answers which your Affiant believes to have been posed during the lecture. Included among these were the following:

- "Question 1: How do you give your bay'ah[17] if you are miles away?"

---

[17] Your affiant is aware the term "bay'ah" generally refers to an oath of allegiance to a figure of authority. In classical Islam, the term referred to a contract between the ruler and ruled, in which the latter would give its allegiance to the ruler, usually a caliph, in exchange for political and military leadership. In this context, your Affiant believes "bay'ah" would thus constitute a contract in which the individual pledging fealty would obey the orders of the caliph.

- o "Answer 1: Just by accepting it in your heart, that is sufficient…"

- "Question 2: If you are studying, should you finish and get your degree then leave?"
  - o "Answer 2:: Get your degree, qualify then leave…the caliph is asking for intellectuals…learn skills and help the state…else go there and join the battlefield…AND KILL THE KUFAAR!"

- "Question 3: A woman with no mahram (family escort/guardian), how can she travel to the dawla?"
  - o "Answer 3: You are allowed to travel with no mahram…because you can get married when you get there..."

- In a final question about a group not believing the khalifah because it did not control land, the notes respond with an answer that "it is all about ISIS (now Islamic state – IS)"

31.     A few days later, on July 4, 2014, ███████ advised S-1 via email that she had published [on social media] the poster for the upcoming lecture, "Leadership in Islam," which was scheduled for July 5, 2014.  Notes from the lecture, which were posted online and identified the note takers as ███████ and two other ███████ Administrators, included an overview of the three conditions needed for a Caliphate[18] and eleven conditions for a Caliph to be legitimate. Included among the notes were various statements, such as:

- "When the caliphate is establish [sic], it is compulsory on all Muslims to give their bay'ah (oath of allegiance) to the leader";
- "Abu Bakr Al-Baghdadi as ameerul mumineen has fulfilled all 11 conditions of a caliph";
- "These Muslims who reject the dawlah have the persona of Jews";
- A reprimand of two al-Qaeda leaders who were "on the wrong side of history" and needed to "give their bay'ah to the caliph publicly"

32.     Between July 5, 2014, and July 6, 2014, ███████ and S-1 exchanged a series of emails in which S-1 instructed ███████ to use an AK47 as her logo for the poster for the upcoming lecture. The lecture was advertised for on or about July 6, 2014, and titled "Jihad: Its

---

[18] Your affiant notes the term "Caliphate" can be used to refer to an Islamic State ruled by a leader, or caliph. A caliphate is often characterized as a state that implements sharia law.

14

Aim and Objective." Lecture notes were later posted to the ▮ website and these notes identified ▮ and another Administrator as those responsible for typing the notes live. Included among the notes were various statements such as:

- "The definition of Jihad…is to wage war against the kuffar";
- "It's easy for a woman to go for jihad because it's easy for her to make an IED and transport it under her abaya";
- "…[J]ihad training is fardul ayn (obligatory) on every Muslim'"
- "[Women} can be trained to make IEDs";
- "You have to pick up your arms when the caliphate is announced."
- "We have to do a cull of the kuffar to protect the world….this is exactly what ISIS is doing."
- "The only way for you to go to Paradise is to die on the battlefield."

33.     Between July 9, 2014 and July 10, 2014, S-1 and ▮ exchanged correspondence about the poster for another upcoming lecture, "The Importance of Hijra," which was delivered in two parts. ▮ again assisted in preparing the poster that S-1 requested, to feature the Masjid Al Aqsa[19] and Islamic State flag.  During the lecture, S-1 explained that making hijrah is the proof that one is a real Muslim. S-1 further explained it was forbidden for Muslims to live in Daarul Harb (the land of war) and how the Islamic State or "dawlah" provided food for the people and used oil money to look after the people.  S-1 then identifies the United States and the United Kingdom as Darul Harb, among other countries.

34.     Lecture notes for the second lecture, which was delivered on July 11, 2014, were again typed live by ▮ and two other administrators. Included among the notes were various statements of why it was dangerous for Muslims to live in Daarul Harb, including:

- "You are swelling the ranks of the enemy";

---

[19] "Masjid al aqsa" is Arabic for "The Farthest Mosque" which is considered the third holiest site in Islam and is located in the Old City of Jerusalem.

15

- "They make it a crime…to help your Muslim brothers and sisters financially…they say you are funding terrorism";
- "They make it illegal for you to join the caravan…they say you are supporting terrorism";
- "When you live among them, you will be raised among them on the Day of Judgment."

35. On or about July 16, 2014, ██████ and S-1 exchanged email correspondence regarding the upcoming lecture series, "Is the New Caliphate Valid?" In this correspondence, ██████ sent the poster that she designed for the lecture, asking for feedback from S-1. S-1 responded that she may post the flyer because it was "excellent." The flyer depicted an image of ISIS leader, Abu Bakr al-Baghdadi, the ISIS flag, and a map showing regions in Asia, Africa, and Europe, which appeared to have been conquered territories of past Islamic Caliphates.

36. On or about July 18, 2014, S-1 conducted and broadcast in the ████ chatroom part one of the lecture series on ISIS's Caliphate referenced above. During the lecture, S-1 explained the Caliphate was announced on the first day of Ramadan 2014 by Abu Bakr al-Baghdadi. Your affiant believes S-1 was discussing Abu Bakr al-Baghdadi's Ramadan message, *supra* paragraph 29. The lecture focused on the three conditions which, according to S-1 made the Caliphate valid. The conditions included that the Caliphate was established on Muslim land, the Caliph implemented "shariah" and not man-made law, and that it must have an army to protect the Islamic State and carry out jihad until Judgement Day. Furthermore, the lecture explained that the Quranic verses cited in S-1's lecture were evidence to support these claims, and that jihad had to continue against the infidels because no Caliph was allowed to hang up his sword.

37. ██ the end of this lecture, S-1 thanked several ██ Administrators for posting the notes, and requested ██████ "doctor the poster" and repost it to be used for part two of the lecture

16

series which would be held the following day.  Furthermore, S-1 thanked ██████ and another ██

Administrator for posting the Quranic hujjah.[20]

38.    Based on the foregoing and other information discussed herein, your affiant

believes ███████ falsely told FBI Agents that she was not an ██ Administrator and

misrepresented the full extent and duration of her involvement as an ██ Administrator.  As the

above shows, ████████ has been an ███ Administrator since 2014, and has had broad

responsibilities in promoting, advertising, documenting, and disseminating pro-ISIS propaganda

on S-1's and ███ behalf.

**Law Enforcement Interview of ████████**

39.    On October 25, 2019, FBI agents interviewed ███████ again, this time ██ her

████████████████████ FBI agents advised ████████ that lying was a crime under

Title 18 U.S. Code § 1001, and ████████ acknowledged she understood.  In response to a

question about th██ chatroom ever encouraging people to travel to the Islamic State, █████████

said it did not to her recollection.  In response to a question about the ██ chatroom expressing

support for Abu Bakr al-Baghdadi, ████████ again responded that it did not to her recollection.

When asked about sharing ISIS media or propaganda, █████████ responded she did not know

what S-1 was doing privately, but she, personally, did not.  Towards the end of the interview,

████████ said her understanding was that when S-1 spoke about ISIS, he aimed to explain the

purpose of having an Islamic State and was not supporting the violence.  ████████ agreed with

FBI Agents' memory of her prior law enforcement interview ████████ and specifically, how

---

[20] "Hujjah" is the Arabic term for proof.  In theology, the term may be applied to a conclusive argument
distinguishing proof from falsehood.

she had distinguished between supporting the concept of an Islamic State versus encouraging people to support the terrorist organization.

