# ATTACHMENT A

*Redacted Docket Materials*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION OF USA FOR 2703(d) ORDER FOR TWO EMAIL ACCOUNTS SERVICED BY TIERPOINT LLC FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705 | SC No. 20-523<br><br>Filed Under Seal |

Reference:    USAO Ref. # ▮▮▮▮▮▮▮▮    Subject Accounts: ▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮

## APPLICATION OF THE UNITED STATES
## FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require TierPoint, LLC ("PROVIDER"), an electronic communication service provider and/or a remote computing service located in St. Louis, Missouri, to disclose certain records and other information pertaining to the email accounts ▮▮▮▮▮▮▮▮ (**TARGET ACCOUNT** 1) and ▮▮▮▮▮▮▮▮ (**TARGET ACCOUNT 2**) as set forth in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

### LEGAL BACKGROUND AND JURISDICTION

1.  PROVIDER is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require PROVIDER to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2.  This Court has jurisdiction to issue the requested Order because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(d). Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

3. As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. See 18 U.S.C. § 3237.

4. A court order under section 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## RELEVANT FACTS

5. The U.S. Department of Commerce, Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE") and U.S. Department of Justice, Federal Bureau of Investigation ("FBI") are investigating suspected violations of export control laws. Specifically, they are investigating the alleged unlawful transshipment of U.S.-origin commodities to destinations outside of the United States, most notably ▉▉▉ in violation of the Export Administration Regulations ("EAR"), 15 CFR § 730, *et. seq.*, the International Emergency Economic Powers Act, 50 U.S.C. § 1705, the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. § 4819, as well as, conspiracies to violate these provisions, 18 U.S.C. § 371.

6. During this investigation, law enforcement identified a U.S.-based company called ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and an individual named ▉▉▉▉▉▉▉▉▉▉▉▉

2



who appears to be the [REDACTED] of [REDACTED] based on shipping documents obtained from U.S. freight carriers.

7.  Based on open source information, [REDACTED] develops, manufactures and supplies sophisticated positioning and guidance systems for military, industrial and commercial applications, including, but not limited to: navigation systems, unmanned aerial and ground vehicles, and autonomous underwater vehicles.

8.  [REDACTED] was the subject of a previous United States investigation in or around [REDACTED] for suspected export control violations. [REDACTED] is believed to have knowledge of the Export Administration Regulations ("EAR"). As part of that investigation, law enforcement informed [REDACTED] officers of the requirements under the EAR. Additionally, many of [REDACTED] commercial invoices examined by law enforcement contained an export compliance statement, which read:

> "These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations."

9.  According to the Automated Export System ("AES"), the U.S. Government's database used to track exports from the United States [REDACTED] has been the principal party in approximately 377 transactions to foreign parties from January 2014 to present. Of these 377 exports, 274 of them listed [REDACTED] as the point of contact for [REDACTED] exports, including on transactions as recent as December 2019.

10. Law enforcement identified numerous transactions that displayed suspicious indicators. Specifically, special agents found that [REDACTED] exported sensitive U.S. items

3

to two separate trading companies located in the ▮▮▮▮▮▮▮▮▮▮ etween July and November 2019,

11. Prior investigations have revealed that procurement agents have exploited U.S. export laws by arranging for items to be first exported to a country (*e.g.*, ▮▮▮ or company that does not have the same licensing requirements as the actual end user. Subsequently, these items are then illicitly re-shipped to a country or company that would normally require a BIS (which is based in Washington, D.C.) export license and/or authorization from the U.S. Department of Treasury, Office of Foreign Assets Control (which is based in Washington, D.C.), which specifically applies to ▮▮▮ and other sanctioned entities. According to the BIS, the ▮▮▮ is a known transshipment point for goods destined for ▮▮▮ based both its proximity to ▮▮▮ and the relative ease with which items are re-exported without scrutiny. The scheme typically occurs as follows: goods are shipped from the United States to the ▮▮▮ often accompanied by certifications, invoices and other representations that the end-user of the goods is located in ▮▮▮ but once the goods arrive, they are re-shipped to ▮▮▮, sometimes immediately. This arrangement permits the true ▮▮▮ end-user to evade and avoid the various U.S. export controls and sanctions limiting trade with ▮▮▮

