# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC., PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | ) ) ) ) ) | Case No. 20-sc-349 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS INC., PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 (See Attachment A, incorporated herein by reference.)

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Sections | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a) | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: __02/20/2020__

_____

*Judge's signature*

City and state: **District of Columbia**

**G. Michael Harvey, U.S. Magistrate Judge**

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC., PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | ) ) ) ) |

Case No.  20-sc-349

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC., PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____March 5, 2020_____ *(not to exceed 14 days)*
  ☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
                                                                                          *(United States Magistrate Judge)*

  ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____02/20/2020_____                    _____
                                                                                          *Judge's signature*

City and state:      _____District of Columbia_____            _____G. Michael Harvey, U.S. Magistrate Judge_____
                                                                                          *Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  20-sc-349 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information which is associated with the Oath Holdings, Inc. account identified by ██████████████ which is stored at premises owned, maintained, controlled, or operated by Oath Holdings, Inc., a company that accepts service of legal process in Sunnyvale, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by THE PROVIDERS to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.    For the time period of January 1, 2016 to Present, the contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services like cloud storage, including but not limited to incoming, outgoing, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[3]

---

[3] Here, PROVIDER's other services include e-mail, contact list, chat, and other services as noted generically above.  It provides the branded services Yahoo! groups (a listserve and bulletin board service, which users can opt into), Yahoo! Messenger (an instant messaging service, which users can opt into), and Flickr (a photo storage and sharing service, which users can opt into).  Yahoo does not currently provide a standalone notes or document storage service, but its smartphone

b.      For the time period of January 1, 2016 to Present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services like cloud storage, including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period of January 1, 2016 to Present All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period of January 1, 2016 to Present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those

---

application has designated "notes" and "documents" functions that operate through Yahoo's e-mail storage.

sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

       f.     All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

       g.     Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.     All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.     For the time period of January 1, 2016 to Present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*., and money laundering, 18 U.S.C. § 1956 as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the amount and location of any U.S. dollar payments, monies, or funds transfers by any party located in Iran, any party acting on behalf of, or in the interest of, an entity associated with Iran, any

U.S. designated entity, any entity or person in or related to Iran transacting or communicating with entities or persons in Iran, or entities or persons acting for the benefit of Iran, including ███████████████████████████  ██████████████ coconspirators, and parties associated with the ██████, and any front company for any of these above mentioned persons or entities;

(f) Evidence related to U.S. dollar transactions, banking, or financial information related to ████████████████████████████████ ██████ coconspirators, and parties associated with the ██████, and the government, representatives, or beneficiaries of Iran, any party located in Iran, any party acting on behalf of, or in the interest of, an entity associated with Iran, any U.S. designated entity, any entity or person in or related to Iran transacting or communicating with entities or persons in Iran or entities or persons acting for the benefit of Iran, and any front company for any of these above mentioned persons or entities;

(g) Evidence related to anti-money laundering controls, know your customer policies, and/or lists, names, persons, companies, and/or entities sanctioned or related to the Department of Treasury Office of Foreign Asset Control ("OFAC");

(h) Evidence related to front companies used by █████████████████████ █████████████████ coconspirators, and parties associated with the ██████, and the government, representatives, or beneficiaries of Iran, any party located in Iran, any party acting on behalf of, or in the interest of, an entity associated with Iran, any U.S. designated entity, any entity or person in or related to Iran, including its practices, makeup, organizational structure, profits, and customers;

6

(i) Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j) the transportation or transmission of funds that have been derived from a criminal offense;

(k) the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l) Information that constitutes evidence concerning (i) the purchase, sale, and/or export of U.S.-origin goods from the United States without a required license; and (ii) the acquisition of goods from the United States and elsewhere to Iran (via third countries), as connected to a conspiracy to import U.S.-origin goods for delivery to end users in Iran;

(m) Records and information related to (i) preparatory steps taken in furtherance of the scheme, including internet searches for U.S.-origin goods and foreign-origin goods (connected to the conspiracy to import U.S.-origin goods) for importation to Iran and ▮▮▮ (via third countries), inquiries of vendors or sellers of the same, and the like; (ii) purchases and sales such goods from vendors or online purchasing sites (*e.g.* eBay); (iii) methods of payment with respect to such purchases; (iv) shipping, delivery, and customs declarations with respect to such purchases; (v) financial records (to include bank records, wire transfers, checks, credit card statements, account information, and the like) with respect to such purchases; (vi) identities of buyers, sellers, and end users of such goods; (vii) planned use of such goods; and (viii) payments made by the end users of such goods.

7

(n) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

(o) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(p) The identity of the person(s) who created or used the Target Accounts or any associated user ID, including records that help reveal the whereabouts of such person(s)

(q) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(r) The identity of the person(s) who communicated with the Target Accounts or any associated user ID about matters relating to the laundering of funds to / from Iran, U.S. sanctions, and assisting the Iranian regime, including records that help reveal their whereabouts

**III.     Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.       such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                      Signature

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC., PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956** | **Case No. 20-sc-349**<br><br>**Filed Under Seal** |

*Reference:*   *USAO Ref. #* ███████████ *; Subject Account(s):* ██████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ███████████ being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information which is associated with one account – that is, ████████████ – which is stored at premises controlled by Oath Holdings, Inc., ("PROVIDER"). Concurrently, I am also submitting search warrant applications for the additional accounts – ███████████████; ██████████████, ███████████████, ██████████████████, ██████████████, ███████████████████, ████████████████; and ████████████████ – stored at other providers.  Those applications present identical factual bases to search. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require the PROVIDERS to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*,  and money laundering, 18 U.S.C. § 1956, will be discovered in the TARGET ACCOUNTS.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

<u>**JURISDICTION**</u>

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction

2

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

6. This investigation relates to violations of IEEPA and its implementing executive orders and regulations. IEEPA, enacted in 1977, granted the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Under IEEPA, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

7. Title 50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

8. Using the powers conferred by IEEPA, the President and Executive Branch departments have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S. goods.

9. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

10. On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous

3

orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

11.     The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC.

12.     The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States. See 31 C.F.R. § 560.410.

13.     The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a).

14.     The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203.

15.     Additionally, on August 6, 2018, the President, pursuant to IEEPA, issued Executive Order 13846, which, among other things, authorized the Secretary of State, in consultation with the secretaries of various other executive agencies, to impose sanctions on

individuals who knowingly engage in a significant transaction for the purchase, acquisition, sale, transport, or marketing of oil or petroleum products from Iran.

16.    After this Executive Order was implemented, the Iranian Oil Minister, Bijan Namdar Zanganeh, said in an interview, "We have unofficial or unconventional sales, all of which are secret, because if they are made known America would immediately stop them."

## **PROBABLE CAUSE**

17.    The United States is investigating the illicit transfer of Iranian petroleum to third party countries, and the payment of these shipments in U.S. dollars, for which U.S. sanctions would require a license from the Department of Treasury Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia. The investigation concerns possible violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*, and money laundering, 18 U.S.C. § 1956.

18.    I am aware that a ███ company (" ███ Company 1") operates a fleet of tankers. Several of their tankers have shipped petroleum to and from Iran and received corresponding U.S. dollar payments.  One of these tankers is the ███████████████ "). Law enforcement tracked this tanker's movements using its Automatic Identification System ("AIS"), and confirmed that it had travelled to Iran on multiple occasions between 2016 and 2017.  Subpoena returns from financial institutions that process international U.S. dollar wires revealed U.S. dollar payments that referenced the ███. The parties failed to seek or obtain a license from OFAC for such transactions.

19.    The managing director of ███ Company 1 confirmed to a news publication that the ███ was sold to an ███ company named ██████████████ in or about July 2019.  Financial records revealed that the U.S. bank which processed the sale of the ███ to ██

5

for approximately ████ froze such transaction for possible sanction compliance / anti-money laundering reasons. Throughout the course of this investigation I have uncovered evidence that ██ has acted as a shell company for individuals located in Iran, which supports the freezing of these funds.

20.    I am aware that due to the freezing of these funds, ████ Company 1 did not receive payment for the sale of the ████. As such, ████ Company 1 (through a subsidiary company) sought and obtained a seizure warrant issued by a civil court in the ████████ with which it seized the ████. The ownership of the ████ is set to be decided by an arbitration tribunal, as specified by the sales contract.

### ████ COCONSPIRATORS

21.    Public corporate registry information revealed that ████ was created around the time that it purchased the ████.

22.    ████ website displays indications that the company was created on behalf of third party companies for the purpose of conducting this transaction.  For example, the ████ website indicates that ██ is actually located at a P.O. Box in ████ not ████ and that the company is cooperating with an ████ company, ██████████████████████████████████ ████ Public records revealed that ████████ is listed as the manager of the ████.

23.    Registration information from ████ website on October 23, 2019 shows that the contact information for ██ was redacted using a privacy service, indicating an intent to hide the ultimate beneficial owner of the company.

24.    Subpoena returns from the company that registered ████ domain show that the website was created on August 24, 2019 by an employee of ████ company ████████ ████████████████████████████████ This date closely aligns to when ████

6

purchased the ███. A corporate registry database revealed business records showing ███ ███ has a common director with ████████ leading me to believe that these are all affiliated companies set up to obfuscate the beneficial owner, consistent with money laundering practices.

25.    Open source information indicates that a company named ████████████ ████████████ is located at the same P.O. Box in ███ as ██. I believe these companies were both involved with the purchase of the ███.

26.    A cached version of ██████ website lists that it attends mining exhibits in both ███ and Iran, which appears consistent with ████ Iranian line of business.

27.    Subpoena returns from LinkedIn revealed that many of the ██████ LinkedIn company profiles and employee profiles were accessed from Iran or listed a location as Iran, despite publicly claiming to be located in ████ Law enforcement also discovered a business listing for ██████████████████████ which lists the ██████ website and an address in Iran, leading law enforcement to believe that ██████ maintains an office in Iran.

28.    ████████████████ is a corporate entity that lists the same P.O. Box in ████ as ██ and ██████ I believe that ████████ was also involved with the purchase of the ███. A reliable confidential source revealed that Iranian national ████ ████ previously listed himself as the marketing manager of ████████ showing that this company is also linked to Iran.

29.    This court previously authorized a request for the metadata of accounts operated by the previously described companies. *See* ████████████. As further described below, metadata from these accounts shows that email addresses associated with ███, ████████████ and Iranian ship management company ████████

█████████████████████████ all communicated with Brokerage Company 1 near the time of the sale of the ███. Law enforcement communicated with counsel for Brokerage Company 1, which revealed that Brokerage Company 1 brokered the sale of the ███. These communications lead me to conclude that an entity located in Iran was directly involved with this transaction. In most of these instances, ███ blind copied the email address used by the ███ employee, indicating that ███ sought to hide this employee's involvement in this transaction. As described previously, ███ ███ maintains an office in Iran.

