# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*
INFORMATION ASSOCIATED WITH FOUR ACCOUNTS
STORED AT PREMISES CONTROLLED BY GOOGLE LLC,
PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF
VIOLATIONS OF 50 U.S.C. § 1705

)
)
)
)
)
)

Case No. 20-sc-628

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* **INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC, PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705 (See Attachment A, incorporated herein by reference.)** located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705 | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 03/26/2020

City and state: District of Columbia

*Judge's signature*

Robin M. Meriweather, U.S. Magistrate Judge

Case 1:21-sc-20699-UNA Document 1 Filed 06/09/22 Page 3 of 40

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❑ Original   ❑ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH FOUR<br>ACCOUNTS STORED AT PREMISES CONTROLLED<br>BY GOOGLE LLC, PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705 | )<br>)<br>)<br>)    Case No.  20-sc-628<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC, PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____April 9, 2020_____ *(not to exceed 14 days)*
  ❑ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____ .
                                                                                    *(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:   ___03/26/2020___

City and state:   ___District of Columbia___          ___Robin M. Meriweather, U.S. Magistrate Judge___
                                                                                        *Judge's signature*

                                                                                        *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-628 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
**Property to Be Searched**

    This warrant applies to information which is associated with the Google LLC accounts identified by ████████████████ ████████████████; ████████████████; and ████████████ and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process in Mountain View, California.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

I.  **Information to be disclosed by Google LLC ("PROVIDER") to facilitate
    execution of the warrant**

To the extent that the information described in Attachment A is within the possession,
custody, or control of PROVIDER, including any records that have been deleted but are still
available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.
§ 2703(f), PROVIDER is required to disclose the following information to the government
corresponding to each account or identifier ("Account") listed in Attachment A:

    a.    For the time period January 1, 2017. to the present: The contents of all
communications and related transactional records for all PROVIDER services used by an Account
subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo
sharing or storage services, remote computing services, instant messaging or chat services, voice
call services, or remote computing services, including but not limited to incoming, outgoing, and
draft e-mails, Gmail, messages, calls, chats, and other electronic communications; attachments to
communications (including native files); source and destination addresses and header or routing
information for each communication (including originating IP addresses of e-mails); and the date,
size, and length of each communication; and any user or device identifiers linked to each
communication (including cookies);[1]

---

[1] PROVIDER's other services include electronic communication services such as Google Voice
(voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats),
Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing),
and YouTube (video sharing); web browsing and search tools such as Google Search (internet
searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web
browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word

b.      For the time period January 1, 2017, to the present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, Google Drive, including all services referenced in paragraph (a), or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period January 1, 2017, to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period January 1, 2017, to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

e. All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Google Cloud Messaging ("GCM");

g. Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number),

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.     All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.     For the time period January 1, 2017, to the present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following: ██████████████████ ████████████████████████████████

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 50, United States Code, Sections 1701-1707, and money laundering, in violation of Title 18, United States Code, Section 1956, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(d) Information that constitutes evidence concerning an illicit scheme to procure items from the United States for end users in Iran and to launder the funds used to promote this scheme;

(e) Records and information related to any purchases of items from the United States, including, invoices, pro forma invoices, bills of sale, receipts, sales records,

purchasing records, waybills, Electronic Export Information, export booking documents, or freight forwarding documents related to U.S. items;

(f) Records and information related to any online payment transactions related to U.S. items;

(g) Records and information related to any shipping, export, delivery or customs declaration of U.S. items;

(h) Records and information related to actual or potential buyers and sellers of United States items, including biographical information, addresses, email addresses, user names, social security numbers, or other pertinent identifying information;

(i) Records or information related to the application for, acquisition of, return of, or denial of export licenses or approvals from the United States government;

(j) Equipment lists, literature, specification information, or photos related to U.S. items;

(k) Records and information related to associates of ███████████ including biographical information, addresses, email addresses, user names, social security numbers, or other pertinent identifying information;

(l) Records and information related to the use or planned use of U.S. items;

(m) The schedule of travel, travel documents, calendar data, or any information concerning the location or travel of ███████████ or any other participant in the acquisition, purchase, transfer, sale, supply, storage, import, export, re-export, transshipment, financing, transportation, and/or freight forwarding, directly or indirectly, or plan to do the same, of U.S. items, including actual or potential buyers, sellers, intermediate consignees, intermediaries, or freight forwarders;

(n) Records and information related to any bank records, checks, credit card bills, account information, and other financial records;

(o) Records and information related to identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

(p) Any communications between " ███ █████ " or any other participant in the acquisition, purchase, transfer, sale, supply, storage, import, export, re-export, transshipment, financing, transportation, and/or freight forwarding, directly or indirectly, or plan to do the same, of U.S. items, including actual or potential buyers, sellers, intermediate consignees, intermediaries, or freight forwarders;

(q) Records and information related to the state of mind of " ███ █████ ," or any other participant in the acquisition, purchase, transfer, sale, supply, storage, import, export, re-export, transshipment, financing, transportation, and/or freight forwarding, directly or indirectly, or plan to do the same, of U.S. items, including actual or potential buyers, sellers, intermediate consignees, intermediaries, or freight forwarders;

(r) Records and information related to the knowledge of export control laws, rules, regulations and/or procedures by " ███ █████ " or any other participant in the acquisition, purchase, transfer, sale, supply, storage, import, export, re-export, transshipment, financing, transportation, and/or freight forwarding, directly or indirectly, or plan to do the same, of U.S. items, including actual or potential buyers, sellers, intermediate consignees, intermediaries, or freight forwarders;

(s) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(t) Evidence indicating the email account owner's state of mind as it relates to the criminal activity under investigation;

(u) Records and information related to the identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(v) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

      a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

      b.     such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

          1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

          2.     the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____

Date                             Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FOUR ACCOUNTS STORED AT
PREMISES CONTROLLED BY
GOOGLE LLC, PURSUANT TO 18
U.S.C. 2703 FOR INVESTIGATION OF
VIOLATIONS OF 50 U.S.C. § 1705

**Case No. 20-sc-628**

**Filed Under Seal**

*Reference:*   *USAO Ref. #* ██████ *; Subject Account:* ████████████
███████████; █████████████████; ███████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for
information which is associated with the followings accounts – that is,
████████████████████████; █████████████████████;
███████████ – which is stored at premises controlled by Google LLC ("PROVIDER"), an
electronic communications services provider and/or remote computing services provider which
accepts service in Mountain View, California.  Concurrently, I am seeking an application for a
search warrant for related accounts – ████████████; ████████████████;
████████████; ████████████; ████████████
████████████; ████████████; and ████████████ – which
application contains a near identical statement of probable cause.  The information to be searched
is described in the following paragraphs and in Attachment A.  This affidavit is made in support
of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and

2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the International Economic Emergency Powers Act ("IEEPA"), in violation of Title 50, United States Code, Sections 1701-1707, and money laundering, in violation of Title 18, United States Code, Section 1956, and conspiracy, in violation of Title 18, United States Code, Section 371, have been committed by ████████████████████████████ and others. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## <u>JURISDICTION</u>

5. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

## **LEGAL BACKGROUND**

6.      Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§ 1701-1707, the President of the United States was granted authority to deal with unusual and

extraordinary threats to the national security, foreign policy, or economy of the United States.  50

U.S.C. § 1701(a).  Pursuant to that authority, the President may declare a national emergency

through Executive Orders that have the full force and effect of law.  Among other things, IEEPA

empowers the President to issue regulations governing exports from the United States.

7.      On March 15, 1995, the President issued Executive Order No. 12957, finding that

"the actions and policies of the Government of Iran constitute an unusual and extraordinary threat

to the national security, foreign policy, and economy of the United States" and declaring "a

national emergency to deal with that threat."   Executive Order No. 12957 was expanded and

continued by Executive Orders Nos. 12959 and 13059.

8.      Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No.

12957, "the Executive Orders") imposed economic sanctions, including a trade embargo, on Iran.

The Executive Orders prohibited, among other things, the exportation, sale, or supply, directly or

indirectly, to Iran of any goods, technology, or services from the United States or by a United

States person.  The Executive Orders also prohibited any transaction by any United States person

or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any

prohibition set forth in the Executive Orders.

9.      The Executive Orders authorized the United States Secretary of the Treasury, in

consultation with the United States Secretary of State, "to take such actions, including the

promulgation of rules and regulation, as may be necessary to carry out the purposes" of the

Executive Orders.  Pursuant to this authority, the Secretary of the Treasury, through the Office of

Foreign Assets Control ("OFAC), promulgated the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, implementing the sanctions required by the Executive Orders.

10.     Specifically, absent permission from OFAC in the form of a license, the ITSR prohibits, among other things:

    a.  The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, trans-shipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

    b.  The reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States, if:  (a) such reexportation is undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran, and (b) the exportation of such goods, technology, or services, was subject to export license application requirements under any United States regulations (31 C.F.R. § 560.205); and

    c.  Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR (31 C.F.R. § 560.203).

11. Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute. 50 U.S.C. § 1705(a). Willful violations of the ITSR constitute criminal offenses under IEEPA, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine. 50 U.S.C. § 1705(c).

## PROBABLE CAUSE

12. The United States is investigating a scheme engaged in by an individual in Iran who is providing false information to procure ██████████████████ The investigation concerns possible violations of, inter alia, IEEPA, in violation of Title 50, United States Code, Sections 1701-1707, and money laundering, in violation of Title 18, United States Code, Section 1956.

13. In November 2017, ████ ██████ ████████████████████████"), using the email account ████████████ (the "██████ Account"), requested a quotation for ██████████████████████ from a U.S. Company ("U.S. Company 1"). Based on my training and experience, I know that Iran has many U.S. origin aviation assets, which require U.S. origin parts to remain operational. The ITSR requires a license from the U.S. government before the exportation of many of these parts from the U.S. to Iran may occur, which limits the export of such items and places items similar to the ones sought by ██████ in high demand in Iran. This court previously issued a search warrant for the ██████ Account. *See* ██ ██████

14. Subpoena returns from U.S. Company 1 and search warrants results for the ██████ Account, which are discussed below, show that ██████ was employed by ██████ ██ which is ██████ company that sells ████████████████ U.S. Company 1 refused

6

to do business with ███ and stated, "We are unable to ship to Iran at this time." In response, ████, using the ███ Account, stated, "We have an office in ██ too[.] Are you able to ship to ███ U.S. Company 1 refused to engage in further business with ███. I am aware that companies in Iran often create companies in third-party countries as a false front to receive shipments of goods from the United States that are ultimately destined for Iran, thereby circumventing U.S. sanctions.

15.     In a separate instance, a United States company that sells ████████ ("U.S. Company 2") notified law enforcement that, in February 2018, ████ requested a quotation for ████████████

16.     ███ claimed to work for a ███ company and provided a ███ phone number.

17.     U.S. Company 2 presented ███ with a quotation in April 2018, and shipped the ordered items to ███ at a ███ address in July 2018, after which ███ wired ███ into U.S. Company 2's bank account in the United States to complete the purchase.

18.     Search warrant results for the ███ Account reveal that, on April 16, 2018, ███ forwarded his correspondences with U.S. Company 2 to an individual named "██," who I believe to be a ████████ who stated, "So need to pay ████████ I understand this exchange to be a conversation about paying U.S. Company 2 on behalf of ███. The payment amount is slightly more than the amount received by U.S. Company 2; however, this discrepancy is likely due to fluctuating exchange rates. ███ stated to ██, "Consider that this order from usa and they shouldn't find out the end user is from iran." Based on this statement, I believe that ███ knew that it was illegal for him to procure U.S. origin items for end users in Iran without a license and that the payment of such items was also illegal.

7

19.     The items ███ procured from U.S. Company 2 required a license from the Department of Treasury's Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, before they could be exported to Iran, or reexported to Iran from a third-party country, such as ███. Law enforcement is unaware of any such application being sought or obtained. The items did not require a license for export to an end user in ███.

20.     A special agent of the U.S. Department of Commerce ("DOC") detained and inspected the items ordered by ███ from U.S. Company 2 while they were in the export process. On November 21, 2018, the DOC special agent contacted ███ at the ███ Account, and requested that ███ complete a "BIS 711 end user/use certification" form before the goods could be exported. The "BIS 711" requires the signature of the final end user of the product and that the final end user declare the specific end use of the product.

21.     On November 23, 2018, ███ responded via the ███ Account to the DOC special agent, stating that ███ worked for a "trading company" and that the customer requesting the product refused to complete the "BIS 711" form. On November 29, 2018, the DOC special agent replied to ███ that anyone who seeks to do business with the United States must comply with U.S. customs and export laws and provide end user and end use information to complete the transactions. ███ did not reply to the DOC special agent. As such, the items are still detained.

22.     Search warrant returns for the ███ Account further revealed that on July 9, 2018, ███ emailed ███ to place an order for items produced by another U.S. Company located in ███ ("U.S. Company 3"). In this email, ███ again stated, "Please notice they shouldn't find out the end user in iran."

23. Search warrant and subpoena returns have revealed that ███████ has been in contact with at least eight companies in the United States since in or about September 2017. These companies included ████████████████████████████████████████████████████ ████████████████ The search warrant returns further revealed that ████████ also communicated with at least six companies in Iran starting in September 2017. Thus, it appears that ████████ has been procuring items from the United States for end users in Iran for several years.

24. In addition, in multiple instances, ████████ attempted to procure ████████████ ████████████████████████ For example, in an email from December 11, 2018, ████████ attempted to procure █████████████████████ from a company in ██████. Based on the information your affiant has at this time, this transaction does not appear to be subject to U.S. export laws. Nevertheless, it is indicative of the type of transactions ████████ appears to undertake. Moreover, as further described below, in another instance he attempted to procure items manufactured in the United States that are associated with an ████████████████ used by the U.S. military.

25. Search warrant returns from the ████████ Account show that ████████ listed an address in ████████████ in his signature block and that he attended an exhibition in ████████████ leading me to believe that he is located in Iran and not ██████.

## TARGET ACCOUNTS

26. The Target Accounts are: ████████████████████ ("**Target Account 1**"); ████████████████████ ("**Target Account 2**"); ████████████████████ ("**Target Account 3**"); ████████████████████ ("**Target Account 4**"); ████████████████████ ("**Target Account 5**"); ████████████████████ ("**Target Account 6**"); ████████████████████ ("**Target Account 7**"); ████████████████████ ("**Target Account**



9

8"); ██████████████ ("**Target Account 9**"); ███████████████ ("**Target Account 10**"); ███████████████ ("**Target Account 11**"); ███████████████████ ("**Target Account 12**").

27.    ███████████████ **("Target Account 1")** – Search warrant returns for the ████ Account revealed that ██████ coordinated regarding procurement with ███████ ██████████████████ who uses **Target Account 1**. These communication occurred from in or about October 2017 to in or about December 2019.

28.    During this time, ███████ and ███████ exchanged schematics and discussed payments. ███████ address book lists this account as "Deputy," leading me to believe that ████████ is the deputy CEO of ██████████████ where ████████ works. Law enforcement identified a public profile in ██████ which lists this email address. The name associated with this profile is █████████████ a direct transliteration from ██████ In separate emails, the user of **Target Account 1** is referred to as ████████████.

29.    On February 15, 2018, ████████, using the ████████ Account, forwarded ████████ at **Target Account 1**, an email from a ████████ company. The email described how ██████████ orders were difficult to pass through customs and how ████████ was on a bank's blacklist, so the company was not willing to continue supplying ████████. In a separate email chain on March 11, 2018, ████████ told a seller of ███████████ that ███████ company was in Iran but also had an office in ██████. The seller was willing to sell the desired product to ████████ in ████. ████████ forwarded this email to ████████ at **Target Account 1** and indicated in ██████████████ ███████████████ I believe that this email indicates that ████████ tasked ████████ to procure the ████████ and that ████████ was reporting that he had found the item as requested.

10

30.     Law enforcement also found a separate publicly available business directory profile for ██████ which lists him as having senior positions at multiple companies, including ██████ company ████████████████████████ lists its business activity as ████████████████████████████

31.     In several emails to **Target Account 1**, ██████ addressed ██████ as ██████ leading me to believe that ████ is an alias for ██████ For example, on January 11, 2018, ██████ emailed ████, and indicated to "████" that ██████ requested that an item be sent to Iran.

32.     ████████████████ (**"Target Account 2"**) – As noted above, ██████ is believed to be an alias for ██████ The username for **Target Account 2** is ██████

33.     On February 22, 2019, ██████ using **Target Account 1**, forwarded ██████ an email from ████████████ that was originally sent to ██████ using **Target Account 2**.

34.     Within the ██████ Account search warrant returns, law enforcement located numerous emails that reference **Target Account 2**.  For example, the ██████ Account contained an email from on or about October 16, 2017, in which **Target Account 2** was used as a contact address for a foreign company to send multiple pricing quotes and invoices for ██████ ████████████████████████████

35.     ████████████ (**"Target Account 3"**) – Search warrant returns for the ██████ Account revealed an October 22, 2017 email from **Target Account 3** to ██████, which indicated that **Target Account 3** was used by ██████ In this email, the signature block associated with **Target Account 3** indicated that the user of this account was ██████ of ██████



36.     On October 7, 2017, ████ sent an email to **Target Account 3** that discussed procuring ████████████████ The discussion indicated that the transaction would be ordered from a ████ company, but two quotations for these items included by ████ in his email included air freight from the United States.  The quotation for the ████ ████ indicated that the total cost was ████████ The quotation also indicated that air freight from the United States to ████ to Iran would cost ██████ (included in the total cost).  The second quotation for ██████ indicated that air freight from the United States to ██ to Iran would cost ████ The email also indicated that ████ sought a ████████ ██████████████ but the supplier did not have access to this item.

37.     On November 4, 2017, **Target Account 3** emailed the ████ Account and stated, "Check with me when back to ████ indicating that the user of **Target Account 3** is located in Iran.

38.     ██████████████ **("Target Account 4")** - Search warrant returns for the ████ Account revealed that ████ saved **Target Account 4** in his address book under the name ████████.

39.     On hundreds of occasions from 2017 to 2019, ██████ using **Target Account 4**, directed ██ by email to arrange payments to third-party companies and copied ████ and ████.

40.     For example, in an email chain on or about April 18, 2019, ██████ using **Target Account 4**, emailed "██" to pay an outstanding invoice.  ████ responded that she paid the amount requested and then ██████ using **Target Account 4**, requested that additional funds should be sent to a ████ supplier.  Similarly, on or about April 29, 2019, ██████ using **Target Account 4**, sent ██ a proforma invoice from a ████ company.

12

41.    Hundreds of these email communications involving **Target Account 4** also included ███████████████████ (**"Target Account 5"**).  For example, both **Target Account 4** and **Target Account 5** were on email communications on or about November 26, 2019, where ████ indicated to ████ ████ that ████ paid funds connected to an invoice for ███████ associated with ██████ and other items, including a ████████████.

42.    In another instance, on or about December 10, 2019, the user of **Target Account 5** asked ████ to pay funds on an outstanding contract, and ████ responded that she made the payment.

43.    ██████████████ (**"Target Account 6"**) – ███████, using the ████████ Account, communicated with **Target Account 6** at least 50 times from September 2017 to June 2018.  Many of these emails discussed shipping items to Iran.  In one instance, on May 2018, an ██████ Company emailed ████████ and **Target Account 6** about an ████████████ shipment to Iran.

44.    In an email chain on September 18, 2017, the user of **Target Account 6** listed his name as ████████ in a signature block, and listed his employer as ████company █████████ ████████████.

45.    Law enforcement identified a publicly available LinkedIn profile for ██████████ which indicates that he is the general manager of ██████ and is located in Iran.

46.    ███████████████████ (**"Target Account 7"**) – The user of **Target Account 7** refers to himself as █████████████ and is listed as the consignee on numerous invoice statements for █████████.

47.    On April 10, 2018, ██████████, using **Target Account 6**, sent ████████ an email chain which included a delivery note for █████████ being shipped to ████, Iran. ██████████████

13

sent ▮▮▮▮ information about ▮▮▮▮▮▮ in this email and described **Target Account 7** as the general email account for ▮▮▮▮▮▮

48.     On September 26, 2017, Target Account 9 sent ▮▮▮▮ at Target Account 1, and **Target Account 7** equipment specifications that Target Account 3 later forwarded to the ▮▮▮▮ Account.

49.     On October 30, 2017, ▮▮▮▮ sent Target Account 6 information about ▮▮▮▮▮▮ ▮▮, which listed an address in Iran for the company and **Target Account 7** as the contact email address.

50.     ▮▮▮▮▮▮ (**"Target Account 8"**) – Search warrant returns for the ▮▮▮▮ Account revealed multiple email correspondences in which **Target Account 8** was referred to as, or the user referred to himself as, ▮▮▮▮▮▮

51.     In one email, on or about March 28, 2018, ▮▮▮▮ using Target Account 8, emailed **Target Account 1**, **Target Account 4**, and **Target Account 7**.  This email included a signature block for ▮▮▮▮ which listed his position as the trading manager of ▮▮▮▮▮▮ which I believe to be short for ▮▮▮▮▮▮

52.     Target Account 8 has been on email correspondences between ▮▮▮▮ and ▮▮▮▮ using Target Account 1, more than 100 times.  ▮▮▮▮ using **Target Account 1**, referred to ▮▮ ▮▮▮ and ▮▮▮ as the individuals in charge of arranging shipments and confirming delivery and shipment of goods. ▮▮▮▮ using **Target Account 1**, referred to **Target Account 8** as the consignee on multiple shipments and invoices.

53.     **Target Account 8** received multiple emails from "▮▮" regarding the status of shipments of items, such as ▮▮▮▮▮ and specifically, ▮▮▮▮▮▮ which are designed for ▮▮▮▮▮▮ **Target Account 8** also received an invoice from ▮▮▮ for

14

█████████████████████ as well as █████████ which coincides with the other Target Accounts involvement in ██████████████████████

54.  ██████████████████ **("Target Account 9")** – Search warrant returns for the ███████ Account revealed that ████████ listed **Target Account 9** as "research manager" in his address book.  Based on the account name and the context of communications between **Target Account 9** and other accounts involved with this scheme, I believe this account is used by the research manager of ████████████.

55.  Between in or about 2017 and in or about 2019, **Target Account 9** sent more than 300 emails to above-identified co-conspirators, many of which included ███████████████████████████████████████████████████████████████████████████████

56.  For example, on August 14, 2018, █████████ sent **Target Account 9** a datasheet for █████████ and asked **Target Account 9** to answer technical questions.

57.  On or about June 12, 2018, **Target Account 9** sent █████████ and ██████████ using **Target Account 1**, schematics related to their procurement activity.

58.  ████████████████████ **("Target Account 10") -** Search warrant returns for the ███████ Account revealed that on or about July 3, 2019, **Target Account 9** sent an email to **Target Account 1** and █████████ advising them that due to changes within the company (*i.e.*, ██████████ future company invoice orders would be sent from two new email addresses, **Target Account 10** and **Target Account 11**.

59.  **Target Account 10** exchanged hundreds of emails with █████████ and █████████ using **Target Account 1**.  Many of these conversations included discussions about ████████████████████████████████████████████████████████████████



60.    On or about July 4, 2019, ███ sent **Target Account 10** a request for a quote from ██.

61.    On or about July 30, 2019, **Target Account 10** provided ███ information about the cost of doing custom modifications to items procured.

62.    ████████████ (**"Target Account 11"**) – As noted above, search warrant returns for the ███ Account revealed that on or about July 3, 2019, **Target Account 9** sent an email to **Target Account 1** and ███ advising them that due to changes within the company (*i.e.*, ██████), future company invoice orders will be sent from two new email addresses, **Target Account 10** and **Target Account 11.**

63.    On or about May 1, 2019, ███ forwarded a potential client an order from **Target Account 10** that copied **Target Account 11**.  On or about April 22, 2019, **Target Account 11**, whose user referred to himself as ███ sent an email to ███, **Target Account 1**, and **Target Account 8**, stating that **Target Account 11** was his new operational business email address.

64.    On or about April 28th, 2019, **Target Account 11**, whose user referred to himself as ██████ sent an email to ███ and **Target Account 1** with detailed mechanical schematics, and invoices for ██████.

65.    In October 2019, ███ and ███ using **Target Account 11**, exchanged two emails about the difficultly in procuring ██████ due to the ██████ On or about October 26, 2019, ███ using **Target Account 11** received information on acquiring a substitute for ██████ related to a particular type of ██████ ██████████.

66.     █████████████████████ **("Target Account 12")** - Search warrant returns for the ██████ Account revealed that ██████ referred to himself as ██████ ████████ in multiple emails.

67.     For example, on or about November 4, 2017, **Target Account 3** emailed the █████ Account and referred to the user of the ██████ Account as ██████ and stated, "Check with me when back to ██████ Two minutes prior to this email, **Target Account 3** emailed the █████ Account and referred to the user as "███," leading me to believe that the user of **Target Account 3** knew that the user of the ██████ Account used the name ████████████ and the alias ██████ ██████.

68.     On November 12, 2017, ██████, using the ██████ Account, included a signature block which listed himself as ████████████ the Trade Manager of ████████████ and listed ██████ known Skype address, indicating that ████████████ is ██████.

69.     In another instance, on October 14, 2017, **Target Account 6** copied **Target Account 12** while emailing ██████ and referred to ██████ as ████████ leading me to believe that the user of **Target Account 6** knew that ██████ used both accounts.

70.     In another email on March 7, 2019, ██████, using the ██████ Account, listed his name as ████████████ and indicated that he was the senior mechanical expert for ██ ████████ In this email, he listed an alternate email address of ████████████ Other emails in ██████ account show that ████████ is a domain used by ████████████

71.     On or about January 2020, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to █████████████████ ████████████████; ████████████████; and ████████████

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

72.     PROVIDER is the provider of the internet-based account(s) identified by ████████████████        ████████████████; ████████████████████; and ████████████.

73.     PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online.  PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

74.     Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website.  During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.  PROVIDER typically does not verify subscriber names.  However, PROVIDER does verify the e-mail address or phone number provided.

75.     Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username.  PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[1]

---

[1] PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet

76.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

77.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, and SMS text messaging.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber.  Based on my training and

---

searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

78.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of services utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

79.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services.  Examples of these identifiers include unique application number, hardware model,

operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

80.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain

useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

81.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

82.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

83.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing

22

inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

84. In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

85. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the

23

foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[2]

86.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal

---

[2] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

87. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that staff at the U.S. Attorney's Office are capable of identifying my voice and telephone number for the Court.

## CONCLUSION

88.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 26, 2020.

_____
HON. ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
INFORMATION ASSOCIATED WITH FOUR ACCOUNTS
STORED AT PREMISES CONTROLLED BY GOOGLE LLC,
PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF
VIOLATIONS OF 50 U.S.C. § 1705

)
)
)
)
)
)

Case No. 20-sc-628

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* **INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC, PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705** (See Attachment A, incorporated herein by reference.)
located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705 | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 03/26/2020

*Judge's signature*

City and state: District of Columbia

Robin M. Meriweather, U.S. Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | )  |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC, PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705 | ) ) ) ) |

Case No.  20-sc-628

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC, PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before        April 9, 2020        *(not to exceed 14 days)*
  ☐ in the daytime 6:00 a.m. to 10:00 p.m.        ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    03/26/2020  @ 5:50pm                                    _____
                                                                                                                    *Judge's signature*

City and state:      District of Columbia                          Robin M. Meriweather, U.S. Magistrate Judge
                                                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-628 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Google LLC accounts identified by ██████████████████ ███████████████████; ██████████████████; and ██████████████ and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process in Mountain View, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.      **Information to be disclosed by Google LLC ("PROVIDER") to facilitate
         execution of the warrant**

   To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A:

   a.      For the time period January 1, 2017. to the present: The contents of all

communications and related transactional records for all PROVIDER services used by an Account

subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo

sharing or storage services, remote computing services, instant messaging or chat services, voice

call services, or remote computing services, including but not limited to incoming, outgoing, and

draft e-mails, Gmail, messages, calls, chats, and other electronic communications; attachments to

communications (including native files); source and destination addresses and header or routing

information for each communication (including originating IP addresses of e-mails); and the date,

size, and length of each communication; and any user or device identifiers linked to each

communication (including cookies);[1]

---

[1] PROVIDER's other services include electronic communication services such as Google Voice
(voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats),
Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing),
and YouTube (video sharing); web browsing and search tools such as Google Search (internet
searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web
browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word

b.      For the time period January 1, 2017, to the present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, Google Drive, including all services referenced in paragraph (a), or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period January 1, 2017, to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period January 1, 2017, to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Google Cloud Messaging ("GCM");

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number),

3

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

       h.     All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

       i.      For the time period January 1, 2017, to the present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

       j.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

       Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:  ████████████

████████████████████████████████

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 50, United States Code, Sections 1701-1707, and money laundering, in violation of Title 18, United States Code, Section 1956, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(d) Information that constitutes evidence concerning an illicit scheme to procure items from the United States for end users in Iran and to launder the funds used to promote this scheme;

(e) Records and information related to any purchases of items from the United States, including, invoices, pro forma invoices, bills of sale, receipts, sales records,

5

purchasing records, waybills, Electronic Export Information, export booking documents, or freight forwarding documents related to U.S. items;

(f) Records and information related to any online payment transactions related to U.S. items;

(g) Records and information related to any shipping, export, delivery or customs declaration of U.S. items;

(h) Records and information related to actual or potential buyers and sellers of United States items, including biographical information, addresses, email addresses, user names, social security numbers, or other pertinent identifying information;

(i) Records or information related to the application for, acquisition of, return of, or denial of export licenses or approvals from the United States government;

(j) Equipment lists, literature, specification information, or photos related to U.S. items;

(k) Records and information related to associates of ███████ including biographical information, addresses, email addresses, user names, social security numbers, or other pertinent identifying information;

(l) Records and information related to the use or planned use of U.S. items;

(m) The schedule of travel, travel documents, calendar data, or any information concerning the location or travel of ███████ or any other participant in the acquisition, purchase, transfer, sale, supply, storage, import, export, re-export, transshipment, financing, transportation, and/or freight forwarding, directly or indirectly, or plan to do the same, of U.S. items, including actual or potential buyers, sellers, intermediate consignees, intermediaries, or freight forwarders;

6

(n) Records and information related to any bank records, checks, credit card bills, account information, and other financial records;

(o) Records and information related to identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

(p) Any communications between ██████████ or any other participant in the acquisition, purchase, transfer, sale, supply, storage, import, export, re-export, transshipment, financing, transportation, and/or freight forwarding, directly or indirectly, or plan to do the same, of U.S. items, including actual or potential buyers, sellers, intermediate consignees, intermediaries, or freight forwarders;

(q) Records and information related to the state of mind of ██████████ or any other participant in the acquisition, purchase, transfer, sale, supply, storage, import, export, re-export, transshipment, financing, transportation, and/or freight forwarding, directly or indirectly, or plan to do the same, of U.S. items, including actual or potential buyers, sellers, intermediate consignees, intermediaries, or freight forwarders;

(r) Records and information related to the knowledge of export control laws, rules, regulations and/or procedures by ██████████ or any other participant in the acquisition, purchase, transfer, sale, supply, storage, import, export, re-export, transshipment, financing, transportation, and/or freight forwarding, directly or indirectly, or plan to do the same, of U.S. items, including actual or potential buyers, sellers, intermediate consignees, intermediaries, or freight forwarders;

(s) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(t) Evidence indicating the email account owner's state of mind as it relates to the criminal activity under investigation;

(u) Records and information related to the identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(v) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                          Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC, PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705** | **Case No. 20-sc-628**<br><br>**Filed Under Seal** |

*Reference:*    *USAO Ref. #* ███████ ; *Subject Account:* ███████████ ; ██████████████ ; ███████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information which is associated with the followings accounts – that is, ████████████████ ; ████████████████ ; ████████████ – which is stored at premises controlled by Google LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which accepts service in Mountain View, California.  Concurrently, I am seeking an application for a search warrant for related accounts – ███████████ ; ███████████████ ; ███████████ ; ███████████ ; ██████████████ ; ███████████ ; and ██████████████ – which application contains a near identical statement of probable cause.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and

2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the International Economic Emergency Powers Act ("IEEPA"), in violation of Title 50, United States Code, Sections 1701-1707, and money laundering, in violation of Title 18, United States Code, Section 1956, and conspiracy, in violation of Title 18, United States Code, Section 371, have been committed by ████████████              ████████████ and others. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

3

## **LEGAL BACKGROUND**

6. Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to issue regulations governing exports from the United States.

7. On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957 was expanded and continued by Executive Orders Nos. 12959 and 13059.

8. Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "the Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

9. The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulation, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury, through the Office of

4

Foreign Assets Control ("OFAC"), promulgated the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, implementing the sanctions required by the Executive Orders.

10.    Specifically, absent permission from OFAC in the form of a license, the ITSR prohibits, among other things:

    a.  The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, trans-shipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

    b.  The reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States, if:  (a) such reexportation is undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran, and (b) the exportation of such goods, technology, or services, was subject to export license application requirements under any United States regulations (31 C.F.R. § 560.205); and

    c.  Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR (31 C.F.R. § 560.203).

11.     Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute.  50 U.S.C. § 1705(a).  Willful violations of the ITSR constitute criminal offenses under IEEPA, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine.  50 U.S.C. § 1705(c).

## PROBABLE CAUSE

12.     The United States is investigating a scheme engaged in by an individual in Iran who is providing false information to procure ███████████████████ The investigation concerns possible violations of, inter alia, IEEPA, in violation of Title 50, United States Code, Sections 1701-1707, and money laundering, in violation of Title 18, United States Code, Section 1956.

13.     In November 2017, ████████████████████████████ using the email account ███████████████ (the ██████ Account"), requested a quotation for █████████████████████ from a U.S. Company ("U.S. Company 1").  Based on my training and experience, I know that Iran has many U.S. origin aviation assets, which require U.S. origin parts to remain operational.  The ITSR requires a license from the U.S. government before the exportation of many of these parts from the U.S. to Iran may occur, which limits the export of such items and places items similar to the ones sought by ██████ in high demand in Iran.  This court previously issued a search warrant for the ██████ Account.  *See* ███ ████

14.     Subpoena returns from U.S. Company 1 and search warrants results for the ██████ Account, which are discussed below, show that ██████ was employed by ███████ ██████ which is ████████ company that sells ████████████████ U.S. Company 1 refused

6

to do business with ███ and stated, "We are unable to ship to Iran at this time." In response, ███, using the ███ Account, stated, "We have an office in ███ too[.] Are you able to ship to ███ U.S. Company 1 refused to engage in further business with ███. I am aware that companies in Iran often create companies in third-party countries as a false front to receive shipments of goods from the United States that are ultimately destined for Iran, thereby circumventing U.S. sanctions.

15.     In a separate instance, a United States company that sells ███████ ("U.S. Company 2") notified law enforcement that, in February 2018, ███ requested a quotation for ██████████████

16.     ███ claimed to work for a ███ company and provided a ███ phone number.

17.     U.S. Company 2 presented ███ with a quotation in April 2018, and shipped the ordered items to ███ at a ███ address in July 2018, after which ███ wired ███ into U.S. Company 2's bank account in the United States to complete the purchase.

18.     Search warrant results for the ███ Account reveal that, on April 16, 2018, ███ forwarded his correspondences with U.S. Company 2 to an individual named ███ who I believe to be a ██████████ who stated, "So need to pay ███████ I understand this exchange to be a conversation about paying U.S. Company 2 on behalf of ███. The payment amount is slightly more than the amount received by U.S. Company 2; however, this discrepancy is likely due to fluctuating exchange rates. ███ stated to ███ "Consider that this order from usa and they shouldn't find out the end user is from iran." Based on this statement, I believe that ███ knew that it was illegal for him to procure U.S. origin items for end users in Iran without a license and that the payment of such items was also illegal.

19.     The items ██████ procured from U.S. Company 2 required a license from the Department of Treasury's Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, before they could be exported to Iran, or reexported to Iran from a third-party country, such as ██████ Law enforcement is unaware of any such application being sought or obtained. The items did not require a license for export to an end user in ██████

20.     A special agent of the U.S. Department of Commerce ("DOC") detained and inspected the items ordered by ██████ from U.S. Company 2 while they were in the export process. On November 21, 2018, the DOC special agent contacted ██████ at the ██████ Account, and requested that ██████ complete a "BIS 711 end user/use certification" form before the goods could be exported. The "BIS 711" requires the signature of the final end user of the product and that the final end user declare the specific end use of the product.

21.     On November 23, 2018, ██████ responded via the ██████ Account to the DOC special agent, stating that ██████ worked for a "trading company" and that the customer requesting the product refused to complete the "BIS 711" form. On November 29, 2018, the DOC special agent replied to ██████ that anyone who seeks to do business with the United States must comply with U.S. customs and export laws and provide end user and end use information to complete the transactions. ██████ did not reply to the DOC special agent. As such, the items are still detained.

22.     Search warrant returns for the ██████ Account further revealed that on July 9, 2018, ██████ emailed ██████ to place an order for items produced by another U.S. Company located in ██████ ("U.S. Company 3"). In this email, ██████ again stated, "Please notice they shouldn't find out the end user in iran."

8

23.     Search warrant and subpoena returns have revealed that ████ has been in contact with at least eight companies in the United States since in or about September 2017. These companies included ████████████████████████████████████████████████ ████████████ The search warrant returns further revealed that █████ also communicated with at least six companies in Iran starting in September 2017. Thus, it appears that █████ has been procuring items from the United States for end users in Iran for several years.

24.     In addition, in multiple instances, █████ attempted to procure ████████ ████████████████████ For example, in an email from December 11, 2018, █████ attempted to procure ████████████████ from a company in █████ Based on the information your affiant has at this time, this transaction does not appear to be subject to U.S. export laws.   Nevertheless, it is indicative of the type of transactions █████ appears to undertake.   Moreover, as further described below, in another instance he attempted to procure items manufactured in the United States that are associated with an ████████████ used by the U.S. military.

25.     Search warrant returns from the █████ Account show that █████ listed an address in ████████ in his signature block and that he attended an exhibition in ████████ leading me to believe that he is located in Iran and not █████.

## TARGET ACCOUNTS

26.     The Target Accounts are: ████████████ (**"Target Account 1"**); ████████████████ (**"Target Account 2"**); ████████████████ (**"Target Account 3"**); ████████████████ (**"Target Account 4"**); ████████████████ (**"Target Account 5"**); ████████████ (**"Target Account 6"**); ████████████████ (**"Target Account 7"**); ████████████ (**"Target Account**

8"); █████████████ ("**Target Account 9**"); █████████████████ ("**Target Account 10**"); ██████████████████ ("**Target Account 11**"); ███████████████████████ ("**Target Account 12**").

27.  ██████████████ (**"Target Account 1"**) – Search warrant returns for the ████████ Account revealed that ████████ coordinated regarding procurement with █████████ ██████████████ who uses **Target Account 1**.  These communication occurred from in or about October 2017 to in or about December 2019.

28.  During this time, ████████ and ██████ exchanged schematics and discussed payments.  ████████ address book lists this account as "Deputy," leading me to believe that ████████ is the deputy CEO of ███████████████ where ████████ works.  Law enforcement identified a public profile in ██████ which lists this email address.  The name associated with this profile is ██████████████ a direct transliteration from ████  In separate emails, the user of **Target Account 1** is referred to as ████████████."

29.  On February 15, 2018, ████████, using the ████████ Account, forwarded █████████ at **Target Account 1**, an email from a ████████company.  The email described how ████████ orders were difficult to pass through customs and how ████████ was on a bank's blacklist, so the company was not willing to continue supplying ████████.  In a separate email chain on March 11, 2018, ████████ told a seller of ████████████that ████████ company was in Iran but also had an office in ██████.  The seller was willing to sell the desired product to ████████ in ██████.  ████████ forwarded this email to ████████ at **Target Account 1** and indicated in ████████████ █████████████ I believe that this email indicates that ████████ tasked ████████ to procure the ████████████ and that ████████ was reporting that he had found the item as requested.

30.     Law enforcement also found a separate publicly available business directory profile for █████, which lists him as having senior positions at multiple companies, including █████ company ██████████████████████ lists its business activity as ████████████████████████████

31.     In several emails to **Target Account 1**, █████ addressed █████ as █████ leading me to believe that █████ is an alias for █████.  For example, on January 11, 2018, █████ emailed ███ and indicated to "████" that █████requested that an item be sent to Iran.

32.     ████████████████ **("Target Account 2")** – As noted above, "█████ is believed to be an alias for █████.  The username for **Target Account 2** is █████

33.     On February 22, 2019, █████, using **Target Account 1**, forwarded █████ an email from ██████████ that was originally sent to █████ using **Target Account 2**.

34.     Within the █████ Account search warrant returns, law enforcement located numerous emails that reference **Target Account 2**.  For example, the █████ Account contained an email from on or about October 16, 2017, in which **Target Account 2** was used as a contact address for a foreign company to send multiple pricing quotes and invoices for █████ ████████████████████████

35.     ████████████ **("Target Account 3")** – Search warrant returns for the █████ Account revealed an October 22, 2017 email from **Target Account 3** to █████, which indicated that **Target Account 3** was used by █████  In this email, the signature block associated with **Target Account 3** indicated that the user of this account was █████ of █████

36.    On October 7, 2017, ███████ sent an email to **Target Account 3** that discussed procuring ██████████████████████ The discussion indicated that the transaction would be ordered from a ██████ company, but two quotations for these items included by ██████ in his email included air freight from the United States.  The quotation for the ██████ ██████ indicated that the total cost was ████████████ The quotation also indicated that air freight from the United States to █████ to Iran would cost ██████████ (included in the total cost).  The second quotation for ████████████ indicated that air freight from the United States to █████ to Iran would cost ██████ The email also indicated that ████████ sought a ██████████████ ████████████████████████ but the supplier did not have access to this item.

37.    On November 4, 2017, **Target Account 3** emailed the ████████ Account and stated, "Check with me when back to ████████ indicating that the user of **Target Account 3** is located in Iran.

38.    ████████████████████████ **("Target Account 4")** - Search warrant returns for the ██████ Account revealed that ████████ saved **Target Account 4** in his address book under the name ██████████████

39.    On hundreds of occasions from 2017 to 2019, ████████ using **Target Account 4**, directed ██████ by email to arrange payments to third-party companies and copied ████████ and ████████.

40.    For example, in an email chain on or about April 18, 2019, ████████ using **Target Account 4**, emailed "████" to pay an outstanding invoice.  ████████ responded that she paid the amount requested and then ████████ using **Target Account 4**, requested that additional funds should be sent to a ██████ supplier.  Similarly, on or about April 29, 2019, ████████ using **Target Account 4**, sent ████ a proforma invoice from a ██████ company.

41. Hundreds of these email communications involving **Target Account 4** also included ███████████████████ (**"Target Account 5"**). For example, both **Target Account 4** and **Target Account 5** were on email communications on or about November 26, 2019, where ████ indicated to ████████ that ████ paid funds connected to an invoice for ████████ associated with ███████ and other items, including a ███████████.

42. In another instance, on or about December 10, 2019, the user of **Target Account 5** asked ████ to pay funds on an outstanding contract, and ████ responded that she made the payment.

43. ████████████ (**"Target Account 6"**) – ██████, using the ████████ Account, communicated with **Target Account 6** at least 50 times from September 2017 to June 2018. Many of these emails discussed shipping items to Iran. In one instance, on May 2018, an █████ Company emailed ████████ and **Target Account 6** about an █████████ shipment to Iran.

44. In an email chain on September 18, 2017, the user of **Target Account 6** listed his name as █████████ in a signature block, and listed his employer as █████ company █████████ █████████.

45. Law enforcement identified a publicly available LinkedIn profile for ████████ which indicates that he is the general manager of ████ and is located in Iran.

46. ██████████████████ (**"Target Account 7"**) – The user of **Target Account 7** refers to himself as █████████ and is listed as the consignee on numerous invoice statements for ██████████.

47. On April 10, 2018, ████████ using **Target Account 6**, sent ████ an email chain which included a delivery note for ████████ being shipped to ████ Iran. ████████

13

sent ███ information about ████████ in this email and described **Target Account 7** as the general email account for ████████

48.     On September 26, 2017, Target Account 9 sent ████, at Target Account 1, and **Target Account 7** equipment specifications that Target Account 3 later forwarded to the ████ Account.

49.     On October 30, 2017, ████ sent Target Account 6 information about ████████ which listed an address in Iran for the company and **Target Account 7** as the contact email address.

50.     ████████ (**"Target Account 8"**) – Search warrant returns for the ████ Account revealed multiple email correspondences in which **Target Account 8** was referred to as, or the user referred to himself as, ████████

51.     In one email, on or about March 28, 2018, ████ using Target Account 8, emailed **Target Account 1**, **Target Account 4**, and **Target Account 7**.  This email included a signature block for ████ which listed his position as the trading manager of ████████ which I believe to be short for ████████

52.     Target Account 8 has been on email correspondences between ████ and ████, using Target Account 1, more than 100 times.  ████, using **Target Account 1**, referred to ████████ and ████ as the individuals in charge of arranging shipments and confirming delivery and shipment of goods.  ████, using **Target Account 1**, referred to **Target Account 8** as the consignee on multiple shipments and invoices.

53.     **Target Account 8** received multiple emails from "████" regarding the status of shipments of items, such as ████████ and specifically, ████████ which are designed for ████████ **Target Account 8** also received an invoice from ████ for

14

████████████████████ as well as ████████ which coincides with the other Target Accounts involvement in ████████████████████

54.     ██████████████ (**"Target Account 9"**) – Search warrant returns for the ██████ Account revealed that ████████ listed **Target Account 9** as "research manager" in his address book.  Based on the account name and the context of communications between **Target Account 9** and other accounts involved with this scheme, I believe this account is used by the research manager of ████████████

55.     Between in or about 2017 and in or about 2019, **Target Account 9** sent more than 300 emails to above-identified co-conspirators, many of which included ████████████████

████████████████████████████████████████████

████████████

56.     For example, on August 14, 2018, ████████ sent **Target Account 9** a datasheet for ████████ and asked **Target Account 9** to answer technical questions.

57.     On or about June 12, 2018, **Target Account 9** sent ████████ and ██████, using **Target Account 1**, schematics related to their procurement activity.

58.     ██████████████ (**"Target Account 10"**) - Search warrant returns for the ██████ Account revealed that on or about July 3, 2019, **Target Account 9** sent an email to **Target Account 1** and ██████ advising them that due to changes within the company (*i.e.*, ████████████, future company invoice orders would be sent from two new email addresses, **Target Account 10** and **Target Account 11**.

59.     **Target Account 10** exchanged hundreds of emails with ██████ and ██████, using **Target Account 1**.  Many of these conversations included discussions about ████████████

████████████████████████

60. On or about July 4, 2019, ███ sent **Target Account 10** a request for a quote from ██.

61. On or about July 30, 2019, **Target Account 10** provided ███ information about the cost of doing custom modifications to items procured.

62. ████████████ (**"Target Account 11"**) – As noted above, search warrant returns for the ███ Account revealed that on or about July 3, 2019, **Target Account 9** sent an email to **Target Account 1** and ███ advising them that due to changes within the company (*i.e.*, ██████████, future company invoice orders will be sent from two new email addresses, **Target Account 10** and **Target Account 11.**

63. On or about May 1, 2019, ███ forwarded a potential client an order from **Target Account 10** that copied **Target Account 11**. On or about April 22, 2019, **Target Account 11**, whose user referred to himself as ███ sent an email to ███, **Target Account 1**, and **Target Account 8**, stating that **Target Account 11** was his new operational business email address.

64. On or about April 28th, 2019, **Target Account 11**, whose user referred to himself as ██████ sent an email to ███ and **Target Account 1** with detailed mechanical schematics, and invoices for ██████.

65. In October 2019, ███ and ███ using **Target Account 11**, exchanged two emails about the difficultly in procuring ██████████ due to the ██████████ On or about October 26, 2019, ███ using **Target Account 11** received information on acquiring a substitute for ██████████ related to a particular type of ██████████ ██████████.

66.  ████████████████████ **("Target Account 12") -** Search warrant returns for the ██████ Account revealed that ████████ referred to himself as ████████ ████████████ in multiple emails.

67.  For example, on or about November 4, 2017, **Target Account 3** emailed the ██████ Account and referred to the user of the ████████ Account as '██████ and stated, "Check with me when back to ████████ Two minutes prior to this email, **Target Account 3** emailed the ██████ Account and referred to the user as ██████ leading me to believe that the user of **Target Account 3** knew that the user of the ██████ Account used the name ████████████████ and the alias ████████.

68.  On November 12, 2017, ████████, using the ████████ Account, included a signature block which listed himself as ████████████ the Trade Manager of ████████████, and listed ████████ known Skype address, indicating that ████████████ is ████████.

69.  In another instance, on October 14, 2017, **Target Account 6** copied **Target Account 12** while emailing ████████ and referred to ████████ as ████████████ leading me to believe that the user of **Target Account 6** knew that ████████ used both accounts.

70.  In another email on March 7, 2019, ████████, using the ██████ Account, listed his name as ████████████████ and indicated that he was the senior mechanical expert for ██ ████████████ In this email, he listed an alternate email address of ████████████████ Other emails in ████████ account show that ████████████ is a domain used by ████████████.

71.  On or about January 2020, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to ████████████████ ████████████████; ████████████████; and ████████████████.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

72.     PROVIDER is the provider of the internet-based account(s) identified by ███████████████████████; ██████████████████████████; and ██████████████████.

73.     PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

74.     Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website. During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

75.     Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[1]

_____

[1] PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet

76.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

77.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, and SMS text messaging.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber.  Based on my training and

---

searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

78. Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of services utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

79. Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model,

operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

80.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain

useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

81.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

82.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

83.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

84.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

85.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the

foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDER can show how and when the account was accessed or used.  For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[2]

86.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal

---

[2] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

87. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that staff at the U.S. Attorney's Office are capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

88.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 26, 2020.

HON. ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE