# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH SIX ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY<br>FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 20-sc-1053 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: **INFORMATION ASSOCIATED WITH SIX ACCOUNTS STORED AT PREMISES** CONTROLLED BY FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956   (See Attachment A, incorporated herein by reference.)

located in the      Northern      District of      California      , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❑ contraband, fruits of crime, or other items illegally possessed;
- ❑ property designed for use, intended for use, or used in committing a crime;
- ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) and (a)(2)(A) | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

- ❑ Continued on the attached sheet.
- ❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:    05/05/2020

City and state:    District of Columbia        G. Michael Harvey, U.S. Magistrate Judge

*Judge's signature*

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH SIX ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY<br>FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | )<br>)<br>)   Case No. 20-sc-1053<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH SIX ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____May 19, 2020_____ *(not to exceed 14 days)*
  ☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____.
                                                                     *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   __05/05/2020_____

                                                          _____
                                                                        *Judge's signature*

City and state:   __District of Columbia_____     G. Michael Harvey, U.S. Magistrate Judge
                                                                        *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-1053 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|         I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date: _____                    _____<br>                                                                                   *Executing officer's signature*<br><br>                                                                    _____<br>                                                                                     *Printed name and title* |

## ATTACHMENT A
**Property to Be Searched**

This warrant applies to information which is associated with the accounts identified by:



and which are stored at premises owned, maintained, controlled, or operated by Facebook, Inc, a

company that accepts service of legal process in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

I.     **Information to be disclosed by Facebook, Inc. ("PROVIDER") to facilitate**
**execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A:

a.     For the time period January 1, 2018 to the present: The contents of any available

messages or other communication associated with the Account (including, but not limited to,

messages, attachments, draft messages, posts, chats, video calling history, "friend" requests,

discussions, recordings, images, or communications of any kind sent to and from the Account,

including stored or preserved copies thereof) and related transactional records for all PROVIDER

services used by an Account subscriber/user, including the source and destination addresses and

all Internet Protocol ("IP") addresses associated with each message or other communication, the

date and time at which each message or other communication was sent, and the size and length of

each message or other communication;

b.     For the time period January 1, 2018 to the present:  All photos and videos uploaded

by the Account and all photos or videos uploaded in which the Account has been "tagged",

including Exchangeable Image File ("EXIF") data and any other metadata associated with those

photos and videos;

c.      Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d.      For the time period January 1, 2018 to the present:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e.      For the time period January 1, 2018 to the present:  All "check ins" and other location information, including, but not limited to GPS coordinates;

2

f.     For the time period January 1, 2018 to the present:  All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

g.     All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s)  including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

h.     For Facebook accounts, all information relating to the account holder/administrator, and identifying information for any other accounts or pages maintained by such account holder/administrator;

i.     All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

j. Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within up to 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations 18 U.S.C. § 1956(h) and (a)(2)(A) (money laundering) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the sending and receipt of funds, including via credit card, cryptocurrency, bitcoin, and online fund transfers;

(f) Information that constitutes evidence concerning the purchase, sale, and exchanging of cryptocurrency;

(g) Information that constitutes evidence concerning the sale of protective gear, including N95 respirators, DuPont suits, gloves and masks;

(h) Information that constitutes evidence concerning activities, treatment, or protection against COVID-19;

(i) Information that constitutes evidence of communications between ███ co-conspirators, customers from online businesses, and persons sending funds;

(j) Information that constitutes evidence concerning establishment and operation of online businesses;

(k) Information that constitutes evidence concerning the laundering of funds from illicit activities through purported licit online businesses;

(l) Information that constitutes evidence of soliciting donations; and

(m) Information that constitutes evidence of a conspiracy.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b. such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                             Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH SIX ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956** | **Case No. 20-sc-1053**<br><br>**Filed Under Seal** |

*Reference:    USAO#* ███████████ *; Subject Accounts:* ███



## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ███████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information which is associated with seven accounts – that is:



which are stored at premises controlled by Facebook, Inc ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is

headquartered at / which accepts service in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. Concurrent to this application, I am separately submitting applications to search related accounts, which applications contain a nearly identical probable cause statement. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.　　The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 1956(h) and (a)(2)(A) have been committed by ███████████ and persons known/unknown. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The Defense Production Act

6. On March 13, 2020, the President of the United States declared a national emergency due to the COVID-19 pandemic.

7. On March 25, 2020, the U.S. Department of Health and Human Services ("HHS") issued "Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Measures Under Executive Order 13910 and Section 102 of the Defense Production Act of 1950." In the notice, HHS designates the following items, among others, as scarce materials:

  o N-95 Filtering Facepiece Respirators, including devices that are disposable half-face-piece non-powered air-purifying particulate respirators intended for use to cover the nose and mouth of the wearer to help reduce wearer exposure to pathogenic biological airborne particulates;
  o Other Filtering Facepiece Respirators (e.g., those designated as N99, N100, R95, R99, R100, or P95, P99, P100), including single-use, disposable half-mask respiratory;

3

- o Protective devices that cover the user's airway (nose and mouth) and offer protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181;
- o Elastomeric, air-purifying respirators and appropriate particulate filters/cartridges;
- o Powered Air Purifying Respirator ("PAPR");
- o Portable Ventilators, including portable devices intended to mechanically control or assist patient breathing by delivering a predetermined percentage of oxygen in the breathing gas;

   . . .

- o Medical gowns or apparel, e.g., surgical gowns or isolation gowns;
- o Personal protective equipment ("PPE") coveralls, e.g., Tyvek Suits;
- o PPE face masks, including any masks that cover the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels;
- o PPE surgical masks, including masks that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials;
- o PPE face shields, including those defined at 21 CFR 878.4040 and those intended for the same purpose;

   . . .

- o Ventilators, anesthesia gas machines modified for use as ventilators, and positive pressure breathing devices modified for use as ventilators (collectively referred to as "ventilators"), ventilator tubing connectors, and ventilator accessories as those terms are described in FDA's March 2020 Enforcement Policy for Ventilators and Accessories and Other Respiratory Devices During the Coronavirus Disease 2019 (COVID-19) Public Health Emergency located at █████████████

## **PROBABLE CAUSE**

8. The list of Target Accounts are as follows:

| Target Account 1 | |
| Target Account 2 | |
| Target Account 3 | |
| Target Account 4 | |
| Target Account 5 | |
| Target Account 6 | |
| Target Account 7 | |
| Target Account 8 | |

4

| Target Account 9 | |
| Target Account 10 | |
| Target Account 11 | |
| Target Account 12 | |
| Target Account 13 | |

9.      The United States is investigating an illicit scheme to launder U.S. dollars to promote an ongoing fraud scheme, and possible violations of, *inter alia*, 18 U.S.C. § 1956 (money laundering) to promote wire fraud among other specified unlawful activities.

10.      The Centers for Disease Control and Prevention ("CDC") has stated that it "does not recommend that the general public wear N95 respirators to protect themselves from respiratory diseases, including coronavirus (COVID-19). Those are critical supplies that must continue to be reserved for health care workers and other medical first responders, as recommended by current CDC guidance." *See* https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95-respirators-and-surgical-masks-face-masks.

11.      In response to the current COVID-19 pandemic, N95 respirators are in high demand worldwide and designated as scarce as described above.

12.      DuPont is a U.S. corporation that manufactures items in the field of industry, consumer goods, worker safety, and healthcare.  DuPont manufactures a Tyvek coverall suit, which is used in hospital and hazardous material cleanups.  According to the HHS, "DuPont's Tyvek is a versatile material that can provide a barrier against fine particles and chemicals. These coverall suits are part of the PPE needed for healthcare workers caring for COVID-19 patients. Other recommended PPE include a N95 respirator or surgical/face mask, a face shield or protective eyewear, and gloves."  *See* https://www.hhs.gov/about/news/2020/04/08/hhs-provide-millions-

tyvek-protective-suits-us-healthcare-workers.html.

13.     Due to the COVID-19 pandemic, there is an acute shortage of DuPont Tyvek suits. Many resellers are out of stock or have limited offerings for sale.  The U.S. government has negotiated an agreement with DuPont to deliver Tyvek Suits to the strategic national stockpile ("SNS").  The SNS is coordinating through the Federal Emergency Management Agency to deliver supplies where they are needed most for the COVID-19 response.

14.     Law enforcement is aware that the scarcity of the above items has led to numerous fraudulent websites claiming to sell authentic PPE online.

15.     Law enforcement, while in Washington, D.C., reviewed the website ███████████ and found that this site claims to sell multiple types of facemasks and PPE, including disposable hospital grade face masks, N95 respirator masks, washable facemasks, DuPont Tyvek coverall suits, and gloves.  A snapshot taken on May 2, 2020 of the site's homepage is displayed below:



16.     On the "About" section of the webpage, ▮▮▮▮▮▮▮▮▮ states:



17.     The claim that the website launched in 1996 is demonstrably false. Publicly-available website registration records revealed that the website was created from an IP address in ▮▮▮▮▮ on February 26, 2020. Additionally, as demonstrated below, the site is not "owned and operated" by sanitary experts.

18.     The site indicates that it accepts payment by Visa, Mastercard, and PayPal, all of which are U.S.-based financial institutions.

19.     ▮▮▮▮▮▮▮▮ section that sells N95 respirators states:

**NOTE: Not all N95 masks are equal. Most are for industrial use. The N95 respirator offered by ▮▮▮▮▮▮▮▮ is FDA cleared for medical use because it passed stringent fluid resistance testing. This is widely considered critical since airborne viruses transfer as fluid droplets.**

• NIOSH [National Institute of Occupations Safety & Health] approved.
• FDA cleared.
• Meets CDC Guidelines for infection control of Flu, SARS, Corona Virus, Tuberculosis, Anthrax, Smallpox and more.

         . . .

**This respirator has been evaluated and approved by The National Institute of Occupations Safety & Health (NIOSH) and is cleared by the U.S. Food & Drug Administration (FDA).** This product is a N95 Respirator deemed "Surgical" by the FDA. It is not a Surgical Mask. "Surgical N95 Respirators" undergo more rigorous testing and are designed to both prevent the spread of germs and protect the wearer's respiratory system.

(emphasis in original).

20.     A review of the masks purportedly for sale on the site revealed that the masks are

produced by a ████ company.  The ████ manufacturer's respirators are not on the list of FDA/NIOSH approved N-95 respirators.

21.     Based on my training and experience (including reviewing publications from the U.S. government), I know that thousands of websites have been created since the beginning of the national COVID-19 pandemic, many of which fraudulently claim to sell authentic and certified PPE, when in fact they do not.  The above fraudulent statements on ████ are consistent with such fraud schemes.

22.     As noted above, ████ also advertises the sale of DuPont Tyvek suits.  Whereas other sites have severely restricted the quantity of any such items for sale (in order to prevent hoarding/price gouging on resale) or simply do not have any stock, ████ allows customers to place orders for any desired quantity of such items with no limits.  This is inconsistent with the overall shortage of PPE, to include DuPont Tyvek suits, and leads me to conclude the site is fraudulent.

*Multiple* ████ *Controlled Facebook Pages Promote* ████

23.     During the course of the investigation, law enforcement, while in Washington, D.C., discovered ████ ("Target Account 1"), which is the Facebook page for ████  This Facebook page lists ████ as its contact information and posts multiple images and a video from/referencing ████ website.  Subpoena returns revealed that **Target Account 1** was registered to ████ in ████.

24.     **Target Account 1**'s first post was on March 10, 2020, with a photo from ████ **Target Account 1** has a video advertisement for ████

8

25.   **Target Account 1** publicly lists ███████████████████ (**"Target Account 2"**) as its contact email address.

26.   2703(d) returns from Facebook show that ███████ used ██████████████████ (**"Target Account 3"**) and ████████████████████ (**"Target Account 4"**) to register **Target Account 1**.

27.   The 2703(d) returns further revealed that ██████ created Facebook page ████████████████████████████████ (**"Target Account 5"**), which he registered using **Target Account 9** and which was linked to **Target Account 10**.

28.   I know from my training and experience that individuals who operate fraudulent website often use other fraudulent companies under their control to advertise for the other sites.

29.   Publicly-available posts show that since 2015, **Target Account 5** has primarily advertised the sale of t-shirts.  I know from my training and experience that one common method of money laundering is to claim that the funds were received through a licit business, such as clothes sales.

30.   On **Target Account 5**, ███████ lists his Skype address, ███████ (**"Target Account 6"**).  2703(d) returns for **Target Account 6** revealed ██████ registered **Target Account 6** using **Target Account 8**.  *See* ██████████████████.

31.   2703(d) returns from Facebook further revealed that ██████ created Facebook page ████████████████████████████ (**"Target Account 7"**), which he registered using **Target Account 9** and was linked to **Target Account 10**.

32.   Publicly-available posts show that since 2014 **Target Account 7** has been primarily used to advertise pants and leggings.  On or about March 17, 2020, **Target Account 7** posted an

advertisement for the website ████████████ Subsequent to this post, **Target Account 7** posted two additional advertisements for face masks.

████ *Received U.S. Dollars from Convicted* ████████████

33.     On ██████████████████████ pled guilty to providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B.  Specifically,

████████████████████████████████████████████████

34.     The plea documents noted that ████ obtained and used more than a dozen fraudulently obtained credit cards to purchase approximately ████████ which in turned she converted back to fiat currency to send to the shell companies.

35.     Financial records revealed that ██████ sent approximately ████ to an individual listed as ████████████ as part of this scheme.  When receiving this payment, ████████████ listed his email address as ████████████ (**"Target Account 8"**) on the banking records.

36.     Subpoena returns for **Target Account 8** revealed that this account was subscribed to ████.  Based on my training and experience, I know that people acting as money launderers frequently use aliases when collecting funds from different sources.  Consistent with this, I believe that the ████████████ name on the prior transaction was an alias.

37.     Subpoena returns further revealed that ████ listed **Target Account 8** as the recovery address for ████████████ (**"Target Account 9"**).

38.     **Target Account 9** was also subscribed in the name of ████. The subpoena returns also revealed that **Target Account 8** and **Target Account 9** logged in from the same IP address on the same day multiple times, leading me to conclude that these two Target Accounts are used

by the same individual, *i.e.*, ██████.  The subpoena returns revealed that ██████ registered **Target Account 9** using a phone number ending in ██████

39.    2703(d) returns for **Target Account 8** revealed that from in or about January 2018 through in or about April 2020, **Target Account 8** received over 200 emails from financial institutions.  *See* ██████████████████████

40.    2703(d) returns further revealed that from in or about February 2018 through in or about April 2020, **Target Account 9** received over 40 emails from cryptocurrency exchanges.  As noted above, ██████████ used bitcoin, a popular form of cryptocurrency, to launder money to shell companies, including in ██████

41.    As described above, ██████ money laundering scheme is primarily promoted through Facebook pages.  2703(d) returns further revealed that from in or about January 2018 through in or about April 2020:

> a.  **Target Account 8** received over 1,000 emails notifications from Facebook about new Facebook messages.
>
> b.  **Target Account 9** received over 2,000 emails notifications from Facebook about new Facebook messages.

██████ *Additional Facebook pages*

42.    Law enforcement has discovered that ██████ operated an additional Facebook account, ████████████████████████████ **("Target Account 10")**. 2703(d) returns for **Target Account 10** revealed that this page was subscribed to ██████ ██████ and registered using **Target Account 9** and the same phone number ending in ██████ *See* ██████████████

43.    The 2703(d) returns further revealed **Target Account 10** and **Target Account 7**

corresponded with at least four of the same other Facebook accounts. In particular, **Target Account 10** and **Target Account 7** both communicated with an online ▆▆▆ store that sells cleaning materials and personal care products. I am aware from prior investigations that PPE fraud sites frequently also sell cleaning products marketed as eliminating COVID-19.

44. ▆▆▆ is also associated with publicly available Facebook page, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (**"Target Account 11"**). This Facebook page lists ▆▆▆ name on a business card. Under ▆▆▆ name is his listed contact information, which also displayed the phone number ending in ▆▆▆ which, as noted above, was also used to register **Target Account 9** and **Target Account 10**. **Target Account 11** listed email account ▆▆▆▆▆ (**Target Account 12**) as the registered email account of this Facebook page.

45. Law enforcement found an additional Facebook page linked to ▆▆▆ known email account. Specifically, the Facebook page ▆▆▆▆▆▆▆▆▆▆ (**"Target Account 13"**) identifies **Target Account 4** as its contact address. As noted above, **Target Account 1** (which is the Facebook page for ▆▆▆▆▆ was registered by ▆▆▆ using **Target Account 4**.

46. **Target Account 13** purports to be ▆▆▆ charity, ▆▆▆▆▆ I was unable to find any verification that this charity exists because the Facebook page does not link to a website and the email address is hosted on Gmail rather than a domain associated with the purported company. Based on my training and experience, I know that this is atypical for charities, which typically strive to have a strong web presence in order to generate donations. Additionally, charities normally give details of how they account for donations (*i.e.*, where the funds are spent) and what their overhead expenses are. **Target Account 13** provided no such details.

12

47.     In fact, outside of ████████ I was unable to find any substantive websites for the above-described clothing businesses and charity, or discussions of such entities on the internet by customers, reviewers, donors, or business directory guides.  Based on my training and experience, this lack of an internet presence is common for front companies.

48.     Moreover, my review of header information associated with the Target Accounts has revealed no communications with manufacturers of PPE or clothing items, or charitable organizations.  That is, in spite of ████ business claiming to be in such industries, there is no electronic communication records to corroborate that he is actually engaged in such business.  This is again consistent with how front companies operate.

49.     On April 29, 2020, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to the Target Accounts.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

50.     PROVIDER is the provider of the internet-based account(s) identified by:



51.     PROVIDER owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com ("Facebook").  The website is owned and operated by PROVIDER.  PROVIDER allows Facebook users to establish accounts with

13

PROVIDER, and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

52.     PROVIDER asks users to provide basic contact and personal identifying information to PROVIDER, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  PROVIDER also assigns a user-identification number ("user ID") to each account.  PROVIDER identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

53.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  PROVIDER assigns a group identification number to each Facebook group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request.  If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

54.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

55.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

56.     PROVIDER allows Facebook users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video. For PROVIDER's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

57.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by PROVIDER unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such

comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

58.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a PROVIDER account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.

59.     A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked". Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

60.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

61.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

62.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

63. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend". The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

64. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

65. In addition to the applications described above, PROVIDER also provides Facebook users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

66. PROVIDER also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

67. Depending on the user's privacy settings, PROVIDER may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

68. Social networking providers like PROVIDER typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with

17

the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

69.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

70.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

71.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices

and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

72.    Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

73.    Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

74.    In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as

well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

75. As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion. From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by PROVIDER, can indicate who has search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described above, PROVIDER logs the IP addresses from which Facebook users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, PROVIDER builds geo-location into some of its Facebook services. Geo-location allows, for example, users to "tag" their location

in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user. Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[1]

76.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically

---

[1] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE<br>OR OTHER RELIABLE ELECTRONIC MEANS

77.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.  I submit that staff at the U.S. Attorney's Office are capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

78.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


                                             Respectfully submitted,


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 5, 2020.


_____
HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH SIX ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY<br>FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 20-sc-1053 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: **INFORMATION ASSOCIATED WITH SIX ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956** (See Attachment A, incorporated herein by reference.)
located in the    Northern    District of    California   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❐ contraband, fruits of crime, or other items illegally possessed;
- ❐ property designed for use, intended for use, or used in committing a crime;
- ❐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) and (a)(2)(A) | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

- ❐ Continued on the attached sheet.
- ❐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:   05/05/2020

2020.05.05 12:26:49 -04'00'

*Judge's signature*

City and state:   District of Columbia        G. Michael Harvey, U.S. Magistrate Judge

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 20-sc-1053 |
| INFORMATION ASSOCIATED WITH SIX ACCOUNTS | ) | |
| STORED AT PREMISES CONTROLLED BY | ) | |
| FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR | ) | |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____

*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH SIX ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK INC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____May 19, 2020_____ *(not to exceed 14 days)*
  ☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
                                                                  *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     _____05/05/2020_____

2020.05.05
12:27:12 -04'00'
*Judge's signature*

City and state:     _____District of Columbia_____          G. Michael Harvey, U.S. Magistrate Judge
                                                            *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-1053 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date: _____<br><br>                              *Executing officer's signature*<br><br>                              *Printed name and title* |

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the accounts identified by:



and which are stored at premises owned, maintained, controlled, or operated by Facebook, Inc, a company that accepts service of legal process in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Facebook, Inc. ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.    For the time period January 1, 2018 to the present: The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all PROVIDER services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.    For the time period January 1, 2018 to the present: All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.     Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d.     For the time period January 1, 2018 to the present:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e.     For the time period January 1, 2018 to the present:  All "check ins" and other location information, including, but not limited to GPS coordinates;

f.  For the time period January 1, 2018 to the present: All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

g.  All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

h.  For Facebook accounts, all information relating to the account holder/administrator, and identifying information for any other accounts or pages maintained by such account holder/administrator;

i.  All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

3

j.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within up to 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

████████████████████████████████████

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations 18 U.S.C. § 1956(h) and (a)(2)(A) (money laundering) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the sending and receipt of funds, including via credit card, cryptocurrency, bitcoin, and online fund transfers;

(f) Information that constitutes evidence concerning the purchase, sale, and exchanging of cryptocurrency;

(g) Information that constitutes evidence concerning the sale of protective gear, including N95 respirators, DuPont suits, gloves and masks;

(h) Information that constitutes evidence concerning activities, treatment, or protection against COVID-19;

(i) Information that constitutes evidence of communications between ███ co-conspirators, customers from online businesses, and persons sending funds;

(j) Information that constitutes evidence concerning establishment and operation of online businesses;

(k) Information that constitutes evidence concerning the laundering of funds from illicit activities through purported licit online businesses;

(l) Information that constitutes evidence of soliciting donations; and

(m) Information that constitutes evidence of a conspiracy.

### III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.       such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                              Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
SIX ACCOUNTS STORED AT
PREMISES CONTROLLED BY
FACEBOOK INC PURSUANT TO 18
U.S.C. 2703 FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. 1956

**Case No. 20-sc-1053**

**Filed Under Seal**

*Reference:    USAO#* ███████     *Subject Accounts:* ████



## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ███████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information which is associated with seven accounts – that is:



which are stored at premises controlled by Facebook, Inc ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is

headquartered at / which accepts service in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. Concurrent to this application, I am separately submitting applications to search related accounts, which applications contain a nearly identical probable cause statement. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 1956(h) and (a)(2)(A) have been committed by ███████ ███████ and persons known/unknown. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.    This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The Defense Production Act

6.    On March 13, 2020, the President of the United States declared a national emergency due to the COVID-19 pandemic.

7.    On March 25, 2020, the U.S. Department of Health and Human Services ("HHS") issued "Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Measures Under Executive Order 13910 and Section 102 of the Defense Production Act of 1950." In the notice, HHS designates the following items, among others, as scarce materials:

- o   N-95 Filtering Facepiece Respirators, including devices that are disposable half-face-piece non-powered air-purifying particulate respirators intended for use to cover the nose and mouth of the wearer to help reduce wearer exposure to pathogenic biological airborne particulates;
- o   Other Filtering Facepiece Respirators (e.g., those designated as N99, N100, R95, R99, R100, or P95, P99, P100), including single-use, disposable half-mask respiratory;

3

- o Protective devices that cover the user's airway (nose and mouth) and offer protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181;
- o Elastomeric, air-purifying respirators and appropriate particulate filters/cartridges;
- o Powered Air Purifying Respirator ("PAPR");
- o Portable Ventilators, including portable devices intended to mechanically control or assist patient breathing by delivering a predetermined percentage of oxygen in the breathing gas;
  . . .

- o Medical gowns or apparel, e.g., surgical gowns or isolation gowns;
- o Personal protective equipment ("PPE") coveralls, e.g., Tyvek Suits;
- o PPE face masks, including any masks that cover the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels;
- o PPE surgical masks, including masks that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials;
- o PPE face shields, including those defined at 21 CFR 878.4040 and those intended for the same purpose;
  . . .
- o Ventilators, anesthesia gas machines modified for use as ventilators, and positive pressure breathing devices modified for use as ventilators (collectively referred to as "ventilators"), ventilator tubing connectors, and ventilator accessories as those terms are described in FDA's March 2020 Enforcement Policy for Ventilators and Accessories and Other Respiratory Devices During the Coronavirus Disease 2019 (COVID-19) Public Health Emergency located at ███████████████████████

## **PROBABLE CAUSE**

8. The list of Target Accounts are as follows:

| Target Account 1 | |
| --- | --- |
| Target Account 2 | |
| Target Account 3 | |
| Target Account 4 | |
| Target Account 5 | |
| Target Account 6 | |
| Target Account 7 | |
| Target Account 8 | |

| Target Account 9 | |
| Target Account 10 | |
| Target Account 11 | |
| Target Account 12 | |
| Target Account 13 | |

9.      The United States is investigating an illicit scheme to launder U.S. dollars to promote an ongoing fraud scheme, and possible violations of, *inter alia*, 18 U.S.C. § 1956 (money laundering) to promote wire fraud among other specified unlawful activities.

10.      The Centers for Disease Control and Prevention ("CDC") has stated that it "does not recommend that the general public wear N95 respirators to protect themselves from respiratory diseases, including coronavirus (COVID-19). Those are critical supplies that must continue to be reserved for health care workers and other medical first responders, as recommended by current CDC guidance."      *See* https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95-respirators-and-surgical-masks-face-masks.

11.      In response to the current COVID-19 pandemic, N95 respirators are in high demand worldwide and designated as scarce as described above.

12.      DuPont is a U.S. corporation that manufactures items in the field of industry, consumer goods, worker safety, and healthcare.  DuPont manufactures a Tyvek coverall suit, which is used in hospital and hazardous material cleanups.  According to the HHS, "DuPont's Tyvek is a versatile material that can provide a barrier against fine particles and chemicals. These coverall suits are part of the PPE needed for healthcare workers caring for COVID-19 patients. Other recommended PPE include a N95 respirator or surgical/face mask, a face shield or protective eyewear, and gloves."      *See* https://www.hhs.gov/about/news/2020/04/08/hhs-provide-millions-

tyvek-protective-suits-us-healthcare-workers.html.

13.     Due to the COVID-19 pandemic, there is an acute shortage of DuPont Tyvek suits. Many resellers are out of stock or have limited offerings for sale.  The U.S. government has negotiated an agreement with DuPont to deliver Tyvek Suits to the strategic national stockpile ("SNS").  The SNS is coordinating through the Federal Emergency Management Agency to deliver supplies where they are needed most for the COVID-19 response.

14.     Law enforcement is aware that the scarcity of the above items has led to numerous fraudulent websites claiming to sell authentic PPE online.

15.     Law enforcement, while in Washington, D.C., reviewed the website ▮▮▮▮▮▮ and found that this site claims to sell multiple types of facemasks and PPE, including disposable hospital grade face masks, N95 respirator masks, washable facemasks, DuPont Tyvek coverall suits, and gloves.  A snapshot taken on May 2, 2020 of the site's homepage is displayed below:



16. On the "About" section of the webpage,  states:

17. The claim that the website launched in 1996 is demonstrably false. Publicly-available website registration records revealed that the website was created from an IP address in ▌▌▌▌▌ on February 26, 2020. Additionally, as demonstrated below, the site is not "owned and operated" by sanitary experts.

18. The site indicates that it accepts payment by Visa, Mastercard, and PayPal, all of which are U.S.-based financial institutions.

19. 

(emphasis in original).

20. A review of the masks purportedly for sale on the site revealed that the masks are

produced by a ▮▮▮▮ company. The ▮▮▮▮ manufacturer's respirators are not on the list of FDA/NIOSH approved N-95 respirators.

21.     Based on my training and experience (including reviewing publications from the U.S. government), I know that thousands of websites have been created since the beginning of the national COVID-19 pandemic, many of which fraudulently claim to sell authentic and certified PPE, when in fact they do not. The above fraudulent statements on ▮▮▮▮ are consistent with such fraud schemes.

22.     As noted above, ▮▮▮▮ also advertises the sale of DuPont Tyvek suits. Whereas other sites have severely restricted the quantity of any such items for sale (in order to prevent hoarding/price gouging on resale) or simply do not have any stock, ▮▮▮▮ allows customers to place orders for any desired quantity of such items with no limits. This is inconsistent with the overall shortage of PPE, to include DuPont Tyvek suits, and leads me to conclude the site is fraudulent.

*Multiple ▮▮▮▮ Controlled Facebook Pages Promote ▮▮▮▮*

23.     During the course of the investigation, law enforcement, while in Washington, D.C., discovered ▮▮▮▮ (**"Target Account 1"**), which is the Facebook page for ▮▮▮▮ This Facebook page lists ▮▮▮▮ as its contact information and posts multiple images and a video from/referencing ▮▮▮▮ website. Subpoena returns revealed that **Target Account 1** was registered to ▮▮▮▮ in ▮▮▮▮.

24.     **Target Account 1**'s first post was on March 10, 2020, with a photo from ▮▮▮▮ **Target Account 1** has a video advertisement for ▮▮▮▮



25.     **Target Account 1** publicly lists ████████████ (**"Target Account 2"**) as its contact email address.

26.     2703(d) returns from Facebook show that ████ used ████████████ (**"Target Account 3"**) and ████████████ (**"Target Account 4"**) to register **Target Account 1**.

27.     The 2703(d) returns further revealed that ████ created Facebook page ████████████ (**"Target Account 5"**), which he registered using **Target Account 9** and which was linked to **Target Account 10**.

28.     I know from my training and experience that individuals who operate fraudulent website often use other fraudulent companies under their control to advertise for the other sites.

29.     Publicly-available posts show that since 2015, **Target Account 5** has primarily advertised the sale of t-shirts.  I know from my training and experience that one common method of money laundering is to claim that the funds were received through a licit business, such as clothes sales.

30.     On **Target Account 5**, ████ lists his Skype address, ████ (**"Target Account 6"**).  2703(d) returns for **Target Account 6** revealed ████ registered **Target Account 6** using **Target Account 8**. *See* ████████████

31.     2703(d) returns from Facebook further revealed that ████ created Facebook page ████████████ (**"Target Account 7"**), which he registered using **Target Account 9** and was linked to **Target Account 10**.

32.     Publicly-available posts show that since 2014 **Target Account 7** has been primarily used to advertise pants and leggings.  On or about March 17, 2020, **Target Account 7** posted an

9

advertisement for the website ███████████ Subsequent to this post, **Target Account 7** posted two additional advertisements for face masks.

███ *Received U.S. Dollars from Convicted* ███████████████

33. On ███████████████ pled guilty to providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B. Specifically,

███████████████████████████████████

34. The plea documents noted that ███ obtained and used more than a dozen fraudulently obtained credit cards to purchase approximately ███████ which in turned she converted back to fiat currency to send to the shell companies.

35. Financial records revealed that ███████ sent approximately ███ to an individual listed as ███████ as part of this scheme. When receiving this payment, ███████ listed his email address as ███████ (**"Target Account 8"**) on the banking records.

36. Subpoena returns for **Target Account 8** revealed that this account was subscribed to ██. Based on my training and experience, I know that people acting as money launderers frequently use aliases when collecting funds from different sources. Consistent with this, I believe that the ███████ name on the prior transaction was an alias.

37. Subpoena returns further revealed that ███ listed **Target Account 8** as the recovery address for ███████ (**"Target Account 9"**).

38. **Target Account 9** was also subscribed in the name of ███. The subpoena returns also revealed that **Target Account 8** and **Target Account 9** logged in from the same IP address on the same day multiple times, leading me to conclude that these two Target Accounts are used

10

by the same individual, *i.e.*, ███. The subpoena returns revealed that ███ registered **Target Account 9** using a phone number ending in ███.

39.     2703(d) returns for **Target Account 8** revealed that from in or about January 2018 through in or about April 2020, **Target Account 8** received over 200 emails from financial institutions. *See* ███████████.

40.     2703(d) returns further revealed that from in or about February 2018 through in or about April 2020, **Target Account 9** received over 40 emails from cryptocurrency exchanges.  As noted above, ███████ used bitcoin, a popular form of cryptocurrency, to launder money to shell companies, including in ███████.

41.     As described above, ███████ money laundering scheme is primarily promoted through Facebook pages.  2703(d) returns further revealed that from in or about January 2018 through in or about April 2020:

    a.  **Target Account 8** received over 1,000 emails notifications from Facebook about new Facebook messages.

    b.  **Target Account 9** received over 2,000 emails notifications from Facebook about new Facebook messages.

    ███ *Additional Facebook pages*

42.     Law enforcement has discovered that ███ operated an additional Facebook account, ███████████████████ **("Target Account 10")**. 2703(d) returns for **Target Account 10** revealed that this page was subscribed to ███████ and registered using **Target Account 9** and the same phone number ending in ███. *See* ███████████.

43.     The 2703(d) returns further revealed **Target Account 10** and **Target Account 7**

corresponded with at least four of the same other Facebook accounts. In particular, **Target Account 10** and **Target Account 7** both communicated with an online ███ store that sells cleaning materials and personal care products. I am aware from prior investigations that PPE fraud sites frequently also sell cleaning products marketed as eliminating COVID-19.

44.      ███ is also associated with publicly available Facebook page, ████████████████████████████████ (**"Target Account 11"**). This Facebook page lists ███ name on a business card. Under ███ name is his listed contact information, which also displayed the phone number ending in ███ which, as noted above, was also used to register **Target Account 9** and **Target Account 10**. **Target Account 11** listed email account ████████ (**Target Account 12**) as the registered email account of this Facebook page.

45.      Law enforcement found an additional Facebook page linked to ███ known email account. Specifically, the Facebook page ██████████████████████ (**"Target Account 13"**) identifies **Target Account 4** as its contact address. As noted above, **Target Account 1** (which is the Facebook page for ████████ was registered by ███ using **Target Account 4**.

46.      **Target Account 13** purports to be ███ charity, ████████ I was unable to find any verification that this charity exists because the Facebook page does not link to a website and the email address is hosted on Gmail rather than a domain associated with the purported company. Based on my training and experience, I know that this is atypical for charities, which typically strive to have a strong web presence in order to generate donations. Additionally, charities normally give details of how they account for donations (*i.e.*, where the funds are spent) and what their overhead expenses are. **Target Account 13** provided no such details.

47.     In fact, outside of ████████████ I was unable to find any substantive websites for the above-described clothing businesses and charity, or discussions of such entities on the internet by customers, reviewers, donors, or business directory guides.  Based on my training and experience, this lack of an internet presence is common for front companies.

48.     Moreover, my review of header information associated with the Target Accounts has revealed no communications with manufacturers of PPE or clothing items, or charitable organizations.  That is, in spite of ██████ business claiming to be in such industries, there is no electronic communication records to corroborate that he is actually engaged in such business.  This is again consistent with how front companies operate.

49.     On April 29, 2020, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to the Target Accounts.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

50.     PROVIDER is the provider of the internet-based account(s) identified by:



51.     PROVIDER owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com ("Facebook").  The website is owned and operated by PROVIDER.  PROVIDER allows Facebook users to establish accounts with

PROVIDER, and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

52.     PROVIDER asks users to provide basic contact and personal identifying information to PROVIDER, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  PROVIDER also assigns a user-identification number ("user ID") to each account.  PROVIDER identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

53.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  PROVIDER assigns a group identification number to each Facebook group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request.  If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

54.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these

14

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

55. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

56. PROVIDER allows Facebook users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video. For PROVIDER's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

57. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by PROVIDER unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such

comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

58. In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a PROVIDER account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.

59. A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked". Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

60. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

61. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

62. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

16

63.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend".  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

64.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

65.     In addition to the applications described above, PROVIDER also provides Facebook users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

66.     PROVIDER also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

67.     Depending on the user's privacy settings, PROVIDER may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

68.     Social networking providers like PROVIDER typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with

the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

69. Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

70.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

71.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices

and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

72. Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

73. Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

74. In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as

well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

75.     As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by PROVIDER, can indicate who has search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described above, PROVIDER logs the IP addresses from which Facebook users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, PROVIDER builds geo-location into some of its Facebook services.  Geo-location allows, for example, users to "tag" their location

in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user. Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[1]

76. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (e.g., e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically

---

[1] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

77.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that staff at the U.S. Attorney's Office are capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

78.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 5, 2020.

2020.05.05
12:27:38 -04'00'

_____
HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE