# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH ONE FACEBOOK
ACCOUNT STORED AT PREMISES CONTROLLED
BY FACEBOOK, INC., FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. § 1956

)
)
)
)
)
)

Case No. 20-sc-1075

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: **INFORMATION ASSOCIATED WITH ONE FACEBOOK ACCOUNT STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956** (See Attachment A, incorporated herein by reference.)

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a) | IEEPA |
| 18 U.S.C. § 1956(h) and (a)(2)(A) | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: 05/06/2020 _____

_____
*Judge's signature*

City and state: District of Columbia _____

G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

Case 1:21-sc-1075 UNSEALED Document 87 Filed 09/05/26 Page 3 of 46

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE<br>FACEBOOK ACCOUNT STORED AT PREMISES<br>CONTROLLED BY FACEBOOK, INC., FOR<br>INVESTIGATION OF VIOLATION OF<br>18 U.S.C. § 1956 | )<br>)<br>)<br>)   Case No.  20-sc-1075<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

    An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the     Northern     District of     California
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE FACEBOOK ACCOUNT STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956
  See Attachment A, hereby incorporated by reference.

    I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

    **YOU ARE COMMANDED** to execute this warrant on or before     May 20, 2020     *(not to exceed 14 days)*
  ☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

    Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     G. Michael Harvey    .
                                                                                   *(United States Magistrate Judge)*

    ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
    ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of          .

Date and time issued:     05/06/2020

                                                           *Judge's signature*

City and state:     District of Columbia                          G. Michael Harvey, U.S. Magistrate Judge
                                                                      *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-1075 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

                                                    _____
                                                            *Executing officer's signature*

                                                    _____
                                                              *Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the account identified as:

Facebook Account ███████████ ██████████████ ("FACEBOOK

ACCOUNT"), which is stored at premises controlled by Facebook, Inc., an electronic

communications services provider and/or remote computing services provider in which accepts

service of legal process in Menlo Park, CA.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**Information to be disclosed by Facebook ("PROVIDER") to facilitate execution of the
warrant**

To the extent that the information described in Attachment A is within the possession,
custody, or control of PROVIDER, including any records that have been deleted but are still
available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.
§ 2703(f), PROVIDER is required to disclose the following information to the government
corresponding to each account or identifier ("Account") listed in Attachment A:

a. All contact and personal identifying information, including: full name, user
identification number, birth date, gender, contact e-mail addresses, Facebook
passwords, Facebook security questions and answers, physical address (including city,
state, and zip code), telephone numbers, screen names, websites, and other personal
identifiers

b. For the time period of January 1, 2016 to present:  The contents of any available
messages or other communication associated with the Account (including, but not
limited to, messages, attachments, draft messages, posts, chats, video calling history,
"friend" requests, discussions, recordings, images, or communications of any kind sent
to and from the Account, including stored or preserved copies thereof) and related
transactional records for all PROVIDER services used by an Account subscriber/user,
including the source and destination addresses and all Internet Protocol ("IP")
addresses associated with each message or other communication, the date and time at

which each message or other communication was sent, and the size and length of each message or other communication;

c.   For the time period of January 1, 2016 to present: All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

d.   Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

e.   For the time period of January 1, 2016 to present: All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like"

3

feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

f. For the time period of January 1, 2016 to present: All "check ins" and other location information;

g. For the time period of January 1, 2016 to present: All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

h. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

4

i.  All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

j.  Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

k.  Within 14 days of the issuance of this warrant, PROVIDER shall deliver information set forth above via United States mail, courier, or email to the following:



## I.      Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq*., and 18 U.S.C. § 1956, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of violations of the above statutes; or (ii) communicated with the Account about matters relating to violations of the above statutes;

(c) Information that constitutes evidence indicating the Account user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the amount and location of any U.S. dollar payments, monies, or funds transfers by ██████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

6



(f) Evidence related to U.S. dollar transactions, banking, or financial information

related ████████████████████████████████████████



(g) Evidence related to anti-money laundering controls, the Bank Secrecy Act, know

your customer policies, and/or lists, names, persons, companies, and/or entities

sanctioned or related to the Department of Treasury Office of Foreign Asset Control

("OFAC");

(h) Evidence related to front companies used ████████████████████████

████████████████████████████████████████



(i)  Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j)  the transportation or transmission of funds that have been derived from a criminal offense;

(k)  the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l)  Information that constitutes evidence concerning (i) the purchase, sale, and/or export of U.S.-origin goods from the United States without a required license; and (ii) the acquisition of goods from the United States and elsewhere to ▮ (via third countries), as connected to a conspiracy to import U.S.-origin goods for delivery to end users in ▮

(m) Records and information related to (i) preparatory steps taken in furtherance of the scheme, including internet searches for U.S.-origin goods and foreign-origin goods (connected to the conspiracy to import U.S.-origin goods) for importation to ▮ ▮ (via third countries), inquiries of vendors or sellers of the same, and the like; (ii) purchases and sales such goods from vendors or online purchasing sites (e.g., eBay); (iii) methods of payment with respect to such purchases; (iv) shipping,

8

delivery, and customs declarations with respect to such purchases; (v) financial records (to include bank records, wire transfers, checks, credit card statements, account information, and the like) with respect to such purchases; (vi) identities of buyers, sellers, and end users of such goods; (vii) planned use of such goods; and (viii) payments made by the end users of such goods.

(n) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

(o) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(p) The identity of the person(s) who created or used the Target Account or any associated user ID, including records that help reveal the whereabouts of such person(s)

(q) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(r) The identity of the person(s) who communicated with the Target Account or any associated user ID about matters relating to the laundering of funds to / from ███ ███ U.S. sanctions, and assisting ████████ including records that help reveal their whereabouts.

**II.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC
RECORDS PURSUANT TO FEDERAL RULES OF
EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                             Signature

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE FACEBOOK ACCOUNT STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956 | Case No. 20-sc-1075 <br><br> **Filed Under Seal** |

Reference:      *USAO Ref. # USAO. #* ███████: *Subject Account:* ███████████ ██████████████

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, ████████████████████████████████████████████

████████████████████████████████████ being duly

sworn, deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with Facebook Account ████████████ ████████████████ ████████████ ("FACEBOOK ACCOUNT"), which are stored at premises controlled by Facebook, Inc.("PROVIDER"), Inc electronic communications services providers and/or remote computing services providers which are headquartered in Menlo Park, California.   I am concurrently seeking an affidavit in support of an application for a search warrant for information which is associated with Google Gmail accounts ████████████████ ("GOOGLE ACCOUNT   ONE"), ████████████████ ("GOOGLE   ACCOUNT   TWO"), ████████████████ ("GOOGLE   ACCOUNT   THREE"), ████████████████ ("GOOGLE ACCOUNT FOUR"), ████████████████ ("GOOGLE ACCOUNT FIVE"),

██████████████████ ("GOOGLE ACCOUNT SIX"), ██████████████

("GOOGLE ACCOUNT SEVEN"), ██████████████████ ("GOOGLE ACCOUNT

EIGHT"), ██████████████████ ("GOOGLE ACCOUNT NINE"), and

██████████████ ("GOOGLE ACCOUNT TEN") (collectively, the "GOOGLE

ACCOUNTS"), which are stored at premises controlled by Google LLC. The statements of

probable cause in these applications are nearly identical.

2.     The information to be searched is described in the following paragraphs and in

Attachment A. This affidavit is made in support of an application for a search warrant under 18

U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require the PROVIDER to disclose to the

government copies of the information (including the content of communications) further described

in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment

B, government-authorized persons will review that information to locate the items described in

Section II of Attachment B, using the procedures described in Section III of Attachment B.





4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that evidence of violations of the International Emergency Economic Powers Act ("IEEPA") and 18 U.S.C. § 1956 will be discovered in the TARGET ACCOUNTS.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK
## The International Emergency Economic Powers Act

7. This investigation relates to violations of IEEPA and its implementing executive orders and regulations. IEEPA, enacted in 1977, granted the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Under IEEPA, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

8. Title 50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

9. Using the powers conferred by IEEPA, the President and Executive Branch departments have issued orders and regulations governing and prohibiting certain transactions with North Korea by U.S. persons or involving U.S. goods.

10. By the authority vested in the President by IEEPA, on or about June 28, 2005, the President signed Executive Order ("E.O.") 13382 blocking the property of persons engaged in weapons of mass destruction ("WMD") proliferation activities and their support networks and denying designated proliferators access to the U.S. financial and commercial systems. This blocking program initially applied to eight organizations in North Korea, Iran, and Syria. The U.S. Department of the Treasury, together with the U.S. Department of State, is authorized to designate additional proliferators of WMD and their supporters under the authorities provided by E.O. 13382. Pursuant to that authority, on or about April 13, 2009, the Secretary of the Treasury

promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." 31 C.F.R. § 544.101 *et seq*.

11.     By the authority vested in the President by IEEPA, on or about June 26, 2008, the President signed E.O. 13466 declaring a national emergency to deal with the threat to the national security and foreign policy of the United States constituted by the existence and risk of the proliferation of weapons-usable fissile material on the Korean Peninsula, and continued certain restrictions with respect to North Korea that previously had been imposed under the authority of the Trading With the Enemy Act. Since 2008, the President has issued subsequent E.O.s, including E.O.s 13551, 13570, 13687, and 13722, expanding the 2008 national emergency and taking additional steps with respect to that emergency, including blocking the property of certain persons (individuals and entities) and prohibiting certain types of transactions.

12.     The U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C., administers these sanctions programs to accomplish U.S. foreign-policy and national-security goals. OFAC accomplishes this by designating companies and individuals through different sanctions programs. When OFAC designates persons (individuals and entities) under the Non-Proliferation Sanctions and North Korea Sanctions programs, the persons are added to a list of Specially Designated Nationals and Blocked Persons ("SDN"). Among other things, entities added to the SDN list are prohibited from engaging in the use of the U.S. financial system for processing international wire transfers denominated in U.S. dollars originating from offshore U.S. dollar accounts at foreign financial institutions which utilize correspondent-banking services at U.S. financial institutions.

13.     Pursuant to E.O. 13382 and 31 C.F.R. § 544.201, dealings by any United States person or within the United States with individuals and entities who have been placed on the SDN

list, except as authorized or licensed by OFAC is prohibited. 31 C.F.R. § 544.201(b). The effect of these regulation is that a U.S. person cannot provide any financial or others services to a person or entity on the SDN list, except as authorized or licensed by OFAC. *See* 31 C.F.R. § 544.405.

14. In sum, by virtue of being included on an SDN list, a person or entity must first obtain a license or authorization from OFAC. *See* 31 C.F.R. §§ 510.201(a) and (f), 510.404(a). A transfer by a SDN of U.S. dollars without a license from OFAC constitutes a violation of IEEPA. On July 6, 2016, OFAC sanctioned the North Korean regime.

**Anti-Money Laundering Obligations**

15. According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act, as well as sanctions programs administered by OFAC.

16. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern. In November 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf. The special measure also required U.S. financial institutions to take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North

Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking in the United States. FinCEN further required U.S. financial institutions to engage in enhanced due diligence to root out any transactions by North Korean financial institutions and entities acting on their behalf. Failure to comply with the special measure entailed civil and criminal penalties for U.S. financial institutions.

17. U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of the U.S. dollar.

18. One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

19. In my training and experience, I know that criminals are aware of the general prohibition of U.S. dollar transactions for the benefit of North Korean entities and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent

North Korean parties from transacting in U.S. dollars. As a result, criminals employ front companies or brokers to act as cutouts, to engage in transactions on their behalf, in order to prevent banks from uncovering the North Korean entity that is a party to the transaction.

20.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

21.     18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, *inter alia*, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

22.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA and the bank fraud statute.

## **PROBABLE CAUSE**

### **I.     Background**

23.     Because of United Nations ("U.N.") and U.S. sanctions that are in effect against North Korea, North Korea and its business entities can only access the U.S. financial system by using front companies to conceal their direct involvement in the transactions and to evade the aforementioned sanctions. I know from my training and experience, as well as from a variety of open source material, that North Korea needs to access the U.S. financial system because, in order to obtain the goods that it needs, it must conduct trade in dollars. According to the United Nations Security Council's February 23, 2015 Report of the Panel of Experts, most of the transactions seen

by the Panel were made in United States dollars from foreign-based banks and transferred through corresponding bank accounts in the United States.

24.     On or about November 2, 2017, FinCEN issued an advisory to further alert financial institutions to North Korean schemes being used to evade U.S. and U.N. sanctions, launder funds, and finance the North Korean regime's WMD and ballistic missile programs.  The advisory was intended to provide financial red flags of illicit North Korean schemes, including the use of financial representatives world-wide.  It also highlighted the use of ███-based front or shell companies, trading companies, and financial institutions operating in areas bordering North Korea. These indicators were intended to assist financial institutions in identifying and reporting suspected illicit activity by the North Korean government and its financial institutions.

25.     I am aware from reliable source reporting that North Korea's government depends on foreign trade, banking, and access to the dollar-based financial system to pay their military and security forces, and that recent U.N. reports confirm that Pyongyang continues to rely on the dollar, and its access to the dollar system, to move money around the world.

26.     A U.S. Department of State Supply Chain Advisory dated July 23, 2018 advised U.S. businesses that North Korea sells a range of information technology ("IT") services and products abroad, including website and app development services in violation of U.S. and U.N. economic sanctions.  According to the advisory, North Korean companies are known to use the anonymity provided by ███████ websites to sell their IT services to unwitting buyers. North Korean IT companies employ tactics such as the use of front companies, aliases and third country facilitators to disguise their North Korean footprint.

27. The Department of the Treasury relatedly warned IT companies and individuals that individuals from North Korea are using fake online information in order to win employment for technology projects.

28. Based on my training and experience and the facts herein, there is probable cause to believe that the user(s) of the GOOGLE ACCOUNTS created a front company, ███████ ████████████████████████████████████████████ to generate revenue from U.S.-based customers, in violation of U.S. laws.

29. ████████ purported to be an IT services company and advertised mobile, web, game and custom software development services according to a historical archive of its website. ████████ website offered freelance developer services at prices ranging from ████████ per hour based upon the experience level of the developer. ████████ affiliated web developers advertised their services on freelance IT sites such as ████████████████.

30. Business registration records accessed from the ████████████████ ████████████ public website indicate that ████████ is a subsidiary of a company called ████████████ A historical web archive of ██████ website lists █████ nationals ████████████████████████████████ as the CEO/Founder and Manger, respectively. ██████ is located at ████████████████████████████████████ ████████████████████ according to ██████ website.

31. ██████ is known to operate at least two ████████ restaurants, ████████ and ████████████ Open source information and previous investigations confirmed that these restaurants are owned by the ████████ government and are used as fronts to conceal revenue generated by illicit activities. Open source reporting further substantiates that ████████ and



are staffed by ████████ citizens and that the proceeds earned from these restaurants are funneled back to the ████████

32.    In September 2018, OFAC designated ███ based company ████████████████ and its sister company, ███ based ████████ as front companies controlled by the ████████████████ and ████████████ used ████████ citizens to provide freelance web development and computer programming work in exchange for foreign currency.  The front company appeared designed to allow the circumvention of identification requirements on freelance job websites in order to obscure the ████████ workers true nationality.  According to OFAC, the revenue generated from ████████ was funneled back to the ████████ government through a series of front companies in ███ The United Nations Security Council acknowledged in Resolution 2397 of 2017 that the revenue generated from ████████ workers overseas contributes to ████████████████

33.    ████████ appears to use the same business model as ████████ namely using ████████ citizens to provide freelance web development and computer programming work on U.S. freelance job websites such as ████████ The investigation has also revealed financial links between ████████ and ████████ including payments to common ████ accounts, common phone numbers and physical addresses, and the use of common IP addresses to access email accounts (including the GOOGLE ACCOUNTS) and ████ accounts linked to both ████████ and ████████

### ████████  ACCOUNTS CREATED USING THE GOOGLE ACCOUNTS

34.    I am aware from open source reporting and a confidential source that individuals employed by the ████████ government routinely use U.S.-based email, cloud, and website

registration and hosting services for illicit activities. These U.S.-based email accounts are used to create accounts on U.S.-based payment processing sites, such as ▮▮▮ to transfer U.S. dollar denominated funds to foreign accounts, in violation of U.S. sanctions.

35.    Subpoena returns from Google revealed GOOGLE ACCOUNT ONE was created on March 19, 2017 from IP address ▮▮▮ and linked to phone number ▮▮▮.

36.    Subpoena returns from ▮▮▮ revealed that on or about March 22, 2017, GOOGLE ACCOUNT ONE was used to create a ▮▮▮ account in the name of ▮▮▮ ▮▮▮ (hereafter "▮▮▮ ACCOUNT ONE"). ▮▮▮ Account One was also created using IP address ▮▮▮ and linked to phone number ▮▮▮. The ▮▮▮ account was opened in the name of ▮▮▮ ▮▮▮ As noted above, this is the address for ▮▮▮ and ▮▮▮ is the CEO of ▮▮▮.

37.    Subpoena returns from ▮▮▮ identified a related second ▮▮▮ account, which is controlled by ▮▮▮ the manager of ▮▮▮ (hereafter ▮▮▮ ACCOUNT TWO").

38.    Subpoena returns from ▮▮▮ further revealed that ▮▮▮ ACCOUNT TWO was associated with GOOGLE ACCOUNT TWO through GOOGLE ACCOUNT SIX.

39.    A review of transaction histories for these ▮▮▮ accounts revealed that they were used to send and receive payments through U.S. freelance IT websites such as ▮▮▮ These payments contained notations that appear to be related to freelance software development work. For example, transaction history for ▮▮▮ ACCOUNT ONE included notations such as "Deposit (1/3 of total project cost) for Website Design for ▮▮▮ and "Payment for app development." ▮▮▮ ACCOUNT TWO included notations such as

"Payment for 48 hours of development based on $25/hour rate. Hours worked between January 21st and January 30th." These notations denote payments ██████ ACCOUNT ONE and ██████ ACCOUNT TWO received for freelance IT services from customers located within the U.S. Both ██████ accounts' transaction history revealed that payments were typically made in U.S. dollars.

██████████ **CONNECTIONS TO** ██████████

40.     Subpoena returns from ██████ revealed that ██████ ACCOUNT ONE received a U.S. dollar payment on March 29, 2017 from "██████ ACCOUNT THREE," which was linked to ██████ Per publicly accessible corporate registration information, ██████ is the registered agent of ██████ identified above as a sanctioned ██████ front company.

41.     ██████ subpoena returns further revealed ██████ ACCOUNT THREE sent two ██████ payments to ██████ ACCOUNT TWO on July 29 and July 30, 2019.

42.     Subpoena returns from ██████ revealed that ██████ ACCOUNT THREE was registered using ██████ phone number ██████████ ██████ subpoena returns further revealed three additional ██████ accounts linked this phone number ██████████

- Account ██████ ("██████ ACCOUNT FOUR");
- Account ██████ ("██████ ACCOUNT FIVE"); and
- Another account ██████████ ("██████ ACCOUNT SIX")

43.     I know from my training and experience that individuals involved in illicit activities desire to remain anonymous and attempt to hide their identity by creating temporary email addresses registered to false or fictitious names and identifiers. These email addresses are often referred to as "burner accounts" and the address and email domain often are made up of random letters and numbers or false names. Based on my training and experience, I believe the above email addresses associated with the respective ██████ accounts are burner email accounts.

44.     I also know from training and experience that sometimes criminals that create burner accounts will connect their real identity at some point of the registration process, which sometimes occurs accidentally.  Each of the accounts identified above that are connected to phone number ████████████ contained the following address on ████ account registration documents: ████████████████████████████████████████████ is the corporate registrant of ████████.

45.     ████ subpoena returns further revealed that ██████ phone number ████ ████████ was also linked to a ██████ account registered using email ██████████████████ (hereafter "████ ACCOUNT SEVEN.")  The name used to register ████ ACCOUNT SEVEN, ██████████████████ which closely matches business name ██████████ the subject of this investigation.  Account registration records included a linked ████████ account held in the name of ████████████, the corporate registrant of ██████████.

46.     Based on my training and experience, I know ██████ users must access the internet in order to initiate or complete transactions on the ██████ platform and to access their email accounts.  In some cases, law enforcement can use the physical internet access location, referred to as an Internet Protocol or "IP" address, to locate and/or identify the individual/ organization conducting the transaction.  Sometimes law enforcement can identify that two seemingly unrelated individuals or organizations are related based on common IP addresses accessed at approximately the same time.

47.     Subpoena returns from ██████ revealed common IP addresses accessed ██████████ ACCOUNT THREE through ██████ ACCOUNT SIX on numerous occasions. For example:

14



48.    Subpoena returns further revealed that on March 29, 2017, ████ ACCOUNT ONE (associated with ████ accessed the same IP address as ████ ACCOUNT THREE (associated with ████ These logins appear to have occurred within approximately ten minutes of each other, further corroborating connections between ████████████ This is the same date that ████ ACCOUNT THREE sent ████ to ████ ACCOUNT ONE. The transaction notes referenced ████████.

49.    ████ requires an email address to register and open an account. Additionally, ████ accounts often include additional email accounts that are authorized to send and receive funds.

50.    ████ subpoena returns revealed that ████ ACCOUNT THREE was registered using GOOGLE ACCOUNT TWO and GOOGLE ACCOUNT NINE.

51.    According to ████ records, GOOGLE ACCOUNT TWO is also a registered email for ████ ACCOUNT TWO.

52.     ████ records further revealed GOOGLE ACCOUNT FOUR is an authorized email account for ████ ACCOUNT SEVEN.  GOOGLE ACCOUNT FOUR is also an authorized email account for ████ ACCOUNT TWO.

53.     2703(d) returns for GOOGLE ACCOUNT TWO through GOOGLE ACCOUNT NINE revealed:

  a.  GOOGLE ACCOUNT TWO's recovery account is GOOGLE ACCOUNT NINE.  GOOGLE ACCOUNT TWO communicated with GOOGLE ACCOUNT NINE as recently as June 27, 2019.

  b.  GOOGLE ACCOUNT THREE's recovery account is GOOGLE ACCOUNT NINE.  Between February 2018 and June 2019, GOOGLE ACCOUNT THREE received approximately 504 emails from ████ As noted above, ████ has been exploited by ████ IT freelance workers to obtain U.S. dollars through outsourced IT work.

  c.  GOOGLE ACCOUNT FIVE's recovery account is GOOGLE ACCOUNT SEVEN.  Between May 2018 and June 2019, GOOGLE ACCOUNT FIVE received approximately 40 emails from ████

  d.  GOOGLE ACCOUNT SIX's recovery account is GOOGLE ACCOUNT EIGHT.  Between February 2018 and March 2018, GOOGLE ACCOUNT SIX received approximately 178 emails from the administrators of ████ is one of the most popular web-based coding platforms and repositories.  Coders can place their code/software on ████ Using it can provide wide exposure for the projects created by the coder.  IT-based projects are uploaded to ████, after which users can then work upon / improve that project.  Based on my training and experience, I know this platform is

directly in line with the type that would be used the by IT workers identified in the above scheme. One publicly available report noted that in order to evade sanctions, ███ ███ were operating businesses out of ███ that developed apps, mobile games and more for people and businesses across the world "through avenues such as ███ ███ and that "[i]t's possible that, using these fake profiles, these ███ companies have made millions of dollars off of unsuspecting clients, using apps like ███ and ███ to remain as anonymous as possible." Between February 2018 and July 2019, GOOGLE ACCOUNT SIX received approximately 99 emails from the administrators of ███ is a group of working web development professionals and open source contributors that provide users information on the software development. Again, the information provided by this site is consistent with what a user of the above-described scheme would use when conducting freelance IT work to generate revenue.

e. GOOGLE ACCOUNT SEVEN is the recovery account for GOOGLE ACCOUNT FIVE. Between January 2018 and September 2018, GOOGLE ACCOUNT SEVEN received approximately 342 emails from the administrators of ███ ███ is a website that advertises jobs, including jobs related to software development and IT. The information provided by this site is consistent with what a user of the above-described scheme would use when seeking freelance information IT work to generate revenue. Between February 2018 and March 2018, GOOGLE ACCOUNT SEVEN received approximately 18 emails from ███.

f. GOOGLE ACCOUNT EIGHT is the recovery account for GOOGLE ACCOUNT SIX. Between February 2018 and July 2018, GOOGLE ACCOUNT EIGHT

17



received approximately 12 emails from the administrator of ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇ is a website that teaches users how to find high pay jobs on ▇▇▇▇▇ GOOGLE ACCOUNT EIGHT also received two emails from the ▇▇▇▇▇▇ domain.

g. GOOGLE ACCOUNT NINE is the recovery account for GOOGLE ACCOUNT TWO, GOOGLE ACCOUNT THREE, and GOOGLE ACCOUNT TEN. GOOGLE ACCOUNT THREE sent and received emails from job sites such a ▇▇▇▇▇ which through training and experience I know is used to solicit employment, including freelance IT work, and as noted above, has been specifically identified as a site used by persons perpetrating this scheme. GOOGLE ACCOUNT NINE was accessed from IP address ▇▇▇▇▇ approximately nine times on July 13, 2019. This same IP address also accessed ▇▇▇▇ ACCOUNT THREE one day later, July 14, 2019.

h. GOOGLE ACCOUNT TEN's recovery account is GOOGLE ACCOUNT NINE. Subpoena returns from ▇▇▇▇ revealed that GOOGLE ACCOUNT TEN was a registered account associated with ▇▇▇▇ ACCOUNT ONE (the ▇▇▇▇▇ account). As noted above, this ▇▇▇▇ account was opened in the name of ▇▇▇▇▇▇▇▇▇ with the address of ▇▇▇▇▇▇.

54. Through training and experience, I know that email accounts, including those at the PROVIDER, can often be linked by cookie.[1] A connection by cookie is an important way to show that linked accounts are controlled by one person. A linkage by cookie typically occurs when a person on the same device and same browser accesses multiple accounts. Essentially, the provider,

---

[1] A cookie is a small piece of information that websites, in this case Google, stores on a user's computer. Cookies are used by website, including Google, to store login states, websites preferences and to allow for personalized content, such as storing a user name and/or password for a Gmail account login.

in part as they try to generate advertising revenue, is creating a unique fingerprint for a user. Google links accounts by the shared cookies on a device to conclude that the multiple accounts are in fact operated by one customer. 2703(d) returns revealed GOOGLE ACCOUNT TWO, GOOGLE ACCOUNT THREE and GOOGLE ACCOUNT NINE are all linked by cookie.

55. Subpoena returns from Google and ▆▆▆ identified numerous IP addresses that accessed the GOOGLE ACCOUNTS and ▆▆▆ accounts associated with ▆▆▆ In many instances, accounts associated with ▆▆▆ accessed the same IP address as GOOGLE ACCOUNT ONE on the same day. The GOOGLE ACCOUNTS referred to in the below chart are authorized email accounts associated with known ▆▆▆▆▆ accounts, which also shared IP connections to GOOGLE ACCOUNT ONE.





56. The subjects of the investigation failed to seek or obtain the requisite OFAC licenses when conducting the above-described transactions.

**GOOGLE ACCOUNTS USED TO SOLICIT BUSINESS THROUGH FREELANCE WEBSITE**

57. A review of subpoena returns provided by ▮▮▮ revealed GOOGLE ACCOUNT TWO through GOOGLE ACCOUNT FOUR all have profiles on ▮▮▮ Each of these profiles have conducted freelance work with U.S. based customers.

58. Subpoena returns from ▮▮▮ accounts revealed the following U.S. dollar payments to ▮▮▮ ACCOUNT TWO from the following ▮▮▮ accounts:



**SOLICITATION OF BUSINESS THROUGH SOCIAL MEDIA ACCOUNT**

59. I know from training and experience that OFAC-sanctioned countries, including ▮▮▮ create fake employees to accept payments through payment platforms such as ▮▮. As part of the scheme to receive the illicit funds, sanctioned companies often create social

media profiles, known as "burner accounts," to purportedly corroborate the identities of the fake employees.

60.    Law enforcement identified one such suspected burner account, a Facebook page for an individual named ████████ (FACEBOOK ACCOUNT).  The page listed ████ employment as a senior software developer at ██████

61.    FACEBOOK ACCOUNT's public facing page stated ████ offered services through U.S. based freelance software development platforms ████████████

62.    Subpoena returns confirmed that ████████ received payments processed by ████ for work that was solicited through ██████ These payments specifically noted payment was provided in exchange for work completed by ██████████

63.    Law enforcement identified numerous similar social media accounts purporting to be employees of ██████

64.    Subpoena returns from Facebook revealed overlaps between logins to FACEBOOK ACCOUNT and logins to accounts linked to known ██████ sanctioned entity ██████ For example, FACEBOOK ACCOUNT was accessed from IP address ████████ on August 10, 2018. ████ ACCOUNT THREE (associated with ██████ was accessed from the same IP address just one day earlier, August 9, 2018.

65.    IP Address analysis also revealed FACEBOOK ACCOUNT was accessed from the same IP addresses on the same day as ██████ ACCOUNT THREE. For example, on November 29, 2018, IP address ██████ accessed both ██████ ACCOUNT SEVEN and TARGET ACCOUNT.

## BACKGROUND CONCERNING FACEBOOK ACCOUNTS

66.     PROVIDER is the provider of the internet-based account ███████████ ████████████ ("FACEBOOK ACCOUNT").

67.     PROVIDER owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com ("Facebook").  The website is owned and operated by PROVIDER.   PROVIDER allows Facebook users to establish accounts with PROVIDER, and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

68.     PROVIDER asks users to provide basic contact and personal identifying information to PROVIDER, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  PROVIDER also assigns a user-identification number ("user ID") to each account.  PROVIDER identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

69.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  PROVIDER assigns a group identification number to each Facebook group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request.  If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's

account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

70.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

71.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

72.     PROVIDER allows Facebook users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is "tagged" in a photo or video, he or she receives a notification of

the "tag" and a link to see the photo or video. For PROVIDER's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

73.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by PROVIDER unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

74.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a PROVIDER account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.

75.     A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked". Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

76.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

77.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

78.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

79.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend".  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

80.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

81.     In addition to the applications described above, PROVIDER also provides Facebook users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

82.     PROVIDER also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a

25

Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

83.     Depending on the user's privacy settings, PROVIDER may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

84.     Social networking providers like PROVIDER typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

85.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile

26

network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

86.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

87.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

88.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

89.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's

support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

90. In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

91. As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion. From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by PROVIDER, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time. Further,

Facebook account activity can show how and when the account was accessed or used. For example, as described above, PROVIDER logs the IP addresses from which Facebook users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, PROVIDER builds geo-location into some of its Facebook services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user. Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[2]

92.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal

---

[2] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## **CONCLUSION**

93. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.

94.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 6th day of May, 2020.

_____
HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 20-sc-1075 |
| INFORMATION ASSOCIATED WITH ONE FACEBOOK ACCOUNT STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956 | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: **INFORMATION ASSOCIATED WITH ONE FACEBOOK ACCOUNT STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956** (See Attachment A, incorporated herein by reference.)

located in the                Northern                District of                California                , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a) | IEEPA |
| 18 U.S.C. § 1956(h) and (a)(2)(A) | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of           days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

███████████████████████████

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
                telephone                                *(specify reliable electronic means).*

Date:   05/06/2020

2020.05.06
17:10:02 -04'00'

*Judge's signature*

City and state:   District of Columbia                        G. Michael Harvey, U.S. Magistrate Judge

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH ONE
FACEBOOK ACCOUNT STORED AT PREMISES
CONTROLLED BY FACEBOOK, INC., FOR
INVESTIGATION OF VIOLATION OF
18 U.S.C. § 1956

)
)
)
)
)
)
)

Case No.  20-sc-1075

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure
of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE FACEBOOK ACCOUNT STORED AT PREMISES CONTROLLED BY
FACEBOOK, INC., FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____May 20, 2020_____ *(not to exceed 14 days)*
  ☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
                                                                    *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
  ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____05/06/2020_____

2020.05.06
17:10:26 -04'00'

*Judge's signature*

City and state:   _____District of Columbia_____

G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sc-1075 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

---

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

    This warrant applies to information which is associated with the account identified as:

Facebook Account ████████████████████████████ ("FACEBOOK

ACCOUNT"), which is stored at premises controlled by Facebook, Inc., an electronic

communications services provider and/or remote computing services provider in which accepts

service of legal process in Menlo Park, CA.

## ATTACHMENT B

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**Information to be disclosed by Facebook ("PROVIDER") to facilitate execution of the
warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers

b. For the time period of January 1, 2016 to present: The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all PROVIDER services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at

2

which each message or other communication was sent, and the size and length of each message or other communication;

c. For the time period of January 1, 2016 to present: All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

d. Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

e. For the time period of January 1, 2016 to present: All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like"

feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

f. For the time period of January 1, 2016 to present: All "check ins" and other location information;

g. For the time period of January 1, 2016 to present: All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

h. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

4

i. All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

j. Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

k. Within 14 days of the issuance of this warrant, PROVIDER shall deliver information set forth above via United States mail, courier, or email to the following:



## I.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq*., and 18 U.S.C. § 1956, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a)   Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)   Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of violations of the above statutes; or (ii) communicated with the Account about matters relating to violations of the above statutes;

(c)   Information that constitutes evidence indicating the Account user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)   Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e)   Information that constitutes evidence concerning the amount and location of any U.S. dollar payments, monies, or funds transfers by █████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████



(f) Evidence related to U.S. dollar transactions, banking, or financial information

related 

(g) Evidence related to anti-money laundering controls, the Bank Secrecy Act, know

your customer policies, and/or lists, names, persons, companies, and/or entities

sanctioned or related to the Department of Treasury Office of Foreign Asset Control

("OFAC");

(h) Evidence related to front companies used

7



(i)  Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j)  the transportation or transmission of funds that have been derived from a criminal offense;

(k)  the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l)  Information that constitutes evidence concerning (i) the purchase, sale, and/or export of U.S.-origin goods from the United States without a required license; and (ii) the acquisition of goods from the United States and elsewhere to ██████ (via third countries), as connected to a conspiracy to import U.S.-origin goods for delivery to end users in ██████

(m) Records and information related to (i) preparatory steps taken in furtherance of the scheme, including internet searches for U.S.-origin goods and foreign-origin goods (connected to the conspiracy to import U.S.-origin goods) for importation to ██████ ██████ (via third countries), inquiries of vendors or sellers of the same, and the like; (ii) purchases and sales such goods from vendors or online purchasing sites (e.g., eBay); (iii) methods of payment with respect to such purchases; (iv) shipping,

delivery, and customs declarations with respect to such purchases; (v) financial records (to include bank records, wire transfers, checks, credit card statements, account information, and the like) with respect to such purchases; (vi) identities of buyers, sellers, and end users of such goods; (vii) planned use of such goods; and (viii) payments made by the end users of such goods.

(n) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

(o) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(p) The identity of the person(s) who created or used the Target Account or any associated user ID, including records that help reveal the whereabouts of such person(s)

(q) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(r) The identity of the person(s) who communicated with the Target Account or any associated user ID about matters relating to the laundering of funds to / from ████ ████ U.S. sanctions, and assisting █████████, including records that help reveal their whereabouts.

## II.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.     such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____     _____
Date                             Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr>
<td>

**IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE FACEBOOK ACCOUNT STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956**

</td>
<td>

**Case No. 20-sc-1075**

<u>**Filed Under Seal**</u>

</td>
</tr>
</table>

*Reference:     USAO Ref. # USAO. #* ██████████*; Subject Account:* ██████████
███████████████

## AFFIDAVIT IN SUPPORT OF
## <u>AN APPLICATION FOR A SEARCH WARRANT</u>

I, ████████████████████████████████████████

████████████████████████████████████████ being duly

sworn, deposes and states as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application for a search warrant for

information which is associated with Facebook Account ████████ ████████

████████ ("FACEBOOK ACCOUNT"), which are stored at premises controlled by

Facebook, Inc.("PROVIDER"), Inc electronic communications services providers and/or remote

computing services providers which are headquartered in Menlo Park, California.   I am

concurrently seeking an affidavit in support of an application for a search warrant for information

which is associated with Google Gmail accounts ████████████ ("GOOGLE

ACCOUNT   ONE"),   ████████████   ("GOOGLE   ACCOUNT   TWO"),

████████████   ("GOOGLE   ACCOUNT   THREE"),   ████████████

("GOOGLE ACCOUNT FOUR"), ████████████ ("GOOGLE ACCOUNT FIVE"),

█████████████████████ ("GOOGLE ACCOUNT SIX"), █████████████████ ("GOOGLE ACCOUNT SEVEN"), ████████████████ ("GOOGLE ACCOUNT EIGHT"), ████████████████ ("GOOGLE ACCOUNT NINE"), and ████████████████ ("GOOGLE ACCOUNT TEN") (collectively, the "GOOGLE ACCOUNTS"), which are stored at premises controlled by Google LLC.  The statements of probable cause in these applications are nearly identical.

2.      The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require the PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.





4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that evidence of violations of the International Emergency Economic Powers Act ("IEEPA") and 18 U.S.C. § 1956 will be discovered in the TARGET ACCOUNTS. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.    This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction

over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below,

acts or omissions in furtherance of the offenses under investigation occurred within Washington,

D.C.  *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK
### The International Emergency Economic Powers Act

7.      This investigation relates to violations of IEEPA and its implementing executive

orders and regulations.  IEEPA, enacted in 1977, granted the President of the United States

authority to deal with unusual and extraordinary threats to the national security and foreign policy

of the United States.  Under IEEPA, the President may declare a national emergency through

Executive Orders that have the full force and effect of law.

8.      Title 50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person

to violate, attempt to violate, conspire to violate, or cause a violation of any license, order,

regulation, or prohibition issued under this title."

9.      Using the powers conferred by IEEPA, the President and Executive Branch

departments have issued orders and regulations governing and prohibiting certain transactions with

North Korea by U.S. persons or involving U.S. goods.

10.     By the authority vested in the President by IEEPA, on or about June 28, 2005, the

President signed Executive Order ("E.O.") 13382 blocking the property of persons engaged in

weapons of mass destruction ("WMD") proliferation activities and their support networks and

denying designated proliferators access to the U.S. financial and commercial systems.  This

blocking program initially applied to eight organizations in North Korea, Iran, and Syria.  The U.S.

Department of the Treasury, together with the U.S. Department of State, is authorized to designate

additional proliferators of WMD and their supporters under the authorities provided by E.O.

13382.  Pursuant to that authority, on or about April 13, 2009, the Secretary of the Treasury

promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." 31 C.F.R. § 544.101 *et seq*.

11. By the authority vested in the President by IEEPA, on or about June 26, 2008, the President signed E.O. 13466 declaring a national emergency to deal with the threat to the national security and foreign policy of the United States constituted by the existence and risk of the proliferation of weapons-usable fissile material on the Korean Peninsula, and continued certain restrictions with respect to North Korea that previously had been imposed under the authority of the Trading With the Enemy Act. Since 2008, the President has issued subsequent E.O.s, including E.O.s 13551, 13570, 13687, and 13722, expanding the 2008 national emergency and taking additional steps with respect to that emergency, including blocking the property of certain persons (individuals and entities) and prohibiting certain types of transactions.

12. The U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C., administers these sanctions programs to accomplish U.S. foreign-policy and national-security goals. OFAC accomplishes this by designating companies and individuals through different sanctions programs. When OFAC designates persons (individuals and entities) under the Non-Proliferation Sanctions and North Korea Sanctions programs, the persons are added to a list of Specially Designated Nationals and Blocked Persons ("SDN"). Among other things, entities added to the SDN list are prohibited from engaging in the use of the U.S. financial system for processing international wire transfers denominated in U.S. dollars originating from offshore U.S. dollar accounts at foreign financial institutions which utilize correspondent-banking services at U.S. financial institutions.

13. Pursuant to E.O. 13382 and 31 C.F.R. § 544.201, dealings by any United States person or within the United States with individuals and entities who have been placed on the SDN

list, except as authorized or licensed by OFAC is prohibited. 31 C.F.R. § 544.201(b). The effect of these regulation is that a U.S. person cannot provide any financial or others services to a person or entity on the SDN list, except as authorized or licensed by OFAC. *See* 31 C.F.R. § 544.405.

14. In sum, by virtue of being included on an SDN list, a person or entity must first obtain a license or authorization from OFAC. *See* 31 C.F.R. §§ 510.201(a) and (f), 510.404(a). A transfer by a SDN of U.S. dollars without a license from OFAC constitutes a violation of IEEPA. On July 6, 2016, OFAC sanctioned the North Korean regime.

**Anti-Money Laundering Obligations**

15. According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act, as well as sanctions programs administered by OFAC.

16. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern. In November 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf. The special measure also required U.S. financial institutions to take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North

Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking in the United States. FinCEN further required U.S. financial institutions to engage in enhanced due diligence to root out any transactions by North Korean financial institutions and entities acting on their behalf. Failure to comply with the special measure entailed civil and criminal penalties for U.S. financial institutions.

17. U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of the U.S. dollar.

18. One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

19. In my training and experience, I know that criminals are aware of the general prohibition of U.S. dollar transactions for the benefit of North Korean entities and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent

North Korean parties from transacting in U.S. dollars. As a result, criminals employ front companies or brokers to act as cutouts, to engage in transactions on their behalf, in order to prevent banks from uncovering the North Korean entity that is a party to the transaction.

20.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

21.     18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, *inter alia*, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

22.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA and the bank fraud statute.

## **PROBABLE CAUSE**

### I.     **Background**

23.     Because of United Nations ("U.N.") and U.S. sanctions that are in effect against North Korea, North Korea and its business entities can only access the U.S. financial system by using front companies to conceal their direct involvement in the transactions and to evade the aforementioned sanctions. I know from my training and experience, as well as from a variety of open source material, that North Korea needs to access the U.S. financial system because, in order to obtain the goods that it needs, it must conduct trade in dollars. According to the United Nations Security Council's February 23, 2015 Report of the Panel of Experts, most of the transactions seen

by the Panel were made in United States dollars from foreign-based banks and transferred through corresponding bank accounts in the United States.

24.     On or about November 2, 2017, FinCEN issued an advisory to further alert financial institutions to North Korean schemes being used to evade U.S. and U.N. sanctions, launder funds, and finance the North Korean regime's WMD and ballistic missile programs.  The advisory was intended to provide financial red flags of illicit North Korean schemes, including the use of financial representatives world-wide.  It also highlighted the use of ▮▮▮-based front or shell companies, trading companies, and financial institutions operating in areas bordering North Korea. These indicators were intended to assist financial institutions in identifying and reporting suspected illicit activity by the North Korean government and its financial institutions.

25.     I am aware from reliable source reporting that North Korea's government depends on foreign trade, banking, and access to the dollar-based financial system to pay their military and security forces, and that recent U.N. reports confirm that Pyongyang continues to rely on the dollar, and its access to the dollar system, to move money around the world.

26.     A U.S. Department of State Supply Chain Advisory dated July 23, 2018 advised U.S. businesses that North Korea sells a range of information technology ("IT") services and products abroad, including website and app development services in violation of U.S. and U.N. economic sanctions.  According to the advisory, North Korean companies are known to use the anonymity provided by ▮▮▮ websites to sell their IT services to unwitting buyers. North Korean IT companies employ tactics such as the use of front companies, aliases and third country facilitators to disguise their North Korean footprint.

27.     The Department of the Treasury relatedly warned IT companies and individuals that individuals from North Korea are using fake online information in order to win employment for technology projects.

28.     Based on my training and experience and the facts herein, there is probable cause to believe that the user(s) of the GOOGLE ACCOUNTS created a front company, ████████ ██████████████████████████████████████████, to generate revenue from U.S.-based customers, in violation of U.S. laws.

29.     ████████ purported to be an IT services company and advertised mobile, web, game and custom software development services according to a historical archive of its website. ████████ website offered freelance developer services at prices ranging from ████████ per hour based upon the experience level of the developer. ████████ affiliated web developers advertised their services on freelance IT sites such as ████████████████.

30.     Business registration records accessed from the ████████████████ ████████ public website indicate that ████████ is a subsidiary of a company called ████████ A historical web archive of ████ website lists ████ nationals ████████████████████████████ as the CEO/Founder and Manger, respectively. ████ is located at ████████████████████████████ according to ████ website.

31.     ████ is known to operate at least two ████████ restaurants, ████████ and ████████████ Open source information and previous investigations confirmed that these restaurants are owned by the ████████ government and are used as fronts to conceal revenue generated by illicit activities.  Open source reporting further substantiates that ████████ and



███████ are staffed by ██████ citizens and that the proceeds earned from these restaurants are funneled back to the ████████████

32. In September 2018, OFAC designated ████ based company ██████████████ ████████████████████████ and its sister company, ██████ based ████████████ as front companies controlled by the ████████████████████ and ████████████████████ used ██████████ citizens to provide freelance web development and computer programming work in exchange for foreign currency. The front company appeared designed to allow the circumvention of identification requirements on freelance job websites in order to obscure the ██████████ workers true nationality. According to OFAC, the revenue generated from ████████ was funneled back to the ████████ government through a series of front companies in ██████ The United Nations Security Council acknowledged in Resolution 2397 of 2017 that the revenue generated from ████████████ workers overseas contributes to ████████████████████████████

33. ████████████ appears to use the same business model as ██████████ namely using ████████████ citizens to provide freelance web development and computer programming work on U.S. freelance job websites such as ██████████ The investigation has also revealed financial links between ████████ and ██████████ including payments to common ████████ accounts, common phone numbers and physical addresses, and the use of common IP addresses to access email accounts (including the GOOGLE ACCOUNTS) and ████████ accounts linked to both ████████████ and ████████████

## ████████ ACCOUNTS CREATED USING THE GOOGLE ACCOUNTS

34. I am aware from open source reporting and a confidential source that individuals employed by the ██████████ government routinely use U.S.-based email, cloud, and website

registration and hosting services for illicit activities. These U.S.-based email accounts are used to create accounts on U.S.-based payment processing sites, such as ███, to transfer U.S. dollar denominated funds to foreign accounts, in violation of U.S. sanctions.

35. Subpoena returns from Google revealed GOOGLE ACCOUNT ONE was created on March 19, 2017 from IP address ███████ and linked to phone number ███████.

36. Subpoena returns from ████ revealed that on or about March 22, 2017, GOOGLE ACCOUNT ONE was used to create a ████ account in the name of ██████████ ██ (hereafter "████████ ACCOUNT ONE"). ██████ Account One was also created using IP address ███████ and linked to phone number ███████. The █████ account was opened in the name of ██████████████████████████████████ ████████████████████████████████ As noted above, this is the address for ██████ and ██████████ is the CEO of █████

37. Subpoena returns from ██████ identified a related second ████████████ account, which is controlled by ████████████████ the manager of ██████ (hereafter "████████ ACCOUNT TWO").

38. Subpoena returns from ████ further revealed that ████████ ACCOUNT TWO was associated with GOOGLE ACCOUNT TWO through GOOGLE ACCOUNT SIX.

39. A review of transaction histories for these ██████ accounts revealed that they were used to send and receive payments through U.S. freelance IT websites such as ████████ These payments contained notations that appear to be related to freelance software development work. For example, transaction history for ████████ ACCOUNT ONE included notations such as "Deposit (1/3 of total project cost) for Website Design for ████████████████ and "Payment for app development." ████████ ACCOUNT TWO included notations such as

"Payment for 48 hours of development based on $25/hour rate. Hours worked between January 21st and January 30th." These notations denote payments ██████ ACCOUNT ONE and ██████ ACCOUNT TWO received for freelance IT services from customers located within the U.S. Both ██████ accounts' transaction history revealed that payments were typically made in U.S. dollars.



## ██████ **CONNECTIONS TO** ██████

40.     Subpoena returns from ██████ revealed that ██████ ACCOUNT ONE received a U.S. dollar payment on March 29, 2017 from "██████ ACCOUNT THREE," which was linked to ██████ Per publicly accessible corporate registration information, ██████ is the registered agent of ██████ identified above as a sanctioned ██████ front company.

41.     ██████ subpoena returns further revealed ██████ ACCOUNT THREE sent two ██████ payments to ██████ ACCOUNT TWO on July 29 and July 30, 2019.

42.     Subpoena returns from ██████ revealed that ██████ ACCOUNT THREE was registered using ██████ phone number ██████ ██████ subpoena returns further revealed three additional ██████ accounts linked this phone number ██████

- Account ██████ | ██████ ACCOUNT FOUR");
- Account ██████ ACCOUNT FIVE"); and
- Another account ██████ ACCOUNT SIX")

43.     I know from my training and experience that individuals involved in illicit activities desire to remain anonymous and attempt to hide their identity by creating temporary email addresses registered to false or fictitious names and identifiers. These email addresses are often referred to as "burner accounts" and the address and email domain often are made up of random letters and numbers or false names. Based on my training and experience, I believe the above email addresses associated with the respective ██████ accounts are burner email accounts.

44.  I also know from training and experience that sometimes criminals that create burner accounts will connect their real identity at some point of the registration process, which sometimes occurs accidentally. Each of the accounts identified above that are connected to phone number ███████ contained the following address on ██ account registration documents: ████████████████████████ ████████ is the corporate registrant of ████.

45.  ████ subpoena returns further revealed that ████ phone number ██ ████████ was also linked to a ████ account registered using email ████████ (hereafter "████ ACCOUNT SEVEN.") The name used to register ████ ACCOUNT SEVEN, ████████ which closely matches business name ██████ the subject of this investigation. Account registration records included a linked ████ account held in the name of ████████ the corporate registrant of ████████.

46.  Based on my training and experience, I know ████ users must access the internet in order to initiate or complete transactions on the ████ platform and to access their email accounts. In some cases, law enforcement can use the physical internet access location, referred to as an Internet Protocol or "IP" address, to locate and/or identify the individual/ organization conducting the transaction. Sometimes law enforcement can identify that two seemingly unrelated individuals or organizations are related based on common IP addresses accessed at approximately the same time.

47.  Subpoena returns from ████ revealed common IP addresses accessed ████ ACCOUNT THREE through ████ ACCOUNT SIX on numerous occasions. For example:

14



48.     Subpoena returns further revealed that on March 29, 2017, ▆▆▆ ACCOUNT ONE (associated with ▆▆▆ accessed the same IP address as ▆▆▆ ACCOUNT THREE (associated with ▆▆▆ These logins appear to have occurred within approximately ten minutes of each other, further corroborating connections between ▆▆▆ This is the same date that ▆▆▆ ACCOUNT THREE sent ▆▆▆ to ▆▆▆ ACCOUNT ONE. The transaction notes referenced ▆▆▆

49.     ▆▆▆ requires an email address to register and open an account.  Additionally, ▆▆▆ accounts often include additional email accounts that are authorized to send and receive funds.

50.     ▆▆▆ subpoena returns revealed that ▆▆▆ ACCOUNT THREE was registered using GOOGLE ACCOUNT TWO and GOOGLE ACCOUNT NINE.

51.     According to ▆▆▆ records, GOOGLE ACCOUNT TWO is also a registered email for ▆▆▆ ACCOUNT TWO.

52.    ████ records further revealed GOOGLE ACCOUNT FOUR is an authorized email account for ████ ACCOUNT SEVEN.  GOOGLE ACCOUNT FOUR is also an authorized email account for ████ ACCOUNT TWO.

53.    2703(d) returns for GOOGLE ACCOUNT TWO through GOOGLE ACCOUNT NINE revealed:

a.  GOOGLE ACCOUNT TWO's recovery account is GOOGLE ACCOUNT NINE.  GOOGLE ACCOUNT TWO communicated with GOOGLE ACCOUNT NINE as recently as June 27, 2019.

b.  GOOGLE  ACCOUNT  THREE's  recovery  account  is  GOOGLE ACCOUNT NINE.  Between February 2018 and June 2019, GOOGLE ACCOUNT THREE received approximately 504 emails from ████ As noted above, ████ has been exploited by ████ IT freelance workers to obtain U.S. dollars through outsourced IT work.

c.  GOOGLE ACCOUNT FIVE's recovery account is GOOGLE ACCOUNT SEVEN.  Between May 2018 and June 2019, GOOGLE ACCOUNT FIVE received approximately 40 emails from ████

d.  GOOGLE ACCOUNT SIX's recovery account is GOOGLE ACCOUNT EIGHT.  Between February 2018 and March 2018, GOOGLE ACCOUNT SIX received approximately 178 emails from the administrators of ████ is one of the most popular web-based coding platforms and repositories.  Coders can place their code/software on ████ Using it can provide wide exposure for the projects created by the coder.  IT-based projects are uploaded to ████ after which users can then work upon / improve that project.  Based on my training and experience, I know this platform is

16

directly in line with the type that would be used the by IT workers identified in the above scheme. One publicly available report noted that in order to evade sanctions, ███ ███ were operating businesses out of ███ that developed apps, mobile games and more for people and businesses across the world "through avenues such as ███ ███ and that "[i]t's possible that, using these fake profiles, these ███ companies have made millions of dollars off of unsuspecting clients, using apps like ███ and ███ to remain as anonymous as possible." Between February 2018 and July 2019, GOOGLE ACCOUNT SIX received approximately 99 emails from the administrators of ███ is a group of working web development professionals and open source contributors that provide users information on the software development. Again, the information provided by this site is consistent with what a user of the above-described scheme would use when conducting freelance IT work to generate revenue.

      e. GOOGLE ACCOUNT SEVEN is the recovery account for GOOGLE ACCOUNT FIVE. Between January 2018 and September 2018, GOOGLE ACCOUNT SEVEN received approximately 342 emails from the administrators of ███ ███ is a website that advertises jobs, including jobs related to software development and IT. The information provided by this site is consistent with what a user of the above-described scheme would use when seeking freelance information IT work to generate revenue. Between February 2018 and March 2018, GOOGLE ACCOUNT SEVEN received approximately 18 emails from ███.

      f. GOOGLE ACCOUNT EIGHT is the recovery account for GOOGLE ACCOUNT SIX. Between February 2018 and July 2018, GOOGLE ACCOUNT EIGHT

received approximately 12 emails from the administrator of ████████ ████████ is a website that teaches users how to find high pay jobs on ████ GOOGLE ACCOUNT EIGHT also received two emails from the ████████ domain.

 g. GOOGLE ACCOUNT NINE is the recovery account for GOOGLE ACCOUNT TWO, GOOGLE ACCOUNT THREE, and GOOGLE ACCOUNT TEN. GOOGLE ACCOUNT THREE sent and received emails from job sites such a ████ which through training and experience I know is used to solicit employment, including freelance IT work, and as noted above, has been specifically identified as a site used by persons perpetrating this scheme. GOOGLE ACCOUNT NINE was accessed from IP address ████ approximately nine times on July 13, 2019. This same IP address also accessed ████ ACCOUNT THREE one day later, July 14, 2019.

 h. GOOGLE ACCOUNT TEN's recovery account is GOOGLE ACCOUNT NINE. Subpoena returns from ████ revealed that GOOGLE ACCOUNT TEN was a registered account associated with ████ ACCOUNT ONE (the Prime Hana account). As noted above, this ████ account was opened in the name of ████████ with the address of ████.

54. Through training and experience, I know that email accounts, including those at the PROVIDER, can often be linked by cookie.[1] A connection by cookie is an important way to show that linked accounts are controlled by one person. A linkage by cookie typically occurs when a person on the same device and same browser accesses multiple accounts. Essentially, the provider,

---

[1] A cookie is a small piece of information that websites, in this case Google, stores on a user's computer. Cookies are used by website, including Google, to store login states, websites preferences and to allow for personalized content, such as storing a user name and/or password for a Gmail account login.

in part as they try to generate advertising revenue, is creating a unique fingerprint for a user. Google links accounts by the shared cookies on a device to conclude that the multiple accounts are in fact operated by one customer. 2703(d) returns revealed GOOGLE ACCOUNT TWO, GOOGLE ACCOUNT THREE and GOOGLE ACCOUNT NINE are all linked by cookie.

55. Subpoena returns from Google and ▇▇▇▇ identified numerous IP addresses that accessed the GOOGLE ACCOUNTS and ▇▇▇▇ accounts associated with ▇▇▇▇▇ In many instances, accounts associated with ▇▇▇▇▇ accessed the same IP address as GOOGLE ACCOUNT ONE on the same day. The GOOGLE ACCOUNTS referred to in the below chart are authorized email accounts associated with known ▇▇▇▇▇▇▇ accounts, which also shared IP connections to GOOGLE ACCOUNT ONE.





56.     The subjects of the investigation failed to seek or obtain the requisite OFAC

licenses when conducting the above-described transactions.

## GOOGLE ACCOUNTS USED TO SOLICIT BUSINESS THROUGH FREELANCE WEBSITE

57.     A review of subpoena returns provided by ▮▮▮▮ revealed GOOGLE ACCOUNT

TWO through GOOGLE ACCOUNT FOUR all have profiles on ▮▮▮▮ Each of these profiles

have conducted freelance work with U.S. based customers.

58.     Subpoena returns from ▮▮▮▮ accounts revealed the following U.S. dollar

payments to ▮▮▮▮ ACCOUNT TWO from the following ▮▮▮▮ accounts:



## SOLICITATION OF BUSINESS THROUGH SOCIAL MEDIA ACCOUNT

59.     I know from training and experience that OFAC-sanctioned countries, including

▮▮▮▮ create fake employees to accept payments through payment platforms such as

▮▮▮. As part of the scheme to receive the illicit funds, sanctioned companies often create social

20

media profiles, known as "burner accounts," to purportedly corroborate the identities of the fake employees.

60.     Law enforcement identified one such suspected burner account, a Facebook page for an individual named ███████ (FACEBOOK ACCOUNT). The page listed ████ employment as a senior software developer at ████████

61.     FACEBOOK ACCOUNT's public facing page stated ████ offered services through U.S. based freelance software development platforms ████████████

62.     Subpoena returns confirmed that ██████ received payments processed by ████ for work that was solicited through ██████ These payments specifically noted payment was provided in exchange for work completed by ███████████████

63.     Law enforcement identified numerous similar social media accounts purporting to be employees of ██████

64.     Subpoena returns from Facebook revealed overlaps between logins to FACEBOOK ACCOUNT and logins to accounts linked to known ██████ sanctioned entity ████████ For example, FACEBOOK ACCOUNT was accessed from IP address ████████ on August 10, 2018. ████ ACCOUNT THREE (associated with ██████ was accessed from the same IP address just one day earlier, August 9, 2018.

65.     IP Address analysis also revealed FACEBOOK ACCOUNT was accessed from the same IP addresses on the same day as ██████ ACCOUNT THREE. For example, on November 29, 2018, IP address ██████ accessed both ██████ ACCOUNT SEVEN and TARGET ACCOUNT.

## BACKGROUND CONCERNING FACEBOOK ACCOUNTS

66.     PROVIDER is the provider of the internet-based account ███████████ ███

███████████ ("FACEBOOK ACCOUNT").

67.     PROVIDER owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com ("Facebook"). The website is owned and

operated by PROVIDER. PROVIDER allows Facebook users to establish accounts with

PROVIDER, and users can then use their Facebook accounts to share written news, photographs,

videos, and other information with other Facebook users, and sometimes with the general public.

68.     PROVIDER asks users to provide basic contact and personal identifying

information to PROVIDER, either during the registration process or thereafter. This information

may include the user's full name, birth date, gender, contact e-mail addresses, Facebook

passwords, Facebook security questions and answers (for password retrieval), physical address

(including city, state, and zip code), telephone numbers, screen names, websites, and other

personal identifiers. PROVIDER also assigns a user-identification number ("user ID") to each

account. PROVIDER identifies unique Facebook accounts by a user's e-mail address, the user ID,

or the username associated with a Facebook profile.

69.     Facebook users may join one or more groups or networks to connect and interact

with other users who are members of the same group or network. PROVIDER assigns a group

identification number to each Facebook group. A Facebook user can also connect directly with

individual Facebook users by sending each user a "friend" request. If the recipient of a "friend"

request accepts the request, then the two users will become "friends" for purposes of Facebook

and can exchange communications or view information about each other. Each Facebook user's

account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

70.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

71.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

72.    PROVIDER allows Facebook users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of

23

the "tag" and a link to see the photo or video. For PROVIDER's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

73.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by PROVIDER unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

74.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a PROVIDER account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.

75.     A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked". Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

24

76. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

77. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

78. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

79. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend". The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

80. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

81. In addition to the applications described above, PROVIDER also provides Facebook users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

82. PROVIDER also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a

Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

83.     Depending on the user's privacy settings, PROVIDER may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

84.     Social networking providers like PROVIDER typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

85.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile

network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

86. PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

27

87.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

88.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

89.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's

support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

90. In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

91. As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion. From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by PROVIDER, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time. Further,

Facebook account activity can show how and when the account was accessed or used. For example, as described above, PROVIDER logs the IP addresses from which Facebook users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, PROVIDER builds geo-location into some of its Facebook services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user. Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[2]

92.      Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal

---

[2] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## **CONCLUSION**

93.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.

94. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 6th day of May, 2020.

2020.05.06
17:10:51 -04'00'

HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE