# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705

)
)
)
)
)
)
)

Case No.  20-sc-1140

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 50 U.S.C. § 1705 | Violation of the International Emergency Economic Powers Act |
| 50 U.S.C. § 4819 | Violation of the Export Control Reform Act of 2018 |
| 18 U.S.C. §§ 2 and 371 | Aiding and Abetting and Conspiracy |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:  05/13/2020
_____
*Judge's signature*

City and state:  Washington, D.C.
G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❒ Original          ❒ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   20-sc-1140 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT | ) |
| STORED AT PREMISES CONTROLLED BY MICROSOFT | ) |
| CORPORATION PURSUANT TO 18 U.S.C. 2703 FOR | ) |
| INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Western_____ District of _____Washington_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

**YOU ARE COMMANDED** to execute this warrant on or before _____May 27, 2020_____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ____U.S. Magistrate Judge G. Michael Harvey____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:   05/13/2020

City and state:   Washington, D.C.

_____
*Judge's signature*

G. Michael Harvey U.S. Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>20-sc-1140 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A
## Property to Be Searched

This warrant applies to information which is associated with the Hotmail account(s) identified by ██████████████ and which is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company that accepts service of legal process at One Microsoft Way, Redmond, Washington.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.     **Information to be disclosed by Microsoft Corporation ("PROVIDER") to
facilitate execution of the warrant**

To the extent the information described in Attachment A is within the possession, custody,

or control of the Provider, including any e-mails, records, files, logs, or information that has been

deleted but is still available to the Provider, or has been preserved pursuant to a request made under

18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the

government for each account or identifier ("Account") listed in Attachment A:

a.      For the time period from October 1, 2012, to the present: The contents of all

communications and related transactional records for all PROVIDER services used by an Account

subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo

sharing or storage services, remote computing services, instant messaging or chat services, voice

call services, or remote computing services), including but not limited to incoming, outgoing, and

draft e-mails, messages, calls, chats, and other electronic communications; attachments to

communications (including native files); source and destination addresses and header or routing

information for each communication (including originating IP addresses of e-mails); the date, size,

and length of each communication; and any user or device identifiers linked to each

communication (including cookies);[5]

---

[5] Here, PROVIDER's other services include: electronic communication and remote
computing services such as Skype (voice calls, video calls, and SMS text messaging), Outlook
Calendar (calendar and task), Office Online (cloud computing services for word processing, data
processing, and presentations); OneDrive (online file storage); web browsing and search tools such

b.      For the time period from October 1, 2012, to the present: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period from October 1, 2012, to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period from October 1, 2012, to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length,

---

as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers); Bing Maps (maps with driving directions and local business search) and other location services; online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications). Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.     All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.     All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

3

g.     Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.     All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.     For the time period from October 1, 2012 to the present: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following: █████

4

## II.     Information to be seized by the government

All information described above in Section I that constitutes **evidence, fruits, or instrumentalities** of violations of 50 U.S.C. § 1705 (IEEPA), 18 U.S.C. § 1956 (money laundering), and 50 U.S.C. § 4819 (ECRA), as well as conspiracy to defraud the United States (18 U.S.C. § 371) and aiding and abetting violations of these provisions (18 U.S.C. § 2), for each account or identifier listed on Attachment A, including but not limited to information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the accounts;

(b) Information involving the procurement or attempted procurement of U.S.-origin goods for use in ███ or by any end-user or entity outside the United States;

(c) Knowledge of United States export control laws;

(d) Conversations between the account holder(s) and individuals as it relates to the export of U.S.-origin products;

(e)  Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the e-mail account owner;

(f)  Evidence indicating the account owner's state of mind as it relates to the criminal activity under investigation;

(g) The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

(h) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(i) The identity of the person(s) who communicated with the account holder about matters relating to the provision, attempted provision, procurement, or attempted procurement of U.S. origin goods, including records that help reveal their whereabouts.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## BUSINESS RECORDS PURSUANT TO FEDERAL RULE
## OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Microsoft C ("Microsoft "), and my official title is _____. I am a custodian of records for Microsoft . I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Microsoft , and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Microsoft ; and

c.      such records were made by Microsoft as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____
Date                                                        Signature

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705** | **SC No. 20-1140**<br><br>**Filed Under Seal** |

*Reference:*     *USAO Ref. #* ███████ *: Subject Account(s):* ████████████

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, █████████ being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant for information associated with one account—that is, ████████████ (**TARGET ACCOUNT**)—that is stored at the premises controlled by Microsoft Corporation ("PROVIDER"), an electronic communications services provider and/or remote computing services provider that is headquartered at One Microsoft Way, Redmond, Washington. The property to be searched is described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Microsoft to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



2



5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 50 U.S.C. § 1705 (the International Emergency Economic Powers Act), 18 U.S.C. § 1956 (money laundering), and 50 U.S.C. § 4819 (the Export Control Reform Act of 2018), as well as conspiracies to violate these provisions (18 U.S.C. § 371) and aiding and abetting violations of these provisions (18 U.S.C. § 2) have been committed by ▮▮▮▮▮▮▮▮▮▮ (the user of **TARGET ACCOUNT**) and others. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## **JURISDICTION**

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or

3

omissions in furtherance of the offenses under investigation occurred within Washington, DC, *see* 18 U.S.C. § 3237, and the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238. Also, certain of the statutes setting forth the federal offenses under investigation, namely 18 U.S.C. § 1956 (money laundering), apply extraterritorially. The offenses under investigation are also the subject of an investigation in the District of Columbia.

## APPLICABLE CRIMINAL LAW

8.     **The Export Administration Act and the Export Administration Regulations, the International Emergency Economic Powers Act, 50 U.S.C. § 1705 ("IEEPA"), and the Export Control Reform Act of 2018.** The EAA regulates the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the DOC promulgated the EAR, 15 C.F.R. §§ 730-774, which contain additional restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. *See* 15 C.F.R. § 730.02. Although the EAA lapsed on August 17, 2001, pursuant to the authority provided to the President under IEEPA, the President issued Executive Order 13222. In that order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the EAA. Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have repeatedly signed renewals of the national emergency with respect to the EAA's expiration, the most recent being that of August 8, 2018. 83 Fed. Reg. 39871 (Aug. 8, 2018).

9. Under IEEPA, it is a crime to willfully violate any regulation promulgated thereunder, including the EAR. *See* 50 U.S.C. § 1705. In particular, Title 50, United States Code, Section 1705 provides:

> (a) Unlawful acts. It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under [the International Emergency Economic Powers Act].
>
> (b) . . .
>
> (c) Criminal penalty. A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in subsection (a) shall, upon conviction, be fined . . ., or if a natural person, may be imprisoned for not more than 20 years, or both.

10. On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provision on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801-4852. In part, ECRA provides permanent statutory authority for the EAR. For conduct that predates August 13, 2018, IEEPA is the controlling statute. For conduct occurring after August 13, 2018, ECRA is the controlling statute.

11. **ECRA** provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled…." 50 U.S.C. § 4811(2). To that end, ECRA grants the President the authority "(1) to control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever

5

located, relating to" specific categories of items and information. *Id*. at § 4812(b). ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

12.     Pursuant to that and prior authority, the DOC reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR, 15 C.F.R. §§ 730-774. In particular, the EAR restricts the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

13.     Items "subject to the EAR" include all items in the United States and all U.S.-origin items wherever located, irrespective of whether a license was required for the export of that items (with certain exceptions not relevant here). Activities of U.S. or foreign persons prohibited by any order issued under the EAR were also are "subject to the EAR."

14.     The most sensitive items subject to EAR controls are identified on the CCL, published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by Export Control Classification Numbers ("ECCN"), each of which has export control requirements depending on destination, end use, and end user. "EAR99" is a classification for items subject to the EAR, but not subject to certain expanded export controls associated with items with an ECCN.

15.     In addition, the EAR contains a list of names of certain foreign persons—including businesses, research institutions, government and private organizations, individuals, and other types of legal persons—that are subject to specific license requirements for the export, reexport, and/or in-country transfer of specified items. These persons comprise the DOC's "Entity List," at Title 15, Code of Federal Regulations, Part 744, Supplement No. 4. Grounds for inclusion on the

Entity List include activities sanctioned by the U.S. State Department and activities contrary to U.S. national security or foreign policy interests. The persons on the Entity List are subject to export licensing requirements and policies beyond those found elsewhere in the EAR. The BIS license requirement applies to any transaction in which items are to be exported, reexported, or transferred to such persons or in which such persons act as a purchaser, intermediate consignee, ultimate consignee, or end-user.

16. Pursuant to 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this part or of any regulation, order, license, or other authorization issued under this part," and pursuant to §4819(b),"[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall" be guilty of a crime.

17. **International Money Laundering**. 18 U.S.C. §§ 1956(a)(2) and (c)(7)(B)(v)(II) provide, in pertinent part:

> (a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> (A) with the intent to promote the carrying on of specified unlawful activity . . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.
>
> (c) As used in this section—
>
> (7) the term "specified unlawful activity" means--
> . . .
> (B) with respect to a financial transaction occurring in whole or in

7

part in the United States, an offense against a foreign nation involving--

. . .

  (v) smuggling or export control violations involving—

(II) an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730-774).

### RELEVANT PERSONS AND ENTITIES



18. ▮▮▮▮▮▮▮▮▮▮▮▮▮, the user of **TARGET ACCOUNT**, is believed to be a ▮▮▮▮ national who lives in ▮▮▮▮▮▮ According to BIS and the Federal Register, ▮▮▮▮▮ and her former company, ▮▮▮▮▮ were added to the Entity List on or about ▮▮▮▮▮▮ for their involvement in the procurement and delivery of ▮▮▮▮▮▮ to entities and persons in ▮▮▮ in violation of the EAR and the International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130.

19. Based on multiple investigative sources, ▮▮▮▮ is believed to be married to ▮▮▮ Person A.

20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Person A is believed to be a ▮▮▮▮ national who resides in ▮▮▮▮▮▮ and is the president of ▮▮▮ Company A and ▮▮▮ Company B.

21. Based on open source records, ▮▮▮▮ Person B is believed to be a ▮▮▮▮ national who works for ▮▮▮ Company B and is associated with ▮▮▮▮ and ▮▮▮ Company A.

22. According to open source databases, ▮▮▮ Company A is a ▮▮▮▮▮ company, purported to be part of the ▮▮▮▮▮▮▮▮ industry and to be involved in import and export of goods.

8

23.     According to open source databases, ▮▮▮ Company B is a ▮▮▮ company, also purported to be part of the ▮▮▮▮▮▮ industry and to be involved in import and export of goods.

24.     ▮▮▮, ▮▮▮ Company A, ▮▮▮ Company B, ▮▮▮ Person A, and ▮▮▮ Person B are collectively referred to as the SUBJECTS.

## PROBABLE CAUSE

### Background

25.     As noted above, ▮▮▮ and ▮▮▮ were added to the Entity List on or about ▮▮▮

26.     According to e-mail communications I reviewed between ▮▮▮ and BIS officials, in or around November 2012, ▮▮▮ appealed BIS's decision to add her and her company ▮▮▮ to the Entity List.

27.     In or around April 2016, ▮▮▮ contacted BIS via a ▮▮▮ e-mail address to inquire about the status of her appeal and request reconsideration of the previous Entity List decision. In this communication, ▮▮▮ wrote that ▮▮▮ has been un-operational since ▮▮▮ and that the company had been dissolved. Additionally, ▮▮▮ stated, "As per all the paperwork submitted you can see that I have never done anything to jeopardise [sic] the security and integrity of United States of America . . . I would like to request that after 3 year [sic] my file is reviewed and my name is removed from the list." ▮▮▮ then informed BIS to use **TARGET ACCOUNT** for further correspondence.

28.     ▮▮▮ efforts ultimately were not successful, and she remains on the Entity List as of the date of this affidavit.

9

**████████ Suspected Scheme to Procure U.S. Goods**

29.     Based on my training and experience, and the investigation to date, I have identified numerous indicators that suggest ████████ has participated in the creation and operation of two companies, ████████ Company A and ████████ Company B. As detailed below, I believe ████████ Company A and ████████ Company B were formed, at least in part, to facilitate the illicit procurement of U.S.-origin items by ████████ and others in order to circumvent the licensing requirements on ████████ and ████████ imposed due to their listing on the Entity List, in violation of IEEPA, ECRA, and other applicable U.S. laws and regulations.

30.     According to a ████████ business registry website I reviewed in April 2020, ████████ Company B was formally incorporated in December 2012 and ████████ Company A was incorporated in March 2013, just months after ████████ and ████████ were added to the Entity List in ████████ The president of both companies was listed as ████████ Person A, who I believe is ████████ according to multiple investigative sources. Both ████████ Company B and ████████ Company A have a listed address in ████████ ████████ respectively.

31.     Based on the open source domain information for ████████ Company B's website, ████████ was the ████████ of contact for the domain, with **TARGET ACCOUNT** listed as the contact e-mail address. Moreover, ████████ Company B's website was registered on or about October 30, 2012, approximately ████ weeks after ████████ and ████████ were added to the Entity List.

32.     According to a publicly viewable website that collects global trade data and company profile information, as of April 26, 2020, ████████ Company B had a previous address of ████

10

█████████████████████████ The Entity List lists this same address as belonging to █████████ and █████████████

33.     On or about June 6, 2017, BIS Special Agents conducted an end-use check on █████████ Company A and met with ████████ Person A as part of BIS' regulatory mission.[1] According to the BIS Special Agents who completed this check, █████████ Company A is a ███████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. During this end-use check, ████████ Person A informed the BIS Special Agents that all of ███████ Company A's sales are to customers in █████████. In other words, █████████ Company A reexports all of the goods it receives from █████████████ to ██████.

34.     According to a █████████████████████████████████ as of April 27, 2020, █████████ Person B has been the ████████████████ of ███████ Company B from January 2014 to the present, and was an ████████████████████████████ from 2011 to 2013. █████████ Person B's duties in both positions have included ██████████████████████████ ████████████████.

35.     U.S. government export records show that █████████ Company A has received at least ██████ shipments of ███████████████████████ since May 2015, with at least ████ of those

---

[1] As explained on the official BIS website: "Many end-use checks are conducted through BIS' Sentinel Program. Trained OEE Special Agents are deployed from the United States to countries to visit the end-users of sensitive controlled commodities and determine whether these items are being used in accordance with license conditions. Sentinel teams assess the suitability of foreign end-users to receive U.S.-origin licensed goods and technology, assess prospective end-users on pending license applications for diversion risk, and conduct educational outreach to foreign trade groups. In this way, Sentinel trips help to create the confidence needed to foster trade while strengthening U.S. national security."

shipments since May 2019, for a total value of at least █████.[2] Additionally, █ of these shipments listed █████ Company A as an ███████████████████████ in █████.

Based on my review of these records, the types of commodities listed (e.g., ████████████

generally have fallen into the same category of items that were previously procured by ████████

and █████████ before they were added to the Entity List.

36.     U.S. government export records did not show any exports of U.S. goods to █████

Company B. However, █████ Person B—an employee of █████ Company B according to ████

█████████████████—was listed as a point of contact on a number of U.S. exports to ████

█████ Company A in 2014. Consequently, based on this listing and other information described

above, I believe █████ Company B and █████ Company A are affiliated and that the

SUBJECTS have a business relationship.

37.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

────────────────────

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

38.     The 2703(d) order results for **TARGET ACCOUNT** show that ████ had approximately ███ e-mail exchanges with e-mail account ██████████████ believed to be used by ██████ (██████ **ACCOUNT 2**), from March 26, 2013, to October 29, 2019. Additionally, many of the e-mail exchanges between **TARGET ACCOUNT** and ██████ **ACCOUNT 2** appear to coincide with the approximate dates of known exports by ███ companies to ██████ Company A, some of which are detailed below.

   a.  On or about October 22, 2013, an identified U.S. company exported electrical components to ████ Company A. Between on or about October 21 and October 22, 2013, **TARGET ACCOUNT** sent ██████ **ACCOUNT 2** three e-mails.

   b.  On or about March 18, 2014, an identified U.S. company exported electrical components to ████ Company A. On or about March 17, 2014, **TARGET ACCOUNT** sent ██████ **ACCOUNT 2** two e-mails.

   c.  On or about July 7 and July 24, 2014, an identified U.S. company exported electrical components to ████ Company A. Between on or about July 7 and July 30, 2014, **TARGET ACCOUNT** and ██████ **ACCOUNT 2** had seven e-mail exchanges.

   d.  On or about July 16, 2015, an identified U.S. company exported electrical components to ████ Company A. Between on or about July 16 and July 17, 2015, **TARGET ACCOUNT** sent ██████ **ACCOUNT 2** 16 e-mails.

   e.  On or about March 15, 2016, an identified U.S. company exported electrical components to ████ Company A. On or about March 15, 2016, **TARGET ACCOUNT** sent ██████ **ACCOUNT 2** one e-mail.

13

f.  On or about July 25, 2016, an identified U.S. company exported electrical components to ███████ Company A. On or about July 25, 2016, **TARGET ACCOUNT** sent ███████ **ACCOUNT 2** three e-mails.

g.  On or about February 10, 2017, an identified U.S. company exported electrical components to ███████ Company A. On or about February 10, 2017, **TARGET ACCOUNT** sent ███████ **ACCOUNT 2** two e-mails.

h.  On or about August 22, 2017, an identified U.S. company exported electrical components to ███████ Company A. On or about August 22, 2017, **TARGET ACCOUNT** sent ███████ **ACCOUNT 2** four e-mails.

i.  On or about May 18 and May 22, 2018, an identified U.S. company exported electrical components to ███████ Company A. On or about May 18 and May 22, 2018, **TARGET ACCOUNT** sent ███████ **ACCOUNT 2** one e-mail.

j.  On or about November 21, 2018, an identified U.S. company exported electrical components to ███████ Company A. On or about November 21, 2018, **TARGET ACCOUNT** sent ███████ **ACCOUNT 2** an e-mail.

k.  On or about March 4, 2019, an identified U.S. company exported electrical components to ███████ Company A. On or about March 4, 2019, **TARGET ACCOUNT** sent ███████ **ACCOUNT 2** two e-mails.

l.  On or about April 19, 2019, an identified U.S. company exported electrical components to ███████ Company A. On or about April 19, 2019, **TARGET ACCOUNT** sent ███████ **ACCOUNT 2** four e-mails.

m.  On or about September 12, 2019, an identified U.S. company exported electrical components to ███████ Company A. Between on or about September 11 and

14

September 13, 2019, **TARGET ACCOUNT** and ███████ **ACCOUNT 2** had three exchanges of e-mail communication.

39.     As of May 1, 2020, the BIS export licensing database showed no current or historical licenses approved for ███████ to receive exports or complete re-exports or transfers of U.S.-origin items. Similarly, this database did not reflect any current or historical authorization on the part of either ███████ Company B or ███████ Company A to receive U.S.-origin items on behalf of ███████.

### Potential Misrepresentations by ███████ to BIS

40.     On September 19, 2019, I contacted ███████ at **TARGET ACCOUNT** using my official BIS e-mail account that contained a signature block showing my law enforcement status. During this communication, I asked ███████ numerous questions, including if she had directly or indirectly (including family members) been involved in the incorporation or operation of any company used to receive U.S.-origin items since October 2012. ███████, using **TARGET ACCOUNT**, responded, "the answer to all questions is no.. ███████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

41.     After this exchange, ███████ sent me via **TARGET ACCOUNT** a photocopy of an identification card bearing her name, photo, date of birth, and other information. During my initial e-mail to ███████, I had requested she send me a photocopy of an official identification document in order for BIS to verify her identity.

42.     On or about September 23, 2019, I received an e-mail from ███████, using **TARGET ACCOUNT**, which read, "Dear [affiant]…i was thinking more about the questions i

15

guess iphone and its accessories can be considered US technology as well as DELL PC and laptop, but i purchased them for my personal use in ▮▮▮▮ from the stores and telephone providers…Best regards [▮▮▮▮▮]". Later that day, I replied to ▮▮▮▮▮ that having commercial electronics for personal use was not the intent of my original questions.

43.     I submit there is probable cause that ▮▮▮▮▮ has knowledge of the EAR and the licensing requirements enacted when a person and/or company is added to the Entity List. I believe ▮▮▮▮▮ may be concealing her affiliation with ▮▮▮▮ Company B and ▮▮▮▮ Company A in order to obscure her involvement in the procurement of ▮▮▮▮▮▮▮▮ most or all of which are subsequently re-exported from ▮▮▮ to end-users in ▮▮▮▮▮▮ As mentioned above, because of the increased risk to U.S. national security and foreign policy interests, foreign persons found on the Entity List are generally prohibited from receiving U.S. goods absent explicit BIS authorization.

## BACKGROUND CONCERNING E-MAIL

44.     Microsoft is the provider of the internet-based account(s) identified by **TARGET ACCOUNT**.

45.     The PROVIDER provides their subscribers internet-based accounts that allow them to send, receive, and store e-mails online. The PROVIDER's accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for the PROVIDER's other services, such as instant messages and remote photo or file storage.

46.     Based on my training and experience, I know that the PROVIDER allows subscribers to obtain accounts by registering on the PROVIDER's website. During the registration process, the PROVIDER asks subscribers to create a username and password, and to provide basic personal

16

information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. The PROVIDER typically does not verify subscriber names. However, the PROVIDER does verify the e-mail address or phone number provided.

47.     Once a subscriber has registered an account, the PROVIDER provide e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. The PROVIDER's subscribers can also use that same username or account in connection with other services provided by the PROVIDER.[3]

48.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to the PROVIDER's account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on the PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on the PROVIDER's servers for a certain period of time.

---

[3] Here, PROVIDER's other services include electronic communication and remote computing services such as Skype (voice calls, video calls, and SMS text messaging), Outlook Calendar (calendar and task), Office Online (cloud computing services for word processing, data processing, and presentations); OneDrive (online file storage); web browsing and search tools such as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers); Bing Maps (maps with driving directions and local business search) and other location services; online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications). Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

17

49.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on the PROVIDER's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on the PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on the PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on the PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

50.     Based on my training and experience, I know that providers such as the PROVIDER also collect and maintain information about their subscribers, including information about their use of the PROVIDER's services. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as the PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the

Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as the PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER's services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

51.     Based on my training and experience, I know that providers such as the PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by the PROVIDER in order to track what devices are using the PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

52.     Based on my training and experience, I know that providers such as the PROVIDER use cookies and similar technologies to track users visiting the PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will

19

recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to the PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as the PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

53.     Based on my training and experience, I know that the PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

54.     Based on my training and experience, I know that subscribers can communicate directly with the PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as the PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

55.     In summary, based on my training and experience in this context, I believe that the computers of the PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and un-retrieved e-mail for the PROVIDER's subscribers), as well as PROVIDER-generated information about its subscribers and their use of the PROVIDER's services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide the PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

56.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the PROVIDER can show how and when the account was accessed or used. For example, providers such as the PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under

investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). [4]

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

57.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney ████████████ an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

58.    Based on the forgoing, I request the Court issue the proposed search warrant for ████████████████████ Because the warrant will be served on Microsoft, who will then

---

[4] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

59.     I further request that the Court order that all papers in support of this Application, including the Affidavit and Search Warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation and the safety of the confidential sources.

## REQUEST FOR NON-DISCLOSURE

60.     I further request that pursuant to the preclusion of notice provisions of 18 U.S.C. § 2705(b), Microsoft be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this warrant for a period of one year. Such an order is justified because notification of the existence of this warrant would seriously jeopardize the ongoing investigation. Such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee or continue his flight from prosecution.

61.     WHEREFORE, it is respectfully requested that the Court grant the attached Order directing Microsoft not to disclose the existence of the Warrant or the application except to the extent necessary to carry out the Order.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 13, 2020

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. 20-sc-1140 |
| *or identify the person by name and address)* | ) | |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED | ) | |
| AT PREMISES CONTROLLED BY MICROSOFT | ) | |
| CORPORATION PURSUANT TO 18 U.S.C. 2703 FOR | ) | |
| INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705 | Violation of the International Emergency Economic Powers Act |
| 50 U.S.C. § 4819 | Violation of the Export Control Reform Act of 2018 |
| 18 U.S.C. §§ 2 and 371 | Aiding and Abetting and Conspiracy |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 05/13/2020 _____

City and state: _____ Washington, D.C. _____

2020.05.13 16:12:28 -04'00'

*Judge's signature*

G. Michael Harvey, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
INFORMATION ASSOCIATED WITH ONE ACCOUNT ) Case No.   20-sc-1140
STORED AT PREMISES CONTROLLED BY MICROSOFT )
CORPORATION PURSUANT TO 18 U.S.C. 2703 FOR )
INVESTIGATION OF VIOLATIONS OF 50 U.S.C. § 1705 )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Western_____ District of _____Washington_____
*(identify the person or describe the property to be searched and give its location)*:
See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

**YOU ARE COMMANDED** to execute this warrant on or before _____May 27, 2020_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____U.S. Magistrate Judge G. Michael Harvey_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    05/13/2020                                    2020.05.13 16:12:50
                                                                        -04'00'
                                                              *Judge's signature*

City and state:   Washington, D.C.                          G. Michael Harvey U.S. Magistrate Judge
                                                                  *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| | **Return** | |
|---|---|---|
| Case No.:<br><br>   20-sc-1140 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
**Property to Be Searched**

This warrant applies to information which is associated with the Hotmail account(s) identified by ████████████ and which is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company that accepts service of legal process at One Microsoft Way, Redmond, Washington.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.      Information to be disclosed by Microsoft Corporation ("PROVIDER") to facilitate execution of the warrant**

To the extent the information described in Attachment A is within the possession, custody, or control of the Provider, including any e-mails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier ("Account") listed in Attachment A:

a.      For the time period from October 1, 2012, to the present: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[5]

---

[5] Here, PROVIDER's other services include: electronic communication and remote computing services such as Skype (voice calls, video calls, and SMS text messaging), Outlook Calendar (calendar and task), Office Online (cloud computing services for word processing, data processing, and presentations); OneDrive (online file storage); web browsing and search tools such

b.     For the time period from October 1, 2012, to the present: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.     For the time period from October 1, 2012, to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.     For the time period from October 1, 2012, to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length,

---

as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers); Bing Maps (maps with driving directions and local business search) and other location services; online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications). Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

g.     Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.     All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.     For the time period from October 1, 2012 to the present: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following: █████

4

## II.     Information to be seized by the government

All information described above in Section I that constitutes **evidence, fruits, or instrumentalities** of violations of 50 U.S.C. § 1705 (IEEPA), 18 U.S.C. § 1956 (money laundering), and 50 U.S.C. § 4819 (ECRA), as well as conspiracy to defraud the United States (18 U.S.C. § 371) and aiding and abetting violations of these provisions (18 U.S.C. § 2), for each account or identifier listed on Attachment A, including but not limited to information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the accounts;

(b) Information involving the procurement or attempted procurement of U.S.-origin goods for use in ████ or by any end-user or entity outside the United States;

(c) Knowledge of United States export control laws;

(d) Conversations between the account holder(s) and individuals as it relates to the export of U.S.-origin products;

(e)  Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the e-mail account owner;

(f) Evidence indicating the account owner's state of mind as it relates to the criminal activity under investigation;

(g) The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

(h) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

6

(i) The identity of the person(s) who communicated with the account holder about matters relating to the provision, attempted provision, procurement, or attempted procurement of U.S. origin goods, including records that help reveal their whereabouts.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## BUSINESS RECORDS PURSUANT TO FEDERAL RULE
## OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Microsoft C ("Microsoft "), and my official title is _____. I am a custodian of records for Microsoft . I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Microsoft , and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b. such records were kept in the ordinary course of a regularly conducted business activity of Microsoft ; and

c. such records were made by Microsoft as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____     _____

Date                                Signature

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
ONE ACCOUNT STORED AT
PREMISES CONTROLLED BY
MICROSOFT CORPORATION
PURSUANT TO 18 U.S.C. 2703 FOR
INVESTIGATION OF VIOLATIONS OF
50 U.S.C. § 1705**

**SC No. 20-1140**

**Filed Under Seal**

*Reference:*     *USAO Ref. #* ███████ *Subject Account(s):* ████████████████

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, ███████████ being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with one account—that is, ████████████████ (**TARGET ACCOUNT**)—that is stored at the premises controlled by Microsoft Corporation ("PROVIDER"), an electronic communications services provider and/or remote computing services provider that is headquartered at One Microsoft Way, Redmond, Washington. The property to be searched is described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Microsoft to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



2



5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 50 U.S.C. § 1705 (the International Emergency Economic Powers Act), 18 U.S.C. § 1956 (money laundering), and 50 U.S.C. § 4819 (the Export Control Reform Act of 2018), as well as conspiracies to violate these provisions (18 U.S.C. § 371) and aiding and abetting violations of these provisions (18 U.S.C. § 2) have been committed by ███████████ (the user of **TARGET ACCOUNT**) and others. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## **JURISDICTION**

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or

3

omissions in furtherance of the offenses under investigation occurred within Washington, DC, *see* 18 U.S.C. § 3237, and the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238. Also, certain of the statutes setting forth the federal offenses under investigation, namely 18 U.S.C. § 1956 (money laundering), apply extraterritorially. The offenses under investigation are also the subject of an investigation in the District of Columbia.

## APPLICABLE CRIMINAL LAW

8.      **The Export Administration Act and the Export Administration Regulations, the International Emergency Economic Powers Act, 50 U.S.C. § 1705 ("IEEPA"), and the Export Control Reform Act of 2018.** The EAA regulates the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the DOC promulgated the EAR, 15 C.F.R. §§ 730-774, which contain additional restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. *See* 15 C.F.R. § 730.02. Although the EAA lapsed on August 17, 2001, pursuant to the authority provided to the President under IEEPA, the President issued Executive Order 13222. In that order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the EAA. Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have repeatedly signed renewals of the national emergency with respect to the EAA's expiration, the most recent being that of August 8, 2018. 83 Fed. Reg. 39871 (Aug. 8, 2018).

9.      Under IEEPA, it is a crime to willfully violate any regulation promulgated thereunder, including the EAR. *See* 50 U.S.C. § 1705. In particular, Title 50, United States Code, Section 1705 provides:

> (a)      Unlawful acts. It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under [the International Emergency Economic Powers Act].
>
> (b)      . . .
>
> (c)      Criminal penalty. A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in subsection (a) shall, upon conviction, be fined . . ., or if a natural person, may be imprisoned for not more than 20 years, or both.

10.      On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provision on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801-4852. In part, ECRA provides permanent statutory authority for the EAR. For conduct that predates August 13, 2018, IEEPA is the controlling statute. For conduct occurring after August 13, 2018, ECRA is the controlling statute.

11.      **ECRA** provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled…." 50 U.S.C. § 4811(2). To that end, ECRA grants the President the authority "(1) to control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever

5

located, relating to" specific categories of items and information. *Id*. at § 4812(b). ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

12.    Pursuant to that and prior authority, the DOC reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR, 15 C.F.R. §§ 730-774. In particular, the EAR restricts the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

13.    Items "subject to the EAR" include all items in the United States and all U.S.-origin items wherever located, irrespective of whether a license was required for the export of that items (with certain exceptions not relevant here). Activities of U.S. or foreign persons prohibited by any order issued under the EAR were also are "subject to the EAR."

14.    The most sensitive items subject to EAR controls are identified on the CCL, published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by Export Control Classification Numbers ("ECCN"), each of which has export control requirements depending on destination, end use, and end user. "EAR99" is a classification for items subject to the EAR, but not subject to certain expanded export controls associated with items with an ECCN.

15.    In addition, the EAR contains a list of names of certain foreign persons—including businesses, research institutions, government and private organizations, individuals, and other types of legal persons—that are subject to specific license requirements for the export, reexport, and/or in-country transfer of specified items. These persons comprise the DOC's "Entity List," at Title 15, Code of Federal Regulations, Part 744, Supplement No. 4. Grounds for inclusion on the

6

Entity List include activities sanctioned by the U.S. State Department and activities contrary to U.S. national security or foreign policy interests. The persons on the Entity List are subject to export licensing requirements and policies beyond those found elsewhere in the EAR. The BIS license requirement applies to any transaction in which items are to be exported, reexported, or transferred to such persons or in which such persons act as a purchaser, intermediate consignee, ultimate consignee, or end-user.

16.     Pursuant to 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this part or of any regulation, order, license, or other authorization issued under this part," and pursuant to §4819(b),"[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall" be guilty of a crime.

17.     **International Money Laundering**. 18 U.S.C. §§ 1956(a)(2) and (c)(7)(B)(v)(II) provide, in pertinent part:

> (a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> (A) with the intent to promote the carrying on of specified unlawful activity . . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.
>
> (c) As used in this section—
>
>  (7) the term "specified unlawful activity" means--
> . . .
>  (B) with respect to a financial transaction occurring in whole or in

7

part in the United States, an offense against a foreign nation involving--

. . .

(v) smuggling or export control violations involving—

(II) an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730-774).

## **RELEVANT PERSONS AND ENTITIES**

18. ▮▮▮▮▮▮▮▮▮▮▮▮, the user of **TARGET ACCOUNT**, is believed to be a ▮▮▮▮ national who lives in ▮▮▮▮▮▮ According to BIS and the Federal Register, ▮▮▮▮▮ and her former company, ▮▮▮▮▮▮ were added to the Entity List on or about ▮▮▮▮▮▮ for their involvement in the procurement and delivery of ▮▮▮▮▮▮ to entities and persons in ▮▮▮ in violation of the EAR and the International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130.

19. Based on multiple investigative sources, ▮▮▮▮ is believed to be married to ▮▮▮▮ Person A.

20. ▮▮▮▮▮▮▮▮▮▮▮▮ Person A is believed to be a ▮▮▮▮ national who resides in ▮▮▮▮▮▮ and is the president of ▮▮▮▮ Company A and ▮▮▮▮ Company B.

21. Based on open source records, ▮▮▮▮ Person B is believed to be a ▮▮▮▮ national who works for ▮▮▮▮ Company B and is associated with ▮▮▮▮ and ▮▮▮▮ Company A.

22. According to open source databases, ▮▮▮▮ Company A is a ▮▮▮▮ company, purported to be part of the ▮▮▮▮▮▮ industry and to be involved in import and export of goods.

8

23.    According to open source databases, ███████ Company B is a ███████ company, also purported to be part of the ███████████████████ industry and to be involved in import and export of goods.

24.    ███████, ███████ Company A, ███████ Company B, ███████ Person A, and ███████ Person B are collectively referred to as the SUBJECTS.

## PROBABLE CAUSE

### Background

25.    As noted above, ███████ and ███████ were added to the Entity List on or about ███████

26.    According to e-mail communications I reviewed between ███████ and BIS officials, in or around November 2012, ███████ appealed BIS's decision to add her and her company ███████ to the Entity List.

27.    In or around April 2016, ███████ contacted BIS via a ███████ e-mail address to inquire about the status of her appeal and request reconsideration of the previous Entity List decision. In this communication, ███████ wrote that ███████ has been un-operational since ███████ and that the company had been dissolved. Additionally, ███████ stated, "As per all the paperwork submitted you can see that I have never done anything to jeopardise [sic] the security and integrity of United States of America . . . I would like to request that after 3 year [sic] my file is reviewed and my name is removed from the list." ███████ then informed BIS to use **TARGET ACCOUNT** for further correspondence.

28.    ███████ efforts ultimately were not successful, and she remains on the Entity List as of the date of this affidavit.

██████████ **Suspected Scheme to Procure U.S. Goods**

29.     Based on my training and experience, and the investigation to date, I have identified numerous indicators that suggest ██████ has participated in the creation and operation of two companies, ██████ Company A and ██████ Company B. As detailed below, I believe ██████ Company A and ██████ Company B were formed, at least in part, to facilitate the illicit procurement of U.S.-origin items by ██████ and others in order to circumvent the licensing requirements on ██████ and ██████ imposed due to their listing on the Entity List, in violation of IEEPA, ECRA, and other applicable U.S. laws and regulations.

30.     According to a ██████ business registry website I reviewed in April 2020, ██████ Company B was formally incorporated in December 2012 and ██████ Company A was incorporated in March 2013, just months after ██████ and ██████ were added to the Entity List in ██████ The president of both companies was listed as ██████ Person A, who I believe is ██████ ██████ according to multiple investigative sources. Both ██████ Company B and ██████ Company A have a listed address in ████████████████ ██████████████████ respectively.

31.     Based on the open source domain information for ██████ Company B's website, ██████ was the ████████████████████████ for the domain, with **TARGET ACCOUNT** listed as the contact e-mail address. Moreover, ██████ Company B's website was registered on or about October 30, 2012, approximately ██ weeks after ██████ and ██████ were added to the Entity List.

32.     According to a publicly viewable website that collects global trade data and company profile information, as of April 26, 2020, ██████ Company B had a previous address of ██████

███████████████████████████ The Entity List lists this same address as belonging to ███████ and ███████

33.     On or about June 6, 2017, BIS Special Agents conducted an end-use check on ███████ Company A and met with ███████ Person A as part of BIS' regulatory mission.[1] According to the BIS Special Agents who completed this check, ███████ Company A is a ███████ ████████████████████████████████████████████████████ ████████████████████████████████████ During this end-use check, ███████ Person A informed the BIS Special Agents that all of ███████ Company A's sales are to customers in ███████. In other words, ███████ Company A reexports all of the goods it receives from ███████ to ███████.

34.     According to a ██████████████████████ as of April 27, 2020, ███████ Person B has been the ██████████ of ███████ Company B from January 2014 to the present, and was an ██████████████████ from 2011 to 2013. ███████ Person B's duties in both positions have included ████████████████████ ████████████

35.     U.S. government export records show that ███████ Company A has received at least ███ shipments of ██████████████████ since May 2015, with at least ███ of those

---

[1] As explained on the official BIS website: "Many end-use checks are conducted through ████████████████████████ are deployed from the United States to countries to visit the end-users of sensitive controlled commodities and determine whether these items are being used in accordance with license conditions. ███████ assess the suitability of foreign end-users to receive U.S.-origin licensed goods and technology, assess prospective end-users on pending license applications for diversion risk, and conduct educational outreach to foreign trade groups. In this way, ███████ trips help to create the confidence needed to foster trade while strengthening U.S. national security."

shipments since May 2019, for a total value of at least ██████.[2] Additionally, ██ of these shipments listed ██████ Company A as an ████████████████████████████████ in ██████.

Based on my review of these records, the types of commodities listed (e.g., ████████████ generally have fallen into the same category of items that were previously procured by ████████ and ████████████ before they were added to the Entity List.

36.     U.S. government export records did not show any exports of U.S. goods to ████████ Company B. However, ██████ Person B—an employee of ██████ Company B according to ████ ████████████████████—was listed as a point of contact on a number of U.S. exports to ██████ Company A in 2014. Consequently, based on this listing and other information described above, I believe ██████ Company B and ██████ Company A are affiliated and that the SUBJECTS have a business relationship.

37.     ████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

───────────────────

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

38.    The 2703(d) order results for **TARGET ACCOUNT** show that ███████ had approximately ████ e-mail exchanges with e-mail account ██████████████████████ believed to be used by ████████ (████████ **ACCOUNT 2**), from March 26, 2013, to October 29, 2019. Additionally, many of the e-mail exchanges between **TARGET ACCOUNT** and ████████ **ACCOUNT 2** appear to coincide with the approximate dates of known exports by ██████ companies to ████████ Company A, some of which are detailed below.

a.   On or about October 22, 2013, an identified U.S. company exported ██████ ████████ to ████ Company A. Between on or about October 21 and October 22, 2013, **TARGET ACCOUNT** sent ████████ **ACCOUNT 2** three e-mails.

b.   On or about March 18, 2014, an identified U.S. company exported ██████ ████████ to ████ Company A. On or about March 17, 2014, **TARGET ACCOUNT** sent ████████ **ACCOUNT 2** two e-mails.

c.   On or about July 7 and July 24, 2014, an identified U.S. company exported ██████████ to ██████ Company A. Between on or about July 7 and July 30, 2014, **TARGET ACCOUNT** and ████████ **ACCOUNT 2** had seven e-mail exchanges.

d.   On or about July 16, 2015, an identified U.S. company exported ██████ ████████ to ████ Company A. Between on or about July 16 and July 17, 2015, **TARGET ACCOUNT** sent ████████ **ACCOUNT 2** 16 e-mails.

e.   On or about March 15, 2016, an identified U.S. company exported ██████ ████████ to ████ Company A. On or about March 15, 2016, **TARGET ACCOUNT** sent ████████ **ACCOUNT 2** one e-mail.

f.  On or about July 25, 2016, an identified U.S. company exported  to ▮▮▮ Company A. On or about July 25, 2016, **TARGET ACCOUNT** sent ▮▮▮ **ACCOUNT 2** three e-mails.

g.  On or about February 10, 2017, an identified U.S. company exported ▮▮▮ to ▮▮▮ Company A. On or about February 10, 2017, **TARGET ACCOUNT** sent ▮▮▮ **ACCOUNT 2** two e-mails.

h.  On or about August 22, 2017, an identified U.S. company exported ▮▮▮ to ▮▮▮ Company A. On or about August 22, 2017, **TARGET ACCOUNT** sent ▮▮▮ **ACCOUNT 2** four e-mails.

i.  On or about May 18 and May 22, 2018, an identified U.S. company exported ▮▮▮ to ▮▮▮ Company A. On or about May 18 and May 22, 2018, **TARGET ACCOUNT** sent ▮▮▮ **ACCOUNT 2** one e-mail.

j.  On or about November 21, 2018, an identified U.S. company exported ▮▮▮ to ▮▮▮ Company A. On or about November 21, 2018, **TARGET ACCOUNT** sent ▮▮▮ **ACCOUNT 2** an e-mail.

k.  On or about March 4, 2019, an identified U.S. company exported ▮▮▮ to ▮▮▮ Company A. On or about March 4, 2019, **TARGET ACCOUNT** sent ▮▮▮ **ACCOUNT 2** two e-mails.

l.  On or about April 19, 2019, an identified U.S. company exported ▮▮▮ to ▮▮▮ Company A. On or about April 19, 2019, **TARGET ACCOUNT** sent ▮▮▮ **ACCOUNT 2** four e-mails.

m.  On or about September 12, 2019, an identified U.S. company exported ▮▮▮ to ▮▮▮ Company A. Between on or about September 11 and

14

September 13, 2019, **TARGET ACCOUNT** and ███████ **ACCOUNT 2** had three exchanges of e-mail communication.

39.     As of May 1, 2020, ████████████████ showed no current or historical licenses approved for ██████ to receive exports or complete re-exports or transfers of U.S.-origin items. Similarly, this database did not reflect any current or historical authorization on the part of either ████ Company B or ████ Company A to receive U.S.-origin items on behalf of ██████.

**Potential Misrepresentations by ██████ to BIS**

40.     On September 19, 2019, I contacted ██████ at **TARGET ACCOUNT** using my official BIS e-mail account that contained a signature block showing my law enforcement status. During this communication, I asked ██████ numerous questions, including if she had directly or indirectly (including family members) been involved in the incorporation or operation of any company used to receive U.S.-origin items since October 2012. ██████, using **TARGET ACCOUNT**, responded, "the answer to all questions is no.. ████████████████████

██████████████████████████████████████

41.     After this exchange, ██████ sent me via **TARGET ACCOUNT** a photocopy of an identification card bearing her name, photo, date of birth, and other information. During my initial e-mail to ██████, I had requested she send me a photocopy of an official identification document in order for BIS to verify her identity.

42.     On or about September 23, 2019, I received an e-mail from ██████, using **TARGET ACCOUNT**, which read, "Dear [affiant]…i was thinking more about the questions i

15

guess iphone and its accessories can be considered US technology as well as DELL PC and laptop, but i purchased them for my personal use in ████ from the stores and telephone providers…Best regards [████]". Later that day, I replied to ████ that having commercial electronics for personal use was not the intent of my original questions.

43.     I submit there is probable cause that ████ has knowledge of the EAR and the licensing requirements enacted when a person and/or company is added to the Entity List. I believe ████ may be concealing her affiliation with ████ Company B and ████ Company A in order to obscure her involvement in the procurement of ████████ most or all of which are subsequently re-exported from ████ to end-users in ████████ As mentioned above, because of the increased risk to U.S. national security and foreign policy interests, foreign persons found on the Entity List are generally prohibited from receiving U.S. goods absent explicit BIS authorization.

## BACKGROUND CONCERNING E-MAIL

44.     Microsoft is the provider of the internet-based account(s) identified by **TARGET ACCOUNT**.

45.     The PROVIDER provides their subscribers internet-based accounts that allow them to send, receive, and store e-mails online. The PROVIDER's accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for the PROVIDER's other services, such as instant messages and remote photo or file storage.

46.     Based on my training and experience, I know that the PROVIDER allows subscribers to obtain accounts by registering on the PROVIDER's website. During the registration process, the PROVIDER asks subscribers to create a username and password, and to provide basic personal

16

information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. The PROVIDER typically does not verify subscriber names. However, the PROVIDER does verify the e-mail address or phone number provided.

47.  Once a subscriber has registered an account, the PROVIDER provide e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. The PROVIDER's subscribers can also use that same username or account in connection with other services provided by the PROVIDER.[3]

48.  In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to the PROVIDER's account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on the PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on the PROVIDER's servers for a certain period of time.

---

[3] Here, PROVIDER's other services include electronic communication and remote computing services such as Skype (voice calls, video calls, and SMS text messaging), Outlook Calendar (calendar and task), Office Online (cloud computing services for word processing, data processing, and presentations); OneDrive (online file storage); web browsing and search tools such as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers); Bing Maps (maps with driving directions and local business search) and other location services; online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications). Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

49.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on the PROVIDER's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on the PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on the PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on the PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

50.     Based on my training and experience, I know that providers such as the PROVIDER also collect and maintain information about their subscribers, including information about their use of the PROVIDER's services. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as the PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the

Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as the PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER's services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

51.     Based on my training and experience, I know that providers such as the PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by the PROVIDER in order to track what devices are using the PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

52.     Based on my training and experience, I know that providers such as the PROVIDER use cookies and similar technologies to track users visiting the PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will

recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to the PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as the PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

53.     Based on my training and experience, I know that the PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

54.     Based on my training and experience, I know that subscribers can communicate directly with the PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as the PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

55.     In summary, based on my training and experience in this context, I believe that the computers of the PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and un-retrieved e-mail for the PROVIDER's subscribers), as well as PROVIDER-generated information about its subscribers and their use of the PROVIDER's services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide the PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

56.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the PROVIDER can show how and when the account was accessed or used. For example, providers such as the PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under

21

investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). [4]

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

57.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney ███████████ an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

58.     Based on the forgoing, I request the Court issue the proposed search warrant for ███████████████ Because the warrant will be served on Microsoft, who will then

---

[4] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

59.     I further request that the Court order that all papers in support of this Application, including the Affidavit and Search Warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation and the safety of the confidential sources.

## REQUEST FOR NON-DISCLOSURE

60.     I further request that pursuant to the preclusion of notice provisions of 18 U.S.C. § 2705(b), Microsoft be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this warrant for a period of one year. Such an order is justified because notification of the existence of this warrant would seriously jeopardize the ongoing investigation. Such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee or continue his flight from prosecution.

61.    WHEREFORE, it is respectfully requested that the Court grant the attached Order directing Microsoft not to disclose the existence of the Warrant or the application except to the extent necessary to carry out the Order.



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 13, 2020

2020.05.13 16:13:23
-04'00'

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE