# ATTACHMENT

# A

*Redacted Docket Materials*

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. 19-sc-1059 |
| INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC FOR INVESTIGATION OF VIOLATION OF 18 U.S.C.1956 (See Attachment A, incorporated herein by reference.)

located in the      **Northern**      District of      **California**     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a) | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of     days *(give exact ending date if more than 30 days:*     *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

         **telephone**      *(specify reliable electronic means)*.

Date:   05/15/2019

                          *Judge's signature*

City and state:   District of Columbia      G. Michael Harvey, U.S. Magistrate Judge

                                *Printed name and title*

Case 1:22-sc-10699-UNSEALED Document 162 Filed 12/05/22 Page 3 of 83

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH TWO ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY GOOGLE<br>LLC PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  19-sc-1059 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956
 See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
 See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____May 29, 2019_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     05/15/2019_____                _____
                                                                                                              *Judge's signature*

City and state:     District of Columbia_____       G. Michael Harvey, U.S. Magistrate Judge
                                                                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  19-sc-1059 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Google accounts identified by  and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.      **Information to be disclosed by Google LLC ("PROVIDER") to facilitate execution
of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.      For the time period from March 1, 2013 to present:  The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services (E.G., GOOGLE DRIVE), including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[4]

---

[4] Here, PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and

1

b.      For the time period from March 1, 2013 to present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period March 1, 2013 to present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period March 1, 2013 to present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and

---

reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

2

durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.  All device or user identifiers which have ever been linked to the Account, including but not limited to all cookies and similar technologies, unique application numbers, hardware models, operating system versions, device serial numbers, Global Unique Identifiers ("GUID"), mobile network information, telephone numbers, Media Access Control ("MAC") addresses, and International Mobile Equipment Identities ("IMEI");

g.  Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.  All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.     For the time period March 1, 2013 to present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

k.     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

l.     Within **14** days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq*. and 18 U.S.C. § 1956 as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the amount and location of any



5

of Korea ("North Korea"), any party located in North Korea, any party acting on behalf of, or in the interest of, an entity associated with North Korea, any U.S. of U.N. designated entity, any entity or person in or related to the People's Republic of China ("PRC") transacting or communicating with entities or persons in North Korea or entities or persons acting for the benefit of North Korea, and any front company for any of these above mentioned persons or entities;

(f) Evidence related to U.S. dollar transactions, banking, or financial information related to █████████████████████████████████████ ███████████████████████ the government, representatives, or beneficiaries of North Korea, any party located in North Korea, any party acting on behalf of, or in the interest of, an entity associated with North Korea, any U.S. of U.N. designated entity, any entity or person in or related to the PRC transacting or communicating with entities or persons in North Korea or entities or persons acting for the benefit of North Korea, and any front company for any of these above mentioned persons or entities;

(g) Evidence related to anti-money laundering controls, the Bank Secrecy Act, Know Your Customer policies, and/or lists, names, persons, companies, and/or entities sanctioned or related to the Department of Treasury Office of Foreign Asset Control ("OFAC");

(h) Evidence related to the business of ████████████████████████████ ████████████████████████████████████████ including its practices, makeup, organizational structure, profits, and customers;

(i) Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j)  the transportation or transmission of funds that have been derived from a criminal offense;

(k)  the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l)  Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

(m) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(n)  The identity of the person(s) who created or used the Target Account or any associated user ID, including records that help reveal the whereabouts of such person(s)

(o)  Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

(p)  The identity of the person(s) who communicated with the Target Accounts or any associated user ID about matters relating to the laundering of funds to / from North Korea, U.S. sanctions, and assisting North Korea regime, including records that help reveal their whereabouts.

III.     **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF
## EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                     Signature

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
TWO ACCOUNTS STORED AT
PREMISES CONTROLLED BY
GOOGLE LLC PURSUANT TO 18 U.S.C.
2703 FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. 1956

SC No. _____

**Filed Under Seal**

*Reference:*   *USAO Ref. #* ███████   *Subject Account(s):* ████████████ *and* ████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information which is associated with two accounts – that is, ████████████ ("**Target Account 1**") and ████████████ ("**Target Account 2**") – stored at premises controlled by Google LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at/which accepts service at 1600 Amphitheatre Parkway, Mountain View, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review

that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.





5.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and the executive orders and regulations promulgated thereunder; and the federal money laundering statute, 18 U.S.C. § 1956, have been committed by the users of the Target Accounts.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.    This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

7.    This investigation relates to violations of IEEPA and its implementing executive orders and regulations. IEEPA, enacted in 1977, granted the President of the United States

3

authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Under IEEPA, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

8.      50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

9.      Using the powers conferred by IEEPA, the President and Executive Branch departments have issued orders and regulations governing and prohibiting certain transactions with North Korea by U.S. persons or involving U.S. goods.

10.     By the authority vested in the President by IEEPA, on or about June 28, 2005, the President signed E.O. 13382, which blocks the property of persons engaged in proliferation activities and their support networks, and denies designated proliferators access to the U.S. financial and commercial systems. This blocking program initially applied to eight organizations in North Korea, Iran, and Syria. The U.S. Department of the Treasury ("the Treasury Department"), together with the U.S. Department of State, is authorized to designate additional proliferators of WMD and their supporters under the authorities provided by E.O. 13382. Pursuant to that authority, on or about April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." 31 C.F.R. § 544.101 et seq.

11.     By the authority vested in the President by IEEPA, on or about June 26, 2008, the President signed E.O. 13466 declaring a national emergency to deal with the threat to the national security and foreign policy of the United States constituted by the existence and risk of the proliferation of weapons-usable fissile material on the Korean Peninsula, and continued certain restrictions with respect to North Korea that previously had been imposed under the authority of

the Trading With the Enemy Act.  Since 2008, the President has issued subsequent E.O.s, including E.O.s 13551, 13570, 13687, and 13722, expanding the 2008 national emergency and taking additional steps with respect to that emergency, including blocking the property of certain persons (individuals and entities) and prohibiting certain types of transactions.

12.     OFAC administers these sanctions programs to accomplish U.S. foreign-policy and national-security goals. OFAC accomplishes this by designating companies and individuals through different sanctions programs. When OFAC designates persons (individuals and entities) under the Non-Proliferation Sanctions and North Korea Sanctions programs, the persons are added to a list of Specially Designated Nationals ("SDN"). Among other things, entities added to the SDN list are prohibited from engaging in the use of the U.S. financial system for processing international wire transfers denominated in U.S. dollars originating from offshore U.S. dollar accounts at foreign financial institutions which utilize correspondent-banking services at U.S. financial institutions.

13.     Pursuant to E.O. 13382 and 31 C.F.R. § 544.201, dealings by any United States person or within the United States with persons who have been placed on the SDN list, except as authorized or licensed by OFAC, are prohibited. 31 C.F.R. § 544.201(b). The effect of these regulations is that a U.S. person cannot provide any financial or others services to a person or entity on the SDN list, except as authorized or licensed by OFAC. *See* 31 C.F.R. § 544.405.

14.     In sum, by virtue of being included on an SDN list, a person or entity must first obtain a license or authorization from OFAC.  *See* 31 C.F.R. §§ 510.201(a) and (f), 510.404(a).  A transfer by a SDN of U.S. dollars without a license from OFAC constitutes a violation of IEEPA. *See e.g. United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Company, Ltd.*, No. 17-mj-217-BAH, 2017 WL 3233062, at *1, *5 (D.D.C. May 22, 2017)

(explaining that foreign entities that are acting on behalf of North Korean entities that are SDNs have committed violations of IEEPA and the money laundering statute by conducting U.S. dollar wires without first obtaining a license from OFAC); *United States v. All Funds on Deposit in United Bank of Switzerland*, No. 01 CIV. 2091, 2003 WL 56999, at *2 (S.D.N.Y. Jan. 7, 2003) (holding that E.O.s preclude U.S.-dollar transfers from the United States to Iran)

### Anti-Money Laundering Obligations

15. According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act, as well as sanctions programs administered by OFAC.

16. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern. In November 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf. The special measure also required U.S. financial institutions to take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent

6

banking in the United States.  FinCEN further required U.S. financial institutions to engage in enhanced due diligence to root out any transactions by North Korean financial institutions and entities acting on their behalf.  Failure to comply with the special measure entailed civil and criminal penalties for U.S. financial institutions.

17.     U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of the U.S. dollar.

18.     One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

19.     In my training and experience, I know that criminals are aware of the general prohibition of U.S. dollar transactions for the benefit of North Korean entities and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent North Korean parties from transacting in U.S. dollars. As a result, criminals employ front

companies, or brokers to act as cutouts, to engage in transactions on their behalf, in order to prevent banks from uncovering the North Korean entity that is a party to the transaction.

20.     Title 18, United States Code, Section 1956(h) criminalizes a conspiracy to violate § 1956.

21.     Title 18, United States Code, Section 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, *inter alia*, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

22.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA and the bank fraud statute.

## **PROBABLE CAUSE**

### **I.     Background**

23.     Because of United Nations ("U.N.") and U.S. sanctions that are in effect against North Korea, North Korea and its business entities can only access the U.S. financial system by using front companies to conceal their direct involvement in the transactions and to evade the aforementioned sanctions. I know from my training and experience, as well as from a variety of open source material, that North Korea needs to access the U.S. financial system because, in order to obtain the goods that it needs, it must conduct trade in dollars. According to the United Nations Security Council's February 23, 2015 Report of the Panel of Experts, most of the transactions seen

by the Panel were made in United States dollars from foreign-based banks and transferred through corresponding bank accounts in the United States

24.     On or about November 2, 2017, FinCEN issued an advisory to further alert financial institutions to North Korean schemes being used to evade U.S. and U.N. sanctions, launder funds, and finance the North Korean regime's weapons of mass destruction and ballistic missile programs.  The advisory was intended to provide financial red flags of illicit North Korean schemes, including the use of financial representatives world-wide.  It also highlighted the use of China-based front or shell companies, trading companies, and financial institutions operating in areas bordering North Korea. These indicators were intended to assist financial institutions in identifying and reporting suspected illicit activity by the North Korean government and its financial institutions.



transactions.

26.     I am aware from reliable source reporting that North Korea's government depends on foreign trade, banking, and access to the dollar-based financial system to pay their military and security forces, and that recent U.N. reports confirm that Pyongyang continues to rely on the dollar, and its access to the dollar system, to move money around the world.

## II.    <u>Previous Search Warrants for Email Accounts Controlled by ███ officials</u>

A.    <u>Previous Application for ███ email accounts</u>

27.    On March 16, 2017, this Court authorized a search of two ███ email accounts. *See* ███████████████ These two initial search warrants identified numerous additional ███ email accounts that are involved with correspondence regarding illicit ███ financial transactions. To date, search warrants have been issued for the content of seventeen ███ email accounts

28.    The search warrant returns revealed ███ extensive network.  For example, search warrant returns for ██████████ revealed the account was registered from IP address █████, which resolves to ████████████████ As outlined in subsequent search warrant applications (*See* 1:17-mj-███ (GMH)(Sealed) and 1:17-mj-███ (RMM)(Sealed)), the contents for ██████████ revealed that ██████ ████████████████████ who has corresponded with other ███ representatives, often using coded payment instructions and encrypted messages

29.    A team of FBI analysts and forensic accountants conducted cryptanalysis[1] of the payment instructions contained within the content of these search warrant returns. In part, this entailed cross-referencing financial data relating to known North Korean financial facilitators against coded payment instructions.  The review of the coded payment instructions revealed millions of illicit U.S. dollar transactions conducted by ███ via front companies.

30.    Based on a review of the search warrant returns, I know that ███ has relied on covert bank representatives in ██████████████ as well as offices

---

[1] Cryptanalysis is the study of analyzing information systems in order to study the hidden aspects of the systems. Cryptanalysis is used to breach cryptographic security systems and gain access to the contents of coded conversations.

in  to operate their trans-national money laundering network.

**III.** ████████ **Acts as an** ████ **Front Company**

    A. ████████ Corporate Structure Is Consistent with an ████ Front Company

    37. ████████████ bears the hallmarks of a ████ front company. As described above, ████ frequently utilizes front companies in an effort to obscure the source of funds ultimately used for transactions in U.S. Dollars. According to publicly available corporate registry documents, ████████████████████████

████████ Based on my training and experience, this use of an address which is shared by numerous businesses solely for incorporation is consistent with the operation of a front company.

    38. According to ████████ annual corporate filing statement submitted on ████████ it had zero active directors and zero active secretaries in that year. ████ has failed to file an annual report since then. Based on my training and experience, this lack of a public filing and employees is consistent with the operation of a front company.

    39. Both corporate registry data and open source research shows no phone number, email address, website, or presence on the internet for ████. Based on my training and experience, this lack of an online presence is consistent with the operation of a front company. In today's global economy, legitimate businesses do not have such a scant online presence, as businesses seek customers and partners locally and internationally through online outreach.



B.  Illicit Transactions with North Korean Counterparties / Front Companies

43.     As part of this investigation, law enforcement issued grand jury subpoenas to financial institutions that process international U.S. dollar wires.  Subpoena returns from these financial institutions revealed numerous U.S. dollar wires involving ███████ and entities of concern.

44.     A forensic analysis of subpoena returns from U.S. correspondent banks revealed that U.S. dollar transactions totaling $2,415,119.51 by ███████ (as described below) were consistent with North Korean money laundering.

1.   *Transaction with* ███ *Front –* ███████

45.     On October 18, 2017, this Court authorized two seizure warrants for approximately $265,987.70 associated with ███████.  *See* 1:███████ (DAR) (Sealed) and 1:█ ███████

12

(DAR) (Sealed). This Court issued the two seizure warrants after making a probable cause finding that ███████ was a front company incorporated in ██████ that operates for the benefit of ██ .

    46.    I am aware that North Korea uses ██ to work with a host of front companies to access the U.S. financial system and evade U.S. sanctions imposed on ██ and its sanctioned affiliates. In particular, ██████ has acted as a front company to make millions of dollars in payments on behalf of ██ , which is otherwise barred from making such U.S. dollar payments.

    47.    Subpoena returns from U.S. financial institutions revealed that █████ sent a wire for approximately $18,791.74 to ██████ on June 1, 2017. Subpoena returns further revealed that on or about May 3, 2017, █████ sent a wire totaling approximately $149,939.37 to a █████████████ ("█████ Company 1") in regards to a contract with ████████ .

    48.    █████ Company 1 initially told law enforcement that it did not engage in illicit U.S. dollar business with North Korea, however, after being confronted with inculpatory evidence, █████ Company 1 relented and admitted their illegal activities. Specifically, █████ Company 1 admitted to entering multiple contracts for commodity sales to North Korea, which were negotiated by ████████ , but were paid for by front companies, such as the █████ payment noted above. According to employees of █████ Company 1, the now-OFAC-designated ████████████████████████ and at least two associated front companies also paid approximately $10,449,831.47 on behalf of contracts between █████ Company 1 and ██████ between 2015 and 2017.

    49.    According to information provided by █████ Company 1, the commodities associated with contracts with ██████ were shipped to ██████ Based on my training

and experience, I am aware that ████████████████████████ and a transshipment point for goods destined for North Korea.

50.     These payments from ██████ to ██████ or on behalf of ██████ are consistent with ███ money laundering scheme, wherein ███ layers payments between front companies to obfuscate the true beneficiary of the U.S. dollar transactions.

        2.     *Transaction with* ███ *Front –* ██████████

51.     On December 15, 2017, this Court authorized three seizure warrants for approximately $2,108,740.00 that was associated with ████████████ another company associated with North Korea. *See e.g.*, ████████ (RMM) (Sealed). This Court issued the seizure warrants after making a probable cause finding that ███ acted as a front company for the benefit of ██.

52.     Subpoena returns from U.S. correspondent banks revealed that ███ sent one wire for approximately $214,983.00 to ██████ on May 23, 2017. The registered director of ███ was ██████████.

53.     According to separate ██████ corporate registration records, ████ incorporated another company ██████████████████████ on December 12, 2014.

54.     Subpoena returns from U.S. correspondent banks revealed that ████████████ sent one wire for approximately $99,983.00 to ██████ on May 31, 2017.

55.     These payments from ████, a known ████ front company, and ████████████ a company that was registered by the same director as ████, to ██████ are consistent with ████ money laundering scheme, wherein ████ layers payments between front companies to obfuscate the true beneficiary of the U.S. dollar transactions.

3.  *Transactions with* ███ *Counterparty –* ███████████
███████

56.  According to search warrant returns for ██████████, on December 26, 2013, ███ Headquarters sent a series of payment orders to its covert ████████ branch office. One of the orders included instructions to remit $39,481.20 to ███████████ ███████████████

57.  Subpoena returns from U.S. correspondent banks revealed that ████████ sent two wires totaling $599,619.00 to ███████ on May 31, 2017 and June 1, 2017.

58.  These payments from ████████ to ███████ are consistent with ███ money laundering scheme, wherein ███ layers payments between front companies to obfuscate the true beneficiary of the U.S. dollar transactions.

4.  *Transaction with OFAC Designated* ████████████

59.  On or about ██████████ the government filed a complaint to forfeit $6,999,925.00 from ███████████████ alleging it was a front company that laundered U.S. dollars on behalf of ███. *See* ███████████ On the same day, the Treasury Department sanctioned ████ and its executives for illegally purchasing gasoil in U.S. dollars for delivery to North Korea. The designation noted that █████ worked with co-conspirators to circumvent sanctions, and that █████ had attempted to use the U.S. financial system to send millions of dollars in payments on behalf of North Korea-related transactions.

60.  Subpoena returns from U.S. correspondent banks revealed that ███████ sent a wire of approximately $410,000.00 to ██████ on April 25, 2017.

61.  This payment from ████████ to ██████ is consistent with ██████ money laundering scheme, wherein █████ layers payments between front companies to obfuscate the true beneficiary of the U.S. dollar transactions.

15



**IV.** ▮ **is the Director of another Front Company,** ▮ **which also Transacted with** ▮ **Front Companies**

    A.    ▮ is also the Sole Director of ▮

62.    According to publicly available business registration databases, ▮ ▮ was incorporated in ▮ on July 27, 2017. ▮ was incorporated approximately two months after ▮ last payment was frozen by its bank for compliance reasons.

63.    Subpoena returns from U.S. financial institutions revealed that ▮ engaged in less than ten U.S. dollar transactions before the banks started freezing their transactions. Two of the earliest transactions occurred on August 28, 2017 and involved ▮ ▮ bank (identified above). On August 28, 2017, the ▮ bank transferred approximately $246,244.12 via two transactions to ▮ bank account in ▮. The wire reference for both transfers indicated that the transfer was for the closed balance of the ▮ bank account. As such, ▮ funded ▮ bank accounts.

64.    Based on my training and experience, I am aware that individuals who are active in financial proliferation and sanctions evasion often establish multiple front companies. Once a front company becomes known to law enforcement, that front company stops receiving payments, and one of the other front companies continues the illicit financial activity. As occurred here, the closed front company then rolls over its funds to the new front company's new bank account.

65.    According to records published on a Korean trade association's website, ▮ is also the director of ▮. According to the trade association records, ▮ requested a quote for synthetic rubber to be shipped to ▮ As noted above, ▮ is a major transshipment point for smuggling goods into North Korea. Moreover, I am aware that North Korea seeks to

16

import rubber. The above purchase request for rubber was stamped with ▉▉ company seal, and signed by ▉▉ as director.

66.     A separate website that is used by traders to request and provide quotations for goods revealed additional information regarding ▉▉. In September 2017, ▉▉ requested a quote for refined and/or unrefined soybean oil. Based on my training and experience, I know that cooking oil is a commodity that is routinely purchased by North Korean front companies. The contact information for ▉▉ on the quote listed a ▉▉ based phone number ending in ▉▉ which was the same phone number ▉▉ provided to the bank in the ▉▉ for ▉▉ bank accounts.

        B.     ▉▉ transacted with ▉▉ front companies

67.     Subpoena returns from U.S. financial institutions revealed that on August 29, 2017, ▉▉ received a wire for $33,000 from ▉▉ On September 11, 2017, ▉▉ then sent a wire for $33,000.00 to ▉▉ Based on my training and experience, this practice of sending funds in a circular manner is consistent with the money laundering practice known as layering. Criminals "layer" funds by moving them through multiple bank accounts to conceal the source, nature, and origin of the funds.

68.     Search warrant returns for a ▉▉ representative's account revealed a January 26, 2016 email in which a ▉▉ customer requested that the purchaser of invoice ▉▉ be changed to ▉▉ *See* 1:17-mj-▉▉ (GMH) (Sealed). Based on a review of the subsequent emails from the ▉▉ representative and the purchaser, it appears that ▉▉ was added to the invoice to conceal the involvement of ▉▉. The email correspondence further revealed that ▉▉ ultimately made the requested payment. The search warrant returns further revealed that the ▉▉ representative used ▉▉ to facilitate several additional U.S. dollar transactions.

69.     Subpoena returns from U.S. correspondent banks further revealed that ███████ received two payments totaling $307,200 from █████████████████████ on April 6, 2017 and May 18, 2017.  Subpoena returns revealed that █████████ has transacted over $1,800,000 with OFAC-sanctioned companies including █████████ (identified above) and █████████████████ the sanctioned front for ███ covert branch in █████████.

70.     On September 5, 2017, █████████ wired $400,000 to ████.  As noted above, █████████ was incorporated by ████ who also operated ███.  This court previously authorized seizures of funds from ███, after finding it was a ███ front company.  █████████ also previously wired approximately $99,983 to ████ on May 31, 2017.  Based on these commonalities, I have concluded that ████ simply was a "cut out" that inserted itself into receiving payments for ████ after he could no longer use █████.

71.     On June 22, 2018, this court issued seizure warrants for $1,915,973.65 associated with ████ and ███ *See* █████████ (RMM) (Sealed). The Court found probable cause to believe that █████ and ████ were illegally laundering funds for ███ and related sanctioned North Korean entities.

## V.     Target Accounts Communicated with ██████ and User Established ████ Branch Office

109.    According to subpoena returns, **Target Account 1** is subscribed to █████████ ████ and is registered to the aforementioned phone number ending in ████ Open source searches of Facebook revealed █████ account which publicly lists his contact address as **Target Account 1**. The screen name associated with this Facebook account is █████████ Based on the photos associated with this Facebook account, I was able to conclude that ████ is █████████



110.    On June 20, 2018, this court authorized the search of **Target Account 1** and another email accounts utilized by 

111.    These search warrant returns revealed that on November 8, 2017, ███ using **Target Account 1,** forwarded an email from the ████████-based bank utilized by ████ to **Target Account 2**. The email advised ████ that the ████████-based bank had not blocked any payments, but the U.S. Government had. The email contained a link to the OFAC's license application webpage.

112.    The returns further revealed that beginning in at least February 2018, ███ sought to establish a branch office of ███ in ███████ On February 2, 2018, ████, using **Target Account 1**, received an email from a ██████-based accounting and corporate services company with documents that would be required for the establishment of a branch office. In addition to **Target Account 1**, **Target Account 2** was also a recipient of this email.

113.    On or about April 3, 2018, ████, using **Target Account 1**, received an email from a legal services company containing a ██████████████ Certificate of Incorporation for the Representative Office of █████████████████████). ██ forwarded the email to **Target Account 2**.

114.    Incorporation documents for ████ ██████ listed the representative as ████████ ████████ **Target Account 2** was listed as ████ email account.

115.    On or about May 23, 2018, ████, using **Target Account 1**, sent a Word document to **Target Account 2**. The document was on ████ letterhead and was identified as a letter of authorization. Specifically, the document authorized ███ to open and manage a bank account for ████ ██████. The authorization, dated May 23, 2018, was stamped and signed by ███.

19

116.   Separately, on multiple occasions in 2018, , using **Target Account 1**, forwarded to **Target Account 2** confirmations of regarding the purchase of airline tickets. The flights often originated or terminated in ▮▮▮▮ and the passenger was identified as ▮▮▮▮ ▮▮ who carried a passport from ▮▮▮▮

117.   Based on the above information, there is probable cause to believe the **Target Accounts** coordinated with ▮▮▮ regarding specific payments to companies which this Court previously found probable cause to believe were linked to the ▮▮, and to establish a branch office of ▮▮ in ▮▮▮▮. The **Target Accounts** also received flight reservation information for a North Korean citizen.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

118.   PROVIDER is the provider of the internet-based account(s) identified as ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮

119.   PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

120.   Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website. During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

121. Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[2]

122. In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

123. Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, and SMS text messaging; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even

---

[2] Here, PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

124. Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

125. Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as

laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

126. PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in

23

turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

127.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

128.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group

24

of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

129.    Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

130.    In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

31.    As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[3] Based on my training and experience, I know that evidence of who controlled,

---

[3] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.

used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

### REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

131.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. In support of this request, I inform the

---

Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

Court that I am outside of the District of Columbia, where I am working on the investigation of this and other matters. If I were required to appear before the Court in person, it would be a cost to the United States both in travel costs and time diverted from the substantive investigation. I submit that staff at the U.S. Attorney's Office for the District of Columbia are capable of identifying my voice and telephone number for the Court.

**CONCLUSION**

132. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 based on information communicated by telephone on this _15th_ day of May, 2019.

_____
HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

28

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY GOOGLE<br>LLC PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | ) ) ) ) ) )   Case No. 19-sc-1059 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC FOR INVESTIGATION OF VIOLATION OF 18 U.S.C.1956 (See Attachment A, incorporated herein by reference.)

located in the      Northern      District of      California     , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a)<br>18 U.S.C. § 1956 | IEEPA<br>Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of      days *(give exact ending date if more than 30 days:*      *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

         telephone          *(specify reliable electronic means)*.

Date:    05/15/2019

                                          Digitally signed by G. Michael Harvey<br>Date: 2019.05.15 16:07:11 -04'00'

                                          *Judge's signature*

City and state:    District of Columbia            G. Michael Harvey, U.S. Magistrate Judge

                                                 *Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY GOOGLE<br>LLC PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 19-sc-1059 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956
See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____May 29, 2019_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____05/15/2019_____

Digitally signed by G. Michael Harvey
Date: 2019.05.15 16:07:35 -04'00'

*Judge's signature*

City and state: _____District of Columbia_____

G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br> 19-sc-1059 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| Certification |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Google accounts identified by  and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

I. **Information to be disclosed by Google LLC ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a. For the time period from March 1, 2013 to present: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services (E.G., GOOGLE DRIVE), including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[4]

---

[4] Here, PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and

1

b.      For the time period from March 1, 2013 to present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period March 1, 2013 to present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period March 1, 2013 to present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and

---

reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All device or user identifiers which have ever been linked to the Account, including but not limited to all cookies and similar technologies, unique application numbers, hardware models, operating system versions, device serial numbers, Global Unique Identifiers ("GUID"), mobile network information, telephone numbers, Media Access Control ("MAC") addresses, and International Mobile Equipment Identities ("IMEI");

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.      For the time period March 1, 2013 to present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

k.      For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

l.      Within **14** days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq*. and 18 U.S.C. § 1956 as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the amount and location of any



of Korea ("North Korea"), any party located in North Korea, any party acting on behalf of, or in the interest of, an entity associated with North Korea, any U.S. of U.N. designated entity, any entity or person in or related to the People's Republic of China ("PRC") transacting or communicating with entities or persons in North Korea or entities or persons acting for the benefit of North Korea, and any front company for any of these above mentioned persons or entities;

(f) Evidence related to U.S. dollar transactions, banking, or financial information related to ██████████████████████████████████████ ████████████████████████████ the government, representatives, or beneficiaries of North Korea, any party located in North Korea, any party acting on behalf of, or in the interest of, an entity associated with North Korea, any U.S. of U.N. designated entity, any entity or person in or related to the PRC transacting or communicating with entities or persons in North Korea or entities or persons acting for the benefit of North Korea, and any front company for any of these above mentioned persons or entities;

(g) Evidence related to anti-money laundering controls, the Bank Secrecy Act, Know Your Customer policies, and/or lists, names, persons, companies, and/or entities sanctioned or related to the Department of Treasury Office of Foreign Asset Control ("OFAC");

(h) Evidence related to the business of ████████████████████████████ ██████████████████████████████████████ including its practices, makeup, organizational structure, profits, and customers;

(i) Evidence related to sanctions, and practices undertaken to avoid sanctions;

6

(j) the transportation or transmission of funds that have been derived from a criminal offense;

(k) the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

(m) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(n) The identity of the person(s) who created or used the Target Account or any associated user ID, including records that help reveal the whereabouts of such person(s)

(o) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

(p) The identity of the person(s) who communicated with the Target Accounts or any associated user ID about matters relating to the laundering of funds to / from North Korea, U.S. sanctions, and assisting North Korea regime, including records that help reveal their whereabouts.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____

Date                                    Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1956 | SC No. _____ <br><br> **Filed Under Seal** |

*Reference:*     *USAO Ref. #* ████████ *Subject Account(s):* ██████████████ *and* ██████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████████, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information which is associated with two accounts – that is, ████████████ ("**Target Account 1**") and ████████████████ ("**Target Account 2**") – stored at premises controlled by Google LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at/which accepts service at 1600 Amphitheatre Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review

that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.





5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and the executive orders and regulations promulgated thereunder; and the federal money laundering statute, 18 U.S.C. § 1956, have been committed by the users of the Target Accounts.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

7.      This investigation relates to violations of IEEPA and its implementing executive orders and regulations. IEEPA, enacted in 1977, granted the President of the United States

3

authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Under IEEPA, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

8.      50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

9.      Using the powers conferred by IEEPA, the President and Executive Branch departments have issued orders and regulations governing and prohibiting certain transactions with North Korea by U.S. persons or involving U.S. goods.

10.     By the authority vested in the President by IEEPA, on or about June 28, 2005, the President signed E.O. 13382, which blocks the property of persons engaged in proliferation activities and their support networks, and denies designated proliferators access to the U.S. financial and commercial systems. This blocking program initially applied to eight organizations in North Korea, Iran, and Syria. The U.S. Department of the Treasury ("the Treasury Department"), together with the U.S. Department of State, is authorized to designate additional proliferators of WMD and their supporters under the authorities provided by E.O. 13382. Pursuant to that authority, on or about April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." 31 C.F.R. § 544.101 et seq.

11.     By the authority vested in the President by IEEPA, on or about June 26, 2008, the President signed E.O. 13466 declaring a national emergency to deal with the threat to the national security and foreign policy of the United States constituted by the existence and risk of the proliferation of weapons-usable fissile material on the Korean Peninsula, and continued certain restrictions with respect to North Korea that previously had been imposed under the authority of

the Trading With the Enemy Act. Since 2008, the President has issued subsequent E.O.s, including E.O.s 13551, 13570, 13687, and 13722, expanding the 2008 national emergency and taking additional steps with respect to that emergency, including blocking the property of certain persons (individuals and entities) and prohibiting certain types of transactions.

12.     OFAC administers these sanctions programs to accomplish U.S. foreign-policy and national-security goals. OFAC accomplishes this by designating companies and individuals through different sanctions programs. When OFAC designates persons (individuals and entities) under the Non-Proliferation Sanctions and North Korea Sanctions programs, the persons are added to a list of Specially Designated Nationals ("SDN"). Among other things, entities added to the SDN list are prohibited from engaging in the use of the U.S. financial system for processing international wire transfers denominated in U.S. dollars originating from offshore U.S. dollar accounts at foreign financial institutions which utilize correspondent-banking services at U.S. financial institutions.

13.     Pursuant to E.O. 13382 and 31 C.F.R. § 544.201, dealings by any United States person or within the United States with persons who have been placed on the SDN list, except as authorized or licensed by OFAC, are prohibited. 31 C.F.R. § 544.201(b). The effect of these regulations is that a U.S. person cannot provide any financial or others services to a person or entity on the SDN list, except as authorized or licensed by OFAC. *See* 31 C.F.R. § 544.405.

14.     In sum, by virtue of being included on an SDN list, a person or entity must first obtain a license or authorization from OFAC. *See* 31 C.F.R. §§ 510.201(a) and (f), 510.404(a). A transfer by a SDN of U.S. dollars without a license from OFAC constitutes a violation of IEEPA. *See e.g. United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Company, Ltd.*, No. 17-mj-217-BAH, 2017 WL 3233062, at *1, *5 (D.D.C. May 22, 2017)

(explaining that foreign entities that are acting on behalf of North Korean entities that are SDNs have committed violations of IEEPA and the money laundering statute by conducting U.S. dollar wires without first obtaining a license from OFAC); *United States v. All Funds on Deposit in United Bank of Switzerland*, No. 01 CIV. 2091, 2003 WL 56999, at *2 (S.D.N.Y. Jan. 7, 2003) (holding that E.O.s preclude U.S.-dollar transfers from the United States to Iran)

### Anti-Money Laundering Obligations

15.     According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act, as well as sanctions programs administered by OFAC.

16.     The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system.  The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern.  In November 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf.  The special measure also required U.S. financial institutions to take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution.  In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent

banking in the United States. FinCEN further required U.S. financial institutions to engage in enhanced due diligence to root out any transactions by North Korean financial institutions and entities acting on their behalf. Failure to comply with the special measure entailed civil and criminal penalties for U.S. financial institutions.

17.     U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of the U.S. dollar.

18.     One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

19.     In my training and experience, I know that criminals are aware of the general prohibition of U.S. dollar transactions for the benefit of North Korean entities and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent North Korean parties from transacting in U.S. dollars. As a result, criminals employ front

companies, or brokers to act as cutouts, to engage in transactions on their behalf, in order to prevent banks from uncovering the North Korean entity that is a party to the transaction.

20.     Title 18, United States Code, Section 1956(h) criminalizes a conspiracy to violate § 1956.

21.     Title 18, United States Code, Section 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, *inter alia*, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

22.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA and the bank fraud statute.

## **PROBABLE CAUSE**

### I.      **Background**

23.     Because of United Nations ("U.N.") and U.S. sanctions that are in effect against North Korea, North Korea and its business entities can only access the U.S. financial system by using front companies to conceal their direct involvement in the transactions and to evade the aforementioned sanctions. I know from my training and experience, as well as from a variety of open source material, that North Korea needs to access the U.S. financial system because, in order to obtain the goods that it needs, it must conduct trade in dollars. According to the United Nations Security Council's February 23, 2015 Report of the Panel of Experts, most of the transactions seen

by the Panel were made in United States dollars from foreign-based banks and transferred through corresponding bank accounts in the United States

24.     On or about November 2, 2017, FinCEN issued an advisory to further alert financial institutions to North Korean schemes being used to evade U.S. and U.N. sanctions, launder funds, and finance the North Korean regime's weapons of mass destruction and ballistic missile programs.  The advisory was intended to provide financial red flags of illicit North Korean schemes, including the use of financial representatives world-wide.  It also highlighted the use of China-based front or shell companies, trading companies, and financial institutions operating in areas bordering North Korea. These indicators were intended to assist financial institutions in identifying and reporting suspected illicit activity by the North Korean government and its financial institutions.



26.     I am aware from reliable source reporting that North Korea's government depends on foreign trade, banking, and access to the dollar-based financial system to pay their military and security forces, and that recent U.N. reports confirm that Pyongyang continues to rely on the dollar, and its access to the dollar system, to move money around the world.

## II.  **Previous Search Warrants for Email Accounts Controlled by ███ fficials**

A.  Previous Application for ███████ email accounts

27.     On March 16, 2017, this Court authorized a search of two ████ email accounts. *See* ████████████  These two initial search warrants identified numerous additional ████ email accounts that are involved with correspondence regarding illic ████ financial transactions. To date, search warrants have been issued for the content of seventeen ████ email accounts

28.     The search warrant returns revealed ████ extensive network.  For example, search warrant returns for ███████████ revealed the account was registered from IP address ████████ which resolves to ██████████████████ As outlined in subsequent search warrant applications (*See* ██████ (GMH)(Sealed) and 1:17-██████ (RMM)(Sealed)), the contents fo ████████████ revealed that ██████ ████████████████ who has corresponded with other ████ representatives, often using coded payment instructions and encrypted messages

29.     A team of FBI analysts and forensic accountants conducted cryptanalysis[1] of the payment instructions contained within the content of these search warrant returns. In part, this entailed cross-referencing financial data relating to known North Korean financial facilitators against coded payment instructions.  The review of the coded payment instructions revealed millions of illicit U.S. dollar transactions conducted by ████ via front companies.

30.     Based on a review of the search warrant returns, I know that ████ has relied on covert bank representatives in ██████████████████ as well as offices

---

[1] Cryptanalysis is the study of analyzing information systems in order to study the hidden aspects of the systems. Cryptanalysis is used to breach cryptographic security systems and gain access to the contents of coded conversations.

in ███████████████████████████ to operate their trans-national money laundering network.

**III.**     ████████████ **Acts as an** ███████ **Front Company**

     A.     ██████████████ Corporate Structure Is Consistent with an ███████ Front Company

     37.     ████████████████████ bears the hallmarks of a ██████ front company. As described above, FTB frequently utilizes front companies in an effort to obscure the source of funds ultimately used for transactions in U.S. Dollars. According to publicly available corporate registry documents, ████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

companies. Based on my training and experience, this use of an address which is shared by numerous businesses solely for incorporation is consistent with the operation of a front company.

     38.     According to ██████████ annual corporate filing statement submitted on ████████████████ it had zero active directors and zero active secretaries in that year. ███████████ has failed to file an annual report since then. Based on my training and experience, this lack of a public filing and employees is consistent with the operation of a front company.

     39.     Both corporate registry data and open source research shows no phone number, email address, website, or presence on the internet for █████████ Based on my training and experience, this lack of an online presence is consistent with the operation of a front company. In today's global economy, legitimate businesses do not have such a scant online presence, as businesses seek customers and partners locally and internationally through online outreach.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



**B.**   <u>Illicit Transactions with North Korean Counterparties / Front Companies</u>

43.   As part of this investigation, law enforcement issued grand jury subpoenas to financial institutions that process international U.S. dollar wires.  Subpoena returns from these financial institutions revealed numerous U.S. dollar wires involving ███████ and entities of concern.

44.   A forensic analysis of subpoena returns from U.S. correspondent banks revealed that U.S. dollar transactions totaling $2,415,119.51 by ██████ (as described below) were consistent with North Korean money laundering.

1.   *Transaction with* ████████████

45.   On October 18, 2017, this Court authorized two seizure warrants for approximately $265,987.70 associated with ███████ *See* ██████ (DAR) (Sealed) and 1:████████

(DAR) (Sealed). This Court issued the two seizure warrants after making a probable cause finding that █████████ was a front company incorporated in █████ that operates for the benefit of ████

46.     I am aware that North Korea uses ████ to work with a host of front companies to access the U.S. financial system and evade U.S. sanctions imposed on ████ and its sanctioned affiliates. In particular, █████████ has acted as a front company to make millions of dollars in payments on behalf of ████ which is otherwise barred from making such U.S. dollar payments.

47.     Subpoena returns from U.S. financial institutions revealed that ████████ sent a wire for approximately $18,791.74 to ████████ on June 1, 2017.  Subpoena returns further revealed that on or about May 3, 2017, ████████ sent a wire totaling approximately $149,939.37 to a ███████████████████ Company 1") in regards to a contract with █████████████

48.     ████████ Company 1 initially told law enforcement that it did not engage in illicit U.S. dollar business with North Korea, however, after being confronted with inculpatory evidence, █████████ Company 1 relented and admitted their illegal activities. Specifically, ████████ Company 1 admitted to entering multiple contracts for commodity sales to North Korea, which were negotiated by █████████ but were paid for by front companies, such as the ████████ payment noted above. According to employees of ████████ Company 1, the now-OFAC-designated ███████████████████████████████ and at least two associated front companies also paid approximately $10,449,831.47 on behalf of contracts between ████████ Company 1 and █████████ between 2015 and 2017.

49.     According to information provided by ████████ Company 1, the commodities associated with contracts with ████████ were shipped to ████████ Based on my training



and experience, I am aware that ███████████████████████████ and a transshipment point for goods destined for North Korea.

50.    These payments from ████████████████████ or on behalf of ████████████ are consistent with ████ money laundering scheme, wherein ████ layers payments between front companies to obfuscate the true beneficiary of the U.S. dollar transactions.

2.    *Transaction with* ████ *Front –* ████████████

51.    On December 15, 2017, this Court authorized three seizure warrants for approximately $2,108,740.00 that was associated with ████████████████, another company associated with North Korea. *See e.g.*, ██████████ (RMM) (Sealed). This Court issued the seizure warrants after making a probable cause finding that ████ acted as a front company for the benefit of ████.

52.    Subpoena returns from U.S. correspondent banks revealed that ████ sent one wire for approximately $214,983.00 to ██████████ on May 23, 2017. The registered director of ████ was ████████████████.

53.    According to separate ████████████ corporate registration records, ████ incorporated another company ██████████████████████████████████ on December 12, 2014.

54.    Subpoena returns from U.S. correspondent banks revealed that ██████████████████ sent one wire for approximately $99,983.00 to ████████ on May 31, 2017.

55.    These payments from ████ a known ████ front company, and ██████████████ a company that was registered by the same director as ██████████████ are consistent with ████ money laundering scheme, wherein ████ layers payments between front companies to obfuscate the true beneficiary of the U.S. dollar transactions.

14

3. *Transactions with* ███ *Counterparty –* ████████████
████████████

56. According to search warrant returns for ████████████ on December 26, 2013 ███ Headquarters sent a series of payment orders to its covert ████████ branch office. One of the orders included instructions to remit $39,481.20 to ████████████
████████████

57. Subpoena returns from U.S. correspondent banks revealed that ████████ sent two wires totaling $599,619.00 to Gardemar on May 31, 2017 and June 1, 2017.

58. These payments from ████████ to ████████ are consistent with ████ money laundering scheme, wherein ████ layers payments between front companies to obfuscate the true beneficiary of the U.S. dollar transactions.

4. *Transaction with OFAC Designated* ████████████

59. On or about ████████████ the government filed a complaint to forfeit $6,999,925.00 from ████████████ alleging it was a front company that laundered U.S. dollars on behalf of ████ *See* ████████ On the same day, the Treasury Department sanctioned ████ and its executives for illegally purchasing gasoil in U.S. dollars for delivery to North Korea. The designation noted that ████ worked with co-conspirators to circumvent sanctions, and that ████ had attempted to use the U.S. financial system to send millions of dollars in payments on behalf of North Korea-related transactions.

60. Subpoena returns from U.S. correspondent banks revealed that ████ sent a wire of approximately $410,000.00 to ████ on April 25, 2017.

61. This payment from ████████ is consistent with ████ money laundering scheme, wherein ████ layers payments between front companies to obfuscate the true beneficiary of the U.S. dollar transactions.

15

**IV.** ███████ **is the Director of another Front Company,** ████████████ **which also Transacted with** ████ **Front Companies**

    A.    ████ **is also the Sole Director of** ███████████



62.    According to publicly available business registration databases, ███████████ ████████ was incorporated in ████████ on July 27, 2017. ████ was incorporated approximately two months after ████████ last payment was frozen by its bank for compliance reasons.

63.    Subpoena returns from U.S. financial institutions revealed that ████ engaged in less than ten U.S. dollar transactions before the banks started freezing their transactions. Two of the earliest transactions occurred on August 28, 2017 and involved █████████ bank (identified above). On August 28, 2017, the █████ bank transferred approximately $246,244.12 via two transactions to █████ bank account in ███████ The wire reference for both transfers indicated that the transfer was for the closed balance of the ███████ bank account. As such, █████████ funded █████s bank accounts.

64.    Based on my training and experience, I am aware that individuals who are active in financial proliferation and sanctions evasion often establish multiple front companies. Once a front company becomes known to law enforcement, that front company stops receiving payments, and one of the other front companies continues the illicit financial activity. As occurred here, the closed front company then rolls over its funds to the new front company's new bank account.

65.    According to records published on a Korean trade association's website, ████ is also the director of █████ According to the trade association records, █████ requested a quote for synthetic rubber to be shipped to ███████ As noted above, ██████ a major transshipment point for smuggling goods into North Korea. Moreover, I am aware that North Korea seeks to

import rubber. The above purchase request for rubber was stamped with ███ company seal, and signed by ███ as director.

66.     A separate website that is used by traders to request and provide quotations for goods revealed additional information regarding ███ In September 2017, ███ requested a quote for refined and/or unrefined soybean oil. Based on my training and experience, I know that cooking oil is a commodity that is routinely purchased by North Korean front companies. The contact information for ███ on the quote listed a ███ based phone number ending in ███ which was the same phone number ███ provided to the bank in the ███ for ███ bank accounts.

B.     ███ ransacted wit ███ ront companies

67.     Subpoena returns from U.S. financial institutions revealed that on August 29, 2017, ███ received a wire for $33,000 from ███ On September 11, 2017, ███ then sent a wire for $33,000.00 to ███ Based on my training and experience, this practice of sending funds in a circular manner is consistent with the money laundering practice known as layering. Criminals "layer" funds by moving them through multiple bank accounts to conceal the source, nature, and origin of the funds.

68.     Search warrant returns for a ███ representative's account revealed a January 26, 2016 email in which a ███ customer requested that the purchaser of invoice ███ be changed to ███ *See* ███ (GMH) (Sealed). Based on a review of the subsequent emails from the ███ representative and the purchaser, it appears that ███ was added to the invoice to conceal the involvement of ███ The email correspondence further revealed that ███ ultimately made the requested payment. The search warrant returns further revealed that the ███ representative used ███ o facilitate several additional U.S. dollar transactions.

69.     Subpoena returns from U.S. correspondent banks further revealed that ███████ received two payments totaling $307,200 from ████████████████████████████ ███████████ on April 6, 2017 and May 18, 2017.  Subpoena returns revealed that ██████████ has transacted over $1,800,000 with OFAC-sanctioned companies including ███████████ (identified above) and ███████████████████████ the sanctioned front for ███████ covert branch in ███████████████.

70.     On September 5, 2017, ███████████████ wired $400,000 to ███████ As noted above, ███████████████ was incorporated by ███████ who also operated ███████ This court previously authorized seizures of funds from ███████ after finding it was a ███████ front company. ███████████████ also previously wired approximately $99,983 to ██████████ on May 31, 2017. Based on these commonalities, I have concluded that ███████ simply was a "cut out" that inserted itself into receiving payments for ██████████ after he could no longer use ██████████.

71.     On June 22, 2018, this court issued seizure warrants for $1,915,973.65 associated with ███████ and ███████ *See* ████████████ (RMM) (Sealed). The Court found probable cause to believe that █████████ and ███████ were illegally laundering funds for ███████ and related sanctioned North Korean entities.

## V.    Target Accounts Communicated with ██████ and User Established ██████ Branch Office

109.     According to subpoena returns, **Target Account 1** is subscribed to ████████ ███████ and is registered to the aforementioned phone number ending in ███████ Open source searches of Facebook revealed ██████'s account which publicly lists his contact address as **Target Account 1**. The screen name associated with this Facebook account is ████████████████ Based on the photos associated with this Facebook account, I was able to conclude that ███████ is ██████████████████



18

110.    On June 20, 2018, this court authorized the search of **Target Account 1** and another email accounts utilized by ████.

111.    These search warrant returns revealed that on November 8, 2017, ████ using **Target Account 1,** forwarded an email from the █████ based bank utilized by ██████ to **Target Account 2**. The email advised ████ that the ██████ based bank had not blocked any payments, but the U.S. Government had. The email contained a link to the OFAC's license application webpage.

112.    The returns further revealed that beginning in at least February 2018, ████ sought to establish a branch office of ███ in ████. On February 2, 2018, ████ using **Target Account 1**, received an email from a █████ based accounting and corporate services company with documents that would be required for the establishment of a branch office. In addition to **Target Account 1**, **Target Account 2** was also a recipient of this email.

113.    On or about April 3, 2018, ████ using **Target Account 1**, received an email from a legal services company containing a ██████ Certificate of Incorporation for the Representative Office of ██████████ forwarded the email to **Target Account 2**.

114.    Incorporation documents for ██████ listed the representative as █████ ████. **Target Account 2** was listed as ████ email account.

115.    On or about May 23, 2018, ████ using **Target Account 1**, sent a Word document to **Target Account 2**. The document was on ████ letterhead and was identified as a letter of authorization. Specifically, the document authorized ███ to open and manage a bank account for ████████ The authorization, dated May 23, 2018, was stamped and signed by ████.

116.    Separately, on multiple occasions in 2018, ████ using **Target Account 1**, forwarded to **Target Account 2** confirmations of regarding the purchase of airline tickets. The flights often originated or terminated in ████ and the passenger was identified as ████ ████ who carried a passport from ████.

117.    Based on the above information, there is probable cause to believe the **Target Accounts** coordinated with ████ regarding specific payments to companies which this Court previously found probable cause to believe were linked to the ████ and to establish a branch office of ████ in ████. The **Target Accounts** also received flight reservation information for a North Korean citizen.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

118.    PROVIDER is the provider of the internet-based account(s) identified as



119.    PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

120.    Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website. During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

121.    Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[2]

122.    In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

123.    Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, and SMS text messaging; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even

---

[2] Here, PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

124. Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

125. Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as

laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

126.    PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in

turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

127.  Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

128.  Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group

of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

129. Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

130. In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

31. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

25

of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[3] Based on my training and experience, I know that evidence of who controlled,

---

[3] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.

used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

### REQUEST TO SUBMIT WARRANT BY TELEPHONE ### OR OTHER RELIABLE ELECTRONIC MEANS

131.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.  In support of this request, I inform the

---

Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

Court that I am outside of the District of Columbia, where I am working on the investigation of this and other matters. If I were required to appear before the Court in person, it would be a cost to the United States both in travel costs and time diverted from the substantive investigation. I submit that staff at the U.S. Attorney's Office for the District of Columbia are capable of identifying my voice and telephone number for the Court.

## CONCLUSION

132. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Christopher Wong
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 based on information communicated by telephone on this __15th__ day of May, 2019.

Digitally signed by G. Michael Harvey
Date: 2019.05.15 16:08:13 -04'00'

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

28