# ATTACHMENT

# A

*Redacted Docket Materials*

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 19-sc-1090 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT | ) | |
| STORED AT PREMISES CONTROLLED BY OATH | ) | |
| HOLDINGS, INC. FOR INVESTIGATION OF | ) | |
| VIOLATIONS OF 18 U.S.C. 1956 | | |

## AMENDED APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC. FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C.1956 (See Attachment A, incorporated herein by reference.)

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a) | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: 05/20/2019

*Judge's signature*

City and state: District of Columbia

G. Michael Harvey, U.S. Magistrate Judge

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of                                )
*(Briefly describe the property to be searched*              )
*or identify the person by name and address)*                )     Case No.  19-sc-1090
INFORMATION ASSOCIATED WITH ONE ACCOUNT                      )
STORED AT PREMISES CONTROLLED BY OATH                        )
HOLDINGS, INC. FOR INVESTIGATION OF                          )
VIOLATIONS OF 18 U.S.C. 1956                                 )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC. FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. 1956
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____June 3, 2019_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____.
                                                                                        *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   _____05/20/2019_____          _____
                                                                       *Judge's signature*

City and state:   _____District of Columbia_____       _____G. Michael Harvey, U.S. Magistrate Judge_____
                                                                       *Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>19-sc-1090 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with the Yahoo account identified as ██████████ and which is stored at premises owned, maintained, controlled, or operated, by Oath Holdings, Inc., a company that accepts service of legal process at 701 First Avenue, Sunnyvale, California.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.     Information to be disclosed by Oath Holdings, Inc. (the "PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any emails, records, files, logs, or information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     For the time period from March 1, 2013 to the present: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services,  including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[3]

---

[3] Yahoo provides e-mail, contact list, chat, and other services as noted generically above. It provides the branded services Yahoo! groups (a listserve and bulletin board service, which users can opt into), Yahoo! Messenger (an instant messaging service, which users can opt into), and Flickr (a photo storage and sharing service, which users can opt into).  Yahoo does not currently provide a standalone notes or document storage service, but its smartphone application has designated "notes" and "documents" functions that operate through Yahoo's e-mail storage.

b.　For the time period from March 1, 2013 to present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.　For the time period from March 1, 2013 to present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies); The types of service utilized;

d.　For the time period from March 1, 2013 to present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.　All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information,

23

and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.     All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s);

g.     Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.     All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.       For the time period March 1, 2013:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.       Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

k.       Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq*. and 18 U.S.C. § 1956, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence related to the amount and location of any U.S. dollar payments, monies, or funds transfers by 



(f) Information that constitutes evidence concerning U.S. dollar transactions, banking, mineral/gold trade, or financial information related to 

(g) Information that constitutes evidence related to anti-money laundering controls, the bank secrecy act, know your customer policies, and/or lists, names, persons, companies, and/or entities sanctioned or related to the Department of Treasury Office of Foreign Asset Control ("OFAC");

(h) Evidence related to the business of the ███████████████ including its practices, makeup, organizational structure, profits, and customers;

(i) Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j) the transportation or transmission of funds that have been derived from a criminal offense;

(k) the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(m) Evidence indicating the email account owner's state of mind as it relates to the criminal activity under investigation;

(n) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(o) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

(p) The identity of the person(s) who communicated with the user ID about matters relating to the laundering of funds ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## III. Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## BUSINESS RECORDS PURSUANT TO FEDERAL RULE
## OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Oath Holdings ("PROVIDER"), and my official title is _____. I am a custodian of records for PROVIDER. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of PROVIDER, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes).

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                    Signature

29

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC. FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956** | Case No. 19-sc-1090 <br><br> **Filed Under Seal** |

*Reference:*    *USAO Ref. #* ▮▮▮▮▮▮▮▮  *Subject Account(s):* ▮▮▮▮▮▮▮▮▮▮▮

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, ▮▮▮▮▮▮▮▮ being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information which is associated with one account—that is, ▮▮▮▮▮▮▮▮▮▮ (hereinafter referred to as "Target Account"). —which is stored at premises controlled by Oath Holdings, Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at/which accepts service at 701 First Avenue, Sunnyvale, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.　　The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, analysts, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.　　Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of IEEPA and the federal money laundering statute, 18 U.S.C. § 1956, have been committed by ███████████ ███████ and co-conspirators known and unknown, including the user of the Target Account. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

6.      This investigation relates to violations of IEEPA and its implementing executive orders and regulations. IEEPA, enacted in 1977, granted the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Under IEEPA, the President may declare a national emergency through executive orders that have the full force and effect of law.

7.      50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

8.      Using the powers conferred by IEEPA, the President has issued orders and regulations governing and prohibiting certain transactions with North Korea by U.S. persons or involving U.S. goods.

9.      On or about June 28, 2005, the President signed executive order ("E.O.") 13382, which blocked individuals engaging in, or supporting, activities promoting the proliferation of weapons of mass destruction ("WMD"). This blocking program initially applied to eight organizations in North Korea, Iran, and Syria. The U.S. Department of the Treasury, together with

the U.S. Department of State, is authorized to designate additional proliferators of WMD and their supporters under the authorities provided by E.O. 13382. Pursuant to that authority, on or about April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101 *et seq.*

10.     On or about June 26, 2008, the President signed E.O. 13466, which declared a national emergency in response to the risk of the proliferation of WMD on the Korean Peninsula. In E.O. 13466, the President ordered that certain trade restrictions with respect to North Korea be continued under the authority of the Trading With the Enemy Act. Since 2008, the President has issued subsequent E.O.s, including E.O.s 13551, 13570, 13687, and 13722, expanding the 2008 national emergency in various respects, including blocking the property of certain persons (individuals and entities) from transactions involving U.S. Dollars, as well as prohibiting certain types of transactions with U.S. persons.

11.     The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in Washington, DC, administers a number of sanctions programs to accomplish U.S. foreign-policy and national-security goals. Two of OFAC's active sanction programs include the Non-Proliferation Sanctions program and the North Korea Sanctions program. OFAC's current Non-Proliferation Sanctions program began in 2005 pursuant to E.O. 13382. OFAC's current North Korea Sanctions program began in 2008 pursuant to E.O. 13466. When OFAC designates persons under the Non-Proliferation Sanctions and North Korea Sanctions programs, the sanctioned persons are added to a list of Specially Designated Nationals ("SDNs"). Among other things, persons added to the SDN list are prohibited from engaging with the U.S. financial system in any respect.  That prohibition extends to the processing of international wire transfers denominated in U.S. dollars originating from offshore U.S. dollar accounts at foreign

financial institutions, which utilize correspondent-banking services at U.S. financial institutions for such transfers.

**Anti-Money Laundering Obligations**

12.     According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act, as well as sanctions programs administered by OFAC.

13.     The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system.  The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern.  In November 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf.   The special measure also required U.S. financial institutions to take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution.  In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking in the United States.  FinCEN further required U.S. financial institutions to engage in enhanced due diligence to root out any transactions by North Korean financial institutions and

entities acting on their behalf. Failure to comply with the special measure entailed civil and criminal penalties for U.S. financial institutions.

14.    U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of the U.S. dollar.

15.    One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

16.    In my training and experience, I know that criminals are aware of the general prohibition of U.S. dollar transactions for the benefit of North Korean entities and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent North Korean parties from transacting in U.S. dollars. As a result, criminals employ front companies, or brokers to act as cutouts, to engage in transactions on their behalf, in order to prevent banks from uncovering the North Korean entity that is a party to the transaction.

17.     Title 18, United States Code, Section 1956(h) criminalizes a conspiracy to violate § 1956.

18.     Title 18, United States Code, Section 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, *inter alia*, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

19.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA and the bank fraud statute.

## PROBABLE CAUSE

### I.     Background

20.     Because of United Nations ("U.N.") and U.S. sanctions that are in effect against North Korea, North Korea and its business entities can only access the U.S. financial system by using front companies to conceal their direct involvement in the transactions and to evade the aforementioned sanctions. I know from my training and experience, as well as from a variety of open source material, that North Korea needs to access the U.S. financial system because, in order to obtain the goods that it needs, it must conduct trade in dollars. According to the United Nations Security Council's February 23, 2015 Report of the Panel of Experts, most of the transactions seen by the Panel were made in United States dollars from foreign-based banks and transferred through corresponding bank accounts in the United States

21.     On or about November 2, 2017, FinCEN issued an advisory to further alert financial institutions to North Korean schemes being used to evade U.S. and U.N. sanctions, launder funds, and finance the North Korean regime's weapons of mass destruction and ballistic missile

programs. The advisory was intended to provide financial red flags of illicit North Korean schemes, including the use of financial representatives world-wide. It also highlighted the use of China-based front or shell companies, trading companies, and financial institutions operating in areas bordering North Korea. These indicators were intended to assist financial institutions in identifying and reporting suspected illicit activity by the North Korean government and its financial institutions.

22.    In March 2013, OFAC sanctioned ███████████████ ("███") for facilitating transactions on behalf of actors linked to its proliferation network. The designation noted that North Korea uses ███ to facilitate millions of dollars in transactions on behalf of actors linked to its weapons of mass destruction proliferation network. ███ and all other North Korean banks have been identified by the United Nations and the United States Treasury Department as having engaged in systemic money laundering and continued U.S. dollar transactions after the imposition of U.S. sanctions. In fact, ███ is the official North Korean bank for all foreign currency transactions.

23.    I am aware from reliable source reporting that North Korea's government depends on foreign trade, banking, and access to the dollar-based financial system to pay their military and security forces, and that recent U.N. reports confirm that Pyongyang continues to rely on the dollar, and its access to the dollar system, to move money around the world.

**II.    Previous Search Warrants for Email Accounts Controlled by ███ officials**

24.    On ███████████, this Court authorized a search of two ███ email accounts. *See* ████████████ (Sealed). These two initial search warrants identified numerous additional ███ email accounts that are involved with correspondence regarding illicit ███ financial transactions. To date, search warrants have been issued for the content of seventeen ███ email accounts

25.     The search warrant returns revealed ▮▮▮ extensive network.  For example, search warrant returns for ▮▮▮▮▮▮▮▮▮▮▮▮ revealed the account was registered from IP address ▮▮▮▮▮▮, which resolves to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As outlined in subsequent search warrant applications (*See* ▮▮▮▮▮▮ (GMH)(Sealed) and ▮▮▮ ▮▮▮▮ (RMM)(Sealed)), the contents for ▮▮▮▮▮▮▮▮▮ revealed that ▮▮▮▮▮ is a ▮▮▮ banking representative based in ▮▮▮▮▮▮▮▮▮ who has corresponded with other ▮▮▮ representatives, often using coded payment instructions and encrypted messages

26.     A team of FBI analysts and forensic accountants conducted cryptanalysis[1] of the payment instructions contained within the content of these search warrant returns. In part, this entailed cross-referencing financial data relating to known North Korean financial facilitators against coded payment instructions.  The review of the coded payment instructions revealed millions of illicit U.S. dollar transactions conducted by ▮▮▮ via front companies.

27.     Based on a review of the search warrant returns, I know that ▮▮▮ has relied on covert bank representatives in ▮▮▮▮▮▮▮▮▮▮▮▮▮, as well as offices in ▮▮▮▮▮▮▮▮▮▮▮▮ to operate their trans-national money laundering network.

28.     The search warrant returns further revealed that ▮▮▮ has relied on representatives in the overseas covert branches of ▮▮▮ to assist with money laundering activities on behalf of North Korean entities. Although some of the ▮▮▮ representatives have deleted the contents of their email accounts, other ▮▮▮ representatives have extensive email records that detail how they used front companies to access the U.S. financial system in an effort to circumvent U.S. sanctions.

---

[1] Cryptanalysis is the study of analyzing information systems in order to study the hidden aspects of the systems. Cryptanalysis is used to breach cryptographic security systems and gain access to the contents of coded conversations.

Furthermore, although messages between ██ representative are frequently coded and/or encrypted, some representatives still conduct transactions that include un-coded company registration documents, invoices, and payment confirmations related to their money laundering and procurement activities.

**III.** <u>████████████████████████████ **has been Identified as a North Korean Intelligence Officer and Money Launderer**</u>

    A.   <u>Background on</u> ████████████████████

    29.   The FBI is investigating ████████████████████████████ for violations of federal money laundering and sanctions laws. Prior search warrant returns revealed that ██ is a ████████ national living in ████████ *See* ████████ (RMM) (Sealed). ██ has a long history of conspiring with the ██. According to a 2008 investigation conducted by the U.S. Senate, ██ opened U.S. dollar accounts for ██ at ████████ ("████") beginning in the late 1990s. These accounts were used by ██ and the North Korean government to illegally avoid international regulatory scrutiny and to launder North Korean governmental funds through U.S. correspondent bank accounts. ██ was subject to a 311 designation by the U.S. Treasury in 2005 for the illicit services it provided to North Korea. This action, which terminated ████ ability to engage in U.S. correspondent banking activities, essentially caused ██ to collapse. ██ was a central figure in ██ association with North Korea.

    30.   Search warrant returns further revealed that ██, ██ business partner, is a ████ official who operates a ████████████████ ████████ which is owned by ██. The investigation revealed that ██ has conducted multiple illicit U.S. dollar transactions with representatives of the ██.



10

IV. 

    A.                     <u>Business Dealings with</u>     and

31.     Search warrant returns revealed a contract    sent to    in June 2014, in which had agreed to purchase large quantities of gold and silver from one of    companies. The contract law provided that    would purchase between 12 and 100 kilograms of gold, and between 0.2 and 4 metric tons of silver, per shipment from    company. The contract further indicated that metals would be packaged in parcels of 12-13 kilograms for gold, 17-18 kilograms for silver, and would be delivered to Payment was to be made to an account provided by    upon confirmation of the purity of the metals sold.

32.     I know from my training and experience that gold is a commodity that is heavily mined in North Korea, and then sold for U.S. dollars to fund the sanctioned regime.

33.     The signatory on the contract for    was listed as email address, the **Target Account**, was listed as the contact information for    .

34.     In early July 2014,    provided    with an update regarding    second shipment of gold and silver. According to    , the second shipment to    had been loaded onto "    " and consisted of 57 packages totaling 1,030 kilograms. According to open source data, "    " is the flight code for The consignee for the shipment was The shipper was

35.     Corporate ownership records obtained by law enforcement revealed that

36.     A review of ██████ corporate registry revealed ██ is the director of ██ ██████████.

37.     ██ applied for a U.S. visa in February 2008 in which he provided the **Target Account** as his contact address. ██ identified his employer on the Visa application as another ██████ precious metals trading firm.

38.     Subpoena returns from financial institutions that process international U.S. dollar wires revealed that ██████ remitted at least $2.7 million dollars to ████████████ ████████████ between September 2014 and March 2015.

39.     On June 14, 2017, the government filed a forfeiture complaint for funds seized from ██████, a company owned by ██████ a ██████ national based in ████████ The complaint alleged that ██████ was a front company that was created to launder U.S. dollars on behalf of ██. Law enforcement's investigation into ██████ revealed that its sole business purpose was to launder funds for the North Korean regime.

40.     In August 22, 2017, OFAC designated ██████ for acting as a front company for ██. The designation noted that ██████ provided financial services to ██ by, among other things, conducting U.S.-dollar denominated transactions.

41.     Given the timing of ██████ payments to ██████, which began a short time after the gold and silver deliveries noted above, there is probable cause to believe that the payments involving ██████ and ██████ were part of ██ illicit scheme to launder U.S. Dollars. Such activities are consistent with ██ documented money laundering practices on behalf of ██.

B.   ████████ connection to ████████████ a known front company for OFAC-designated

42.   OFAC designated ████████████ for its affiliation with North Korea's military and for operating in North Korea's financial industry.  Previous search warrant returns revealed a May 2013 conversation in which ████ was asked to meet with the president of ████ in ████████.

43.   According to the U.N. Panel of Experts, ██████████████ was a front company associated with ██████████████████ Search warrant returns confirmed that ██████ was linked to ██████ covert office in ████████████ (which office also operated ████████) and assisted ██████ with various money laundering activities.

44.   2703(d) returns relating to the Target Account revealed multiple instances of email correspondence with ██████████████, which previous search warrant returns have revealed to be used as part of ██████ International Bank's and ██████ money laundering scheme.

45.   Specifically, previous search warrants revealed an email sent by ████ to ████████████████, wherein ████ discussed business dealings between ██ and the user of the ████████████ email account.  ████ discussed expenses relating to two ████ Bank members living in a building that also housed the ██████████████ (the above-listed business owned by ████ and operated by ████).  ████ also referred to an ongoing and unresolved issue between ████ and the the user of email address ██████████████.

46.   Additionally, previous search warrants revealed an illicit payment request from ██████████████ to the covert branch of ████ Shenyang on August 24, 2015, wherein ██████████████ requested $498,900 to be remitted to ████████████████.

13

███████ Another FBI investigation revealed that ███████████ was communicating North Korean officials as part of a scheme to launder funds and import goods into North Korea.

47.  Notwithstanding that ████ was designated by OFAC on March 16, 2016, 2703(d) returns revealed that the **Target Account** and █████████████████ communicated at least 300 times beginning in approximately August 2015.

48.  On December 19, 2018, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to ████████████████

## BACKGROUND CONCERNING E-MAIL

49.  PROVIDER is the provider of the internet-based account identified by ████████████████

50.  PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

51.  Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website. During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.  PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

52.  Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username.

PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[2]

53.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

54.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based

---

[2] Yahoo provides e-mail, contact list, chat, and other services as noted generically above.  It provides the branded services Yahoo! groups (a listserve and bulletin board service, which users can opt into), Yahoo! Messenger (an instant messaging service, which users can opt into), and Flickr (a photo storage and sharing service, which users can opt into).  Yahoo does not currently provide a standalone notes or document storage service, but its smartphone application has designated "notes" and "documents" functions that operate through Yahoo's e-mail storage.

on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

55.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

56.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services.  Examples of these identifiers include unique application number, hardware model,

operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

57. Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

58. Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common

17

computer cookies, and common names or addresses, that can show a single person, or single group

of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know

that evidence concerning the identity of such linked accounts can be useful evidence in identifying

the person or persons who have used a particular PROVIDER account.

59.    Based on my training and experience, I know that subscribers can communicate

directly with PROVIDER about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users. Providers such as PROVIDER typically retain records

about such communications, including records of contacts between the user and the provider's

support services, as well records of any actions taken by the provider or user as a result of the

communications. In my training and experience, such information may constitute evidence of the

crimes under investigation because the information can be used to identify the account's user or

users.

60.    In summary, based on my training and experience in this context, I believe that the

computers of PROVIDER are likely to contain user-generated content such as stored electronic

communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well

as PROVIDER-generated information about its subscribers and their use of PROVIDER services

and other online services. In my training and experience, all of that information may constitute

evidence of the crimes under investigation because the information can be used to identify the

account's user or users. In fact, even if subscribers provide PROVIDER with false information

about their identities, that false information often nevertheless provides clues to their identities,

locations, or illicit activities.

61.    As explained above, information stored in connection with a PROVIDER account

may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

62.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.

63.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,



Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 based on information communicated by telephone on this  20th  day of May, 2019.

_____
HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT PREMISES CONTROLLED BY OATH<br>HOLDINGS, INC. FOR INVESTIGATION OF<br>VIOLATIONS OF 18 U.S.C. 1956 | )<br>)<br>)<br>)<br>)<br>)   Case No. **19-sc-1090** |

## AMENDED APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC. FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C.1956 (See Attachment A, incorporated herein by reference.)

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a) | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: __05/20/2019__

City and state: District of Columbia

Digitally signed by G. Michael Harvey
Date: 2019.05.20 16:00:05 -04'00'

*Judge's signature*

G. Michael Harvey, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| In the Matter of the Search of | ) |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC. FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. 1956 | ) ) ) ) |

Case No.  19-sc-1090

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC. FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. 1956
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____June 3, 2019_____ *(not to exceed 14 days)*
  ☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____.
                                                                    *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      05/20/2019

Digitally signed by G. Michael Harvey
Date: 2019.05.20 16:00:21 -04'00'

*Judge's signature*

City and state:      District of Columbia

G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  19-sc-1090 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

           _____
                 *Executing officer's signature*

           _____
                 *Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with the Yahoo account identified as

█████████████ and which is stored at premises owned, maintained, controlled, or

operated, by Oath Holdings, Inc., a company that accepts service of legal process at 701 First

Avenue, Sunnyvale, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.    Information to be disclosed by Oath Holdings, Inc. (the "PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any emails, records, files, logs, or information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    For the time period from March 1, 2013 to the present: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services,  including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[3]

---

[3] Yahoo provides e-mail, contact list, chat, and other services as noted generically above. It provides the branded services Yahoo! groups (a listserve and bulletin board service, which users can opt into), Yahoo! Messenger (an instant messaging service, which users can opt into), and Flickr (a photo storage and sharing service, which users can opt into).  Yahoo does not currently provide a standalone notes or document storage service, but its smartphone application has designated "notes" and "documents" functions that operate through Yahoo's e-mail storage.

b.    For the time period from March 1, 2013 to present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.    For the time period from March 1, 2013 to present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies); The types of service utilized;

d.    For the time period from March 1, 2013 to present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.    All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information,

and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s);

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

24

i.      For the time period March 1, 2013:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

k.      Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq*. and 18 U.S.C. § 1956, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence related to the amount and location of any U.S. dollar payments, monies, or funds transfers by ███████████████

████████████████████████████████████████████



(f) Information that constitutes evidence concerning U.S. dollar transactions, banking, mineral/gold trade, or financial information related to ████████████████



(g) Information that constitutes evidence related to anti-money laundering controls, the bank secrecy act, know your customer policies, and/or lists, names, persons, companies, and/or entities sanctioned or related to the Department of Treasury Office of Foreign Asset Control ("OFAC");

(h) Evidence related to the business of the ████████████████ including its practices, makeup, organizational structure, profits, and customers;

(i) Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j) the transportation or transmission of funds that have been derived from a criminal offense;

27

(k) the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(m) Evidence indicating the email account owner's state of mind as it relates to the criminal activity under investigation;

(n) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(o) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

(p) The identity of the person(s) who communicated with the user ID about matters relating to the laundering of funds to / from ███████████████ ████████████████████████████████████

## III. Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

      I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Oath Holdings ("PROVIDER"), and my official title is _____. I am a custodian of records for PROVIDER. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of PROVIDER, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes).

      I further state that:

      a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

      b.     such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

          1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

          2.     the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

      I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____   _____

Date                  Signature

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC. FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956** | Case No. 19-sc-1090 <br><br> **Filed Under Seal** |

*Reference:* **USAO Ref. #** ▮▮▮▮▮▮▮  *Subject Account(s):* ▮▮▮▮▮▮▮▮▮

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, ▮▮▮▮▮▮ being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information which is associated with one account—that is, ▮▮▮▮▮▮▮▮▮ (hereinafter referred to as "Target Account"). —which is stored at premises controlled by Oath Holdings, Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at/which accepts service at 701 First Avenue, Sunnyvale, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, analysts, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of IEEPA and the federal money laundering statute, 18 U.S.C. § 1956, have been committed by ████████████ ████████ and co-conspirators known and unknown, including the user of the Target Account. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

6.      This investigation relates to violations of IEEPA and its implementing executive orders and regulations. IEEPA, enacted in 1977, granted the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Under IEEPA, the President may declare a national emergency through executive orders that have the full force and effect of law.

7.      50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

8.      Using the powers conferred by IEEPA, the President has issued orders and regulations governing and prohibiting certain transactions with North Korea by U.S. persons or involving U.S. goods.

9.      On or about June 28, 2005, the President signed executive order ("E.O.") 13382, which blocked individuals engaging in, or supporting, activities promoting the proliferation of weapons of mass destruction ("WMD"). This blocking program initially applied to eight organizations in North Korea, Iran, and Syria. The U.S. Department of the Treasury, together with

the U.S. Department of State, is authorized to designate additional proliferators of WMD and their supporters under the authorities provided by E.O. 13382. Pursuant to that authority, on or about April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101 *et seq*.

10.     On or about June 26, 2008, the President signed E.O. 13466, which declared a national emergency in response to the risk of the proliferation of WMD on the Korean Peninsula. In E.O. 13466, the President ordered that certain trade restrictions with respect to North Korea be continued under the authority of the Trading With the Enemy Act. Since 2008, the President has issued subsequent E.O.s, including E.O.s 13551, 13570, 13687, and 13722, expanding the 2008 national emergency in various respects, including blocking the property of certain persons (individuals and entities) from transactions involving U.S. Dollars, as well as prohibiting certain types of transactions with U.S. persons.

11.     The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in Washington, DC, administers a number of sanctions programs to accomplish U.S. foreign-policy and national-security goals. Two of OFAC's active sanction programs include the Non-Proliferation Sanctions program and the North Korea Sanctions program. OFAC's current Non-Proliferation Sanctions program began in 2005 pursuant to E.O. 13382. OFAC's current North Korea Sanctions program began in 2008 pursuant to E.O. 13466. When OFAC designates persons under the Non-Proliferation Sanctions and North Korea Sanctions programs, the sanctioned persons are added to a list of Specially Designated Nationals ("SDNs"). Among other things, persons added to the SDN list are prohibited from engaging with the U.S. financial system in any respect.  That prohibition extends to the processing of international wire transfers denominated in U.S. dollars originating from offshore U.S. dollar accounts at foreign

financial institutions, which utilize correspondent-banking services at U.S. financial institutions for such transfers.

### **Anti-Money Laundering Obligations**

12.     According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act, as well as sanctions programs administered by OFAC.

13.     The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system.  The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern.  In November 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf.   The special measure also required U.S. financial institutions to take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution.  In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking in the United States.  FinCEN further required U.S. financial institutions to engage in enhanced due diligence to root out any transactions by North Korean financial institutions and

entities acting on their behalf. Failure to comply with the special measure entailed civil and criminal penalties for U.S. financial institutions.

14.    U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of the U.S. dollar.

15.    One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

16.    In my training and experience, I know that criminals are aware of the general prohibition of U.S. dollar transactions for the benefit of North Korean entities and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent North Korean parties from transacting in U.S. dollars. As a result, criminals employ front companies, or brokers to act as cutouts, to engage in transactions on their behalf, in order to prevent banks from uncovering the North Korean entity that is a party to the transaction.

17.     Title 18, United States Code, Section 1956(h) criminalizes a conspiracy to violate § 1956.

18.     Title 18, United States Code, Section 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, *inter alia*, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

19.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA and the bank fraud statute.

## PROBABLE CAUSE

### I.     Background

20.     Because of United Nations ("U.N.") and U.S. sanctions that are in effect against North Korea, North Korea and its business entities can only access the U.S. financial system by using front companies to conceal their direct involvement in the transactions and to evade the aforementioned sanctions. I know from my training and experience, as well as from a variety of open source material, that North Korea needs to access the U.S. financial system because, in order to obtain the goods that it needs, it must conduct trade in dollars. According to the United Nations Security Council's February 23, 2015 Report of the Panel of Experts, most of the transactions seen by the Panel were made in United States dollars from foreign-based banks and transferred through corresponding bank accounts in the United States

21.     On or about November 2, 2017, FinCEN issued an advisory to further alert financial institutions to North Korean schemes being used to evade U.S. and U.N. sanctions, launder funds, and finance the North Korean regime's weapons of mass destruction and ballistic missile

programs. The advisory was intended to provide financial red flags of illicit North Korean schemes, including the use of financial representatives world-wide. It also highlighted the use of China-based front or shell companies, trading companies, and financial institutions operating in areas bordering North Korea. These indicators were intended to assist financial institutions in identifying and reporting suspected illicit activity by the North Korean government and its financial institutions.

22.     In March 2013, OFAC sanctioned ███████████████████ ("███") for facilitating transactions on behalf of actors linked to its proliferation network. The designation noted that North Korea uses ███ to facilitate millions of dollars in transactions on behalf of actors linked to its weapons of mass destruction proliferation network. ███ and all other North Korean banks have been identified by the United Nations and the United States Treasury Department as having engaged in systemic money laundering and continued U.S. dollar transactions after the imposition of U.S. sanctions. In fact, ███ is the official North Korean bank for all foreign currency transactions.

23.     I am aware from reliable source reporting that North Korea's government depends on foreign trade, banking, and access to the dollar-based financial system to pay their military and security forces, and that recent U.N. reports confirm that Pyongyang continues to rely on the dollar, and its access to the dollar system, to move money around the world.

**II.     Previous Search Warrants for Email Accounts Controlled by ███ officials**

24.     On ██████████ this Court authorized a search of two ███ email accounts. *See* ████████████ (Sealed). These two initial search warrants identified numerous additional ███ email accounts that are involved with correspondence regarding illicit ███ financial transactions. To date, search warrants have been issued for the content of seventeen ███ email accounts

8

25. The search warrant returns revealed ███ extensive network. For example, search warrant returns for ████████████ revealed the account was registered from IP address ███████, which resolves to ██████████████████████ As outlined in subsequent search warrant applications (*See* 1:████████ (GMH)(Sealed) and 1:mj-█████ (RMM)(Sealed)), the contents for ████████████ revealed that ██████████ is a ███ banking representative based in ██████████ who has corresponded with other ███ representatives, often using coded payment instructions and encrypted messages

26. A team of FBI analysts and forensic accountants conducted cryptanalysis[1] of the payment instructions contained within the content of these search warrant returns. In part, this entailed cross-referencing financial data relating to known North Korean financial facilitators against coded payment instructions. The review of the coded payment instructions revealed millions of illicit U.S. dollar transactions conducted by ███ via front companies.

27. Based on a review of the search warrant returns, I know that ███ has relied on covert bank representatives in ████████████, as well as offices in ██████████ to operate their trans-national money laundering network.

28. The search warrant returns further revealed that ███ has relied on representatives in the overseas covert branches of ███ to assist with money laundering activities on behalf of North Korean entities. Although some of the ███ representatives have deleted the contents of their email accounts, other ███ representatives have extensive email records that detail how they used front companies to access the U.S. financial system in an effort to circumvent U.S. sanctions.

---

[1] Cryptanalysis is the study of analyzing information systems in order to study the hidden aspects of the systems. Cryptanalysis is used to breach cryptographic security systems and gain access to the contents of coded conversations.

Furthermore, although messages between ■■■ representative are frequently coded and/or encrypted, some representatives still conduct transactions that include un-coded company registration documents, invoices, and payment confirmations related to their money laundering and procurement activities.

**III.** ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ **has been Identified as a North Korean Intelligence Officer and Money Launderer**

A. <u>Background on</u> ■■■■■■■■■■■■■■■■■■■■■■

29. The FBI is investigating ■■■■■■■■■■■■■■■■■■■■■ for violations of federal money laundering and sanctions laws. Prior search warrant returns revealed that ■■ is a ■■■■■■■■■■■■■■■■■■■■■■■■■ *See* ■■■■■■■■■■■■ (Sealed). ■■ has a long history of conspiring with the ■■■. According to a 2008 investigation conducted by the U.S. Senate, ■■ opened U.S. dollar accounts for ■■ at ■■■■■■■■■ ■■■ beginning in the late 1990s. These accounts were used by ■■ and the North Korean government to illegally avoid international regulatory scrutiny and to launder North Korean governmental funds through U.S. correspondent bank accounts. ■■ was subject to a 311 designation by the U.S. Treasury in 2005 for the illicit services it provided to North Korea. This action, which terminated ■■ ability to engage in U.S. correspondent banking activities, essentially caused ■■ to collapse. ■■ was a central figure in ■■ association with North Korea.

30. Search warrant returns further revealed that ■■, ■■ business partner, is a Cambodia-based North Korean official who operates a ■■■■■■■■■■■■■ ■■■■■ which is owned by ■■. The investigation revealed that ■■ has conducted multiple illicit U.S. dollar transactions with representatives of the ■■.

IV. 

A. ▮▮▮▮▮ Business Dealings with ▮▮ and ▮▮

31. Search warrant returns revealed a contract ▮▮ sent to ▮▮ in June 2014, in which ▮▮▮▮▮▮▮▮▮▮▮▮ had agreed to purchase large quantities of gold and silver from one of ▮▮ companies. The contract law provided that ▮▮▮▮ would purchase between 12 and 100 kilograms of gold, and between 0.2 and 4 metric tons of silver, per shipment from ▮▮ company. The contract further indicated that metals would be packaged in parcels of 12-13 kilograms for gold, 17-18 kilograms for silver, and would be delivered to ▮▮▮ ▮▮▮▮▮▮▮▮ Payment was to be made to an account provided by ▮▮ upon confirmation of the purity of the metals sold.

32. I know from my training and experience that gold is a commodity that is heavily mined in North Korea, and then sold for U.S. dollars to fund the sanctioned regime.

33. The signatory on the contract for ▮▮▮▮ was listed as ▮▮▮▮▮ ("▮▮"). ▮▮ email address, the **Target Account**, was listed as the contact information for ▮▮▮.

34. In early July 2014, ▮▮ provided ▮▮ with an update regarding ▮▮▮ second shipment of gold and silver. According to ▮▮, the second shipment to ▮▮▮ had been loaded onto "▮▮▮" and consisted of 57 packages totaling 1,030 kilograms. According to open source data, "▮▮▮" is the flight code for ▮▮▮▮▮▮▮▮▮▮▮▮ The consignee for the shipment was ▮▮▮▮▮▮▮▮▮ The shipper was ▮▮ ▮▮▮.

35. Corporate ownership records obtained by law enforcement revealed that ▮▮▮ ▮▮▮▮▮ trade company owned by ▮▮.

36.     A review of  corporate registry revealed ⬛ is the director of ⬛ ⬛ Precious Metals.

37.     ⬛ applied for a U.S. visa in February 2008 in which he provided the **Target Account** as his contact address. ⬛ identified his employer on the Visa application as another ⬛, precious metals trading firm.

38.     Subpoena returns from financial institutions that process international U.S. dollar wires revealed that ⬛ remitted at least $2.7 million dollars to ⬛ ⬛ between September 2014 and March 2015.

39.     On June 14, 2017, the government filed a forfeiture complaint for funds seized from ⬛, a company owned by ⬛ The complaint alleged that ⬛ was a front company that was created to launder U.S. dollars on behalf of ⬛. Law enforcement's investigation into ⬛ revealed that its sole business purpose was to launder funds for the North Korean regime.

40.     In August 22, 2017, OFAC designated ⬛ for acting as a front company for ⬛. The designation noted that ⬛ provided financial services to ⬛ by, among other things, conducting U.S.-dollar denominated transactions.

41.     Given the timing of ⬛ payments to ⬛, which began a short time after the gold and silver deliveries noted above, there is probable cause to believe that the payments involving ⬛ and ⬛ were part of ⬛ illicit scheme to launder U.S. Dollars. Such activities are consistent with ⬛ documented money laundering practices on behalf of ⬛.

12

B. ███████████ connection to ███████████ a known front company for OFAC-designated ███████

42.    OFAC designated ███████████ for its affiliation with North Korea's military and for operating in North Korea's financial industry.  Previous search warrant returns revealed a May 2013 conversation in which ███ was asked to meet with the president of ███ in Beijing.

43.    According to the U.N. Panel of Experts, ███████████ was a front company associated with ███████████ office. Search warrant returns confirmed that ███ was linked to ███ covert office in ███████ (which office also operated ███████) and assisted ███ with various money laundering activities.

44.    2703(d) returns relating to the Target Account revealed multiple instances of email correspondence with ███████████, which previous search warrant returns have revealed to be used as part of ███ International Bank's and ███ money laundering scheme.

45.    Specifically, previous search warrants revealed an email sent by ███ to ███████████, wherein ███ discussed business dealings between ███ and the user of the ███████████ email account. ███ discussed expenses relating to two ███ Bank members living in a building that also housed the ███████████ above-listed business owned by ███ and operated by ███). ███ also referred to an ongoing and unresolved issue between ███ and the the user of email address ███████████

46.    Additionally, previous search warrants revealed an illicit payment request from ███████████ to the covert branch of ███ Shenyang on August 24, 2015, wherein ███████████ requested $498,900 to be remitted to ███████████

████ Another FBI investigation revealed that ░████████ was communicating North Korean officials as part of a scheme to launder funds and import goods into North Korea.

47.     Notwithstanding that ████ was designated by OFAC on March 16, 2016, 2703(d) returns revealed that the **Target Account** and ████████████████ communicated at least 300 times beginning in approximately August 2015.

48.     On December 19, 2018, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to ████████████████

### BACKGROUND CONCERNING E-MAIL

49.     PROVIDER is the provider of the internet-based account identified by ████████████████

50.     PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

51.     Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website. During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.  PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

52.     Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username.

PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[2]

53.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

54.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based

---

[2] Yahoo provides e-mail, contact list, chat, and other services as noted generically above.  It provides the branded services Yahoo! groups (a listserve and bulletin board service, which users can opt into), Yahoo! Messenger (an instant messaging service, which users can opt into), and Flickr (a photo storage and sharing service, which users can opt into).  Yahoo does not currently provide a standalone notes or document storage service, but its smartphone application has designated "notes" and "documents" functions that operate through Yahoo's e-mail storage.

on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

55.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

56.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services.  Examples of these identifiers include unique application number, hardware model,

16

operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

57.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

58.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common

computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

59.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

60.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

61.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

18

conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

62.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.

63.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Neil Parrott
Special Agent
Federal Bureau Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 based on information communicated by telephone on this __20th__ day of May, 2019.

Digitally signed by G. Michael Harvey
Date: 2019.05.20 16:00:39 -04'00'

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

20