# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO ACCOUNT(S)<br>STORED AT PREMISES CONTROLLED BY GOOGLE LLC<br>PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF<br>VIOLATION OF 50 U.S.C. § 1701, ET SEQ. | )<br>)<br>)<br>)<br>)<br>)     Case No. 19-sc-01222 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 50 U.S.C. § 1701, et seq.;<br>15 C.F.R. §§ 730-774; 50<br>U.S.C. § 4819 | Violations of the International Emergency Economic Powers Act, the Export<br>Administration Regulations, and the Export Control Reform Act of 2018 |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: \_\_\_\_\_ 06/06/2019 \_\_\_\_\_

_____

*Judge's signature*

City and state: Washington, D.C.

Robin M. Meriweather, U.S. Magistrate Judge

*Printed name and title*

Case 1:22-sc-01222-JMC *SEALED* Document 1-4 Filed 12/06/25 Page 3 of 34

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.  19-sc-01222 |
| INFORMATION ASSOCIATED WITH TWO ACCOUNT(S) | ) |
| STORED AT PREMISES CONTROLLED BY GOOGLE LLC | ) |
| PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF | ) |
| VIOLATION OF 50 U.S.C. § 1701, ET SEQ. | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the      Northern      District of       California
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

      **YOU ARE COMMANDED** to execute this warrant on or before      June 20, 2019      *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    U.S. Magistrate Judge Robin M. Meriweather    .
                                                                     *(United States Magistrate Judge)*

      ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
      ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    06/06/2019            _____
                                                            *Judge's signature*

City and state:    Washington, D.C.               Robin M. Meriweather, U.S. Magistrate Judge
                                                                  *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: <br> 19-sc-01222 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with email addresses ███████████████████████████████████████ that are stored at the premises owned, maintained, controlled, or operated by Google LLC, an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B

## Particular Things to be Seized and Procedures to Facilitate Execution of the Warrant

**I.     Information to be disclosed by Google LLC ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, regardless of whether such information is located within or outside of the United States, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier listed in Attachment A:

a.     For the time period from the inception of the target accounts to the present: the contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, or voice call services), including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);

b.     For the time period from the inception of the target accounts to the present: the contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, or voice

call services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

      c.     For the time period from the inception of the target accounts to the present, all PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

      d.     For the time period from the inception of the target accounts to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

      e.     All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

      f.     All device or user identifiers which have ever been linked to the Account, including but not limited to all cookies and similar technologies, unique application numbers, hardware models, operating system versions, device serial numbers, Global Unique Identifiers ("GUID"),

mobile network information, telephone numbers, Media Access Control ("MAC") addresses, and International Mobile Equipment Identities ("IMEI");

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (e.g., credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period from the inception of the target accounts to the present, all records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

i.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.      For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.  The PROVIDER is hereby ordered to disclose the above information to the government within fourteen (14) days of the issuance of this warrant.

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence,

and instrumentalities of violations of Title 50, United States Code, Sections 1701, et seq., also known as the International Emergency Economic Powers Act ("IEEPA"), as described in the affidavit submitted in support of this Warrant, including, for each Account, from the inception of the account to the present, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning unlawful export or transshipment of U.S.-origin items.

## III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____
[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.  all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.  such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.  the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.  the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) of the Federal Rules of Evidence.


_____         _____
Date                                      Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNT(S) STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 50 U.S.C. § 1701, ET SEQ. | SC No. 19-sc-01222<br><br><br>**Filed Under Seal** |

*Reference: USAO Ref. #* ████████ *; Subject Account(s):* ████████████ *and* ████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ██████, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with two accounts – that is, ████████████ and ████████████ – which are stored at premises controlled by Google LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at 1600 Amphitheatre Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.



4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or all of the knowledge of others, about this matter.

5.     In conducting this investigation, I have reviewed the reports of other agents who have interviewed representatives of companies who received purchase orders and provided quotations to individuals associated with the violation. I have also reviewed numerous records,

including emails and sales documents relevant to the investigation. The information contained herein is based in part on the documentation I have reviewed.

6.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the International Emergency Economic Powers Act, 50 U.S.C. § 1701, et seq. ("IEEPA"), the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, and the Export Control Reform Act of 2018, 50 U.S.C. § 4819, have been committed by ████████████████████ representing the foreign entities █████████████████████████████████ ██████████. There is probable cause to search the email accounts as described in Attachment A, specifically, █████████████████ and ███████████████████, for evidence, instrumentalities, contraband, and/or fruits of the crimes further described below.

## JURISDICTION

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the United States District Court for the District of Columbia, is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i). As set forth more fully below, acts or omissions in furtherance of the offenses under investigation, specifically the failure to obtain a license to export and the falsification of information submitted in support of license applications, occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

---

[1] The actual identities of the person or persons using these e-mail accounts is unknown. In email correspondence that I have reviewed, the users of these accounts refer to themselves as ██████████████.

**LEGAL BACKGROUND AND PROBABLE CAUSE**

8.      The export of articles affecting the national security of the United States is governed by various regulatory schemes, including those implemented under IEEPA, 50 U.S.C. § 1701, et seq. Under IEEPA, the President of the United States is granted the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States, where such an extraordinary threat has its source in whole, or in substantial part, outside the United States. Pursuant to this authority, through Executive Order 13222 of August 17, 2001, and successive Presidential Notices, the most recent being that of August 8, 2018 (83 FR 39871 (Aug 13, 2018)), the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, have continued in full force and effect.[2]

9.      The BIS reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR. In particular, the EAR restricts the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by an Export Control Classification Number ("ECCN"), each of which has export control requirements depending on the destination, end use, and end user of the item at issue. The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or to be lawfully re-exported from one foreign destination to another.

---

[2] On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018), currently codified at 50 U.S.C. § 4819. In part, ECRA provides permanent statutory authority for the EAR. For conduct predating August 13, 2018, IEEPA is the controlling statute. For conduct occurring after August 13, 2018, ECRA is the controlling statute.

10.     As part of the license application process, BIS may require license applicants to obtain a Statement by Ultimate Consignee and Purchaser. 15 C.F.R. part 748.11(a)(3)(Note 2). The statement can be made either on company letterhead, or on a Form BIS-711. 15 C.F.R. part 748.11(b). Applicants obtain such statements from their customers (i.e. the ultimate consignee and purchaser), who certify their intended disposition of the items, including the end-use, incorporation, distribution, resale, or reexport of the item at issue in the license application. *See* Supplement 3 to part 748 of the EAR. The consignee and/or purchaser must notify the applicant if changes in the facts or circumstances occur after the statement is sent to the applicant. 15 C.F.R. 748.11(b)(5)(iii).

11.     At all times relevant to this affidavit, it was unlawful and a violation of the EAR to make a false or misleading representation, statement, or certification directly to the Department of Commerce or indirectly through any other person, in connection with the preparation, submission, issuance, use, or maintenance of any export control document, including an export license or license application. 15 C.F.R. part 764.2(g)(1)(ii) and 50 U.S.C. § 4819(a)(2)(F)(ii).

12.     Additionally, at all times relevant to this affidavit, a license was required to export or reexport to Iran an ███████████████████████████████ along with other items subject to the EAR identified below.

███████████ **and** ███████████

13.     ███████ is a trading company operating out of ███████████████ that has contacted various U.S. companies to purchase ███████████████ purportedly for end use in ███████ As described below, there is probable cause to believe that ███████ has procured or attempted to procure ███████████████████ in order to ship those parts to Iran. ███████ primarily corresponds with U.S. companies using the email address ███████████████, which purportedly belongs to ███████████ the manager of ███.

Another individual, using the name █████████ has also used the email address of █████████████████ Specifically, a person calling himself █████████ used this email address on or about April 22, 2019 to inform a U.S. company that ██████ had changed its name to █████████ and had a new address. Thereafter, █████████ used the email address of █████████████████ and █████████ letterhead of to correspond with a U.S. company regarding the purchase of export-controlled ████████.

14.     The means and manner of ████████ efforts to export restricted items from the United States to Iran in violation of IEEPA, the EAR, and ECRA has generally worked as follows: ████, communicating through █████████████████ or █████████████████, or using a phone number originating from Iran, contacts a U.S. company to purchase █████████. ████ claims that the █████████ are for end-use by a █████████ company or governmental entity and submits a false end-user statement in support of its purchase. In actuality, the entity identified as the end-user has no business relationship with ████, which itself does not appear to have a standalone office or physical presence in ████████. Using a freight forwarding company, ████ then arranges for shipment of the export-controlled parts to Iran.

**BIS Validated Export License D1103064**

15.     On or about September 12, 2017, BIS issued export license number █████████ to a U.S. company in █████████████ ("USCOM1"), to export one █████████████████ █████████ valued at $11,900 to ████████. ████ was identified as the purchaser and intermediate consignee and █████████████████████ was listed as the ultimate consignee. █████████, using the █████████████████ account, communicated with USCOM1 concerning the order. In the Form BIS-711 that accompanied the license application, █████████, the manager for ████, certified that █████████ was the ultimate consignee, that the



████████████████████ was to be used in ███████, and that it would not be reexported. An individual, using the name ████████████ signed as the purchasing manager for ████████. According to the end-used check conducted at ███████, as detailed further below, ███████ was not the actual ultimate consignee nor end-user for this transaction.

**BIS Export License Application** ████████████

16.     On or about April 1, 2019, a U.S. company in ████████ ("USCOM2") submitted an export license application to request authorization to export three items identified as ████████ ████████████ valued at $4,500 to ████████ in ████████. The application related back to a ████ purchase order dated November 14, 2018. The license application listed ████ as the purchaser and intermediate consignee and listed ████████ as the Ultimate Consignee. In support of the license application, on or about November 15, 2018, ████████████ signed an End-User Form, on USCOM2 letterhead, identifying ████ as the buyer and listing ████████ as the end user. The email ████████████████ was listed as ████ email address. As revealed by the end-used check conducted at ████████ detailed below, ████████ had never done business with ████████ and ████ was not an approved vendor for ████████.

17.     The license application was Returned Without Action ("RWA") on or about April 17, 2019. The applicant was instructed to reapply with technical specifications for the item. The RWA also stated that the OEE had performed an end-use check on ████ and found ████ to be an unreliable recipient.

18.     On or about April 24, 2019, USCOM2 informed the OEE CFO that USCOM2 had been contacted that day by someone purporting to be ████████ using the ████████████████ email address. The email stated that ████ had changed its name and location to ████████████████████████████ ████. An updated end use



statement listed this information and the email address of ██████████ as the purchaser and intermediate consignee. Additional communication between ██████, using ████████████████, and USCOM2 transpired.

**End-Use Check at the listed place of business for ████.**

19.      On or about February 2019, at the request of the OEE CFO, the Department of Commerce's Export Control Officer ("ECO") based in ██████ traveled to ███████ to conduct end-use checks relating to ██████ transactions.

20.      On or about February 19, 2019, the ECO met with ███████████████████ █████████████████████████████ a Secretarial Firm, located at ███████████████████████████████████████████████████████████ ███████. ██████ serves as a registered business address for more than 250 companies located in and around ████████████ including ████. ██████ works directly with small companies that do not have an actual office to provide administrative services like parcel delivery and mail receipt.

21.      ████████ stated that ████ first registered with ██████ in 2008. The point of contact for ████ provided to █████ was a ██████; █████ did not provide ███████ first name. █████████ was also unable to provide information relating to ████ original registration. According to ████████, the records were too old and had been placed in storage. ████████ explained that under ████████ contract with ████, ██████ served only as a registered address for ████ and provided no other services. █████████ explained that ██████ would also accept parcels for a customer and that accepting such parcels was an implied service provided by ████ to its customers. ████████ had received a few packages for ████ prior to 2016, but █████████ was unable to provide information about the origin of those packages. █████████ stated that ████████ would receive a call from someone from ████ explaining a shipment was on the way.

8

Upon receipt of the parcel by ███████, ██████ would inform ████ of the delivery by phone. ████ would then have someone pick up the packages. ██████████ said this was a standard business practice conducted by many █████ clients.

22.    ██████ provided a letter from the Government of ██████ company registry group, ████████████████████████ stating that ████ had been dissolved as of March 2016. █████████ provided a copy of a letter dated 23 March 2016 that ████████ received from ███, and a copy of the letter sent to ████ directors, ████████████████████████████.

23.    After ██████ was struck off from the █████ business registry in 2016, ██████████ assistant, ███████ stated that ██████ had rejected and returned several parcels received by ███████ to █████. ██████ stated that ████████ continued to receive parcels for ████ for part of 2018, but had not received a parcel since late 2018. Both ████████ and ████████ stated that one of the ██████████' who worked at ███████ might have received a parcel for █████ when ████████ or ████████ were not around.

24.    █████████ stated he was unable to provide any further business documentation to the ECO, unless it was officially requested by the █████████████████. ████████████ was unable to provide a name, other than ████████ and could not provide either a recent forwarding address or a working phone number associated with █████. After receiving the ECO meeting request, ████████ attempted to call ████████ at the previously confirmed number █████████████, but found that the number was no longer working.

**End-Use Check at ████████**

25.    On February 21, 2019, the ECO met with █████████████████████████████





26.    ████████ is a government-linked company owned by the government of the ████████████████ ████████ was established in ████ and provides aero survey service for oil field companies, mainly using Bell helicopters ████████ was registered with ████████████████████████████.

27.    ████ stated that ████████ has never done business with ████ and that he was surprised to learn that ████ had listed ████████ as the end user of any shipment. ████ stated that ████ was not a ████████ approved vendor. The ECO informed ████ and the ████████ team that an individual listed as ████████ allegedly represented ████████ in signing the End Use/End User Statement that was submitted in support of BIS license ████████ for USCOM1. ████ stated that the individual who signed the form never worked for ████████.  .

28.    The ECO verified with ████████ whether it had received the ████████████████ part number ████████████ shipped by USCOM1 through ████ as the intermediate consignee, purportedly for end-use by ████ ████████████████ confirmed that ████████████████████-████ was not in the ████████ database and that the associated aircraft, ████████████████ belonged to a Bell helicopter previously owned by ████████.  ████████ confirmed that that ████ ████████████████ had been sold more than 10 years ago to ████████████████ ████████████████.

**End-Use Check at ████████████████████████**

29.    ████████████████████████ was listed as an intermediate consignee on USCOM1's    BIS    license    application    ████████    ████    ████,    using    the



████████████████████ account, informed USCOM1 that ████ would be the purchaser but that the shipping address for the order would be to ████.

30.     On February 20, 2019, the ECO met with ████████████████████████████ The OEE CFO had requested a pre-license end-use check at ████ due to the fact that they were listed as an intermediate consignee on USCOM1's BIS license application. ████████ provided a contract signed by ████ in 2008 appointing ████ as ████ freight forwarding agent. The contract named ██████████ of ███, as ████ representative.

31.     ████ main office is located at ████████████████████████████ ██████████████████████. ███ also has a warehouse located in ████████████ ███████████████████████. ████ explained that ████ primary business activity is freight forwarding, mainly handling airfreight export shipments. ████ was established in ████ and currently has three employees in its main office, not including ████, and one employee in its warehouse. ████ stated that ████ mainly handled pharmaceutical products. ████ stated that ████ had forwarded a few shipments to Iran via ████████.

32.     ████ stated that he was not aware that ████ was struck off from ████ in 2016 and that ████ was still the appointed freight forwarding agent for ████. ████ had met with ████ from ████ as recently as January 2019 to discuss shipments from the U.S. ████ informed ████ that ████ had cancelled the U.S. shipment relating to the pending license application during the meeting. The ECO asked ████ whether he knew a ████████ who was associated with ████. ████ replied that he had never heard of a ████████. ████ also stated that he did not have any business activity with ████████. ████ explained that ████ was just the transport provider for ████ shipments.

33.     A review of the documents provided by ▮▮▮ show that ▮▮▮ handled ten shipments for ▮▮▮ from July 5, 2017 through December 21, 2017. All ten shipments were listed as sent from ▮▮▮ or ▮▮▮ to Tehran, Iran via ▮▮▮▮▮▮

34.     On March 13, 2019, the ECO spoke via email with ▮▮▮ to obtain contact information for ▮▮▮ and Mr. ▮▮▮. ▮▮▮ stated he had been trying to contact ▮▮▮, but that the phone contacts were no longer valid.

### Additional Attempts to Acquire U.S. Origin Items

35.     On or about September 26, 2018, ▮▮▮ contacted a U.S company in ▮▮▮▮ ("USCOM3"). ▮▮▮ contacted USCOM3 using the ▮▮▮▮▮▮▮ email account to submit a purchase order for six ▮▮▮▮▮▮▮▮▮ at $73,920 each, for a total of $443,520. ▮▮▮ purported to be located at ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

36.     Using the ▮▮▮▮▮▮ email account, ▮▮▮ emailed a copy of the BIS Form 711, Statement by Ultimate Consignee and Purchaser, and USCOM3's end user certification to USCOM3. The end user was listed as the ▮▮▮▮▮▮ In the end user certification for ▮▮▮▮▮▮▮▮ stated the aircraft application as ▮▮▮▮ ▮" However, ▮▮▮▮▮▮ are not interchangeable with the blades used on a ▮▮▮ ▮▮▮ Soon after receiving this email, USCOM3 received a notice from their internet provider that an IP address in Iran had viewed their website. Based on my knowledge, training, and experience, use of an IP address in Iran is an indication of possible diversion to Iran.

37.     USCOM3 conducted open source research regarding the use of the ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ and was unable to confirm that the ▮▮▮▮ ▮▮▮▮



38.    USCOM3 had previously fulfilled two orders for ▮▮▮ for ▮▮▮▮▮▮▮ ▮▮▮▮ and had one pending order. After reviewing the payment information for the two fulfilled orders, USCOM3 determined that the funds were drawn on two different personal bank accounts in ▮▮▮▮ Based on my knowledge, training and experience, the use of ▮▮▮▮ bank accounts is known for increasingly being involved with diversion of items to Iran.

39.    On or about October 1, 2018, USCOM3 contacted the OEE CFO based on this information. Upon reviewing the email headers associated with ▮▮▮▮▮▮▮▮▮, it was determined that the IP addresses of a July 2017 email and a September 16, 2018 email to USCOM3 originated in Iran. Additionally, during one of the meetings with USCOM3, "▮▮▮▮▮▮" called USCOM3 from the following telephone number: ▮▮▮▮▮▮. The international country code for Iran begins with "98." Based on my knowledge, training, and experience, use of IP addresses and phone numbers associated with Iran are other indicators of possible diversion to Iran.

40.    The OEE CFO obtained and received the documents associated with the prior orders from USCOM3. In many of the orders ▮▮▮ falsely indicated that ▮▮▮▮ would be the end user for the parts. Additionally, ▮▮▮ directed that some of the orders be shipped to ▮▮, likely for onward diversion to Iran.

**Conclusion**

41.    At no time relevant to this affidavit did ▮▮▮▮▮, ▮▮▮▮▮, ▮▮▮, ▮▮▮, or ▮▮▮ apply for, receive, or possess a license from BIS or OFAC to export items to Iran.

42.    As set forth above, there is probable cause to believe that ▮▮▮, ▮▮▮▮▮, ▮▮▮, ▮▮▮, and ▮▮▮▮▮, using the email addresses ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ have engaged in a scheme to violate IEEPA, the EAR, and ECRA



by exporting or attempting to export restricted items to Iran. To effectuate this scheme, ████, ████, ███████, and ██████ falsely certified that they are purchasing export-controlled parts for end-users in █████ when, in actuality, they do not represent those end-users. Based on my training and experience, the end-user checks, the telephone calls, e-mails, and website visits originating from Iran, the use of private █████ bank accounts, █████ lack of a genuine physical presence in █████ and it's unregistered status as a ███████ company, and █████ freight forwarding of shipments to Iran, there is probable cause to believe that individuals using the email addresses ██████████████ and ████████████████ and purportedly representing companies doing business as █████ and ███████ have committed and conspired to commit violations of IEEPA, the EAR, and ECRA by exporting and attempting to export CCL-based items subject to the EAR and destined for Iran without obtaining the required export license, and by falsifying Form BIS-711, Statement by Ultimate Consignee and Purchaser, and End-Use Statements.

### BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

43.    PROVIDER is the provider of the internet-based account(s) identified by ████████████████ and ████████████████

44.    PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

45.    In my training and experience, I have learned that PROVIDER provides a variety of online services, including electronic mail (email) access, to the public. PROVIDER allows

14

subscribers to obtain email accounts at the domain name gmail.com, like the email accounts listed in Attachment A. Subscribers obtain an account by registering with PROVIDER. PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website. During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

46.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, and, for paying subscribers, means and source of payment (including any credit or bank account numbers). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

47.     Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[3]

---

[3] Here, PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History

48.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

49.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including: instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store: contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

---

(bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

50. Thus, the computers of PROVIDER are likely to contain stored electronic communications (including retrieved and unretrieved email for PROVIDER subscribers) and information concerning subscribers and their use of PROVIDER services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

51. Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of login (i.e. session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

52. Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and

relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

53. PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance

of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

54.    Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

55.    Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know

that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

56.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of crimes under investigation because the information can be used to identify the account's user or users.

57.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

58.     This application seeks a warrant to search all responsive records and information under the control of PROVIDER, a provider subject to the jurisdiction of this court, regardless of where PROVIDER has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications

and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within PROVIDER's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

59. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.

For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[4]

60.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

---

[4] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

61.     By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the Account user at a particular time (e.g., location information integrated into an image or video sent via email).

62.     Lastly, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

### REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

63.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Special Assistant U.S. Attorney Danielle Rosborough, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

### CONCLUSION

Based on the foregoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 6, 2019.

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO ACCOUNT(S)<br>STORED AT PREMISES CONTROLLED BY GOOGLE LLC<br>PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF<br>VIOLATION OF 50 U.S.C. § 1701, ET SEQ. | )<br>)<br>)<br>)<br>)<br>)    Case No. 19-sc-01222 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

located in the     Northern     District of     California     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

   ☑ evidence of a crime;

   ☑ contraband, fruits of crime, or other items illegally possessed;

   ☐ property designed for use, intended for use, or used in committing a crime;

   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1701, et seq.;<br>15 C.F.R. §§ 730-774; 50<br>U.S.C. § 4819 | Violations of the International Emergency Economic Powers Act, the Export<br>Administration Regulations, and the Export Control Reform Act of 2018 |

The application is based on these facts:

See attached Affidavit

   ☑ Continued on the attached sheet.

   ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:     06/06/2019

City and state:   Washington, D.C.

*Judge's signature*

2019.06.06
12:12:59 -04'00'

Robin M. Meriweather, U.S. Magistrate Judge

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  19-sc-01222 |
| INFORMATION ASSOCIATED WITH TWO ACCOUNT(S) | ) |
| STORED AT PREMISES CONTROLLED BY GOOGLE LLC | ) |
| PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF | ) |
| VIOLATION OF 50 U.S.C. § 1701, ET SEQ. | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

**YOU ARE COMMANDED** to execute this warrant on or before _____June 20, 2019_____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____U.S. Magistrate Judge Robin M. Meriweather_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   __06/06/2019__

2019.06.06
12:13:19 -04'00'
*Judge's signature*

City and state:   __Washington, D.C.__

Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>  19-sc-01222 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|  I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date: _____         _____<br>                                                       *Executing officer's signature*<br><br>                                                       *Printed name and title* |

## ATTACHMENT A

### Property to Be Searched

This    warrant    applies    to    information    associated    with    email    addresses
███████████████████████████████████ that are stored at the premises
owned, maintained, controlled, or operated by Google LLC, an email provider headquartered at
1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B

## Particular Things to be Seized and Procedures to Facilitate Execution of the Warrant

I.     **Information to be disclosed by Google LLC ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, regardless of whether such information is located within or outside of the United States, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier listed in Attachment A:

a.     For the time period from the inception of the target accounts to the present: the contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, or voice call services), including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);

b.     For the time period from the inception of the target accounts to the present: the contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, or voice

call services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.    For the time period from the inception of the target accounts to the present, all PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.    For the time period from the inception of the target accounts to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.    All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.    All device or user identifiers which have ever been linked to the Account, including but not limited to all cookies and similar technologies, unique application numbers, hardware models, operating system versions, device serial numbers, Global Unique Identifiers ("GUID"),

2

mobile network information, telephone numbers, Media Access Control ("MAC") addresses, and International Mobile Equipment Identities ("IMEI");

g.　　Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (e.g., credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.　　For the time period from the inception of the target accounts to the present, all records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

i.　　Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.　　For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored. The PROVIDER is hereby ordered to disclose the above information to the government within fourteen (14) days of the issuance of this warrant.

### II.　　Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence,

and instrumentalities of violations of Title 50, United States Code, Sections 1701, et seq., also known as the International Emergency Economic Powers Act ("IEEPA"), as described in the affidavit submitted in support of this Warrant, including, for each Account, from the inception of the account to the present, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning unlawful export or transshipment of U.S.-origin items.

## III. Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.  all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.  such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.  the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.  the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) of the Federal Rules of Evidence.


_____          _____
Date                                Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNT(S) STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 50 U.S.C. § 1701, ET SEQ. | SC No. 19-sc-01222 <br><br> **Filed Under Seal** |

*Reference: USAO Ref. #* ███████ *Subject Account(s):* ████████ *and* ███████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████ being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with two accounts – that is, ████████████ ████████████ – which are stored at premises controlled by Google LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at 1600 Amphitheatre Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.



4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or all of the knowledge of others, about this matter.

5.    In conducting this investigation, I have reviewed the reports of other agents who have interviewed representatives of companies who received purchase orders and provided quotations to individuals associated with the violation. I have also reviewed numerous records,

including emails and sales documents relevant to the investigation. The information contained herein is based in part on the documentation I have reviewed.

6. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the International Emergency Economic Powers Act, 50 U.S.C. § 1701, et seq. ("IEEPA"), the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, and the Export Control Reform Act of 2018, 50 U.S.C. § 4819, have been committed by ███████████████████ representing the foreign entities ███████████████████████████████ ████████████████ There is probable cause to search the email accounts as described in Attachment A, specifically, ████████████████████████████████████████ for evidence, instrumentalities, contraband, and/or fruits of the crimes further described below.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the United States District Court for the District of Columbia, is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i). As set forth more fully below, acts or omissions in furtherance of the offenses under investigation, specifically the failure to obtain a license to export and the falsification of information submitted in support of license applications, occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

---

[1] The actual identities of the person or persons using these e-mail accounts is unknown. In email correspondence that I have reviewed, the users of these accounts refer to themselves as ████████████████

**LEGAL BACKGROUND AND PROBABLE CAUSE**

8.    The export of articles affecting the national security of the United States is governed by various regulatory schemes, including those implemented under IEEPA, 50 U.S.C. § 1701, et seq. Under IEEPA, the President of the United States is granted the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States, where such an extraordinary threat has its source in whole, or in substantial part, outside the United States. Pursuant to this authority, through Executive Order 13222 of August 17, 2001, and successive Presidential Notices, the most recent being that of August 8, 2018 (83 FR 39871 (Aug 13, 2018)), the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, have continued in full force and effect.[2]

9.    The BIS reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR. In particular, the EAR restricts the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by an Export Control Classification Number ("ECCN"), each of which has export control requirements depending on the destination, end use, and end user of the item at issue. The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or to be lawfully re-exported from one foreign destination to another.

---

[2] On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018), currently codified at 50 U.S.C. § 4819. In part, ECRA provides permanent statutory authority for the EAR. For conduct predating August 13, 2018, IEEPA is the controlling statute. For conduct occurring after August 13, 2018, ECRA is the controlling statute.

10.     As part of the license application process, BIS may require license applicants to obtain a Statement by Ultimate Consignee and Purchaser. 15 C.F.R. part 748.11(a)(3)(Note 2). The statement can be made either on company letterhead, or on a Form BIS-711. 15 C.F.R. part 748.11(b). Applicants obtain such statements from their customers (i.e. the ultimate consignee and purchaser), who certify their intended disposition of the items, including the end-use, incorporation, distribution, resale, or reexport of the item at issue in the license application. *See* Supplement 3 to part 748 of the EAR. The consignee and/or purchaser must notify the applicant if changes in the facts or circumstances occur after the statement is sent to the applicant. 15 C.F.R. 748.11(b)(5)(iii).

11.     At all times relevant to this affidavit, it was unlawful and a violation of the EAR to make a false or misleading representation, statement, or certification directly to the Department of Commerce or indirectly through any other person, in connection with the preparation, submission, issuance, use, or maintenance of any export control document, including an export license or license application. 15 C.F.R. part 764.2(g)(1)(ii) and 50 U.S.C. § 4819(a)(2)(F)(ii).

12.     Additionally, at all times relevant to this affidavit, a license was required to export or reexport to Iran an █████████████████████████████████ along with other items subject to the EAR identified below.



13.     ███████ is a trading company operating out of ███████████████████ that has contacted various U.S. companies to purchase ██████████████████ purportedly for end use in ███████████ As described below, there is probable cause to believe that ███████ has procured or attempted to procure ███████████████████ in order to ship those parts to Iran. ███████ primarily corresponds with U.S. companies using the email address ██████████████████ which purportedly belongs to ██████████████████

5

Another individual, using the name ███████ has also used the email address of ████████████. Specifically, a person calling himself ████████ used this email address on or about April 22, 2019 to inform a U.S. company that ████ had changed its name to ████████ and had a new address. Thereafter, ████████ used the email address of ████████████ and ████████ letterhead of to correspond with a U.S. company regarding the purchase of export-controlled ████████.

14.    The means and manner of ████s efforts to export restricted items from the United States to Iran in violation of IEEPA, the EAR, and ECRA has generally worked as follows: ████ communicating through ████████████████████████ or using a phone number originating from Iran, contacts a U.S. company to purchase ████████ claims that the ████████ are for end-use by a ████████ company or governmental entity and submits a false end-user statement in support of its purchase. In actuality, the entity identified as the end-user has no business relationship with ████ which itself does not appear to have a standalone office or physical presence in ████. Using a freight forwarding company, ████ then arranges for shipment of the export-controlled parts to Iran.

## BIS Validated Export License D1103064

15.    On or about September 12, 2017, BIS issued export license number ████████ to a U.S. company in ████████████ ("USCOM1"), to export one ████████████████ ████████ valued at $11,900 to ████████ was identified as the purchaser and intermediate consignee and ████████████████████ was listed as the ultimate consignee. ████████, using the ████████████ account, communicated with USCOM1 concerning the order. In the Form BIS-711 that accompanied the license application, ████████ the manager for ████, certified that ████████ was the ultimate consignee, that the





▆▆▆▆▆▆▆▆▆▆▆ was to be used in ▆▆▆▆▆ and that it would not be reexported. An individual, using the name ▆▆▆▆▆ signed as the purchasing manager for ▆▆▆▆▆ According to the end-used check conducted at ▆▆▆▆▆, as detailed further below, ▆▆▆▆▆ was not the actual ultimate consignee nor end-user for this transaction.

**BIS Export License Application** ▆▆▆▆▆

16.     On or about April 1, 2019, a U.S. company in ▆▆▆▆▆ ("USCOM2") submitted an export license application to request authorization to export three items identified as ▆▆▆ ▆▆▆▆▆ valued at $4,500 to ▆▆▆▆ in ▆▆▆▆. The application related back to a ▆▆▆ purchase order dated November 14, 2018. The license application listed ▆▆▆ as the purchaser and intermediate consignee and listed ▆▆▆▆ as the Ultimate Consignee. In support of the license application, on or about November 15, 2018, ▆▆▆▆▆ signed an End-User Form, on USCOM2 letterhead, identifying ▆▆▆ as the buyer and listing ▆▆▆▆ as the end user. The email ▆▆▆▆▆▆▆ was listed as ▆▆▆ email address. As revealed by the end-used check conducted at ▆▆▆ detailed below, ▆▆▆▆ had never done business with ▆▆▆ and ▆▆▆ was not an approved vendor for ▆▆▆▆

17.     The license application was Returned Without Action ("RWA") on or about April 17, 2019. The applicant was instructed to reapply with technical specifications for the item. The RWA also stated that the OEE had performed an end-use check on ▆▆▆ and found ▆▆▆ to be an unreliable recipient.

18.     On or about April 24, 2019, USCOM2 informed the OEE CFO that USCOM2 had been contacted that day by someone purporting to be ▆▆▆▆▆ using the ▆▆▆▆▆▆▆ email address. The email stated that ▆▆▆ had changed its name and location to ▆▆▆▆▆▆▆▆▆▆ An updated end use

statement listed this information and the email address of ███████████████ as the purchaser and intermediate consignee. Additional communication between ███████ using ████████████████ and USCOM2 transpired.

**End-Use Check at the listed place of business for ████**

19.     On or about February 2019, at the request of the OEE CFO, the Department of Commerce's Export Control Officer ("ECO") based in ███████ traveled to ███████ to conduct end-use checks relating to ████s transactions.

20.     On or about February 19, 2019, the ECO met with █████████████████████ █████████████████████████████████████ a Secretarial Firm, located at ████████████████████████████████████████████████████████████ ██████████████ serves as a registered business address for more than 250 companies located in and around ██████████ including ██████████ works directly with small companies that do not have an actual office to provide administrative services like parcel delivery and mail receipt.

21.     ██████████ stated that ████ first registered with █████████ in 2008. The point of contact for ████ provided to ████████ was a ████████████████ did not provide ███████s first name. ████████ was also unable to provide information relating to ████s original registration. According to ██████████, the records were too old and had been placed in storage. ████████ explained that under ████████s contract with ██████████ served only as a registered address for ████ and provided no other services. ██████████ explained that ████████ would also accept parcels for a customer and that accepting such parcels was an implied service provided by ████ to its customers. ████████ had received a few packages for ████ prior to 2016, but ██████████ was unable to provide information about the origin of those packages. ██████████ stated that ████████ would receive a call from someone from ████ explaining a shipment was on the way.

Upon receipt of the parcel by ████████████ would inform ██████ of the delivery by phone. ████ would then have someone pick up the packages. ████████ said this was a standard business practice conducted by many ██████ clients.

22.    ████████ provided a letter from the Government of ██████ company registry group, ████████████████████ stating that ██████ had been dissolved as of March 2016. ████████ provided a copy of a letter dated 23 March 2016 that ██████ received from ████, and a copy of the letter sent to ██████ directors, ████████████████████

23.    After ██████ was struck off from the ██████ business registry in 2016, ████████ assistant, ████████ stated that ██████ had rejected and returned several parcels received by ████████████ stated that ████████ continued to receive parcels for ████ for part of 2018, but had not received a parcel since late 2018. Both ██████ and ████████ stated that one of the ████████ who worked at ██████ might have received a parcel for ██████ when ████████ or ████████ were not around.

24.    ████████ stated he was unable to provide any further business documentation to the ECO, unless it was officially requested by the ████████████████ was unable to provide a name, other than ██████ and could not provide either a recent forwarding address or a working phone number associated with ██████ After receiving the ECO meeting request, ████████ attempted to call ████████ at the previously confirmed number (████████████), but found that the number was no longer working.

**End-Use Check at ████████**

25.    On February 21, 2019, the ECO met with ████████████████████





26.    ███████ is a government-linked company owned by the government of the ███████████████████████ was established in ████ and provides aero survey service for oil field companies, mainly using Bell helicopters ██████ was registered with ████████████ ████████████████.

27.    ████ stated that ██████ has never done business with ████ and that he was surprised to learn that ████ had listed ████████ as the end user of any shipment. ████ stated that ████ was not a ████████ approved vendor. The ECO informed █████ and the ███████ team that an individual listed as ██████████ allegedly represented ██████████ in signing the End Use/End User Statement that was submitted in support of BIS license ██████████ for USCOM1. ██████ stated that the individual who signed the form never worked for ██████████ .

28.    The ECO verified with █████████ whether it had received the ████████████ part number ████████████ shipped by USCOM1 through █████ as the intermediate consignee, purportedly for end-use by █████████████████ confirmed that ████████████████ ██████ was not in the ████████ database and that the associated aircraft, ████████████████ belonged to a Bell helicopter previously owned by █████████████ confirmed that that ████████████████ had been sold more than 10 years ago to ██████████████████ ████████████████.

**End-Use Check at** ████████████████████

29.    ██████████████████████ was listed as an intermediate consignee on USCOM1's    BIS    license    application    █████████████████████    using    the

10

███████████████ account, informed USCOM1 that ██████ would be the purchaser but that the shipping address for the order would be to █████.

30.    On February 20, 2019, the ECO met with ████████████████████████████. The OEE CFO had requested a pre-license end-use check at ██████ due to the fact that they were listed as an intermediate consignee on USCOM1's BIS license application. ████████ provided a contract signed by ██████ in 2008 appointing ████████ as ████████ s freight forwarding agent. The contract named █████████████████████ representative.

31.    ██████ s main office is located at ██████████████████████████████████. ████████████████████████████ also has a warehouse located in ████████████████. ████████████████████████████ explained that ████████ primary business activity is freight forwarding, mainly handling airfreight export shipments. ████████ was established in ██████ and currently has three employees in its main office, not including ████████ and one employee in its warehouse. ████████ stated that ██████ mainly handled pharmaceutical products. ████████ stated that ██████ had forwarded a few shipments to Iran via ██████████.

32.    ████████ stated that he was not aware that ██████ was struck off from ██████ in 2016 and that ██████ was still the appointed freight forwarding agent for █████████████ had met with ██████ ██████ from ██████ as recently as January 2019 to discuss shipments from the U.S. ██████ informed ██████████ that ████████ had cancelled the U.S. shipment relating to the pending license application during the meeting. The ECO asked ██████████ whether he knew a ████████████ who was associated with ████████████ replied that he had never heard of a ████████████████ also stated that he did not have any business activity with ████████████████ explained that ████████ was just the transport provider for ████████ shipments.

33.     A review of the documents provided by ███ show that ███ handled ten shipments for ███ from July 5, 2017 through December 21, 2017. All ten shipments were listed as sent from ████████ to Tehran, Iran via ██████████.

34.     On March 13, 2019, the ECO spoke via email with ████████ to obtain contact information for ███ and ██████████ stated he had been trying to contact ██████ but that the phone contacts were no longer valid.

**Additional Attempts to Acquire U.S. Origin Items**

35.     On or about September 26, 2018, ██████ contacted a U.S company in ████████ ("USCOM3"). ██████ contacted USCOM3 using the ████████████████ email account to submit a purchase order for six ████████████████████████ at $73,920 each, for a total of $443,520. ██████ purported to be located at ████████████ ████████████████████████████████████.

36.     Using the ████████████████ email account, ██████ emailed a copy of the BIS Form 711, Statement by Ultimate Consignee and Purchaser, and USCOM3's end user certification to USCOM3. The end user was listed as the ██████████████ In the end user certification for ██████████████████ stated the aircraft application as ████████████ ██" However, ██████████████ are not interchangeable with the blades used on a ████████ ████████ Soon after receiving this email, USCOM3 received a notice from their internet provider that an IP address in Iran had viewed their website. Based on my knowledge, training, and experience, use of an IP address in Iran is an indication of possible diversion to Iran.

37.     USCOM3 conducted open source research regarding the use of the ████████████ ████████████████████████████████ and was unable to confirm that the ████████████ ██████████████████.

38.     USCOM3 had previously fulfilled two orders for  for ████████████████
█████ and had one pending order. After reviewing the payment information for the two fulfilled orders, USCOM3 determined that the funds were drawn on two different personal bank accounts in █████ Based on my knowledge, training and experience, the use of █████ bank accounts is known for increasingly being involved with diversion of items to Iran.

39.     On or about October 1, 2018, USCOM3 contacted the OEE CFO based on this information. Upon reviewing the email headers associated with ████████████████ it was determined that the IP addresses of a July 2017 email and a September 16, 2018 email to USCOM3 originated in Iran. Additionally, during one of the meetings with USCOM3, ████ ██████ called USCOM3 from the following telephone number: ████████████ The international country code for Iran begins with "98." Based on my knowledge, training, and experience, use of IP addresses and phone numbers associated with Iran are other indicators of possible diversion to Iran.

40.     The OEE CFO obtained and received the documents associated with the prior orders from USCOM3. In many of the orders █████ falsely indicated that ███████ would be the end user for the parts. Additionally, ██████ directed that some of the orders be shipped to █████ likely for onward diversion to Iran.

**Conclusion**

41.     At no time relevant to this affidavit did ████████████████████████
██████████ apply for, receive, or possess a license from BIS or OFAC to export items to Iran.

42.     As set forth above, there is probable cause to believe that ████████████████
████████████████ using the email addresses ████████████████████
████████████████ have engaged in a scheme to violate IEEPA, the EAR, and ECRA



by exporting or attempting to export restricted items to Iran. To effectuate this scheme, ██████ ██████████████████████████ falsely certified that they are purchasing export-controlled parts for end-users in ███████ when, in actuality, they do not represent those end-users. Based on my training and experience, the end-user checks, the telephone calls, e-mails, and website visits originating from Iran, the use of private █████ bank accounts, █████'s lack of a genuine physical presence in ████████ and it's unregistered status as a ████████ company, and █████ freight forwarding of shipments to Iran, there is probable cause to believe that individuals using the email addresses ███████████████████████████████████ and purportedly representing companies doing business as ██████████████ have committed and conspired to commit violations of IEEPA, the EAR, and ECRA by exporting and attempting to export CCL-based items subject to the EAR and destined for Iran without obtaining the required export license, and by falsifying Form BIS-711, Statement by Ultimate Consignee and Purchaser, and End-Use Statements.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

43. PROVIDER is the provider of the internet-based account(s) identified by ████████████████████████████████████.

44. PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

45. In my training and experience, I have learned that PROVIDER provides a variety of online services, including electronic mail (email) access, to the public. PROVIDER allows

subscribers to obtain email accounts at the domain name gmail.com, like the email accounts listed in Attachment A. Subscribers obtain an account by registering with PROVIDER. PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website. During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

46. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, and, for paying subscribers, means and source of payment (including any credit or bank account numbers). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

47. Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[3]

---

[3] Here, PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History

48.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

49.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including: instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store: contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

---

(bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

50.     Thus, the computers of PROVIDER are likely to contain stored electronic communications (including retrieved and unretrieved email for PROVIDER subscribers) and information concerning subscribers and their use of PROVIDER services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

51.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of login (i.e. session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

52.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and

relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

53.    PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance

of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

54.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

55.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know

that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

56.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of crimes under investigation because the information can be used to identify the account's user or users.

57.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

58.     This application seeks a warrant to search all responsive records and information under the control of PROVIDER, a provider subject to the jurisdiction of this court, regardless of where PROVIDER has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications

and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within PROVIDER's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

59. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.

For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[4]

60. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

---

[4] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

61.     By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the Account user at a particular time (e.g., location information integrated into an image or video sent via email).

62.     Lastly, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

### REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

63.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Special Assistant U.S. Attorney Danielle Rosborough, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

### CONCLUSION

Based on the foregoing, I request that the Court issue the proposed search warrant.  Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

### REQUEST FOR SEALING

I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 6, 2019.

2019.06.06
12:13:50
-04'00'

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE