# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information Associated with the Facebook account<br>identified by user ID ████████, which is stored<br>at premises controlled by Facebook, Inc. | )<br>)<br>)<br>)<br>)<br>) |

Case No. 19-sc-1484

Under Seal

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 875(c) | "Interstate Transmission of Threats in Interstate Commerce" |
| 18 U.S.C. Section 844(e) | "Willfully Making a Threat" |

The application is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sworn to before me and signed in my presence.

Date: _____ 07/17/2019 _____

_____
*Judge's signature*

City and state: Washington, DC

Deborah A. Robinson, Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  19-sc-1484 |
| Information Associated with the Facebook account | ) |
| identified by user ID ▓▓▓▓▓▓, which is stored | ) Under Seal |
| at premises controlled by Facebook, Inc. | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ California
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before     July 30, 2019     *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Deborah A. Robinson     .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     07/17/2019 11:35 am

_____
*Judge's signature*

City and state:     Washington, DC

Deborah A. Robinson, Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>    19-sc-1484 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____            _____
                                                            *Executing officer's signature*

                                                    _____
                                                            *Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Facebook account identified by User ID ███████████ associated with ████████████ and which is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

**ATTACHMENT B**
**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

I.     **Information to be disclosed by Facebook to facilitate execution of the warrant.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the **Target Account** listed in Attachment A:

   a.   For the time period January 1, 2019, to the present: The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, activity logs, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all Facebook services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

   b.   For the time period January 1, 2019, to the present: All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged," including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.  Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, screen names, websites and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d.  For the time period January 1, 2019, to the present: All records or other information related to the Account, including address books, contact and "friend" lists (including the friends' Facebook user identification numbers), calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member (including the groups' Facebook group identification numbers; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts

and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e. For the time period January 1, 2019, to the present: All "check ins" and other location information;

f. For the time period January 1, 2019, to the present: All records pertaining to communications between Facebook and any person regarding the Account, including all private messages, chat history, video calling history, and contacts with support services and records of actions taken;

g. All information about the Facebook pages that the Account is or was a "fan" of;

h. The types of services utilized by the user;

i. The length of service (including start date) and the means of any source of payments associated with the service (including any credit card or bank account number);

j. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

k. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including

unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

l.   All information held by Facebook related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-Facebook based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

m.   Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within seven days of the issuance of this warrant, Facebook shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, or instrumentalities of, or contraband from, violations of 18 U.S.C. §§ 875(c) and 844(e), as described in the affidavit in support of this Warrant, including information pertaining to the following matters:

    (a)  Evidence of the identification or location of the user of the Account;

    (b)  Records related to communications concerning ██████████████████████
██████████████████

    (c)  Evidence indicating how and when the Facebook account were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

    (d)  Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

    (e)   Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

    (f)  The identity of the person(s) who created or used the Target Account, including records that help reveal the whereabouts of such person(s).

    (g)  The identity of the person(s) who communicated with the Target Account about matters relating to the ████████████ threats, threats to ██████ and/or ████████████████ preparatory steps taken in furtherance of the scheme, including records that help reveal their whereabouts.

**III.**       **Government procedures for warrant execution**

       The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

       Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH ONE
ACCOUNT STORED AT PREMISES
CONTROLLED BY FACEBOOK, INC.,
PURSUANT T O 18 U.S.C. § 2703 FOR
INVESTIGATION OF VIOLATION OF 18
U.S.C. 875(c)

SC No. __19-sc-1484_____

**Filed Under Seal**

USAO REF. # ████████; SUBJECT ACCOUNT ASSOCIATED WITH ████████ AND FACEBOOK USER ID: ████████

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, ████████████████████████████████

████████████████████ being duly sworn, deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with one account, that is Facebook User ID: ████████ associated with ████████, ("**Target Account**"), which is stored at premises controlled by Facebook, Inc. ("Facebook"), an electronic communications service provider and/or remote computing services provider, which is headquartered at/accepts service at 1601 Willow Road, Menlo Park, California.   The information to be searched is described in the following paragraphs and Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of: (1) Interstate Transmission of Threats in Interstate Commerce), in violation of 18 U.S.C. § 875(c), and (2) Willfully Making a Threat, in violation of 18 U.S.C. § 844(e), have been committed by ███████ ████████████  There is also probable cause to search the information described in Attachment

A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## **JURISDICTION**

5.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.

## **PROBABLE CAUSE**



7.    On or about January 28, 2019, ▮▮▮ called ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ called ▮▮▮▮▮ at her job regarding ▮▮▮▮▮  During that telephone conversation, ▮▮ identified himself as ▮▮▮▮▮ and spoke with ▮▮▮ about ▮▮▮  That same day, ▮▮ called back ▮▮▮▮, said that he was going to file a complaint with ▮▮▮▮▮ and would "bring down the system."  ▮▮▮▮▮ referred ▮▮ to ▮▮▮▮▮▮▮ for further assistance.

8.	On May 6, 2019, ▮▮▮ called ▮▮▮▮▮ multiple times at her job. ▮▮▮ called from telephone number (▮▮▮▮▮. During the first telephone conversation, ▮▮▮ was furious and said that he was framed (referring to ▮▮▮▮▮). ▮▮▮▮▮ tried to calm down ▮▮ but was unable to do so. ▮▮▮ wanted ▮▮▮▮▮▮ contact information and was angry that ▮▮▮ did not have it readily available to provide. Ultimately, ▮▮▮▮ hung up on ▮▮ because she could not have a productive conversation with him. That telephone conversation was not recorded.

9.	During the second telephone conversation that same day, ▮▮▮ was cursing and yelling at ▮▮▮ and told her "I am coming after you" and "you are going to pay for what you did." ▮▮▮ also said that the first law enforcement officer to come into contact with him will be a martyr. That telephone conversation was not recorded. Thereafter, that same day ▮▮▮ called ▮▮▮ at least four more times. ▮▮▮▮ did not answer those telephone calls because she recognized the telephone number that ▮▮▮ had used to call her earlier that day.

10.	Also on May 6, 2019, ▮▮▮ left a voice mail message on ▮▮▮▮▮ work telephone. Law enforcement obtained a copy of that voice mail message. Before the message is played, the recording states "voice call from extension ▮▮▮▮▮." During that voice mail message, a male voice said, "I'm waiting for you to report me [sic], go ahead, go ahead and report those threats that I communicated because I have some that were communicated to me that I would like people to know about." The male also said that he had already posted the emails on line.



Also on May 6, 2019, ▮▮▮ sent several emails to ▮▮▮▮▮ work email address. For all of ▮▮▮ emails, his name ▮▮▮" and email address "▮▮▮▮▮▮▮" were included in the "From" category. On May 6, 2019, at approximately 10:23 a.m., ▮▮▮ sent the following email to ▮▮▮▮▮: Your bosses' professional POC, give it to me now! And you also need to tell me who their boss is and that person's so when I figure out that you're

just stalling, I can move on to the next law breaking terrorist rogue ██████████.

Additionally, you need to be working around the clock to find out how I'm going to report you to ██████.

Best Regards

██████████

11.    At Approximately 10:39 a.m. that same morning, ██████ sent a reply email to ████ stating that she had copied her supervisor and stated his name.  Later that same morning at approximately 10:51 a.m., ████ sent an email to the complaining witness that stated:

You made so many excuses for why ██████ has such a delay in communication but you don't have any excuses so why am I still waiting for your bullshit reply?  Also could you go ahead a forward your complaints to the appropriate authority.  You did communicate to me on the phone that you feel threatened by me.  And you should.

You have served beyond your usefulness lol.

██████████

12.    At approximately 11:37 a.m. that same day, ████ sent the following email to ████ ████:

Lol another ██████ huh?  You people seem to have trouble reaching ████████████ I don't care about ████████████ But give me his bosses' poc tho.  No ████ could ever be the final over all approval authority.

I'm learning a lot about corruption from you.  Anytime I am referred to someone lower than ████████ then I won't accept what is being said at face value.  I'm sure there are ██████ in your office which I why you people are off the meter right now with this bullshit you are currently on.

I hope you get hit by a car on your way home today. I hope you don't make it. Lol. I hope you rip your pants when you sit down. I hope

someone puts a thumb tack in that same chair. I hope you spill hot coffee on yourself. I hope you do your job with integrity and honesty. I hope you believe in ███████ core values. I hope you believe in the U.S. Constitution. I hope you have faith in the justice system. I hope you believe in fairness and equality. I hope you know you suck. I hope you step in dog shit. I hope someone rings your doorbell and run. I hope your next delivery from amazon comes a day late. I hope you get trapped in a corner with an angry feral cat. Avoid zoos too, because I hope you fall into a gorilla enclosure and get fucked up, that shit would be funny AF my guy. I hope these emails get you all fired. I hope you suffer worse than i have. I hope you'll find this funny someday. I hope you don't take this seriously like you don't take your responsibilities and obligations seriously.

I hope you have a nice day.

And I also hope someone fucks it up lol.

Best Regards

████████

13.    At approximately 12:37 p.m. that day, ██████ sent an email to ████████ that contained a screenshot of the internet home page of ████████████████████████ ██████ Circled in red was the division where █████████ works.  Also on that home page were the mailing address and telephone numbers for ██████████ employer.  Your affiant believes that ██████ was informing █████████ that he knew where she worked.   That same afternoon at approximately 1:25 p.m., ██████ sent another email to █████████ that included the following statements:

No reply?  What's wrong?  Did I say something that hurted your tiny feelings?  Lol I've decided that you're going to be contacted by me for the rest of your natural existence lol.  This is fun to me.  Since I can go to college or work, I will bother you instead college girl.

So how do you feel about my language now?  Is it threatening yet? Do you feel threatened by me?  Are you feeling unsafe lol?  Do you feel secure in your little standard issue office?

I don't feel safe at all.  I feel very threatened by your action and or lack of.  I don't feel secure anywhere.  So you better pick up your phone every day that why I can feel somewhat safe knowing that you are not in ███████

Lmfao "threatening language"

You're a big pussy lol. A real genuine coward.  I'm glad this is going to your ████ account.  You can look at this.

████ then included an email dated September 7, 2016, that he had sent to another person in the ███████. That email was from ██████████████████████. In that September 7, 2016, email ████ identified himself as ████████," he discussed ███████████████ ████████████████████████████████████████████████████████████ ████████████████ ████ further stated in the September 7, 2016, email that he was resending the email from his "personal," which was a reference to his personal email account. Also, the Cc: category listed the email address "██████████████████" - the same email account from which ████ was sending emails to the complaining witness.

14.     Later that same afternoon, at approximately 4:53 p.m., ████ sent another email to the complaining witness that stated in relevant part,

How's life? Do you like being able to breathe? Do you like being able to live? Do you like not being fucked with?  Do you guys hug your family after a long day of being a scumbag?  I don't hug my family.  They all left me because they believe in. . . .

                                        *  *  *  *

I hope you all have people counting on your ability to be employed and live a healthy life. I'm going to fuck that all up lmao! You all better act fast because I promise you that this will not be an issue in my life before 2020 gets here. Not fucking around. One way or another, I will eliminate you all from my life this could have been

handled at the ████; level. ████ could have disposed of those charges is he had done his job. So fuck y'all. Please report my "threatening language" like you said you were. But not to another one of your but-buddies. Report me to the next highest authority.

So let's see. Hmm after ████████ there is ummm. . . . oh ████████

You people are basically terrorist, you understand that? This is terrorism. Your actions destabilize Government continuity and efficiency. And you ████████████████ that make you all an inside threat. ████████

In one of the emails that ████ had sent to ████████, he included a written memorandum that was ████████████████████████ that was addressed to him while he was in ████████ ████

15.     Later that same day, at approximately 4:43 p.m., ████ emailed his Facebook link to the complaining witness. During the investigation, law enforcement reviewed the content of ████ Facebook page. On May 5, 2019, at 5:55 p.m., a post was on ████ Facebook account that read:

How does one gain access to the dark web?

Google is useless… too heavily sanctioned for me to search for simple things such as; optics opposite of inferred.

This is supposed to be a free market so finding specs on building UV optics shouldn't be difficult when the market for inferred optics is so vast.

In this Facebook post, ████ may have been referring to building a device to enhance weapon capabilities.

16.     On May 6, 2019, the following message was posted on ████ Facebook account:

They are running from me. I called ████████████ just now and she said to me that all of the concerns that I've presented to her were vague and unsubstantiated and does not warrant reopening my case!

VAGUE?! Are you deadass my nigga! She hung up on me before I was actually able to threaten her. She deserves to die, a long with everyone else responsible for my situation. Clearly they have figured out how to avoid prison but I'm sure they can still be killed. This power they rely on sooo much doesn't grant immortality or invincibility lol. I'm done talking. If I see someone come out of a government vehicle and into my apartment building, that person or people are now very likely to come under attack. This is what I've been waiting for.

The first person to call my bluff is the first martyr. Nothing is taken seriously until someone dies.

That same day at approximately 3:03 p.m., the following message was posted on ████

Facebook account:

Lol last week I had 40 Friends now I'm down to 36. It was 37 but I just deleted someone for never replying to my messages.

So if you don't really care about me or my posts then just begone, I'm about to be homeless now so my rage and anger only increases from here.

17.     Later that same day at approximately 3:45 p.m., the following post was on ████

Facebook account:

Lmfao come for me then! Just keep in mind, I didn't strike first. Everything I'm doing is to protect myself. Self defense is defense of self. I'm not being defended by ████ I'm being attached. Time to strike back. Doesn't seem like they're interested in justice to me so I guess this is just a vendetta.

A few minutes later, at 3:49 p.m., the following post was on ████ Facebook account:

This shit worries me everyday because these individuals know that I'm not going to let this go.

They have already crossed the planet to keep these lies quiet and here I am home side, and they're still keeping it up.

What's the point in leaving it to MY imagination to wonder how far these people will go to cover their ass. That is very dangerous. . . .

18.  Later that evening, at approximately 8:13 p.m., the following message was posted on ███ Facebook account:

I promise you that won't make anyone an accessory but this is everyone's one and only chance to NOT be associated with me because I am going to hurt people. It's not an "if" deal. It's "when" type of thing. So right now is your only chance to downgrade from friends to acquaintance or anything lesser. Any from here on out, anyone who suggests I get over the past is a target to me. You must be friend of ████████████████████████ There's only a short 13 names on my kill list. Don't fuck around and end up as a bench warmer on my roster.

Your affiant believes that ██████ first name, ██████ is the "██████ listed in this post.

19.  On May 9, 2019, the following message was posted on ███ Facebook account:

None of my "threats" are true, I posted them here to give these dickheads the support the need to report me to the authorities. And the did not. Funny how one white girl says I touched her, I'm on jail in hours. One white But when it comes to me just trying to get my car back, all the white people tell me "no". Like how did it even come to this? All I ever really did was work and play my PS4.

Also on ███ Facebook account was a photograph that included ███ who was dressed in ██████████

20.  During the investigation, law enforcement obtained the telephone number that ███ had used to call the complaining witness. Investigations conducted at that time revealed that it was a cellular telephone with no subscriber information and that the service provider was Sprint. With the assistance of the Metropolitan Police Department of the District of Columbia, on May 8, 2019, law enforcement began to track that cellular telephone number on an emergency basis.

Geolocation data revealed that during the week of May 6, 2019, that cellular telephone was in the ███████████████.

21.     On May 10, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia authorized the issuance of arrest warrant for ████ and a Criminal Complaint that charged one count of Transmitting Threats in Interstate Commerce, in violation of 18 U.S.C. § 875(c).     On May 11, 2019, a special agent with the NCIS ████████ Field Office and other members of law enforcement went to an apartment in █████████████ where they believed ████ resided, to execute the arrest warrant for him.  ████ was not at home at that time. However, law enforcement spoke with ████████████████████████████████████ ████ confirmed that the ████ lived there.

22.     On May 13, 2019, law enforcement returned to the apartment where ████ lived in ████████████████ to execute the arrest warrant for him.  Law enforcement knocked on the apartment door and no one answered.  Law enforcement rang the doorbell.  ████ opened a window to the outside walkway and could be seen by law enforcement.  The NCIS special agent previously had viewed a photograph of ████, observed him, and confirmed that it was ████.  The NCIS special agent informed ████ that they had a warrant for his arrest, asked whether he was ██████████, and showed him a copy of the arrest warrant.  ████ confirmed his identity, said that he did not believe that the warrant was legitimate, and that he was not going to obey it.  Law enforcement again showed ████ a copy of the arrest warrant.  The NCIS special agent heard someone putting heavy things down in front of the apartment's front door in what sounded like an effort to barricade the apartment front door to prevent entry.  Members of law enforcement continued to talk to ████ who remained inside the apartment.  ████ refused to open the apartment front door and was not cooperative.  After law enforcement made numerous attempts to have ████ open the apartment

door, due to safety concerns for ██████████████████████████████ ████████████████ law enforcement breached the apartment front door. Upon entry into the apartment law enforcement confirmed that ████ had barricaded the apartment front door. ████ was taken into custody and arrested.

23.    While inside the apartment law enforcement conducted a security sweep and observed in plain view in an opened bag in ████ bedroom what appeared to be an AR-15 type rifle with a collapsible stock. On May 13, 2019, the Honorable ████████████ of the United States District Court for ████████████████████ authorized a search warrant for the apartment where ████ lived in ████████████████ During the execution of the search warrant, law enforcement recovered several items, including the AR-15 type rifle with a collapsible stock that had what appeared to be an attached scope. No ammunition was recovered.

24.    ████ used the email address, ██████████████████ ████ also used Sprint cellular telephone number (██████████ to contact ████████. Additionally, he sent to ████ ████ the following link to his Facebook account:

███████████████████████████████████████████

██████████

25.    Based upon the investigation conducted to date, the names of the individuals on

██████ kill list have been connected to █████████████████████████████████████

████████████

26.    On May 9, 2019, Facebook was served with a preservation letter under 18 U.S.C.

§ 2703(f) related to user profile ████████████, associated with ████████████.

## BACKGROUND CONCERNING FACEBOOK

27.    Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com.  The website is owned and operated by

Facebook.  Facebook allows its users to establish accounts with Facebook, and users can then use

their accounts to share written news, photographs, videos, and other information with other

Facebook users, and sometimes with the general public.

28.    Facebook asks users to provide basic contact and personal identifying information

to Facebook, either during the registration process or thereafter.  This information may include the

user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

security questions and answers (for password retrieval), physical address (including city, state, and

zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook

also assigns a user identification number ("user ID") to each account.  Facebook identifies unique

Facebook accounts by a user's email address, the user ID number, or the username associated with

a Facebook profile.

29.    Facebook users may join one or more groups or networks to connect and interact

with other users who are members of the same group or network.  Facebook assigns a group

identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request. If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

30.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

31.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or

her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

32.     Facebook allows users to upload photos and videos, which may include any metadata such as a location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

33.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

34.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a Facebook account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content

can remain on Facebook's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Facebook's servers for a certain period of time.

35.     A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked." Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

36.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

38.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been "tagged," as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend." The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

41.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized

message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

42.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

45.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

46. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

48. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

49. Based on my training and experience, I know that providers such as Facebook also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various

ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Facebook in order to track what devices are using Facebook's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Facebook accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Facebook account.

50. Based on my training and experience, I know that providers such as Facebook use cookies and similar technologies to track users visiting Facebook's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Facebook. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Facebook may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and

linked information can help identify who was using a Facebook account and determine the scope of criminal activity.

51.     Based on my training and experience, I know that Facebook maintains records that can link different Facebook accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Facebook accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Facebook account.

52.     Based on my training and experience, I know that subscribers can communicate directly with Facebook about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

53.     In summary, based on my training and experience in this context, I believe that the computers of Facebook are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Facebook subscribers), as well as Facebook-generated information about its subscribers and their use of Facebook services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the

account's user or users. In fact, even if subscribers provide Facebook with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

54.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. From my training, experience, and investigation, I know that a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the

Facebook account owner. Finally, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

55. Based on my training and experience, I know that evidence of who controlled, used, and/or created a Facebook account may be found within the user-generated content created or stored by the Facebook subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar Facebook accounts do not typically change hands on a frequent basis,

identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

56. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

57. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Karla-Dee Clark, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

58.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


Respectfully submitted,


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July 17, 2019.


_____
DEBORAH A. ROBINSON

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  19-sc-1484 |
| Information Associated with the Facebook account identified by user ID ▮▮▮▮▮ which is stored at premises controlled by Facebook, Inc. | ) ) ) | Under Seal |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ___Northern___ ᵏᵇᵘˡⁱ⁹ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 875(c) | "Interstate Transmission of Threats in Interstate Commerce" |
| 18 U.S.C. Section 844(e) | "Willfully Making a Threat" |

The application is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Sworn to before me and signed in my presence.

Date:  ___07/17/2019___

City and state:  Washington, DC

_Judge's signature_

Deborah A. Robinson, Magistrate Judge

_Printed name and title_

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    19-sc-1484 |
| Information Associated with the Facebook account | ) | |
| identified by user ID ███████ which is stored | ) | Under Seal |
| at premises controlled by Facebook, Inc. | ) | |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ California
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ July 30, 2019 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Deborah A. Robinson _____ .
                                                                                                          *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    07/17/2019 11:35 am    C3:45 PM    _____
                                                                                                          *Judge's signature*

City and state:    Washington, DC    Deborah A. Robinson, Magistrate Judge
                                                                                      *Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>19-sc-1484 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____          _____
                                                    *Executing officer's signature*

                                                    _____
                                                    *Printed name and title*

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information which is associated with the Facebook account identified by User ID ██████████ associated with ██████████ and which is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

**ATTACHMENT B**
**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

I.      **Information to be disclosed by Facebook to facilitate execution of the warrant.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the **Target Account** listed in Attachment A:

a.  For the time period January 1, 2019, to the present: The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, activity logs, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all Facebook services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.  For the time period January 1, 2019, to the present: All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged," including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c. Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, screen names, websites and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d. For the time period January 1, 2019, to the present: All records or other information related to the Account, including address books, contact and "friend" lists (including the friends' Facebook user identification numbers), calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member (including the groups' Facebook group identification numbers; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts

2

and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e. For the time period January 1, 2019, to the present: All "check ins" and other location information;

f. For the time period January 1, 2019, to the present: All records pertaining to communications between Facebook and any person regarding the Account, including all private messages, chat history, video calling history, and contacts with support services and records of actions taken;

g. All information about the Facebook pages that the Account is or was a "fan" of;

h. The types of services utilized by the user;

i. The length of service (including start date) and the means of any source of payments associated with the service (including any credit card or bank account number);

j. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

k. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including

3

unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

l.  All information held by Facebook related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-Facebook based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

m.  Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within seven days of the issuance of this warrant, Facebook shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



4

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, or instrumentalities of, or contraband from, violations of 18 U.S.C. §§ 875(c) and 844(e), as described in the affidavit in support of this Warrant, including information pertaining to the following matters:

(a) Evidence of the identification or location of the user of the Account;

(b) Records related to communications concerning ███████████████████████ ██████████████████;

(c) Evidence indicating how and when the Facebook account were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(d) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

(e) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(f) The identity of the person(s) who created or used the Target Account, including records that help reveal the whereabouts of such person(s).

(g) The identity of the person(s) who communicated with the Target Account about matters relating to the ████████████ threats, threats to ████████ and/or ███████████████████████ preparatory steps taken in furtherance of the scheme, including records that help reveal their whereabouts.

5

III.      **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH ONE
ACCOUNT STORED AT PREMISES
CONTROLLED BY FACEBOOK, INC.,
PURSUANT T O 18 U.S.C. § 2703 FOR
INVESTIGATION OF VIOLATION OF 18
U.S.C. 875(c)

SC No. __19-sc-1484_____

**Filed Under Seal**

**USAO REF. #** ‖‖‖‖‖**; SUBJECT ACCOUNT ASSOCIATED WITH ANTHONY M.
REID AND FACEBOOK USER ID:** ‖‖‖‖‖‖‖‖

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

‖‖‖‖‖‖‖‖‖‖‖‖ being duly sworn, deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information which is associated with one account, that is Facebook User ID: ‖‖‖‖‖‖

associated with ‖‖‖‖‖‖ ("**Target Account**"), which is stored at premises controlled by

Facebook, Inc. ("Facebook"), an electronic communications service provider and/or remote

computing services provider, which is headquartered at/accepts service at 1601 Willow Road,

Menlo Park, California.   The information to be searched is described in the following paragraphs

and Attachment A.  This affidavit is made in support of an application for a search warrant under

18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the

government copies of the information (including the content of communications) further described

in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment

B, government-authorized persons will review that information to locate the items described in

Section II of Attachment B, using the procedures described in Section III of Attachment B.



3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of: (1) Interstate Transmission of Threats in Interstate Commerce), in violation of 18 U.S.C. § 875(c), and (2) Willfully Making a Threat, in violation of 18 U.S.C. § 844(e), have been committed by ███████. There is also probable cause to search the information described in Attachment

2

A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.　　This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE



7.　　On or about January 28, 2019, ▉ called ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ called ▉▉▉▉ at her job regarding ▉▉▉▉▉ During that telephone conversation, ▉ identified himself as ▉▉▉▉ and spoke with ▉▉▉ about his appeal.  That same day, ▉ called back ▉▉▉ said that he was going to file a complaint with ▉▉▉▉▉ and would "bring down the system."  ▉▉▉ referred ▉ to ▉▉▉▉▉▉ for further assistance.

3

8.      On May 6, 2019, ███ called ███████ multiple times at her job. ███ called from telephone number ███████ During the first telephone conversation, ███ was furious and said that he was framed (referring to ███████ tried to calm down ███ but was unable to do so. ███ wanted ███████ contact information and was angry that ███ did not have it readily available to provide. Ultimately, ███████ hung up on ███ because she could not have a productive conversation with him. That telephone conversation was not recorded.

9.      During the second telephone conversation that same day, ███ was cursing and yelling at ███████ and told her "I am coming after you" and "you are going to pay for what you did." ███ also said that the first law enforcement officer to come into contact with him will be a martyr. That telephone conversation was not recorded. Thereafter, that same day ███ called ███ ███████ at least four more times. ███████ did not answer those telephone calls because she recognized the telephone number that ███ had used to call her earlier that day.

10.     Also on May 6, 2019, ███ left a voice mail message on ███████ work telephone. Law enforcement obtained a copy of that voice mail message. Before the message is played, the recording states "voice call from extension ███████ During that voice mail message, a male voice said, "I'm waiting for you to report me [sic], go ahead, go ahead and report those threats that I communicated because I have some that were communicated to me that I would like people to know about." The male also said that he had already posted the emails on line.



Also on May 6, 2019, ███ sent several emails to ███████ work email address. For all of ███ emails, his name ' ███ and email address ███████ were included in the "From" category. On May 6, 2019, at approximately 10:23 a.m., ███ sent the following email to ███████ Your bosses' professional POC, give it to me now! And you also need to tell me

4

who their boss is and that person's so when I figure out that you're just stalling, I can move on to the next law breaking terrorist rogue ███████

Additionally, you need to be working around the clock to find out how I'm going to report you to ████████

Best Regards

████████

11.    At Approximately 10:39 a.m. that same morning, ████████ sent a reply email to ████ stating that she had copied her supervisor and stated his name. Later that same morning at approximately 10:51 a.m., ████ sent an email to the complaining witness that stated:

You made so many excuses for why ████ has such a delay in communication but you don't have any excuses so why am I still waiting for your bullshit reply? Also could you go ahead a forward your complaints to the appropriate authority. You did communicate to me on the phone that you feel threatened by me. And you should.

You have served beyond your usefulness lol.

████████

12.    At approximately 11:37 a.m. that same day, Reid sent the following email to Ms. Snyder:

Lol another ████ huh? You people seem to have trouble reaching ██████████ I don't care about █████████ But give me his bosses' poc tho. No ██ could ever be the final over all approval authority.

I'm learning a lot about corruption from you. Anytime I am referred to someone lower than ██████ then I won't accept what is being said at face value. I'm sure there are █████ in your office which I why you people are off the meter right now with this bullshit you are currently on.

5

I hope you get hit by a car on your way home today. I hope you don't make it. Lol. I hope you rip your pants when you sit down. I hope someone puts a thumb tack in that same chair. I hope you spill hot coffee on yourself. I hope you do your job with integrity and honesty. I hope you believe in ▮▮▮▮▮ core values. I hope you believe in the U.S. Constitution. I hope you have faith in the justice system. I hope you believe in fairness and equality. I hope you know you suck. I hope you step in dog shit. I hope someone rings your doorbell and run. I hope your next delivery from amazon comes a day late. I hope you get trapped in a corner with an angry feral cat. Avoid zoos too, because I hope you fall into a gorilla enclosure and get fucked up, that shit would be funny AF my guy. I hope these emails get you all fired. I hope you suffer worse than i have. I hope you'll find this funny someday. I hope you don't take this seriously like you don't take your responsibilities and obligations seriously.

I hope you have a nice day.

And I also hope someone fucks it up lol.

Best Regards

▮▮▮▮▮▮

13.     At approximately 12:37 p.m. that day, ▮ sent an email to ▮▮▮▮ that contained a screenshot of the internet home page of ▮▮▮▮▮▮▮▮▮ ▮▮▮ Circled in red was the division where ▮▮▮▮ works. Also on that home page were the mailing address and telephone numbers for ▮▮▮s employer. Your affiant believes that ▮▮ was informing ▮▮▮▮ that he knew where she worked. That same afternoon at approximately 1:25 p.m., ▮ sent another email to ▮▮▮▮ that included the following statements:

No reply? What's wrong? Did I say something that hurt your tiny feelings? Lol I've decided that you're going to be contacted by me for the rest of your natural existence lol. This is fun to me. Since I can go to college or work, I will bother you instead college girl.

6

So how do you feel about my language now? Is it threatening yet?
Do you feel threatened by me? Are you feeling unsafe lol? Do you
feel secure in your little standard issue office?

I don't feel safe at all. I feel very threatened by your action and or
lack of. I don't feel secure anywhere. So you better pick up your
phone every day that why I can feel somewhat safe knowing that
you are not i████████

Lmfao "threatening language"

You're a big pussy lol. A real genuine coward. I'm glad this is going
to your ████ account. You can look at this.

████ then included an email dated September 7, 2016, that he had sent to another person in the

████████████ That email was from ████████████████████ In that

September 7, 2016, email ████ identified himself as "████████ he discussed ████████████

████████████████████████████████████████████████

████████████████ Reid further stated in the September 7, 2016, email that he was

resending the email from his "personal," which was a reference to his personal email account.

Also, the Cc: category listed the email address ████████████████ - the same email account

from which ████ was sending emails to the complaining witness.

14.    Later that same afternoon, at approximately 4:53 p.m., ████ sent another email to

the complaining witness that stated in relevant part,

How's life? Do you like being able to breathe? Do you like being
able to live? Do you like not being fucked with? Do you guys hug
your family after a long day of being a scumbag? I don't hug my
family. They all left me because they believe in. . . .

* * * *

7

I hope you all have people counting on your ability to be employed and live a healthy life. I'm going to fuck that all up lmao! You all better act fast because I promise you that this will not be an issue in my life before 2020 gets here. Not fucking around. One way or another, I will eliminate you all from my life this could have been handled at the ████s level. ██████ could have disposed of those charges is he had done his job. So fuck y'all. Please report my "threatening language" like you said you were. But not to another one of your but-buddies. Report me to the next highest authority.

So let's see. Hmm after ██████████ there is ummm. . . . oh ██████████

You people are basically terrorist, you understand that? This is terrorism. Your actions destabilize Government continuity and efficiency. And you ██████████████that make you all an inside threat.

██████████

In one of the emails that Reid had sent to ██████████ he included a written memorandum that was ██████████████████████████████that was addressed to him while he was in ██████████ ████

15.     Later that same day, at approximately 4:43 p.m., ████ emailed his Facebook link to the complaining witness. During the investigation, law enforcement reviewed the content of ████ Facebook page. On May 5, 2019, at 5:55 p.m., a post was on ████s Facebook account that read:

How does one gain access to the dark web?

Google is useless… too heavily sanctioned for me to search for simple things such as; optics opposite of inferred.

This is supposed to be a free market so finding specs on building UV optics shouldn't be difficult when the market for inferred optics is so vast.

8

In this Facebook post, ▆▆▆▆ may have been referring to building a device to enhance weapon capabilities.

16.    On May 6, 2019, the following message was posted on ▆▆▆▆ Facebook account:

> They are running from me. I called ▆▆▆▆▆▆▆ just now and she said to me that all of the concerns that I've presented to her were vague and unsubstantiated and does not warrant reopening my case!
>
> VAGUE?! Are you deadass my nigga! She hung up on me before I was actually able to threaten her. She deserves to die, a long with everyone else responsible for my situation. Clearly they have figured out how to avoid prison but I'm sure they can still be killed. This power they rely on sooo much doesn't grant immortality or invincibility lol. I'm done talking. If I see someone come out of a government vehicle and into my apartment building, that person or people are now very likely to come under attack. This is what I've been waiting for.
>
> The first person to call my bluff is the first martyr. Nothing is taken seriously until someone dies.

That same day at approximately 3:03 p.m., the following message was posted on ▆▆▆▆ Facebook account:

> Lol last week I had 40 Friends now I'm down to 36. It was 37 but I just deleted someone for never replying to my messages.
>
> So if you don't really care about me or my posts then just begone, I'm about to be homeless now so my rage and anger only increases from here.

17.    Later that same day at approximately 3:45 p.m., the following post was on ▆▆▆▆ Facebook account:

> Lmfao come for me then! Just keep in mind, I didn't strike first. Everything I'm doing is to protect myself. Self defense is defense of self. I'm not being defended by ▆▆▆▆ I'm being attached. Time to strike back. Doesn't seem like they're interested in justice to me so I guess this is just a vendetta.

9

A few minutes later, at 3:49 p.m., the following post was on ██████ Facebook account:

> This shit worries me everyday because these individuals know that I'm not going to let this go.
>
> They have already crossed the planet to keep these lies quiet and here I am home side, and they're still keeping it up.
>
> What's the point in leaving it to MY imagination to wonder how far these people will go to cover their ass. That is very dangerous. . . .

18.     Later that evening, at approximately 8:13 p.m., the following message was posted on ██████ Facebook account:

> I promise you that won't make anyone an accessory but this is everyone's one and only chance to NOT be associated with me because I am going to hurt people. It's not an "if" deal. It's "when" type of thing. So right now is your only chance to downgrade from friends to acquaintance or anything lesser. Any from here on out, anyone who suggests I get over the past is a target to me. You must be friend of ██████████████████████ There's only a short 13 names on my kill list. Don't fuck around and end up as a bench warmer on my roster.

Your affiant believes that ██████████ first name, ██████ is the ██████ listed in this post.

19.     On May 9, 2019, the following message was posted on ████ s Facebook account:

> None of my "threats" are true, I posted them here to give these dickheads the support the need to report me to the authorities. And the did not. Funny how one white girl says I touched her, I'm on jail in hours. One white But when it comes to me just trying to get my car back, all the white people tell me "no". Like how did it even come to this? All I ever really did was work and play my PS4.

Also on ████ s Facebook account was a photograph that included ██████ who was dressed in ██████████████

10

20.     During the investigation, law enforcement obtained the telephone number that ███ had used to call the complaining witness.  Investigations conducted at that time revealed that it was a cellular telephone with no subscriber information and that the service provider was Sprint. With the assistance of the Metropolitan Police Department of the District of Columbia, on May 8, 2019, law enforcement began to track that cellular telephone number on an emergency basis. Geolocation data revealed that during the week of May 6, 2019, that cellular telephone was in the ███████████.

21.     On May 10, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia authorized the issuance of arrest warrant for ███ and a Criminal Complaint that charged one count of Transmitting Threats in Interstate Commerce, in violation of 18 U.S.C. § 875(c).    On May 11, 2019, a special agent with the NCIS ██████ Field Office and other members of law enforcement went to an apartment in ████████████ where they believed ███ resided, to execute the arrest warrant for him.  ███ was not at home at that time. However, law enforcement spoke with ██████████████████████████ and confirmed that the ███ lived there.

22.     On May 13, 2019, law enforcement returned to the apartment where ███ lived in ████████████ to execute the arrest warrant for him.  Law enforcement knocked on the apartment door and no one answered.  Law enforcement rang the doorbell. ███ opened a window to the outside walkway and could be seen by law enforcement.  The NCIS special agent previously had viewed a photograph of ███ observed him, and confirmed that it was Reid. The NCIS special agent informed ███ that they had a warrant for his arrest, asked whether he was ██████████ and showed him a copy of the arrest warrant.  ███ confirmed his identity, said that he did not believe that the warrant was legitimate, and that he was not going to obey it.  Law enforcement

11

again showed ▮▮ a copy of the arrest warrant. The NCIS special agent heard someone putting heavy things down in front of the apartment's front door in what sounded like an effort to barricade the apartment front door to prevent entry. Members of law enforcement continued to talk to ▮▮▮ who remained inside the apartment. ▮▮▮ refused to open the apartment front door and was not cooperative. After law enforcement made numerous attempts to have ▮▮▮ open the apartment door, due to safety concerns for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ law enforcement breached the apartment front door. Upon entry into the apartment law enforcement confirmed that ▮▮▮ had barricaded the apartment front door. ▮▮▮ was taken into custody and arrested.

23.     While inside the apartment law enforcement conducted a security sweep and observed in plain view in an opened bag in ▮▮▮ s bedroom what appeared to be an AR-15 type rifle with a collapsible stock. On May 13, 2019, the Honorable ▮▮▮▮▮▮▮ of the United States District Court for ▮▮▮▮▮▮▮▮▮▮▮ authorized a search warrant for the apartment where ▮▮▮ ived in ▮▮▮▮▮▮▮▮ During the execution of the search warrant, law enforcement recovered several items, including the AR-15 type rifle with a collapsible stock that had what appeared to be an attached scope. No ammunition was recovered.

24.     Reid used the email address ▮▮▮▮▮▮▮▮ Reid also used Sprint cellular telephone number ▮▮▮▮▮▮ to contact ▮▮▮▮ Additionally, he sent to ▮▮ ▮▮ the following link to his Facebook account:

12

█████████████████████████████████████████████████████████████

25. Based upon the investigation conducted to date, the names of the individuals on ████ kill list have been connected to ████████████████████████████████ ████████████████

26. On May 9, 2019, Facebook was served with a preservation letter under 18 U.S.C. § 2703(f) related to user profile ████████████ associated with ███████████

## BACKGROUND CONCERNING FACEBOOK

27. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. The website is owned and operated by Facebook. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

28. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number ("user ID") to each account. Facebook identifies unique Facebook accounts by a user's email address, the user ID number, or the username associated with a Facebook profile.

29. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group

identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request.  If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

30.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

31.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or

her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

32.     Facebook allows users to upload photos and videos, which may include any metadata such as a location that the user transmitted when s/he uploaded the photo or video.  It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

33.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

34.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a Facebook account can be indefinitely stored in connection with that account, unless the subscriber deletes the material.  Further, such user-generated content

15

can remain on Facebook's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Facebook's servers for a certain period of time.

35. A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked." Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

36. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

38. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been "tagged," as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend." The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

41. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized

16

message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

42.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

45.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

46.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47.     Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

48.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

49.     Based on my training and experience, I know that providers such as Facebook also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various

ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Facebook in order to track what devices are using Facebook's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Facebook accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Facebook account.

50.      Based on my training and experience, I know that providers such as Facebook use cookies and similar technologies to track users visiting Facebook's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Facebook. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Facebook may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and

linked information can help identify who was using a Facebook account and determine the scope of criminal activity.

51.     Based on my training and experience, I know that Facebook maintains records that can link different Facebook accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Facebook accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Facebook account.

52.     Based on my training and experience, I know that subscribers can communicate directly with Facebook about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

53.     In summary, based on my training and experience in this context, I believe that the computers of Facebook are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Facebook subscribers), as well as Facebook-generated information about its subscribers and their use of Facebook services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the

account's user or users.  In fact, even if subscribers provide Facebook with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

54.      As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  From my training, experience, and investigation, I know that a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.    Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the

21

Facebook account owner. Finally, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

55.    Based on my training and experience, I know that evidence of who controlled, used, and/or created a Facebook account may be found within the user-generated content created or stored by the Facebook subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar Facebook accounts do not typically change hands on a frequent basis,

identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

56. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

57. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Karla-Dee Clark, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

58.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on July 17, 2019.

DEBORAH A. ROBINSON