40.    As discussed above, ▮▮▮▮▮ played a central role in the ▮▮ chatroom, specifically in lectures and media that reached a large number of people and expressly supported Abu Bakr al-Baghdadi, explained the obligation for Muslims to make hijrah to the Islamic State, and directed Muslims to fight for ISIS and kill nonbelievers. ▮▮▮▮▮ personal Facebook account, **TARGET ACCOUNT 2**, was associated with an ▮ fan page. This ▮ fan page **(TARGET ACCOUNT 1)** was also operated by ▮▮▮▮. As discussed herein, **TARGET ACCOUNT 1** experienced a substantial increase in viewership in and around the time when ▮▮▮▮ was assisting S-1 in promoting ▮ pro-ISIS messages.  . Based on this, your Affiant believes there will be evidence of ▮▮▮▮ false statements contained in the Facebook accounts which are the subject of this affidavit in support of a search warrant.

41.    Additionally, the TARGET ACCOUNTS also appear to contain evidence related to ▮▮▮▮ knowledge of S-1's support for ISIS prior to engaging in wire fraud to collect funds from S-1's supporters intended for S-1, as discussed further below.

▮▮▮▮ and S-1's Fundraising Efforts

42.    ▮▮▮▮ was also actively involved in fundraising and collecting donations for the operation of the ▮ enterprise.  On January 5, 2016, a local law enforcement agency advised the FBI that during an ▮ discussion on December 21, 2015, a user name known to be associated with S-1 posted the following: "according to Shariah we kill apostates" and "If they turn back from Islam then kill them.  Surah 4:89".  Later in the same chat room, an individual believed to be another ▮ Administrator posted the following solicitation for funding, "DONATE TO THE

18

DAWAH[21] OF [S-1]- EMAIL TO:::: [Email Address 1] - TO ASK FOR DIRECTIONS ON HOW TO USE [MONEY TRANSMITTING SERVICE 1 ("MTS1")] OR [MONEY TRANSMITTING SERVICE 2 ("MTS2")]::::::JZK[22]".

43.     Further, on January 25, 2016, a local law enforcement agency advised the FBI that on January 18, 2016, an undercover operative (UCE) for the agency engaged in a private online conversation with an account believed to be used by S-1.  During this conversation S-1 asked the UCE to send money to Kingston, ███████, using a specific money transmitting service, hereafter referred to as "MTS1," under S-1's spouse's name, which S-1 identified as "████████ ████████" Excerpts of the conversation are as follows:

████████ haikh i would like to make donation for the dawa what is the best way?

S-1: the best way is via [MTS1]

S-1: send it to ████████████

S-1: her name is:

S-1: ███████ ███████

████ okay insh Allah

S-1 ████████████████

S-1: how much u are planning to send

████████ do i need an account number or just send it in her name insh Allha?

S-1: no account no needed

---

[21] "Dawah" (variation "dawa") means the proselytizing or preaching of Islam.
[22] "JZK" is often used as an abbreviation for "*JazakAllah Khair"*, which is an Arabic phrase meaning "May God reward you."

44.     Your affiant is aware that similar solicitations for donations occurred regularly in the ████ chat room. Shortly after becoming an administrator in March 2014, ████ sought to expand the funding base of ████ to include other social media platforms. On June 7, 2014, ████ sent an email to an individual using the nickname ████ ████ suggested they begin posting for donations on Facebook, Twitter, the blog, and in the Paltalk chatroom. ████ acknowledged in the email that in a separate conversation, another ████ Administrator advised her she would need S-1's permission to make this expansion because he believed the public solicitation for donations could cause the freezing of S-1's latest MTS1 and MTS2 accounts. A review of ████ emails identified an earlier email on June 3, 2014[24], in which thi ████ Administrator advised ████ that she would need "Shaikh's" approval prior to publically soliciting for donations due to concerns that the Shaikh's "latest" accounts may get frozen. ████ responded to the other ████ Administrator that it was "a dilemma".

*MTS1 and MTS2 Financial Records for* ████

45.     Since April 2, 2012, S-1 has been blocked or interdicted by MTS1 from using its services.[25] The FBI's review of records provided by MTS1 in January 2018 indicated that from

---

[23] Your affiant is aware the term "Muqatil" can be translated to mean "fighter" or "combatant" and often refers to a combatant in the military context. The nickname was associated with the email account, and email service provider records revealed multiple exchanges in which S-1 identified himself by name and instructed recipients to use this email address because he did not trust his other account, which your affiant believes is in reference to an account using an honorific and S-1's last name.

[24] Your affiant notes a prior version of this search warrant indicated this email correspondence occurred on June 3, 2017, when in fact, it occurred on June 3, 2014.



in or about November 2014 to December 2016, ██████ appeared to have received approximately $24,000 through approximately 97 separate transactions via MTS1 while residing in ██████ with S-1. These payments were from various senders in the United States, United Kingdom, and Canada, among other countries. MTS1 records indicated that ██████ utilized approximately three different forms of her own identification █ approximately 16 different locations throughou ██████ pick up these funds. Your affiant believes based on S-1's online fundraising efforts and ██████ role as an ██████ Administrator and S-1's ██████ the wire transfers sent to ██████ were sent to, or on behalf of, S-1. MTS1 indicated that it "interdicted," or blocked, ██████ from using its money transfer services in or around December 2016 because MTS1 assessed ██████ activity to be consistent with terrorist financing.

46. MTS2's records revealed that S-1 was blocked from using its services following the OFAC's designation of S-1 in or around December 2017. MTS2 indicated S-1 was put on a watch list maintained by a third party vendor in 2004 as a result o██████████████████ ██████████████; however, MTS2 did not subscribe to this watch list █ the time. The FBI's review of records provided by MTS2 indicated that from in or about August 2014 to December 2016, ██████ appeared to have received approximately $1,250, via MTS2. These payments were from senders in different countries. MTS2 records further indicated that the recipient (██████) utilized three different forms of her own personal identification to receive these payments.

*FBI Interview of S-4 about money transfers to* ██████

47. The FBI conducted voluntary interviews of S-4 in July and August 2017. In those interviews, S-4 was asked about its contacts and financial support of S-1, and S-4 made numerous false statements about its contacts with S-1, and denied providing any money to S-1 directly or

21



indirectly through other persons. ██████████████████████████

██████████████████████████████████████ S-4 is one of the

individuals who sent money to ██████ using MTS1.  During a subsequent interview with FBI

Agents and Assistant United States Attorneys ████████████████████ S-

4 stated that it contacted S-1 in 2016 and asked if it could send money to S-1.  S-4 stated that S-1

instructed it to send money to ██████ using MTS1 because ██████ name was "clean."

S-4 understood the term "clean" to mean that ██████ was not a terrorist and the transaction to

S-1 would be completed successfully if sent through ██████.

48.     A review of S-1 email records obtained from legal process revealed that on June 5,

2016, S-4 emailed S-1: "Salaam, I would like to give donation of 50 dollars whichever way

possible. Its what I can afford to do as of now, I know its not much. How would I go about doing

so?" On June 5, 2016, S-1 responded: "wa alaikum salam wrwb. You may send it via [MTS1] to

my ████ name ██████ ████ ████████████████ ls use your real name to send it in

case of a hiccup u can claim your money back ██████ name is clean so you shud be fine insha

allah. What city do u live in I forgot?"

49.     The FBI's review of records provided by MTS1 in January 2018 revealed two

transactions in June 2016 and December 2016, in which S-4 sent by wire approximately $50 and

$300, respectively, to ██████.

50.     S-4 stated it did not know if S-1 was being watched by law enforcement authorities,

and indicated that it also communicated directly with ██████ via a messaging application

(hereinafter "MA1"), which utilizes a mobile electronic device and the internet.  S-4 also told the

FBI that it sent MA1 messages to ██████ what it believed to be ██████ cellular phone.

Your affiant is aware that persons who engage in criminal activity will often attempt to hide or

obscure their financial transactions through friends, confidants, or family members to avoid detection by law enforcement. MTS1 also indicated that it blocked another attempted transaction with S-4 to S-1, through ███████ on April 6, 2017.

*FBI Interview of* ███████ *about financial transactions on January 25, 2018*

51. During ███████ voluntary interview with FBI Agents ███████████████████ ████████████████████████████ stated that S-1 had a bank account in ██████ but "they closed it down." When asked if ███████ ever had a bank account closed or a financial transaction blocked, ███████ responded, "No because I don't do any weird transactions, my stuff is legit." When asked about accepting donations on S-1's behalf, ███████ initially indicated that she accepted money on S-1's behalf approximately two years ago for Eid, an Islamic holiday. ███████ was directly asked if she ever accepted any donations or any contributions from anyone in the world other than that Eid. ███████ responded that there may have been a few other times. When asked if there were more or less than ten other instances outside of Eid in which she accepted money, ███████ responded, "Less than, maybe even five times. I'm-it was probably less than that 'cuz I didn't like that whole business." ███████ again reiterated that she did not accept money on S-1's behalf outside of those few occasions.

*FBI Interview of* ███████ *about financial transactions on October 25, 2019*

52. On October 25, 2019, ███████ was interviewed by FBI Agents ██ her ████████ ██████████████ FBI Agents again advised ███████ that lying was a crime under Title 18 U.S. Code 1001, and ███████ acknowledged that she understood. ███████ stated that she only accepted a miniscule amount of money and it was not to support S-1's activities or the ██ dawah. ███████ explained that she was "leery" about receiving money because it could

23



hurt her account, and her standing. ████████ later stated that S-1 made money that was basically

for their living, but she was not familiar with his money because she had no part in it.

    53.    Your affiant believes ████████ knowingly made false statements to FBI Agents

about her involvement in collecting funds on behalf of S-1 ████████████████████████

████████████████████████████████ and ████████████████████████████

on October 25, 2019.  As discussed above, ████████ received approximately 100 wire transfers

via MTS1 and MTS2 between August 2014 and December 2016, and █ least five of these transfers

were identified by S-4 and S-5 as having been intended for S-1.

    54.    Based on the information discussed herein, your affiant believes ████████ and S-

1 devised a scheme to defraud MTS1 and MTS2 wherein S-1 directed ███ followers to wire funds

via MTS1 and MTS2 to ████████ instead of directly to S-1.  Through this scheme, your affiant

believes ████████ and S-1 obtained money wired through MTS1 and MTS2 under false

pretenses: that funds were being wired through MTS 1 and MTS2 for persons other than S-1,

namely ████████, when in truth the money was intended for, and provided to, S-1.  Your affiant

believes this scheme was executed by S-1 and ████████ because ████████ name was "clean"

and S-1 and ████████ believed ████████ name had not yet been blocked by MTS1 or MTS2.

    55.    Furthermore, your affiant believes ████████ visited numerous MTS1 and MTS2

branch locations in ████████, collected funds from wire transfers using multiple forms of

identification, and lied to FBI agents about her activity because she was attempting to conceal her

involvement in the scheme.  Your affiant notes that ████████ acknowledged she "…didn't like

that whole business" in the context of collecting funds on behalf of S-1 and was "leery" of it, but

your affiant believes ████████ nonetheless participated in this scheme despite the possible legal

ramifications.

**BACKGROUND CONCERNING FACEBOOK'S ACCOUNTS**

56.     Facebook is the provider of the internet-based account(s) identified by User IDs ████████████ *(TARGET ACCOUNT 1)*, and ████████ *(TARGET ACCOUNT 2)*.

57.     Facebook owns and operates a free-access social networking website of the same name that can be accessed █ http://www.facebook.com ("Facebook").  The website is owned and operated by Facebook.  Facebook allows users to establish accounts with Facebook, and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

58.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user-identification number ("user ID") to each account.  Facebook identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

59.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each Facebook group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request.  If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's

25

account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

60.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

61.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations ▉ particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

62.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of the "tag"

26

and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

63. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

64. In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a Facebook account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on Facebook's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Facebook's servers for a certain period of time.

65. A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked". Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

66. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

27

67.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

68.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

69.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend".  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

70.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

71.     In addition to the applications described above, Facebook also provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

72.     Facebook also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

28

73.     Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

74.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

75.     Based on my training and experience, I know that providers such as Facebook also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Facebook in order to track what devices are using Facebook's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute

29

evidence of the crimes under investigation because they can be used (a) to find other Facebook accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Facebook account.

76.     Facebook also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's Facebook account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as Facebook) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of Facebook are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's Facebook account via the mobile application.

77.     Based on my training and experience, I know that providers such as Facebook use cookies and similar technologies to track users visiting Facebook's webpages and using its

products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Facebook. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Facebook may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Facebook account and determine the scope of criminal activity.

78.    Based on my training and experience, I know that Facebook maintains records that can link different Facebook accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Facebook accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Facebook account.

79.    Based on my training and experience, I know that subscribers can communicate directly with Facebook about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the

crimes under investigation because the information can be used to identify the account's user or users.

80.     In summary, based on my training and experience in this context, I believe that the computers of Facebook are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Facebook subscribers), as well as Facebook-generated information about its subscribers and their use of Facebook services and other online services.   In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.   In fact, even if subscribers provide Facebook with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

81.     As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion.   From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant ▌ a residence.   For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account ▌ a relevant time.   Further, Facebook account activity can show how and when the account was accessed or used.   For example, as described above, Facebook logs the IP addresses from which Facebook users access

32

their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its Facebook services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user. Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[26]

82.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a Facebook account may be found within the user-generated content created or stored by the Facebook subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can

---

[26] ▮ times, social media providers such as Facebook can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of Facebook's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for ▮ least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar Facebook accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

83.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Tejpal S. Chawla, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

84.     Based on the foregoing, I request that the Court issue the proposed search warrant based on probable cause to believe that the accounts contain evidence of criminal activity or themselves are instrumentalities, or fruits of these crimes. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

85.     The government further requests to share the information obtained from this search (to include copies of digital media) with any government agency investigating, or aiding in the investigation of this case or related matters.

Respectfully submitted,

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 22, 2020

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

35

# UNITED STATES MAGISTRATE JUDGE
# U.S. DISTRICT COURT BUILDING
# WASHINGTON, D.C.

PLEASE ISSUE: ☐ Arrest  ☑ Search  ☑ Seizure

warrant for:  IN THE MATTER OF THE SEARCH OF INFORMATION
ASSOCIATED WITH TWO ACCOUNTS STORED ██ PREMISES
CONTROLLED BY FACEBOOK INC. PURSUANT TO 18 U.S.C. § 2703
FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1343

Violation: ☐ D.C.C.  ☑ U.S.C.  Title: 18

Section(s):  1343

/s/ Tejpal S. Chawla
_____
Tejpal S. Chawla
Assistant United States Attorney
(202) 252-7

6/22/2020
_____
Date

COMPLETE FOR ALL ARREST WARRANTS:

*The following information __must__ be provided for __ALL__ arrest warrants and an* **original** *and* **duplicate** *of this form must be submitted to the Clerk's Office with the warrant papers.*

Officer / Agent Name: ███████████

Badge Number: ███████

Agency / Unit: ████████████████████████████

24 Hour Telephone Number: ██████████
 (For officer/agent)

Cellular Number:  Same as above
 (For officer/agent)

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH<br>TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK<br>INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF<br>VIOLATION OF 18 U.S.C. § 1343 | )<br>)<br>)<br>)  Case No. 20-sc-01549<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1001(a)(2) | Material False Statements in an Investigation Involving International Terrorism |

The application is based on these facts:

See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 06/22/2020 _____

2020.06.22 16:32:53 -04'00'

*Judge's signature*

City and state: Washington, D.C.

U.S. Magistrate Judge Robin M. Meriweather

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  20-sc-01549 |
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH | ) |
| TWO ACCOUNTS STORED ▇ PREMISES CONTROLLED BY FACEBOOK | ) |
| INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF | ) |
| VIOLATION OF 18 U.S.C. § 1343 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____July 6, 2020_____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ ▇ any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt ▇ the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   06/22/2020

2020.06.22 16:33:15 -04'00'

*Judge's signature*

City and state:   Washington, D.C.

U.S. Magistrate Judge Robin M. Meriweather
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>   20-sc-01549 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Facebook, Inc. accounts identified by Facebook User IDs ████████████ **(TARGET ACCOUNT 1)**, and ██████████ **(TARGET ACCOUNT 2)**, and which is stored █ premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process █ 1601 Willow Road, Menlo Park, California.

### ATTACHMENT B

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.   Information to be disclosed by Facebook, Inc. ("Facebook") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any records that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.      For the time period from October 1, 2013 to the Present:[27] The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all Facebook services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time ▮ which each message or other communication was sent, and the size and length of each message or other communication;

b.      For the time period from October 1, 2013 to the Present:  All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been

---

[27] This warrant seeks records to date out of an abundance of caution because although the accounts were previously deactivated by Facebook in 2015, the records were not preserved until 2018 and again in 2020, and storage records relevant to the accounts may have only have been recently stored/created by the provider.

"tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

      c.     Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

      d.     For the time period from October 1, 2013 to the Present: All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e.     For the time period from October 1, 2013 to the Present:  All "check ins" and other location information;

f.     For the time period from October 1, 2013 to the Present:  All records pertaining to communications between Facebook and any person regarding the Account, including contacts with support services and records of actions taken;

g.     All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN").

h.     All information held by Facebook related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-Facebook based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.    All information held by Facebook related to any financial transactions, financial records, or documentation, including credit card information, account information, receipts, notes, and ledgers.

Within 14 days of the issuance of this warrant, Facebook shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



## II. Information to be seized by the government

All information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. §1343, Wire Fraud, and Title 18 U.S.C. § 1001, Material False Statements involving international terrorism, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(c) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(d) All records, communications, drafts, or other material related to support of designated foreign terrorist organizations and entities (FTOs), including, but not limited to, ISIS and S-1;

(e) All records, communications, drafts, or other material that discuss ISIS or any other FTOs; terrorist attacks, actions, communications, or planning; persons who have ever sought to travel to ISIS territory; or persons who have sought to provide material support to ISIS or any other FTO;

(f) All records, communications, drafts, or other material relating to statements made by the Account user regarding on-line chat rooms, social media platforms, the █ website, relationship with S-1 and persons linked to S-1;

(g) All records, communications, drafts, or other material that is communicated through on-line chat rooms, social media platforms, video-sharing websites, or the █ website;

(h) All records, communications, drafts, or other material related to operation of the █ chat room, social media platforms, █ website, and the communications of all administrators;

(i) All financial records of information;

(j) Evidence of solicitation of money or re-distribution of solicited money;

(k) Information that constitutes evidence concerning fundraising, transfer of money, conversion of money, concealing information about transactions, wire fraud or other financial fraud by the Account user, persons communicating with the Account user, or others connected to S-1;

(l) Information related to financial information, accounts, ledgers, and access to monetary instruments, goods, and funds, including use of intermediaries to disperse or collect funds and goods;

(m) Evidence related to the deletion, removal or destruction of possible evidence of possible criminal activity, including electronic information (including user-generated content and content which the user received), phones, computers, files, documents, photographs or other media;

(n) Records of or information about Internet Protocol addresses associated with the Account and its activity;

(o) Records and documents that identify co-conspirators, accomplices, and aiders and abettors to alleged criminal conduct, including in the commission of the above offenses;

(p) All records, communications, drafts, or other material concerning efforts to avoid detection by law enforcement or obfuscate evidence of criminal activity;

(q) Evidence related to the Account user's deletion of electronic information, including communications, documents, receipts, and transactions related to S-1 or any person connected with S-1; and,

(r) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) in the commission of the criminal activity under investigation; or (ii) communicated about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(s) Evidence related to the User's or Service Provider's deactivation of accounts, where applicable, and the Terms of Service which were violated.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); draft or deleted records; and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.  The review of electronic data produced by Facebook in response to this warrant may be conducted by any government personnel assisting the investigation, who may include, in addition to law enforcement officers and agents, analysts, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody, control of attorneys for the government and their support staff for their independent review.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication █ trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF
## EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made ▮ or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by PROVIDER, and ▮ all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____        _____
Date                             Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED** ▉ **PREMISES CONTROLLED BY FACEBOOK INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1343** | Case No.   20-sc-1549<br><br><br>**Filed Under Seal** |

*Reference:  USAO* ▉▉▉▉ *Subject Accounts:  Facebook User IDs* ▉▉▉▉▉▉, *and* ▉▉▉▉

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with two Facebook accounts – that is, User IDs ▉▉▉▉▉▉▉▉▉ **(TARGET ACCOUNT 1),** and ▉▉▉▉ **(TARGET ACCOUNT 2)** – stored ▉ the premises owned, maintained, controlled, or operated by Facebook, Inc., an electronic communications services provider and/or remote computing services provider which is headquartered ▉ / which accepts service ▉ 1601 Willow Road, Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook, Inc. ("Facebook" or the "Provider") to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in

Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents, witnesses, and agencies.  I have also

2

reviewed other search warrants previously granted in this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that ███████ ███████ ("███████") has committed violations of 18 U.S.C. §1343 (Wire Fraud), and 18 U.S.C. §1001(a)(2) (material false statements in an investigation involving international terrorism). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C., *see* 18 U.S.C. § 3237. Additionally, ███████████████████████ and the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district. *See* 18 U.S.C. § 3238.

3

7.     When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

## STATUTORY VIOLATIONS

### Wire Fraud

8.     Title 18, United States Code Section 1343 criminalizes knowingly devising a scheme for obtaining money by means of false pretenses or causes to be transmitted by means of wire in interstate commerce any signals for the purpose of executing such scheme. 18 U.S.C. §1343.

### Material False Statements Involving International Terrorism

9.     Title 18, United States Code Section 1001 criminalizes knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the executive branch of the United States.  18 U.S.C. §1001(a)(2).  If the matter involves domestic or international terrorism, the maximum penalty is eight years of incarceration.

## PROBABLE CAUSE

### Background on ISIS and Its Internet Recruitment Efforts

10.     The FBI has been investigating the use of the Internet and social media by foreign terrorist groups, including the Islamic State and al-Sham ("ISIS").  On or about October 15, 2004, the U.S. Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawhid

4

wa'al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the INA and as a SDGT entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added a number of aliases to the ISIL listing, including: The Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production (collectively referred to herein as "ISIS"). On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. ISIS remains a designated FTO.

11.     Based on your affiant's training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, traveled to Syria and Iraq to join ISIS, an act they commonly refer to as hijrah"[1]; (b) foreign fighters commonly entered Syria by crossing the border from Turkey or Jordan; (c) foreign fighters from Western countries traveled to locations in Turkey, including Istanbul, and then traveled to towns closer to the border where they were brought into Syria to join ISIS; (d) Abu Bakr al-Baghdadi was the leader (or "Caliph") of ISIS before he was killed by U.S. forces on or about October 26, 2019; (e) on or about October 31, 2019, Abu Ibrahim al-Hashimi al Qurayshi became the current leader of ISIS; (f) on or about March 24, 2020 Secretary of State Michael R. Pompeo designated al Qurayshi as a Specially

---

[1] Based on my training and experience, I know "hijrah" generally means migrations, and in this context refers to travel to engage in jihad.

Designated Global Terrorist; (g) since on or about September 22, 2014, ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and its leadership gave blanket approval for this indiscriminate killing by individuals residing in these countries.

12.     To gain supporters, recruit fighters, and raise funds, ISIS spreads its message of violent jihad[2] using social media platforms, such as Twitter, Facebook, YouTube, Instagram, and Paltalk. On these platforms, ISIS advocates post audio and video files that include recruitment messages and updates of events in Syria and Iraq. Online chat rooms controlled by ISIS advocates further effectuate this support.

13.     One such online community was a pro-ISIS Paltalk chat room called ████████ ████████ which contained audio of speeches made by SUSPECT 1 ("S-1"). S-1 was convicted in British court for soliciting murder related to his encouragement of Muslims to fight and kill "kuffars" (non-believers): Americans, Jews, Christians, Hindus, and other non-Muslims. After S-1's conviction, imprisonment, and release, S-1 continued to encourage violence and terrorist acts in speeches posted on the Internet or in Paltalk chat rooms. S-1 has also recorded numerous statements inciting violence and supporting ISIS, its former leader al-Baghdadi, al-Qaeda, and Osama bin Laden. ██ contained recorded lectures of S-1 proselytizing on behalf of and in support of ISIS. I have viewed the ██ site and am familiar with its contents and organization.

---

[2] Based on my training and experience, I know "jihad" is an Arabic word which literally means striving or struggling, but in this context it refers to a holy war, fight, or struggle against the enemies of Islam.

14.    S-1 is not a U.S. person



**FBI Investigation of** ██████

17.    In September of 2014, ████████████ W-1, reported to the FBI that SUSPECT 2 ("S-2") and SUSPECT 3 ("S-3")[4], both of whom a██████████, were vocal supporters of ISIS and espoused their desire to join the terrorist organization.  W-1 reported that ████████████████████████████████████accepted it and S-3's views pertaining to ISIS.[5]  W-1 indicated that S-2 and S-3 watched ISIS-related videos in the living room while ███████ cooked.  W-1 recalled one particular instance in 2014, during Ramadan, when S-2 and S-3 viewed a video depicting the killing of a Shia male and praised the methodical manner in which ISIS killed people.  Notably, this was around the time that ████████ married S-1.  W-1 further indicated that both S-2 and S-3 would get excited about the videos and both stated that killing people was the right way to do things.



---

[6] Your affiant is aware the term "nasheed" can refer to vocal music that is popular in the Islamic world and generally makes reference to Islamic beliefs, history, religion, and current events.  Your affiant is further aware that many ISIS productions utilize nasheeds.

███████ **Role as an** ██ **Administrator**

19.     On or about March 20, 2014, ███████ received an email welcoming her as a new

██ Administrator and assigning her the moniker ████████████████████████████

████████████████████████████████████████████████████████████████████████

██████ ████████ was advised that lying to the FBI would constitute a violation of federal law,

and in that interview she initially told the FBI agents that "[she] was not an Administrator [of

██]." ████████ later acknowledged she would sometimes help in the class and login with an ██

Administrator account.    Later in the interview, ███████ admitted that she was an ██

Administrator often over the past year, and that her involvement varied prior to that.  As an

Administrator, she stated that she would take notes and post them on the ██ website, post Quranic

verses and find hadith[8] during lectures, as well as, advertise the lectures on social media for S-1.

20.     ██████████████████████ W-2[9] indicated that it visited the online

██ chat room. █████████████████████████████████



_____

[7] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Google accounts used by or associated with S-1 and/or ████████. In response to the warrant, Google provided this email among others.

[8] "Hadith" is a collection of traditions containing sayings of the Prophet Muhammad that is one of the major sources of guidance for Muslims.

21. ████████████████████████████████████████

████████ W-2 reported that the primary ████ Administrator used the kunya,[10] ████

████████ ████████ stated in an interview with FBI Agents that ████████ was a

name she used on social media and/or communication accounts. Service provider records

confirmed this fact. As such, your affiant believes that ████████ used the moniker "█

████████" when serving as an ████ Administrator for S-1.

22. W-2 further indicated that ████████ acted as S-1's secretary and was aware of S-

1's activities. W-2 also described ████████ as the lead Administrator in the ████ chat room. W-2

explained that ████████ handled all of S-1's correspondence, designed online posters to

advertise ████ lectures, facilitated lectures, coordinated the posting of hadith and Quranic verses in

the chat room, monitored ████ chat room discussions, and posted audio of ████ lectures to the ████

website.

23. Other evidence found in the investigation confirms that, upon becoming an ████

Administrator in or around March 2014, ████████ assumed a prominent role in creating and

managing ████ social media accounts. Search warrant returns revealed that on or about April 2,

2014, ████████ received an email from Facebook with the "latest insights about your Facebook

pages" for the week of March 24 through March 30. The Facebook email contained viewership

metrics for the page "████ [S-1] Posters" page (User ID ████████).[11] The metrics

indicated that the Facebook page during that time period had obtained 11 "new likes," engaged

---

[10] "Kunya" is a term that can be used to describe a nickname or an honorary Islamic name for someone.

[11] On August 2, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia issued a search and seizure warrant for information associated with five Facebook accounts used by or associated with S-1 and/or ████████. In response to the warrant, Facebook provided records for this account among others.

with 53 people and had a weekly total reach of 405 users. Open source research showed that the "Weekly Total Reach" metric on Facebook reflects the number of unique users who navigated to the page.

24.    Further, a review of the aforementioned Google email search warrant returns revealed correspondence on or about June 8, 2014, between ▮▮▮▮▮▮ and another ▮▮ Administrator, AT5, who is known to the FBI, and in which ▮▮▮▮▮▮ asked about setting up a new fan web page. Seemingly in response to this inquiry, on or about June 9, 2014, this ▮▮ Administrator responded to ▮▮▮▮▮▮, providing a new Facebook account, "▮▮▮▮▮▮▮▮▮▮▮▮" along with the login credentials and associated password for said account.

25.    Shortly thereafter, ▮▮▮▮▮▮ began receiving email updates from Facebook containing viewership metrics on additional ▮▮-related pages. For example, on or about July 23, 2014, ▮▮▮▮▮▮ received an email from Facebook with "the latest insights about your Facebook Pages" from July 14, 2014 to July 20, 2014.  Notably, this email from Facebook was associated with **Facebook User ID** ▮▮▮▮▮▮ **(TARGET ACCOUNT 2)**.  Subsequent legal process identified the name of this account to be "**Umm Sulayman**" and registered to ▮▮▮▮▮▮ known email accou▮▮▮▮▮▮▮▮▮▮[13]. Additionally, records provided by Google revealed an instant message chat in March 2014 between S-3 and ▮▮▮▮▮▮ in which she explained to S-3

---

[12] Your affiant notes this email account, ▮▮▮▮▮▮, was the subject of a prior search warrant issued by the District Court for the District of Columbia on or about August 2, 2019.

[13] Legal process for **Facebook User ID** ▮▮▮▮▮▮ **(TARGET ACCOUNT 2)** also revealed the account was deactivated on September 2, 2015. Records preservation request letters under 18 U.S.C. § 2703(f) were served to Facebook for **TARGET ACCOUNT 2** on or about April 6, 2018; July 16, 2018; September 4, 2018; and April 8, 2020.

that she changed the name of the account to ███████████ because she posts "things on a website" and "didn't want ppl to know [her] name."

26. The Facebook pages mentioned in the "latest insights" email included the ██████████████' page (User ID ██████████████), or **TARGET ACCOUNT 1**. Notably, legal process for **TARGET ACCOUNT 1** revealed the page was registered using the aforementioned ████████████████ email account on June 9, 2014.[14]

27. The email also mentioned the "~ ████████████████████████ page (User ID ████████████)[15], and "█ [S-1] Posters"[16] page. A review of email records obtained from Google showed correspondence on or about May 21, 2014, between ███████████ and the same █ Administrator, AT5, referenced above in which ████████ discussed merging the old "█ [S-1] Posters" page into the new Facebook page "**Authentic Tauheed**," or **TARGET ACCOUNT 1**.

28. Over the ensuing months, search warrant evidence has confirmed that ████████ continued to receive viewership emails from Facebook █ her Google address, and web traffic to her Facebook pages increased significantly. For example, in a Facebook viewership email documenting insights for the July 14, 2014 to July 20, 2014 timeframe referenced above, "Weekly Total Reach" increased to 39,880 and Total Page Likes to 1,934 for **TARGET ACCOUNT 1**.

---

[14] Legal process for **Facebook User ID** ████████████ (**TARGET ACCOUNT 1**) also revealed the account was deactivated on April 21, 2015. A records preservation request letter under 18 U.S.C. § 2703(f) was served to Facebook for **TARGET ACCOUNT 1** on or about April 8, 2020.

[15] Legal process for the "~ ████████████████████████████████" page (User ID ████████████) revealed no responsive records. Your affiant believes the page may have been deactivated and no records were retained by Facebook.

[16] *See supra* footnote 11

29.     Notably, your affiant is aware that between July 1, 2014, and July 20, 2014, S-1 –
with ▮▮▮▮▮▮ assistance – delivered several lectures in support of ISIS and its recently-
announced Caliph ▮ the time, Abu Bakr al-Baghdadi. Notes and audio for most of these lectures
were posted to the ▮▮ website. On July 1, 2014, shortly after Abu Bakr al-Baghdadi's sermon in
Mosul announcing the establishment of the Islamic State, S-1 instructed ▮▮▮▮▮▮ via email to
change the topic for the July 2, 2014 lecture to "A Ramadan Message from Ameerul Mu'mineen
Abu Bakr al Baghdadi (translated by: [S-1])." Over the next two days, S-1 then forwarded
▮▮▮▮▮▮ several links, via email, pertaining to Abu Bakr al Baghdadi's speech and his
biography, presumably to include in future lectures.

30.     Following the lecture, ▮▮▮▮▮▮ exchanged correspondence with an individual
whom, despite operating without an "▮▮" moniker, your affiant believes to be another ▮▮
Administrator. In the email, ▮▮▮▮▮▮ detailed edits she wanted to make to the draft version of
the notes for S-1's lecture which would be posted to the ▮▮ website. The draft version of the notes
listed ▮▮▮▮▮▮▮▮ as the note taker. Further, the notes contained the same links previously
sent from S-1 to ▮▮▮▮▮, including "The biography of Khalifa Abu Bakr Al-Baghdadi, Amir
Ul Mu'minin (Commander of the Believers)", ISIS's al-Hayat Media Center video, "This is the
Promise of Allah," and an English version of Abu Bakr Al-Baghdadi's sermon.  The notes also
included questions and answers which your Affiant believes to have been posed during the lecture.
Included among these were the following:

- "Question 1: How do you give your bay'ah[17] if you are miles away?"

---

[17] Your affiant is aware the term "bay'ah" generally refers to an oath of allegiance to a figure of authority. In classical
Islam, the term referred to a contract between the ruler and ruled, in which the latter would give its allegiance to the
ruler, usually a caliph, in exchange for political and military leadership. In this context, your Affiant believes "bay'ah"
would thus constitute a contract in which the individual pledging fealty would obey the orders of the caliph.

> ○ "Answer 1: Just by accepting it in your heart, that is sufficient…"

- "Question 2: If you are studying, should you finish and get your degree then leave?"
  > ○ "Answer 2:: Get your degree, qualify then leave…the caliph is asking for intellectuals…learn skills and help the state…else go there and join the battlefield…AND KILL THE KUFAAR!"

- "Question 3: A woman with no mahram (family escort/guardian), how can she travel to the dawla?"
  > ○ "Answer 3: You are allowed to travel with no mahram…because you can get married when you get there..."

- In a final question about a group not believing the khalifah because it did not control land, the notes respond with an answer that "it is all about ISIS (now Islamic state – IS)"

31.     A few days later, on July 4, 2014, ████████ advised S-1 via email that she had published [on social media] the poster for the upcoming lecture, "Leadership in Islam," which was scheduled for July 5, 2014.  Notes from the lecture, which were posted online and identified the note takers as ████████nd two other ████ Administrators, included an overview of the three conditions needed for a Caliphate[18] and eleven conditions for a Caliph to be legitimate. Included among the notes were various statements, such as:

- "When the caliphate is establish [sic], it is compulsory on all Muslims to give their bay'ah (oath of allegiance) to the leader";
- "Abu Bakr Al-Baghdadi as ameerul mumineen has fulfilled all 11 conditions of a caliph";
- "These Muslims who reject the dawlah have the persona of Jews";
- A reprimand of two al-Qaeda leaders who were "on the wrong side of history" and needed to "give their bay'ah to the caliph publicly"

32.     Between July 5, 2014, and July 6, 2014, ████████ and S-1 exchanged a series of emails in which S-1 instructed ████████ to use an AK47 as her logo for the poster for the upcoming lecture. The lecture was advertised for on or about July 6, 2014, and titled "Jihad: Its

---

[18] Your affiant notes the term "Caliphate" can be used to refer to an Islamic State ruled by a leader, or caliph. A caliphate is often characterized as a state that implements sharia law.

Aim and Objective." Lecture notes were later posted to the ██ website and these notes identified ████ and another Administrator as those responsible for typing the notes live. Included among the notes were various statements such as:

- "The definition of Jihad…is to wage war against the kuffar";
- "It's easy for a woman to go for jihad because it's easy for her to make an IED and transport it under her abaya";
- "…[J]ihad training is fardul ayn (obligatory) on every Muslim'"
- "[Women} can be trained to make IEDs";
- "You have to pick up your arms when the caliphate is announced."
- "We have to do a cull of the kuffar to protect the world….this is exactly what ISIS is doing."
- "The only way for you to go to Paradise is to die on the battlefield."

33.     Between July 9, 2014 and July 10, 2014, S-1 and ████ exchanged correspondence about the poster for another upcoming lecture, "The Importance of Hijra," which was delivered in two parts. ████ again assisted in preparing the poster that S-1 requested, to feature the Masjid Al Aqsa[19] and Islamic State flag.  During the lecture, S-1 explained that making hijrah is the proof that one is a real Muslim. S-1 further explained it was forbidden for Muslims to live in Daarul Harb (the land of war) and how the Islamic State or "dawlah" provided food for the people and used oil money to look after the people.  S-1 then identifies the United States and the United Kingdom as Darul Harb, among other countries.

34.     Lecture notes for the second lecture, which was delivered on July 11, 2014, were again typed live by ████ and two other administrators. Included among the notes were various statements of why it was dangerous for Muslims to live in Daarul Harb, including:

- "You are swelling the ranks of the enemy";

---

[19] "Masjid al aqsa" is Arabic for "The Farthest Mosque" which is considered the third holiest site in Islam and is located in the Old City of Jerusalem.

- "They make it a crime…to help your Muslim brothers and sisters financially…they say you are funding terrorism";
- "They make it illegal for you to join the caravan…they say you are supporting terrorism";
- "When you live among them, you will be raised among them on the Day of Judgment."

35. On or about July 16, 2014, ▮▮▮▮ and S-1 exchanged email correspondence regarding the upcoming lecture series, "Is the New Caliphate Valid?" In this correspondence, ▮▮▮▮ sent the poster that she designed for the lecture, asking for feedback from S-1. S-1 responded that she may post the flyer because it was "excellent." The flyer depicted an image of ISIS leader, Abu Bakr al-Baghdadi, the ISIS flag, and a map showing regions in Asia, Africa, and Europe, which appeared to have been conquered territories of past Islamic Caliphates.

36. On or about July 18, 2014, S-1 conducted and broadcast in the ▮▮ chatroom part one of the lecture series on ISIS's Caliphate referenced above. During the lecture, S-1 explained the Caliphate was announced on the first day of Ramadan 2014 by Abu Bakr al-Baghdadi. Your affiant believes S-1 was discussing Abu Bakr al-Baghdadi's Ramadan message, *supra* paragraph 29. The lecture focused on the three conditions which, according to S-1 made the Caliphate valid. The conditions included that the Caliphate was established on Muslim land, the Caliph implemented "shariah" and not man-made law, and that it must have an army to protect the Islamic State and carry out jihad until Judgement Day. Furthermore, the lecture explained that the Quranic verses cited in S-1's lecture were evidence to support these claims, and that jihad had to continue against the infidels because no Caliph was allowed to hang up his sword.

37. ▮▮ the end of this lecture, S-1 thanked several ▮▮ Administrators for posting the notes, and requested ▮▮ "doctor the poster" and repost it to be used for part two of the lecture

16

series which would be held the following day. Furthermore, S-1 thanked ███ and another ███ Administrator for posting the Quranic hujjah.[20]

38.     Based on the foregoing and other information discussed herein, your affiant believes ████████ falsely told FBI Agents that she was not an ███ Administrator and misrepresented the full extent and duration of her involvement as an ███ Administrator.  As the above shows, ████████ has been an ███ Administrator since 2014, and has had broad responsibilities in promoting, advertising, documenting, and disseminating pro-ISIS propaganda on S-1's and ███ behalf.

**Law Enforcement Interview of ████████**

39.     On October 25, 2019, FBI agents interviewed ████████ again, this time ███ her ████████████████████ FBI agents advised ████████ that lying was a crime under Title 18 U.S. Code § 1001, and ████████ acknowledged she understood. In response to a question about the ███ chatroom ever encouraging people to travel to the Islamic State, ████████ said it did not to her recollection. In response to a question about the ███ chatroom expressing support for Abu Bakr al-Baghdadi, ████████ again responded that it did not to her recollection. When asked about sharing ISIS media or propaganda, ████████ responded she did not know what S-1 was doing privately, but she, personally, did not. Towards the end of the interview, ████████ said her understanding was that when S-1 spoke about ISIS, he aimed to explain the purpose of having an Islamic State and was not supporting the violence. ████████ agreed with FBI Agents' memory of her prior law enforcement interview i████████nd specifically, how

---

[20] "Hujjah" is the Arabic term for proof. In theology, the term may be applied to a conclusive argument distinguishing proof from falsehood.

she had distinguished between supporting the concept of an Islamic State versus encouraging people to support the terrorist organization.

40.     As discussed above, ████████ played a central role in the ██ chatroom, specifically in lectures and media that reached a large number of people and expressly supported Abu Bakr al-Baghdadi, explained the obligation for Muslims to make hijrah to the Islamic State, and directed Muslims to fight for ISIS and kill nonbelievers. ████████ personal Facebook account, **TARGET ACCOUNT 2**, was associated with an ██ fan page. This ██ fan page **(TARGET ACCOUNT 1)** was also operated by ████████. As discussed herein, **TARGET ACCOUNT 1** experienced a substantial increase in viewership in and around the time when ████████ was assisting S-1 in promoting ██ pro-ISIS messages. . Based on this, your Affiant believes there will be evidence of ████████ false statements contained in the Facebook accounts which are the subject of this affidavit in support of a search warrant.

41.     Additionally, the TARGET ACCOUNTS also appear to contain evidence related to ████████ knowledge of S-1's support for ISIS prior to engaging in wire fraud to collect funds from S-1's supporters intended for S-1, as discussed further below.

### ████████ and S-1's Fundraising Efforts

42.     ████████ was also actively involved in fundraising and collecting donations for the operation of the ██ enterprise.  On January 5, 2016, a local law enforcement agency advised the FBI that during an ██ discussion on December 21, 2015, a user name known to be associated with S-1 posted the following: "according to Shariah we kill apostates" and "If they turn back from Islam then kill them.  Surah 4:89".  Later in the same chat room, an individual believed to be another ██ Administrator posted the following solicitation for funding, "DONATE TO THE

DAWAH[21] OF [S-1]- EMAIL TO:::: [Email Address 1] - TO ASK FOR DIRECTIONS ON HOW TO USE [MONEY TRANSMITTING SERVICE 1 ("MTS1")] OR [MONEY TRANSMITTING SERVICE 2 ("MTS2")]::::::JZK[22]".

43.     Further, on January 25, 2016, a local law enforcement agency advised the FBI that on January 18, 2016, an undercover operative (████) for the agency engaged in a private online conversation with an account believed to be used by S-1.  During this conversation S-1 asked the ████ to send money to Kingston, ████, using a specific money transmitting service, hereafter referred to as "MTS1," under S-1's spouse's name, which S-1 identified as "████ ████" Excerpts of the conversation are as follows:

████: shaikh i would like to make donation for the dawa what is the best way?

S-1: the best way is via [MTS1]

S-1: send it to n████ name

S-1: her name is:

S-1: ████ ████

████: okay insh Allah

S-1 ████████

S-1: how much u are planning to send

████: do i need an account number or just send it in her name insh Allha?

S-1: no account no needed

---

[21] "Dawah" (variation "dawa") means the proselytizing or preaching of Islam.
[22] "JZK" is often used as an abbreviation for "*JazakAllah Khair*", which is an Arabic phrase meaning "May God reward you."

19

44.     Your affiant is aware that similar solicitations for donations occurred regularly in the ■■ chat room. Shortly after becoming an administrator in March 2014, ■■■■■ sought to expand the funding base of ■■ to include other social media platforms. On June 7, 2014, ■■■■■ sent an email to an individual using the nickname ■■■■■■■■■■ ■■■■■ suggested they begin posting for donations on Facebook, Twitter, the blog, and in the Paltalk chatroom. ■■■■■■ acknowledged in the email that in a separate conversation, another ■■ Administrator advised her she would need S-1's permission to make this expansion because he believed the public solicitation for donations could cause the freezing of S-1's latest MTS1 and MTS2 accounts. A review of ■■■■■■ emails identified an earlier email on June 3, 2014[24], in which this ■■ Administrator advised ■■■■■■ that she would need "Shaikh's" approval prior to publically soliciting for donations due to concerns that the Shaikh's "latest" accounts may get frozen. ■■■■■■ responded to the other ■■ Administrator that it was "a dilemma".

*MTS1 and MTS2 Financial Records for* ■■■■■■

45.     Since April 2, 2012, S-1 has been blocked or interdicted by MTS1 from using its services.[25] The FBI's review of records provided by MTS1 in January 2018 indicated that from

---

[23] Your affiant is aware the term "Muqatil" can be translated to mean "fighter" or "combatant" and often refers to a combatant in the military context. The nickname was associated with the email account, and email service provider records revealed multiple exchanges in which S-1 identified himself by name and instructed recipients to use this email address because he did not trust his other account, which your affiant believes is in reference to an account using an honorific and S-1's last name.

[24] Your affiant notes a prior version of this search warrant indicated this email correspondence occurred on June 3, 2017, when in fact, it occurred on June 3, 2014.



in or about November 2014 to December 2016, ███████ appeared to have received approximately $24,000 through approximately 97 separate transactions via MTS1 while residing in ██████ with S-1. These payments were from various senders in the United States, United Kingdom, and Canada, among other countries. MTS1 records indicated that ███████ utilized approximately three different forms of her own identification █ approximately 16 different locations throughout ███████ to pick up these funds. Your affiant believes based on S-1's online fundraising efforts and ████████ role as an ███ Administrator and S-1's ███████ the wire transfers sent to ████████ were sent to, or on behalf of, S-1. MTS1 indicated that it "interdicted," or blocked, ████████ from using its money transfer services in or around December 2016 because MTS1 assessed ███████ activity to be consistent with terrorist financing.

46. MTS2's records revealed that S-1 was blocked from using its services following the OFAC's designation of S-1 in or around December 2017. MTS2 indicated S-1 was put on a watch list maintained by a third party vendor in 2004 as a result o█████████████████████ ████████████████████████ however, MTS2 did not subscribe to this watch list █ the time. The FBI's review of records provided by MTS2 indicated that from in or about August 2014 to December 2016, ████████ appeared to have received approximately $1,250, via MTS2. These payments were from senders in different countries. MTS2 records further indicated that the recipient (███████) utilized three different forms of her own personal identification to receive these payments.

*FBI Interview of S-4 about money transfers to* ████████

47. The FBI conducted voluntary interviews of S-4 in July and August 2017. In those interviews, S-4 was asked about its contacts and financial support of S-1, and S-4 made numerous false statements about its contacts with S-1, and denied providing any money to S-1 directly or

21



indirectly through other persons. ███████████████████████████ ███████████████████████████████████████████ S-4 is one of the individuals who sent money to ████████ using MTS1. During a subsequent interview with FBI Agents and Assistant United States Attorneys ████████████████████████ S-4 stated that it contacted S-1 in 2016 and asked if it could send money to S-1. S-4 stated that S-1 instructed it to send money to ████████ using MTS1 because ███████ name was "clean." S-4 understood the term "clean" to mean that ████████ was not a terrorist and the transaction to S-1 would be completed successfully if sent through ████████.

48.    A review of S-1 email records obtained from legal process revealed that on June 5, 2016, S-4 emailed S-1: "Salaam, I would like to give donation of 50 dollars whichever way possible. Its what I can afford to do as of now, I know its not much. How would I go about doing so?" On June 5, 2016, S-1 responded: "wa alaikum salam wrwb. You may send it via [MTS1] to my ████ name ████████ ████████████████ Pls use your real name to send it in case of a hiccup u can claim your money back. My ████ name is clean so you shud be fine insha allah. What city do u live in I forgot?"

49.    The FBI's review of records provided by MTS1 in January 2018 revealed two transactions in June 2016 and December 2016, in which S-4 sent by wire approximately $50 and $300, respectively, to ████████.

50.    S-4 stated it did not know if S-1 was being watched by law enforcement authorities, and indicated that it also communicated directly with ████████ via a messaging application (hereinafter "MA1"), which utilizes a mobile electronic device and the internet. S-4 also told the FBI that it sent MA1 messages to ████████ what it believed to be ████████ cellular phone. Your affiant is aware that persons who engage in criminal activity will often attempt to hide or

22

obscure their financial transactions through friends, confidants, or family members to avoid detection by law enforcement. MTS1 also indicated that it blocked another attempted transaction with S-4 to S-1, through █████ on April 6, 2017.

*FBI Interview of █████ about financial transactions on January 25, 2018*

    51.    During █████ voluntary interview with FBI Agents ██████████████ ████████████████████ stated that S-1 had a bank account in █████, but "they closed it down." When asked if █████ ever had a bank account closed or a financial transaction blocked, █████ responded, "No because I don't do any weird transactions, my stuff is legit." When asked about accepting donations on S-1's behalf, █████ initially indicated that she accepted money on S-1's behalf approximately two years ago for Eid, an Islamic holiday. █████ was directly asked if she ever accepted any donations or any contributions from anyone in the world other than that Eid. █████ responded that there may have been a few other times. When asked if there were more or less than ten other instances outside of Eid in which she accepted money, █████ responded, "Less than, maybe even five times. I'm-it was probably less than that 'cuz I didn't like that whole business." █████ again reiterated that she did not accept money on S-1's behalf outside of those few occasions.

*FBI Interview of █████ about financial transactions on October 25, 2019*

    52.    On October 25, 2019, █████ was interviewed by FBI Agents █ her Residence ████████████ FBI Agents again advised █████ that lying was a crime under Title 18 U.S. Code 1001, and █████ acknowledged that she understood. █████ stated that she only accepted a miniscule amount of money and it was not to support S-1's activities or the █ dawah. █████ explained that she was "leery" about receiving money because it could



hurt her account, and her standing. ████████ later stated that S-1 made money that was basically for their living, but she was not familiar with his money because she had no part in it.

53.     Your affiant believes ████████ knowingly made false statements to FBI Agents about her involvement in collecting funds on behalf of S-1 ████████████████████████ ████████████████████████████████████████████████████████████████████████████ on October 25, 2019.  As discussed above, ████████ received approximately 100 wire transfers via MTS1 and MTS2 between August 2014 and December 2016, and █ least five of these transfers were identified by S-4 and S-5 as having been intended for S-1.

54.     Based on the information discussed herein, your affiant believes ████████ and S-1 devised a scheme to defraud MTS1 and MTS2 wherein S-1 directed █ followers to wire funds via MTS1 and MTS2 to ████████ instead of directly to S-1.  Through this scheme, your affiant believes ████████ and S-1 obtained money wired through MTS1 and MTS2 under false pretenses: that funds were being wired through MTS 1 and MTS2 for persons other than S-1, namely ████████, when in truth the money was intended for, and provided to, S-1.  Your affiant believes this scheme was executed by S-1 and ████████ because ████████ name was "clean" and S-1 and ████████ believed ████████ name had not yet been blocked by MTS1 or MTS2.

55.     Furthermore, your affiant believes ████████ visited numerous MTS1 and MTS2 branch locations in ████████, collected funds from wire transfers using multiple forms of identification, and lied to FBI agents about her activity because she was attempting to conceal her involvement in the scheme.  Your affiant notes that ████████ acknowledged she "…didn't like that whole business" in the context of collecting funds on behalf of S-1 and was "leery" of it, but your affiant believes ████████ nonetheless participated in this scheme despite the possible legal ramifications.

24

**BACKGROUND CONCERNING FACEBOOK'S ACCOUNTS**

56.     Facebook is the provider of the internet-based account(s) identified by User IDs ████████████ *(TARGET ACCOUNT 1)*, and ████████ *(TARGET ACCOUNT 2)*.

57.     Facebook owns and operates a free-access social networking website of the same name that can be accessed █ http://www.facebook.com ("Facebook"). The website is owned and operated by Facebook. Facebook allows users to establish accounts with Facebook, and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

58.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user-identification number ("user ID") to each account. Facebook identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

59.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each Facebook group. A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request. If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's

account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

60.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

61.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations ▮ particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

62.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of the "tag"

and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

63. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

64. In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a Facebook account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on Facebook's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Facebook's servers for a certain period of time.

65. A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked". Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

66. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

27

67.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

68.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

69.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend".  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

70.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

71.    In addition to the applications described above, Facebook also provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

72.    Facebook also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

28

73.     Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

74.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

75.     Based on my training and experience, I know that providers such as Facebook also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Facebook in order to track what devices are using Facebook's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute

29

evidence of the crimes under investigation because they can be used (a) to find other Facebook accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Facebook account.

76.     Facebook also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's Facebook account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as Facebook) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of Facebook are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's Facebook account via the mobile application.

77.     Based on my training and experience, I know that providers such as Facebook use cookies and similar technologies to track users visiting Facebook's webpages and using its

products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Facebook. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Facebook may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Facebook account and determine the scope of criminal activity.

78.    Based on my training and experience, I know that Facebook maintains records that can link different Facebook accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Facebook accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Facebook account.

79.    Based on my training and experience, I know that subscribers can communicate directly with Facebook about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the

31

crimes under investigation because the information can be used to identify the account's user or users.

80.     In summary, based on my training and experience in this context, I believe that the computers of Facebook are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Facebook subscribers), as well as Facebook-generated information about its subscribers and their use of Facebook services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide Facebook with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

81.     As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion. From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant ▌ a residence. For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account ▌ a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described above, Facebook logs the IP addresses from which Facebook users access

32

their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its Facebook services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user. Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[26]

82.    Based on my training and experience, I know that evidence of who controlled, used, and/or created a Facebook account may be found within the user-generated content created or stored by the Facebook subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can

---

[26] █ times, social media providers such as Facebook can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of Facebook's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for █ least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar Facebook accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

83.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Tejpal S. Chawla, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

84. Based on the foregoing, I request that the Court issue the proposed search warrant based on probable cause to believe that the accounts contain evidence of criminal activity or themselves are instrumentalities, or fruits of these crimes. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

85. The government further requests to share the information obtained from this search (to include copies of digital media) with any government agency investigating, or aiding in the investigation of this case or related matters.



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 22, 2020

2020.06.22
16:33:38 -04'00'

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

35