12. One such ▮▮▮ company that ▮▮▮▮▮▮ shipped to was ▮▮▮▮▮▮ (▮▮▮▮▮▮"). AES data from separate exports that took place in 2017 and 2019 shows that ▮▮▮▮▮▮ shares the same ▮▮▮ based address as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13. ▮▮▮ was added to the BIS Entity List (hereafter "Entity List") in May 2019 for engaging in activities that are contrary to the national security and foreign policy objectives of the United States. Such companies/individuals also present a greater risk of diversion of commodities

4

and technology to other entities that may operate against the interests of the United States and its allies; for example, the ▮ military or terrorist organizations. The Entity List is publically viewable via the Internet and commonly used by U.S. exporters during their due diligence of prospective foreign buyers. It identifies foreign parties prohibited from receiving some or all items subject to the EAR without a BIS license authorizing export from the United States. The exporter, re-exporter, or transferor (in-country) may seek such a BIS license for export.

14. As part of the investigation, law enforcement obtained and reviewed shipping records from a U.S.-based freight carrier that facilitated ▮ export of sensitive U.S. goods to ▮ This review disclosed the items were actually received by ▮ as summarized below:

  a. On or about November 5, 2019, ▮ created a commercial invoice, bearing ▮ s name and purported signature, for the shipment in question that listed ▮ as the recipient and ▮ as the recipient point of contact. The recipient address was ▮

  b. On or about November 7, 2019, the shipment arrived in the ▮

  c. On or about November 10, 2019, the U.S.-based freight carrier made a tracking system note that "An import license is missing and is required for clearance…We'll contact ▮ or receiver about this delivery."

  d. On or about November 18, 2019, ▮ created an additional invoice to supplement the shipment, bearing ▮ name and purported signature, that listed ▮ as the recipient and " ▮ as the recipient

5

points of contact. The recipient address was ▮▮▮▮▮▮ ▮▮▮▮▮▮.

e. On or about December 8, 2019, the U.S.-based freight carrier made a tracking system note that "The receiver has moved. We're attempting to obtain a new delivery address for this receiver."

f. On or about December 10, 2019, the U.S.-based freight carrier confirmed the shipment was delivered to '▮▮▮▮▮', which appears to be a phonetic spelling of ▮▮▮▮▮▮.

15. ▮▮▮▮▮▮▮▮▮▮ as the point of contact, also completed 10 exports to a ▮▮▮▮ based company called ▮▮▮▮▮▮▮▮▮▮▮▮ from February 2017 to September 2019. At least one of these shipments contained sensitive U.S. goods export-controlled for missile technology reasons and required an export license. Law enforcement's review of the BIS export licensing database found no existing export licenses approved for or submitted by ▮▮▮▮▮▮ to export, re-export, or transfer these specific items to ▮▮▮▮▮▮▮▮▮▮.

16. The website for ▮▮▮▮▮▮▮▮ indicated it was a retailer for wines and spirits. This purchase of controlled items by a company that does not normally use/sell such goods is considered a "red flag" or cause for concern in export compliance terms.

17. ▮▮▮▮▮▮▮▮ shipping records reviewed by law enforcement disclosed ▮▮▮▮ used **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** during numerous interactions with U.S.-based freight carriers during ▮▮▮▮▮▮▮▮ export of U.S.-origin items. **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** are serviced by Provider.

Case 1:20-mj-... Document ... Filed 07/28/20 Page 7 of 11

6

Role That Metadata Will Serve In Advancing the Investigation

18. Based on prior investigations, law enforcement is aware that criminal co-conspirators communicate frequently through private messages and email about their legitimate and illegitimate businesses, as well as the transfer of proceeds from such businesses. Private messages and email offer a uniquely valuable form for such communication, as they can be accessed from any location. Many such persons also believe that such messages are difficult to trace, which leads them to have inculpatory conversations.

19. Moreover, persons operating international procurement operations typically have to communicate via email with persons funding their operations, due to the time differences involved, as well as limited phone access in certain regions of the world. When transferring funds to co-conspirators, electronic communications will normally occur to inform the other party that the money has been sent, followed up by communications that the money has been received. Law enforcement is also aware from prior investigations that subordinates in the management chain must communicate to their superiors the status of their illegal tasks as well as receive new illegal tasks. Based on these facts, law enforcement believes that the subjects of the investigation are communicating via email.

20. The header information of these communications can reveal the scope of the contacts between the money launderers/export control violators and who the important co-conspirators are. Multiple individuals and companies associated with the targets of this investigation have taken steps to obscure or anonymize their identities. Learning the header information from associated email accounts is likely to reveal persons within this network, including customers possibly in ▇ as well as further identify any other users of the email account.

7

21. Because criminals who communicate via email fear detection, they typically employ multiple fake identities, which is accomplished by creating numerous free email accounts. Part of managing this vast number of accounts often leads to the linking of recovery accounts. This allows a single user the ability to access as well as reset passwords for the multiple linked accounts. Law enforcement is aware that the tracking and detection of linked accounts is one way by which a person and/or co-conspirators can be identified. Moreover, the linking of a recovery account can further demonstrate who has access and/or control of an account.

22. Learning the requested information will allow law enforcement to investigate these newly identified persons, and in some instances surveil and interview them. Identifying, surveilling, and interviewing these persons will advance the investigation of the subjects and their co-conspirators, by further revealing the scope of their activities, both legal and illegal.

### REQUEST FOR ORDER

23. The facts set forth above show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Accordingly, the United States requests that PROVIDER be directed to produce all items described in Part II of Attachment A to the proposed Order within ten days of receipt of the Order.

24. The United States further requests that the Order direct PROVIDER not to notify any person, including the subscriber or customer of each account listed in Part I of Attachment A, of the existence of the application of the United States or the Order for one year from the date of the Court's Order. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the

court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *See* 18 U.S.C. § 2705(b).[1]

25. In this case, the proposed Order seeks information relevant to establishing the illegal activity under investigation and identifying the individual(s) responsible. Accordingly, disclosure may reveal the existence, scope, and direction of the United States' ongoing and confidential investigation. Once alerted to this investigation, potential target(s) could be immediately prompted to destroy or conceal incriminating evidence, alter their operational tactics to avoid future detection, and otherwise take steps to undermine the investigation and avoid future prosecution. In particular, given that they are known to use electronic communication and remote computing services, the potential target(s) could quickly and easily destroy or encrypt digital evidence relating to their criminal activity. Notification could also result in the target(s) avoiding travel to the United States or other countries from which they may be extradited.

26. Therefore, based on the foregoing, there are reasonable grounds to believe that notification of the existence of this Order would result in flight from prosecution, destruction of or tampering with evidence, or other serious jeopardy to this investigation. *See* 18 U.S.C. § 2705(b)(2), (3), and (5).

27. Given the complex nature of the criminal activity under investigation and likely involvement of foreign-based coconspirators and evidence, and also given that the criminal scheme

---

[1] The government relies on § 2705(b) to seek a preclusion-of-notice order because the government is requesting only non-content information pursuant to § 2703(d), an action which is authorized by § 2703(c). *See* 18 U.S.C. § 2703(c)(1)(B) ("governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when [it] . . . obtains a court order for such disclosure under subsection (d) of this section"). Under § 2703(c), the government has no obligation to notify the subscriber. *See* 18 U.S.C. § 2703(c)(3) ("governmental entity receiving records or information under this section is not required to provide notice to a subscriber or customer").

9

may be ongoing, the United States anticipates that this confidential investigation will continue for the next year or longer.

28. Accordingly, this Court should command PROVIDER not to notify any other person (except attorneys for PROVIDER for the purpose of receiving legal advice) of the existence of the proposed Order for a period of one year (commencing on the date of the proposed Order), unless the period of nondisclosure is later modified by the Court. Should the court-ordered nondisclosure under Section 2705(b) become no longer needed because of the closure of the investigation or arrest of the account holder, the United States will make best efforts to notify the Court promptly and seek appropriate relief.

29.     In this matter, the United States also requests that the instant Application and the Order be filed under seal. The Court has the inherent power to seal court filings when appropriate, including the proposed Order. *United States v. Hubbard*, 650 F.2d 293, 315-16 (D.C. Cir. 1980) (citing *Nixon v. Warner Commn'ns, Inc.*, 435 U.S. 589, 598 (1978)). More particularly, the Court may seal the Application and Order to prevent serious jeopardy to an ongoing criminal investigation when such jeopardy creates a compelling governmental interest in confidentiality. *See Washington Post v. Robinson*, 935 F.2d 282, 287-89 (D.C. Cir. 1991). For the reasons stated above, the United States has a compelling interest in confidentiality to justify sealing the Application and Order. *See id.*

Respectfully submitted,

TIMOTHY J. SHEA
United States Attorney

　　　/s/ *Zia Faruqui*
Zia M. Faruqui
Assistant United States Attorney
555 4th Street, N.W., Room
Washington, D.C. 20530;
Office: 202-252-7117
Zia.Faruqui@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION OF USA FOR 2703(d) ORDER FOR TWO EMAIL ACCOUNTS SERVICED BY TIERPOINT LLC FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705 | SC No. 20-523<br><br>**Filed Under Seal** |

### ORDER

The United States has submitted an Application pursuant to 18 U.S.C. § 2703(d), requesting that the Court issue an Order requiring TierPoint, LLC ("PROVIDER"), an electronic communication and/or remote computing service provider located in St. Louis, Missouri, to disclose the records and other information described in Attachment A to this Order. The Court finds that the United States has offered specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation. Furthermore, the Court determines that there is reason to believe that notification of the existence of this Order will seriously jeopardize the ongoing investigation, including by giving targets an opportunity to flee from prosecution and destroy or tamper with evidence. *See* 18 U.S.C. § 2705(b)(2), (3), (5).

IT IS THEREFORE ORDERED, pursuant to 18 U.S.C. § 2703(d), that PROVIDER shall, within ten days of receipt of this Order, disclose to the United States the records and other information described in Attachment A to this Order.

IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that PROVIDER shall not disclose the existence of the application of the United States or this Order of the Court to any other person (except attorneys for PROVIDER for the purpose of receiving legal advice) for a period of one year (commencing on the date of this Order), unless the period of nondisclosure is later modified by the Court.

IT IS FURTHER ORDERED that the Application and this Order are sealed until otherwise ordered by the Court, except that the United States may disclose the existence and/or contents of the Application and this Order to appropriate law enforcement authorities.

2020.03.23
18:56:58 -04'00'

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

2

# ATTACHMENT A

I. **The Account(s)**

The Order applies to certain records and other information with the (i) following email accounts; (ii) any forwarding or fetching accounts relating to the following email accounts; (iii) all other TierPoint, LLC ("PROVIDER") account(s) linked to the following email addresses by cookie overlap; (iv) all other PROVIDER accounts that list the same recovery email address as the following email addresses; and (v) all other PROVIDER accounts that share the same login IP address or registered telephone numbers associated with the following identifier(s):

- ███████████
- ████████████████

and any preserved data and/or preservation numbers associated therewith.

II. **Records and Other Information to Be Disclosed**

   A. **Information about the customer or subscriber or the Account(s):**

PROVIDER is required to disclose to the United States the following records and other information, if available, for each account or identifier listed in Part I of this Attachment (the "Account(s)") constituting information about the customer or subscriber or the Account(s):

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

3. Local and long distance telephone connection records;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including MAC addresses);

7. Other subscriber numbers or identities (including the registration IP address), including any current or past accounts linked to the Account(s) by telephone number, recovery or alternate e-mail address, IP address, or other unique device or user identifier; and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

**B. All records and other information relating to the Account and Linked Accounts (except the contents of communications)**

PROVIDER is required to disclose to the United States the following records and other information, if available, for the Accounts and Linked Accounts for the time period from January 1, 2017, to the present, constituting all records and other information relating to the Accounts (except the contents of communications), including:

1. Records of user activity for each connection made to or from the Account(s), including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses; and

2. Information about each electronic communication sent or received by the Account(s), including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers), and any other associated header or routing information; and

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, do hereby attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by TierPoint LLC ("TierPoint"), and my official title is _____. I am a custodian of records for TierPoint. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of TierPoint, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    All records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    Such records were kept in the ordinary course of a regularly conducted business activity of TierPoint; and

    c.    Such records were made by TierPoint as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____
Date    Signature

    C.