30. ███ ███ advertises that they have decades of business experience with the ████████████████████ On November 5, 2018, OFAC designated the ███ pursuant to Executive Order ("E.O.") 13599 for being a part of the Government of Iran.

31. ███ ███ also claimed to do business with the ████████████ which is a subsidiary of the ██████████████ according to publicly available information. ████████████ OFAC noted that the ███ was instrumental in Iran's petroleum industries, which helps to finance ████████████ ████████

32. According to open source information, ███ ███ has additionally operated and managed tankers with the ████████████ OFAC designated ███ in March 2012. Concerning ███, OFAC stated: "████ which has offices in Iran and ████ is being designated for being owned or controlled by ████████. OFAC designated ██████ in October 2007 under E.O. 13382 as an engineering arm of the ███ that the ███ uses to generate income and fund its operations." OFAC designated the ███ pursuant to E.O. 13224 in October 2017 for providing support to a number of terrorist groups.

8

33. As described above, ▉▉ ▉▉ has a long history of working with designated entities in Iran and prior 2703(d) returns showed that a ▉▉ ▉▉ email account was included on an email between ▉ and Brokerage Company 1. The sale of the ▉▉ involved the transfer ▉▉▉ that transited through the United States. The failure of the parties to seek a license prior to such sale a violation of the sanctions against Iran.

## TARGET ACCOUNTS

34. ▉▉▉▉▉ (**"Target Account 1"**) –Subpoena returns for subscriber information for **Target Account 1** revealed it was registered using an Iranian phone number. IP login information further revealed that **Target Account 1** was accessed in Iran and ▉▉

35. The 2703(d) returns revealed that **Target Account 1** communicated with a number of additional companies in Iran, including ▉▉ ▉▉ and Iranian ship management company ▉▉ ▉▉. An email account used by ▉▉ ▉▉ (as evidenced by the fact it was on the ▉▉ ▉▉ domain) emailed Target Account 1 approximately 82 times around the time of the sale of the ▉▉. Many of these emails included accounts at ▉▉▉▉ (as evidenced by the fact it was on the ▉▉▉▉ domain) and ▉.

36. **Target account 1** was blind copied on over 20 emails between ▉▉ and Brokerage Company 1.

37. ▉▉▉▉ (**"Target Account 2"**) – As noted above, ▉▉▉▉ is affiliated with the ▉▉ ▉▉ website, which listed an address in Iran. On a business listing, ▉▉▉▉ listed **Target Account 2** as its contact email address. Subpoena returns for subscriber information for **Target Account 2** revealed **Target Account 1** as the alternate email address, leading me to conclude that the same user accesses **Target Account 2** and **Target Account 1**. Based on my training and experience, I know that single users will frequently link

9

accounts in such manner.

38.     On a separate business listing, Iranian company ███████ lists **Target Account 2** as its contact email address.  Subpoena returns for subscriber information for **Target Account 2** show that the user of this account listed his country as Iran and the verified phone number had an Iranian country code.  The IP login activity for this account shows that it was accessed from ████ and Iran in November 2019.

39.     The metadata for Target Account 1 further reveals that Target Account 2 and Target Account 1 communicated via email on multiple occasions.  On April 2, 2016, both of these accounts received an email from Iranian company ███████ which is a petroleum-focused engineering petroleum company according to an Iranian business listing.

40.     ████████ (**"Target Account 3"**) – I believe that Target Account 3 is used by ███, based on the name of this account and the communications involving this account.

41.     2703(d) returns revealed that from June to October 2019, **Target Account 3** emailed multiple accounts at Brokerage Company 1.  On July 22, 2019, **Target Account 3** carbon copied Iranian company ██ ███ on one of these emails and blind copied **Target Account 1**.  As noted above, subscriber returns for **Target Account 1** and **Target Account 3** revealed their use by individuals in Iran, leading me to believe that ███ was aware of Iranian involvement in its acquisition of petroleum tanker ███.

42.     **Target Account 3** also emailed an email account on the ██ ███ domain for ████████ at least 58 times from July to October 2019.  According to the ██ ██ website, ███ is the technical director of ██ ███.

43.     **Target Account 3** additionally emailed multiple ██ ██ employees (on the ██ ██ domain) at least five times in July 2019.  For example, one such sets of communications was

10

with "███████████████" This account is a name match for ██ ██ employee ████ ████ Subscriber information from ████████████ LinkedIn profile indicated that he registered his Linkedin account using an Iranian IP address, despite listing his location as ████.

44.   ████████████████ ("**Target Account 4**") – 2703(d) returns revealed that **Target Account 4** was included on at least 21 emails between ███ and Brokerage Company 1 from June to October 2019. 2703(d) returns separately revealed that **Target Account 1** also received these identical emails, leading me to believe that **Target Account 1** was on the blind carbon copy line.

45.   **Target Account 4** was also included on numerous emails with accounts on the ██ ████ domain, accounts on the █████████ domain, **Target Account 3**, **Target Account 1**, and accounts on the ██████ domain.  As noted above, █████████manages the ████.

46.   ████████████████ ("**Target Account 5**") – As noted above, the ██ ████ website shows that █████ is the technical manager of the company and lists an Iranian phone number as his contact information.

47.   2703(d) returns revealed that **Target Account 5** participated in 29 email communications involving **Target Account 1**.  The name of **Target Account 5** is a name match ██████████████████████████████████████████████████ ████████████████████████████████ **Target Account 5** was also carbon copied on emails with ██████ official email account on the ████ ████ domain, which I know to be a common practice of people seeking to keep a copy of important correspondence.  As such, I believe **Target Account 5** is operated by ████████.

48.   2703(d) returns revealed that on August 19, 2019, **Target Account 3** emailed **Target Account 1**, multiple ████████████ employees, and **Target Account 5**. These parties

all were involved in the sale of the ████, thus leading me to believe that ████ used **Target Account 5** to communicate about the ████.

49.     ████████████████ (**"Target Account 6"**) – 2703(d) returns revealed that **Target Account 6** is linked by cookies to **Target Account 1**.   Based on my training and experience, I know that, a "cookie" is a small piece of data sent from a website and stored on a user's computer by the user's web browser while the user is browsing the internet.  A linkage by cookie typically occurs when a person on the same device and same browser accesses multiple email accounts.  The provider links accounts by the shared cookies on a device to conclude that the multiple accounts are in fact one customer.  A cookie can have multiple purposes, such as keeping a user logged into a website, saving a user's viewing preferences, or by personalizing the content the website displays for a user, such as with online shopping.  Additionally, much of Provider's revenue comes from targeted advertising.  Provider, in part as they try to generate ad revenue, is creating a unique fingerprint for a user.  In order to better target users, Provider links email accounts that it determines to be owned/operated by the same person/party based on activity from the same computer to better fine tune a profile of that user.  Linking accounts via cookies is more sophisticated than linking accounts by an IP address over a period of time.

50.     The 2703(d) returns further revealed **Target Account 6** has received at least 10 emails from **Target Account 1**.

51.     The 2703(d) returns further revealed that **Target Account 6** maintained joint correspondence with **Target Account 1**, and an email account on the ████████████domain for more than three years.

52.     On January 23, 2017, an email account that is associated with the ████████████ ████████████ (according to a trade website) emailed **Target Account 1** and **Target**



**Account 6**. Based on my training and experience, I know that Iran has a long history of petroleum sales to ██████, which is also subject to U.S. sanctions.

53.    ████████████████████████ (**"Target Account 7"**) – ████████████ domain, ██████████ used a privacy protection service to prevent third parties from learning the operator of the domain. Subpoena returns from the privacy protection service for this domain revealed that an individual used **Target Account 7** when creating the ██ ████ domain.

54.    2703(d) returns for **Target Account 7** provided subscriber information listing the registrant as '██████████████' leading me to conclude this account is used by ██████████ **Target Account 7** sent emails to and received emails from ███ ███ at least 19 times in August 2019.

55.    2703(d) returns revealed that beginning in December 2019, **Target Account 7** communicated with ██████████████████ (**"Target Account 8"**) at least 30 times from November 2019 to January 2020.

56.    The ████ changed its name to ████████ after ███ gained ownership of the tanker. Based on my training and experience, I know that the captain of a petroleum tanker is often referred to as the "master," and as such I believe this email address is operated by the Captain of the ████. I know from prior investigations that the email account of the master of a vessel frequently has communications about illicit transshipments of petroleum.

57.    ████████████████ (**"Target Account 9"**) – **Target Account 9** is listed linked by cookies to **Target Account 1**, and **Target Account 6** and has received approximately 150 emails from **Target Account 1**, during the past three years. As noted above, this linkage by cookies reflects the accessing of accounts by a single device.

58.     Based on my training and experience, I believe this account is used by the same individual who uses **Target Account 1** and **Target Account 6**.

59.      On or about February 11, 2020, each PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to the Target Accounts.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

60.     PROVIDER is the provider of the internet-based account(s) identified by ███████████████.

61.     The FOUR PROVIDERS provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online.  PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

62.     Based on my training and experience, I know that the PROVIDER allows subscribers to obtain accounts by registering on the PROVIDER's website.  During the registration process, the PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.  The

63.      PROVIDER typically does not verify subscriber names.  However, PROVIDER does verify the e-mail address or phone number provided.

64.     Once a subscriber has registered an account, the PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's

username.  PROVIDER's subscribers can also use that same username or account in connection with other services provided by the PROVIDER.[1]

65.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

66.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; social networking.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer

---

[1] Here, PROVIDER's other services include: e-mail, contact list, chat, and other services as noted generically above.  It provides the branded services Yahoo! groups (a listserve and bulletin board service, which users can opt into), Yahoo! Messenger (an instant messaging service, which users can opt into), and Flickr (a photo storage and sharing service, which users can opt into).  Yahoo does not currently provide a standalone notes or document storage service, but its smartphone application has designated "notes" and "documents" functions that operate through Yahoo's e-mail storage.

files and other information created or stored by the PROVIDER's subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

67. Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

68. Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts

16

and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

69.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.  This application is associated with the subscriber's PROVIDER account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain

useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

70.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

71.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

72.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

73. In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

74. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the

foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[2]

75. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal

---

[2] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

76. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney, Zia Faruqui, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## <u>CONCLUSION</u>

77.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 20, 2020.

_____
THE HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

## for the

## District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT PREMISES CONTROLLED BY OATH<br>HOLDINGS, INC., PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 20-sc-349 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS INC., PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 (See Attachment A, incorporated herein by reference.)

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Sections | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a)<br>18 U.S.C. § 1956 | IEEPA<br>Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: 02/20/2020

G. Michael Harvey

Digitally signed by G. Michael Harvey
Date: 2020.02.20 15:41:25 -05'00'

*Judge's signature*

City and state: District of Columbia

G. Michael Harvey, U.S. Magistrate Judge

*Printed name and title*

☐ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.   20-sc-349 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT | ) |
| STORED AT PREMISES CONTROLLED BY OATH | ) |
| HOLDINGS, INC., PURSUANT TO 18 U.S.C. 2703 FOR | ) |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the    Northern    District of    California
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC., PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956
   See Attachment A, hereby incorporated by reference.

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
   See Attachment B, hereby incorporated by reference.

      **YOU ARE COMMANDED** to execute this warrant on or before    March 5, 2020    *(not to exceed 14 days)*
   ☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    G. Michael Harvey    .
                                                    *(United States Magistrate Judge)*

      ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
   ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    02/20/2020

G. Michael Harvey

Digitally signed by G. Michael Harvey
Date: 2020.02.20 15:41:41 -05'00'

*Judge's signature*

City and state:    District of Columbia                    G. Michael Harvey, U.S. Magistrate Judge
                                                                 *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-349 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

          I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information which is associated with the Oath Holdings, Inc. account identified by ███████████, which is stored at premises owned, maintained, controlled, or operated by Oath Holdings, Inc., a company that accepts service of legal process in Sunnyvale, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.     **Information to be disclosed by THE PROVIDERS to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.     For the time period of January 1, 2016 to Present, the contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services like cloud storage, including but not limited to incoming, outgoing, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[3]

---

[3] Here, PROVIDER's other services include e-mail, contact list, chat, and other services as noted generically above.  It provides the branded services Yahoo! groups (a listserve and bulletin board service, which users can opt into), Yahoo! Messenger (an instant messaging service, which users can opt into), and Flickr (a photo storage and sharing service, which users can opt into).  Yahoo does not currently provide a standalone notes or document storage service, but its smartphone

1

b.      For the time period of January 1, 2016 to Present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services like cloud storage, including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period of January 1, 2016 to Present All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period of January 1, 2016 to Present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those

---

application has designated "notes" and "documents" functions that operate through Yahoo's e-mail storage.

sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.  All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

g.  Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

3

h.     All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.     For the time period of January 1, 2016 to Present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*., and money laundering, 18 U.S.C. § 1956 as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

    (a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

    (b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

    (c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

    (d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

    (e) Information that constitutes evidence concerning the amount and location of any U.S. dollar payments, monies, or funds transfers by any party located in Iran, any party acting on behalf of, or in the interest of, an entity associated with Iran, any

U.S. designated entity, any entity or person in or related to Iran transacting or communicating with entities or persons in Iran, or entities or persons acting for the benefit of Iran, including  coconspirators, and parties associated with the ██████, and any front company for any of these above mentioned persons or entities;

(f) Evidence related to U.S. dollar transactions, banking, or financial information related to ████████████████ ███████ ████████████ coconspirators, and parties associated with the ██████, and the government, representatives, or beneficiaries of Iran, any party located in Iran, any party acting on behalf of, or in the interest of, an entity associated with Iran, any U.S. designated entity, any entity or person in or related to Iran transacting or communicating with entities or persons in Iran or entities or persons acting for the benefit of Iran, and any front company for any of these above mentioned persons or entities;

(g) Evidence related to anti-money laundering controls, know your customer policies, and/or lists, names, persons, companies, and/or entities sanctioned or related to the Department of Treasury Office of Foreign Asset Control ("OFAC");

(h) Evidence related to front companies used by ████████████████ ████████████████ coconspirators, and parties associated with the ██████, and the government, representatives, or beneficiaries of Iran, any party located in Iran, any party acting on behalf of, or in the interest of, an entity associated with Iran, any U.S. designated entity, any entity or person in or related to Iran, including its practices, makeup, organizational structure, profits, and customers;

6

(i)  Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j)  the transportation or transmission of funds that have been derived from a criminal offense;

(k)  the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l)  Information that constitutes evidence concerning (i) the purchase, sale, and/or export of U.S.-origin goods from the United States without a required license; and (ii) the acquisition of goods from the United States and elsewhere to Iran (via third countries), as connected to a conspiracy to import U.S.-origin goods for delivery to end users in Iran;

(m) Records and information related to (i) preparatory steps taken in furtherance of the scheme, including internet searches for U.S.-origin goods and foreign-origin goods (connected to the conspiracy to import U.S.-origin goods) for importation to Iran and ████ (via third countries), inquiries of vendors or sellers of the same, and the like; (ii) purchases and sales such goods from vendors or online purchasing sites (*e.g.* eBay); (iii) methods of payment with respect to such purchases; (iv) shipping, delivery, and customs declarations with respect to such purchases; (v) financial records (to include bank records, wire transfers, checks, credit card statements, account information, and the like) with respect to such purchases; (vi) identities of buyers, sellers, and end users of such goods; (vii) planned use of such goods; and (viii) payments made by the end users of such goods.

(n) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

(o) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(p) The identity of the person(s) who created or used the Target Accounts or any associated user ID, including records that help reveal the whereabouts of such person(s)

(q) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(r) The identity of the person(s) who communicated with the Target Accounts or any associated user ID about matters relating to the laundering of funds to / from Iran, U.S. sanctions, and assisting the Iranian regime, including records that help reveal their whereabouts

### III.   Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____           _____
Date                                Signature

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC., PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | Case No. 20-sc-349<br><br>**Filed Under Seal** |

*Reference:*    *USAO Ref. #* ███████████ *; Subject Account(s):* ████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████████ being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information which is associated with one account – that is, ████████████ – which is stored at premises controlled by Oath Holdings, Inc., ("PROVIDER"). Concurrently, I am also submitting search warrant applications for the additional accounts – ████████████ ; ████████████ , ████████████ , ████████████ , ████████████ , ████████████ , ████████████ ; and ████████████ – stored at other providers. Those applications present identical factual bases to search. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require the PROVIDERS to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*.,  and money laundering, 18 U.S.C. § 1956, will be discovered in the TARGET ACCOUNTS.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

6. This investigation relates to violations of IEEPA and its implementing executive orders and regulations. IEEPA, enacted in 1977, granted the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Under IEEPA, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

7. Title 50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

8. Using the powers conferred by IEEPA, the President and Executive Branch departments have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S. goods.

9. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

10. On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous

3

orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

11. The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC.

12. The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States. See 31 C.F.R. § 560.410.

13. The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a).

14. The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203.

15. Additionally, on August 6, 2018, the President, pursuant to IEEPA, issued Executive Order 13846, which, among other things, authorized the Secretary of State, in consultation with the secretaries of various other executive agencies, to impose sanctions on

4

individuals who knowingly engage in a significant transaction for the purchase, acquisition, sale, transport, or marketing of oil or petroleum products from Iran.

16.     After this Executive Order was implemented, the Iranian Oil Minister, Bijan Namdar Zanganeh, said in an interview, "We have unofficial or unconventional sales, all of which are secret, because if they are made known America would immediately stop them."

## PROBABLE CAUSE

17.     The United States is investigating the illicit transfer of Iranian petroleum to third party countries, and the payment of these shipments in U.S. dollars, for which U.S. sanctions would require a license from the Department of Treasury Office of Foreign Assets Control (OFAC), which is located in the District of Columbia. The investigation concerns possible violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*, and money laundering, 18 U.S.C. § 1956.

18.     I am aware that a ▮▮▮ company ("▮▮▮ Company 1") operates a fleet of tankers. Several of their tankers have shipped petroleum to and from Iran and received corresponding U.S. dollar payments.  One of these tankers is the ▮▮▮▮▮▮▮▮▮▮▮▮").  Law enforcement tracked this tanker's movements using its Automatic Identification System ("AIS"), and confirmed that it had travelled to Iran on multiple occasions between 2016 and 2017.  Subpoena returns from financial institutions that process international U.S. dollar wires revealed U.S. dollar payments that referenced the ▮▮▮. The parties failed to seek or obtain a license from OFAC for such transactions.

19.     The managing director of ▮▮▮ Company 1 confirmed to a news publication that the ▮▮▮ was sold to an ▮▮▮ company named ▮▮▮▮▮▮▮▮▮ in or about July 2019.  Financial records revealed that the U.S. bank which processed the sale of the ▮▮▮ to ▮▮

for approximately ████ froze such transaction for possible sanction compliance / anti-money laundering reasons. Throughout the course of this investigation I have uncovered evidence that ██ has acted as a shell company for individuals located in Iran, which supports the freezing of these funds.

20.    I am aware that due to the freezing of these funds, ████ Company 1 did not receive payment for the sale of the ████. As such, ████ Company 1 (through a subsidiary company) sought and obtained a seizure warrant issued by a civil court in the ███████ with which it seized the ████. The ownership of the ████ is set to be decided by an arbitration tribunal, as specified by the sales contract.

## ████ COCONSPIRATORS

21.    Public corporate registry information revealed that ████ was created around the time that it purchased the ████.

22.    ████ website displays indications that the company was created on behalf of third party companies for the purpose of conducting this transaction.  For example, the ██ website indicates that ██ is actually located at a P.O. Box in ████, not ████ and that the company is cooperating with an ████ company, █████████████████████████████ ████ Public records revealed that ██████ is listed as the manager of the ████.

23.    Registration information from ████ website on October 23, 2019 shows that the contact information for ██ was redacted using a privacy service, indicating an intent to hide the ultimate beneficial owner of the company.

24.    Subpoena returns from the company that registered ████ domain show that the website was created on August 24, 2019 by an employee of ████ company ██████ █████████████████████████ This date closely aligns to when ██

6

purchased the ███. A corporate registry database revealed business records showing ██████

███ has a common director with ████████ leading me to believe that these are all affiliated

companies set up to obfuscate the beneficial owner, consistent with money laundering practices.

25.  Open source information indicates that a company named ██████████████

████████████████ is located at the same P.O. Box in ████ as ██. I believe

these companies were both involved with the purchase of the █████.

26.  A cached version of ███████ website lists that it attends mining exhibits in both

████ and Iran, which appears consistent with ████ Iranian line of business.

27.  Subpoena returns from LinkedIn revealed that many of the ██████ LinkedIn

company profiles and employee profiles were accessed from Iran or listed a location as Iran,

despite publicly claiming to be located in ████. Law enforcement also discovered a business

listing for ████████████████████████ which lists

the ██████ website and an address in Iran, leading law enforcement to believe that ████████

maintains an office in Iran.

28.  ██████████████████ is a corporate entity that lists the

same P.O. Box in ████ as ██ and ███████ I believe that ████████ was also involved

with the purchase of the ███. A reliable confidential source revealed that Iranian national ████

████ previously listed himself as the marketing manager of ████████ showing that this

company is also linked to Iran.

29.  This court previously authorized a request for the metadata of accounts operated by

the previously described companies. *See* ██████████████ As further

described below, metadata from these accounts shows that email addresses associated with ████,

████████████ and Iranian ship management company ██████████

7

█████████████████████████ all communicated with Brokerage Company 1 near the time of the sale of the █████. Law enforcement communicated with counsel for Brokerage Company 1, which revealed that Brokerage Company 1 brokered the sale of the █████. These communications lead me to conclude that an entity located in Iran was directly involved with this transaction. In most of these instances, █████ blind copied the email address used by the █████ employee, indicating that ████ sought to hide this employee's involvement in this transaction. As described previously, ███████ maintains an office in Iran.

30.    ████ ██████ advertises that they have decades of business experience with the ████████████████████████████ On November 5, 2018, OFAC designated the ████ pursuant to Executive Order ("E.O.") 13599 for being a part of the Government of Iran.

31.    ████ ██████ also claimed to do business with the ███████████████ which is a subsidiary of the ████████████████████ according to publicly available information. ███████████████ OFAC noted that the █████ was instrumental in Iran's petroleum industries, which helps to finance ███████████████ ███████████████████.

32.    According to open source information, █████ ██████ has additionally operated and managed tankers with the Iran-based ████████████") . OFAC designated ████ in March 2012. Concerning █████, OFAC stated: "████████ which has offices in Iran and ████████ is being designated for being owned or controlled by ████████████ OFAC designated ████████ ██████ in October 2007 under E.O. 13382 as an engineering arm of the ██████ that the █████ uses to generate income and fund its operations." OFAC designated the ██████ pursuant to E.O. 13224 in October 2017 for providing support to a number of terrorist groups.

8

33. As described above, ███ ████ has a long history of working with designated entities in Iran and prior 2703(d) returns showed that a ███ ███ email account was included on an email between ██ and Brokerage Company 1. The sale of the ███ involved the transfer ██████ that transited through the United States. The failure of the parties to seek a license prior to such sale a violation of the sanctions against Iran.

## TARGET ACCOUNTS

34. ████████████ (**"Target Account 1"**) –Subpoena returns for subscriber information for **Target Account 1** revealed it was registered using an Iranian phone number. IP login information further revealed that **Target Account 1** was accessed in Iran and ████.

35. The 2703(d) returns revealed that **Target Account 1** communicated with a number of additional companies in Iran, including ██████ and Iranian ship management company ███ ███. An email account used by ██ ███ (as evidenced by the fact it was on the ███ ███ domain) emailed Target Account 1 approximately 82 times around the time of the sale of the ███. Many of these emails included accounts at ██████████ (as evidenced by the fact it was on the ████████ domain) and ██.

36. **Target account 1** was blind copied on over 20 emails between ██ and Brokerage Company 1.

37. ████████████ (**"Target Account 2"**) – As noted above, ██████████ is affiliated with the ██████ website, which listed an address in Iran. On a business listing, ████████ listed **Target Account 2** as its contact email address. Subpoena returns for subscriber information for **Target Account 2** revealed **Target Account 1** as the alternate email address, leading me to conclude that the same user accesses **Target Account 2** and **Target Account 1**. Based on my training and experience, I know that single users will frequently link

accounts in such manner.

38.     On a separate business listing, Iranian company ███████ lists **Target Account 2** as its contact email address.  Subpoena returns for subscriber information for **Target Account 2** show that the user of this account listed his country as Iran and the verified phone number had an Iranian country code.  The IP login activity for this account shows that it was accessed from ███ and Iran in November 2019.

39.     The metadata for Target Account 1 further reveals that Target Account 2 and Target Account 1 communicated via email on multiple occasions.  On April 2, 2016, both of these accounts received an email from Iranian company ████████ which is a petroleum-focused engineering petroleum company according to an Iranian business listing.

40.     ████████ (**"Target Account 3"**) – I believe that Target Account 3 is used by ███, based on the name of this account and the communications involving this account.

41.     2703(d) returns revealed that from June to October 2019, **Target Account 3** emailed multiple accounts at Brokerage Company 1.  On July 22, 2019, **Target Account 3** carbon copied Iranian company ██ ███ on one of these emails and blind copied **Target Account 1**. As noted above, subscriber returns for **Target Account 1** and **Target Account 3** revealed their use by individuals in Iran, leading me to believe that ███ was aware of Iranian involvement in its acquisition of petroleum tanker ███.

42.     **Target Account 3** also emailed an email account on the ██ ███ domain for ████████ at least 58 times from July to October 2019.  According to the ██ ██ website, ████ is the technical director of ██ ███.

43.     **Target Account 3** additionally emailed multiple ██████ employees (on the ███ ███ domain) at least five times in July 2019.  For example, one such sets of communications was



with ▮▮▮▮▮▮▮▮▮ This account is a name match for ▮▮▮▮▮ employee ▮▮▮. ▮▮▮ Subscriber information from ▮▮▮▮▮ LinkedIn profile indicated that he registered his Linkedin account using an Iranian IP address, despite listing his location as ▮▮▮.

44. ▮▮▮▮▮▮▮▮▮▮▮ (**"Target Account 4"**) – 2703(d) returns revealed that **Target Account 4** was included on at least 21 emails between ▮ and Brokerage Company 1 from June to October 2019. 2703(d) returns separately revealed that **Target Account 1** also received these identical emails, leading me to believe that **Target Account 1** was on the blind carbon copy line.

45. **Target Account 4** was also included on numerous emails with accounts on the ▮▮ ▮▮ domain, accounts on the ▮▮▮▮▮▮▮▮domain, **Target Account 3**, **Target Account 1**, and accounts on the ▮▮▮▮ domain. As noted above, ▮▮▮▮▮ manages the ▮▮▮.

46. ▮▮▮▮▮▮▮▮▮▮ (**"Target Account 5"**) – As noted above, the ▮▮ ▮▮ website shows that ▮▮▮ is the technical manager of the company and lists an Iranian phone number as his contact information.

47. 2703(d) returns revealed that **Target Account 5** participated in 29 email communications involving **Target Account 1**. The name of **Target Account 5** is a name match ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Target Account 5** was also carbon copied on emails with ▮▮▮ official email account on the ▮▮ ▮▮ domain, which I know to be a common practice of people seeking to keep a copy of important correspondence. As such, I believe **Target Account 5** is operated by ▮▮▮.

48. 2703(d) returns revealed that on August 19, 2019, **Target Account 3** emailed **Target Account 1**, multiple ▮▮▮▮▮▮ employees, and **Target Account 5**. These parties

all were involved in the sale of the ███, thus leading me to believe that ███ used **Target Account 5** to communicate about the ███.

49.     ███████████ (**"Target Account 6"**) – 2703(d) returns revealed that **Target Account 6** is linked by cookies to **Target Account 1**.  Based on my training and experience, I know that, a "cookie" is a small piece of data sent from a website and stored on a user's computer by the user's web browser while the user is browsing the internet.  A linkage by cookie typically occurs when a person on the same device and same browser accesses multiple email accounts.  The provider links accounts by the shared cookies on a device to conclude that the multiple accounts are in fact one customer.  A cookie can have multiple purposes, such as keeping a user logged into a website, saving a user's viewing preferences, or by personalizing the content the website displays for a user, such as with online shopping.  Additionally, much of Provider's revenue comes from targeted advertising.  Provider, in part as they try to generate ad revenue, is creating a unique fingerprint for a user.  In order to better target users, Provider links email accounts that it determines to be owned/operated by the same person/party based on activity from the same computer to better fine tune a profile of that user.  Linking accounts via cookies is more sophisticated than linking accounts by an IP address over a period of time.

50.     The 2703(d) returns further revealed **Target Account 6** has received at least 10 emails from **Target Account 1**.

51.     The 2703(d) returns further revealed that **Target Account 6** maintained joint correspondence with **Target Account 1**, and an email account on the ██████████ domain for more than three years.

52.     On January 23, 2017, an email account that is associated with the ████████ ████████████ (according to a trade website) emailed **Target Account 1** and **Target**

**Account 6**. Based on my training and experience, I know that Iran has a long history of petroleum sales to ▇▇ which is also subject to U.S. sanctions.

53.   ▇▇▇▇▇▇▇▇▇ **("Target Account 7")** – ▇▇ ▇▇▇▇ domain, ▇▇▇▇ used a privacy protection service to prevent third parties from learning the operator of the domain.  Subpoena returns from the privacy protection service for this domain revealed that an individual used **Target Account 7** when creating the ▇▇▇▇ domain.

54.   2703(d) returns for **Target Account 7** provided subscriber information listing the registrant as ▇▇▇▇▇ leading me to conclude this account is used by ▇▇▇▇ **Target Account 7** sent emails to and received emails from ▇▇ ▇▇ at least 19 times in August 2019.

55.   2703(d) returns revealed that beginning in December 2019, **Target Account 7** communicated with ▇▇▇▇▇▇▇ **("Target Account 8")** at least 30 times from November 2019 to January 2020.

56.   The ▇▇▇ changed its name to ▇▇▇▇ after ▇▇ gained ownership of the tanker.  Based on my training and experience, I know that the captain of a petroleum tanker is often referred to as the "master," and as such I believe this email address is operated by the Captain of the ▇▇▇.  I know from prior investigations that the email account of the master of a vessel frequently has communications about illicit transshipments of petroleum.

57.   ▇▇▇▇▇▇▇ **("Target Account 9")** – **Target Account 9** is listed linked by cookies to **Target Account 1**, and **Target Account 6** and has received approximately 150 emails from **Target Account 1**, during the past three years.  As noted above, this linkage by cookies reflects the accessing of accounts by a single device.

58. Based on my training and experience, I believe this account is used by the same individual who uses **Target Account 1** and **Target Account 6**.

59. On or about February 11, 2020, each PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to the Target Accounts.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

60. PROVIDER is the provider of the internet-based account(s) identified by

61. The FOUR PROVIDERS provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

62. Based on my training and experience, I know that the PROVIDER allows subscribers to obtain accounts by registering on the PROVIDER's website. During the registration process, the PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. The

63. PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

64. Once a subscriber has registered an account, the PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's

username. PROVIDER's subscribers can also use that same username or account in connection with other services provided by the PROVIDER.[1]

65.    In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

66.    Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer

---

[1] Here, PROVIDER's other services include: e-mail, contact list, chat, and other services as noted generically above. It provides the branded services Yahoo! groups (a listserve and bulletin board service, which users can opt into), Yahoo! Messenger (an instant messaging service, which users can opt into), and Flickr (a photo storage and sharing service, which users can opt into). Yahoo does not currently provide a standalone notes or document storage service, but its smartphone application has designated "notes" and "documents" functions that operate through Yahoo's e-mail storage.

files and other information created or stored by the PROVIDER's subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

67. Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

68. Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts

and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

69.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.  This application is associated with the subscriber's PROVIDER account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain

useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

70.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

71.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

72.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing

18

inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

73. In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

74. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the

foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[2]

75.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal

---

[2] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

76.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney, Zia Faruqui, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

77.    Based on the forgoing, I request that the Court issue the proposed search warrant.
Because the warrant will be served on PROVIDER, who will then compile the requested records
at a time convenient to it, there exists reasonable cause to permit the execution of the requested
warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law
enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 20, 2020.

G. Michael
Harvey

Digitally signed by G. Michael
Harvey
Date: 2020.02.20 15:41:58 -05'00'

THE HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE