# ATTACHMENT

# A

*Redacted Docket Materials*

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 | Case No. 19-sc-1553 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705   (See Attachment A, incorporated herein by reference.)
located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705 | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:  07/26/2019

_____
*Judge's signature*

City and state:  District of Columbia

Deborah A. Robinson, U.S. Magistrate Judge
*Printed name and title*

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 | ) ) ) ) |

Case No.  19-sc-1553

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Western_____ District of _____Washington_____ *(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705
 See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
 See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____August 9, 2019_____ *(not to exceed 14 days)*
 ☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Deborah A. Robinson_____ .
                                                                                          *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
 ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____07/26/2019_____          _____

                                                                                          *Judge's signature*

City and state:    _____District of Columbia_____      _____Deborah A. Robinson, U.S. Magistrate Judge_____
                                                                                          *Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  19-sc-1553 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the account identified by
███████████████ which is stored at premises controlled by Microsoft, an electronic

communications services provider and/or remote computing services provider in Redmond,

Washington.

## ATTACHMENT B

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.      Information to be disclosed by Microsoft Corporation ("PROVIDER") to
facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A:

a.      For the time period of January 1, 2014 to present:  The contents of all

communications and related transactional records for all PROVIDER services used by an

Account subscriber/user (such as email services, calendar services, file sharing or storage

services, photo sharing or storage services, remote computing services, instant messaging or chat

services, voice call services, or remote computing services), including but not limited to

incoming, outgoing, and draft emails, messages, calls, chats, and other electronic

communications; attachments to communications (including native files); source and destination

addresses and header or routing information for each communication (including originating IP

addresses of emails); the date, size, and length of each communication; and any user or device

identifiers linked to each communication (including cookies);[3]

---

[3] Here, PROVIDER's other services include: electronic communication and remote computing
services such as Skype (voice calls, video calls, and SMS text messaging), Outlook Calendar
(calendar and task), Office Online (cloud computing services for word processing, data
processing, and presentations); OneDrive (online file storage); web browsing and search tools
such as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers);
Bing Maps (maps with driving directions and local business search) and other location services;

b.      For the time period of January 1, 2014 to present:  The contents of all other data and related transactional records for all of PROVIDERS' services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including all services referenced in paragraph (a)), including any information generated, modified, or stored by user(s) OR PROVIDERS in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period of January 1, 2014 to present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period of January 1, 2014 to present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications).   Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

e.     All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.     All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (Cloud Messaging ("GCM"));

g.     Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number),

3

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period of January 1, 2014 to present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

i.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.      The contents of all Microsoft OneDrive files associated with the account, and logs pertaining to use and access of those files, including Sheets, Docs, Slides, Forms, and Drawings; files stored by the account; files shared with or by the account and the account with or by whom the files were shared; the accounts or e-mail addresses associated with each file use or access; the date and time at which each file was stored, shared, accessed, or edited; and the size and type of each file; and

k.      For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

l.      Within **14** days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or email to the following:



4

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq.*, and 18 U.S.C. § 1956, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of violations of the above statutes; or (ii) communicated with the Account about matters relating to violations of the above statutes;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the amount and location of any U.S. dollar payments, monies, or funds transfers by any party located in ███ ███ any party acting on behalf of, or in the interest of, an entity associated with ███████████ designated entity, any entity or person in or related to ██████ transacting or communicating with entities or persons in ███

5



███ or entities or persons acting for the benefit of ██████ including the
██████████ and parties associated with ███████, and any front company
for any of these above mentioned persons or entities;

(f) Evidence related to U.S. dollar transactions, banking, or financial information
related to ████████████ Company 1, Company 2, Company 3,
Company 4, Company 5, Company 6, Company 7, and the government,
representatives, or beneficiaries of ████████ any party located in ████████
██████████ any party acting on behalf of, or in the interest of, an entity
associated with ██████████████ designated entity, any entity or
person in or related to ██████████ transacting or communicating with entities or
persons in ████████ or entities or persons acting for the benefit of ██████
█████ and any front company for any of these above mentioned persons or
entities;

(g) Evidence related to anti-money laundering controls, the Bank Secrecy Act, know
your customer policies, and/or lists, names, persons, companies, and/or entities
sanctioned or related to the Department of Treasury Office of Foreign Asset
Control ("OFAC");

(h) Evidence related to front companies used by █████████████ Company
1, Company 2, Company 3, Company 4, Company 5, Company 6, Company 7,
and the government, representatives, or beneficiaries of ████████ including
its practices, makeup, organizational structure, profits, and customers;

(i) Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j)   the transportation or transmission of funds that have been derived from a criminal

offense;

(k)   the transportation, transmission, or transfer of funds that are intended to be used

to promote, conceal, or support unlawful activity;

(l)   Information that constitutes evidence concerning (i) the purchase, sale, and/or

export of U.S.-origin goods from the United States without a required license; and

(ii) the acquisition of goods from the United States and elsewhere to ████████

████ (via third countries), as connected to a conspiracy to import U.S.-origin

goods for delivery to end users in ████████

(m) Records and information related to (i) preparatory steps taken in furtherance of

the scheme, including internet searches for U.S.-origin goods and foreign-origin

goods (connected to the conspiracy to import U.S.-origin goods) for importation

to ████████ (via third countries), inquiries of vendors or sellers of the same,

and the like; (ii) purchases and sales such goods from vendors or online

purchasing sites (*e.g.* eBay); (iii) methods of payment with respect to such

purchases; (iv) shipping, delivery, and customs declarations with respect to such

purchases; (v) financial records (to include bank records, wire transfers, checks,

credit card statements, account information, and the like) with respect to such

purchases; (vi) identities of buyers, sellers, and end users of such goods; (vii)

planned use of such goods; and (viii) payments made by the end users of such

goods.

7

(n) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

(o) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(p) The identity of the person(s) who created or used the Target Accounts or any associated user ID, including records that help reveal the whereabouts of such person(s)

(q) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(r) The identity of the person(s) who communicated with the Target Accounts or any associated user ID about matters relating to the laundering of funds to / from ███ ███ U.S. sanctions, and assisting █████████████ including records that help reveal their whereabouts.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

9

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____
[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                              Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 | **Case No. 19-sc-1553**<br><br>**Filed Under Seal** |

**Reference:**     **USAO Ref. #**██████ **Subject Accounts:** ██████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████████ being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant for information which is associated with ████████████████ (hereafter "TARGET ACCOUNT 5"), which is stored at premises controlled by Microsoft Corporation (hereafter "the PROVIDER"), an electronic communications services provider and/or remote computing services provider which is located in Redmond, Washington. I am concurrently seeking an affidavit in support of an application for a search warrant for information which is associated with ████████████████ (hereafter "TARGET ACCOUNT 1"), ████████████████ (hereafter "TARGET ACCOUNT 2"), ████████████████ (hereafter "TARGET ACCOUNT 3"), and "████████████████ (hereafter "TARGET ACCOUNT 4"). The affidavit for the related search warrant contains an identical probable cause section to this affidavit. These five email accounts are collectively the TARGET ACCOUNTS.

2.  The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require the PROVIDERS to disclose to

the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that evidence of violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*, and money laundering, 18 U.S.C. § 1956, will be discovered in the TARGET ACCOUNTS. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

**<u>JURISDICTION</u>**

2

6.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

7.     This investigation relates to violations of IEEPA and its implementing executive orders and regulations.  IEEPA, enacted in 1977, granted the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Under IEEPA, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

8.     Title 50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

9.     Using the powers conferred by IEEPA, the President and Executive Branch departments have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S. goods.

10.     Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

3

11.    On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders").  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

12.    The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC.

13.    The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States.  See 31 C.F.R. § 560.410.

14.    The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran.  See 31 C.F.R. § 560.427(a).

15.    The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  31 C.F.R. § 560.203.

4

16.     Additionally, on August 6, 2018, the President, pursuant to IEEPA, issued Executive Order 13846, which, among other things, authorized the Secretary of State, in consultation with the secretaries of various other executive agencies, to impose sanctions on individuals who knowingly engage in a significant transaction for the purchase, acquisition, sale, transport, or marketing of oil or petroleum products from Iran.

17.     After this Executive Order was implemented, the Iranian Oil Minister, Bijan Namdar Zanganeh, said in an interview, "We have unofficial or unconventional sales, all of which are secret, because if they are made known America would immediately stop them."

## PROBABLE CAUSE

### I.     Background

18.     I know from maritime and vessel websites that ████████████████████ flagged large oil tanker capable of carrying ██████████████████████████ of crude oil. Such vessels are required to use a tracking system known as the Automatic Identification System (AIS). AIS was developed in the 1990s as a maritime safety feature which exchanges vessel information electronically with other nearby ships. The system is used by marine navigation officers and other maritime authorities for collision avoidance, identification and vessel locational data. Shipboard AIS became a requirement based on the International Maritime Organization's International Convention for the Safety of Life at Sea on the vessels such as ██ ██ as of December 31, 2004.

19.     AIS acts like a transponder that transmits a ship's location information (based on GPS) via a VHF radio. AIS is a safety feature that notifies other vessels of a vessel's location. Oil tankers over a specified gross tonnage are required to keep AIS on when a tanker is at sea, partly

due to the environmental damage oil tankers can cause by oil spills. AIS also measures how deep

a vessel sits on the water, which is known as its "draft."

20.    I know based on training and experience that many tankers operating on behalf of

sanctioned entities turn this safety system off when engaged in illicit shipments. In particular,

this is a common practice when doing business with ███████ which are both subject to

strict United States sanctions.

███████████

21.    Publically available AIS data reveals that ███████ has made multiple calls to

████████████████████████ which are located ████████████ and are

used to load ██████ onto tankers.

22.    Shipping records revealed that from March through July 2017, ████████ was

captained by █████████████ has publically maintained that he is

employed with ███████████████ since December 14, 2009. In July

2012, OFAC imposed sanctions on ███████ identifying ███████ as a ████████████

entity.

23.    Based on AIS data of ███████ including the draft information measuring how

deep the ship sits on the water, there are at least three instances of ███████ loading petroleum

products in ███ and multiple instances of smaller tankers engaging in ship-to-ship transfers with

████████ after it loaded ███████

24.    For example, AIS data revealed that ███████ loitered at ████████████

████████████████████ from on or about November 1 through on or about

November 30, 2018. The tanker deactivated its AIS as it travelled towards ██████████

████████ which is a location where oil tankers are known to load and unload petroleum. The

6

tanker's AIS remained off until December 15, 2018. When the AIS resumed functioning, the

draft of ███████ was consistent with oil being loaded while the AIS was turned off.

25. ████████ is an oil tanker capable of holding ███████

████████████ of crude oil, which is approximately half the capacity of the

██████ AIS data and statements by ████████████ who worked with ██████

██████ confirmed that ███████████ was co-located with ████████ on January 16, 2019 in

██████████ and that on or about on January 16, 2019, ████████ conducted a ship-to-ship

transfer with ██████████

26. ████████ is an oil tanker capable of holding ████████

████████████████ of crude oil, which is approximately half the capacity of ██

██████ This petroleum tanker has been on a publically available OFAC advisory for oil

tankers that have engaged in ship-to-ship transfers of petroleum destined for █ since March,

2019. AIS data and statements by █████████████ who worked with █████████

shows that ████████ was co-located with ████████ on January 22, 2019, in ████████

██, and that on or about on January 22, 2019, ████████ conducted a ship-to-ship transfer

with ██████████ Shortly thereafter, ██████████ engaged in another ship-to-ship transfer.

27. As to this voyage, ████████ filed and possessed documents which falsely

sourced the oil as coming from ████████ These shipping documents were forged as part of a scheme

to conceal ██████████ of the oil.

28. Law enforcement obtained copies of documents provided by representatives of

██████████ to shipping authorities. These documents specified the origin and quality of the oil.

The Certificate of Quality and the Certificate of Origin, both dated December 12, 2018, stated

7

that ████ received ████ from ███████████ which AIS data shows
to be false.

    29.    The FBI subsequently interviewed ██████████████

████████████████████████ According to the

████████████ tracks all outbound shipment of all types of ██████████

████ handles all shipments of ██████ which are outbound from ████████

    30.    ████████ indicated that the above-identified Certificate of Quality and the
Certificate of Origin were fraudulent. ████████ based this conclusion on numerous factors,
including the fact that the ████████████ which was found on all of the
documents, was fraudulent. ████████ provided law enforcement with an example of a
legitimate ████████████ which appeared different from the stamp found on the
████ documents. In addition, ████████████████ whose name was
stamped on the documents, was not employed at ███████████ Finally, ████
records indicate the ████ has never received a shipment of oil from ████ or from the
█████████████

**Impounding of ████**

    31.    On July 4, 2019, ███████████ assisted the authorities in ████ to
impound ████████ off the coast of ██████ for allegedly carrying oil to ████ in violation of
European Union sanctions.

    32.    On July 5, 2019, ███████████ said the vessel was no longer
listed in ███████████ as of May 29, 2019. ███████████
added that ████ had been de-listed after receiving an alert indicating the ship had participated
in or was linked to terrorism financing.

8

██████████████████████ **and its Contents**

33.    Days after ████████ was seized, ███████████████████ spoke out against the action. █████████████████████████████████████████████ ████████████ threatened to seize ██████████████ in response. ████████ was sanctioned by ███████████████████████ on or about April 15, 2019.

34.    On July 11, 2019, ███████████████████████████ admitted in public statements that ██████████ "had rented this ship ████████ and we ██████ carried the cargo."

35.    In addition, according to open-sources, immediately after ██████████ detainment, ██████████████████ summoned ████████████████████ to voice its "very strong objection to the illegal and unacceptable seizure" of its ship.  Law enforcement understands these statements were intended, in part, to claim ████████ ownership of the vessel and its oil.

██████████████████████████████████████████████████████████

36.    On December 20, 2018, Company 1 received a wire, which transited through the United States, of ████████████ from Company 3 in █████████████ This payment referenced ████████████ and an offshore oil rig.

37.    Company 1 is located at the same address in ██████████████ as an oil procurement company sanctioned by OFAC for shipping petroleum to ████████

38.    ████████████████ has no connection to ████████████ and is a Jurisdiction of Primary Concern for Money Laundering according to the U.S. Department of State.

9

39.     Based on my training and experience, the companies involved with these transactions were being used as cutouts to avoid listing the ultimate senders and beneficiaries on these U.S. dollar transactions.

40.     On or about December 26, 2018, Company 2, which is based in ███████ wired ███████ to Company 3, which payment routed through the United States. This payment referenced ███████ and an offshore oil rig.

41.     Person 1 and Person 2 have an ownership interest in Company 3. Person 1 and Person 2 also have an ownership interest in Company 4, another ████████████ company.  Between January 14 and 17, 2019, which was when ███████ conducted the ship-to-ship transfers with ███████ Company 4 received a wire from Company 5 of approximately ███████ which funds transited the U.S. financial system.

42.     On January 29, 2019, Company 5 also wired ███████ for ████████████ transfer petroleum from ███████ The stated purpose of this payment was "Trade" which was the same instruction that Company 5 used when sending Company 4 funds on or about January 14, 2019.  These funds were similarly wired through the United States.

43.     Thus, at least ███████ traceable to ███████ illicit shipment of ███████ in December 2018 and subsequent ship-to-ship transfer of this petroleum in January 2019 illegally transited the U.S. financial system.

**Additional Connections to ███████**

44.     As noted above, after the seizure of ████████████ were forced to admit their previously secret ownership of the vessel.

45.     ███████ has a complex ownership structure. It is owned, managed, and crewed by separate companies that appear to be operating on behalf of other parties.

10

46.     Publicly available sources of information show multiple different owners of the  One such source revealed that it is owned by Company 6, which lists a P.O. Box for its address and is operated by ████████████ of an oil company, which is part of an oil company that is headquartered in ██████.

47.     Company 7, which is located in ████████████████ In 2016, Company 7 made at least six U.S. dollar payments that referenced ██████████ totaling ████████ to a U.S. company.

48.     Company 7's accounting manager is also the accounting manager for a co-conspirator company that has publicly associated itself with ████████████ OFAC imposed sanctions on ████████████ on April 29, 2014, for providing support in connection with deceptive oil deals for ████ and for assisting ██ in selling oil in evasion of sanctions. ████████ ████████ arranged oil sales for ████████ and facilitated the circumvention of oil sanctions by disguising the oil's origin. ████████████████████ is also ████████ of the co-conspirator company.

49.     The parties failed to seek or obtain the requisite OFAC licenses for the above-described U.S.-dollar transactions.

**Target Accounts**

50.     On June 25, 2019, this Court authorized a 2703(d) order for information associated with Target Accounts 1 and 5. ████████████████████████ On June 24, 2019, this Court authorized a Pen Register Trap and Trace (PRTT) for information associated with Target Accounts 1 and 5. ████████████████ Based on information obtained from prior subpoena returns, the 2703(d) returns, and from the PRTT,

and based on information obtained through the course of this investigation, there is probable cause to believe that:



a. TARGET ACCOUNT 1 is used by ███████████████ Law enforcement discovered a publically available ██████████ for ████ in which he admits to being ████████████ at Company 7 (which, as noted above, is the manager of ████████ and another company which is affiliated with ████████ As previously mentioned, the ████████ was designated by OFAC on April 29, 2014. Subpoena returns from ████████ revealed that ████ used TARGET ACCOUNT 1 to register this ████████ account. Subsequent 2703(d) returns revealed that TARGET ACCOUNT 1 communicated with multiple email addresses on the Company 7 domain and on ████████████████ For example, on or about September 15 and 16, 2012, TARGET ACCOUNT 1 exchanged emails with ████████████████ This appears to the email address for an individual by the name of ████████ Law enforcement located a publically available resume for ████████ in which he states that his work experience includes: ███████████████████████████████████████████ On or about January 7, 2013, TARGET ACCOUNT 1 communicated with ████████████████ This account appears to be used by ████████ who was the ██████████████████████ at the time of this email, according to her profile.

b. TARGET ACCOUNT 2 is used by an individual who exchanged several emails with ████████ the individual associated with TARGET ACCOUNT 5. The vanity name associated with TARGET ACCOUNT 2 is listed as ████████████ I know from training and experience that ████████████ in the shipping industry oversee the

12

█████████████ of vessels under their charge, including docking, surveys, and inspections. TARGET ACCOUNT 2 also exchanged multiple emails accounts on the Company 7 domain. For example, on or about July 13, 2014, an email from a Company 7 email address sent an email to TARGET ACCOUNT 2 and to ███████████████████ (emphasis added). This email also copied TARGET ACCOUNT 3, TARGET ACCOUNT 4 and TARGET ACCOUNT 5. ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ On or about July 22, 2015, TARGET ACCOUNT 2 received an email from TARGET ACCOUNT 5, copying two Company 7 email addresses.

     c.  TARGET ACCOUNT 3 is used by an individual who was copied on numerous emails sent from the Company 7 domain. For example, on July 13, 2014, an email was sent from a Company 7 email address to TARGET ACCOUNT 3, and to ████████████████████ which as noted above appears to be ████████████████ ███ email account. This email also copied TARGET ACCOUNT 2, TARGET ACCOUNT 4 and TARGET ACCOUNT 5. In addition, on September 29, 2014, TARGET ACCOUNT 3 received an email from the Company 7 domain. TARGET ACCOUNT 5 was copied on this communication as well.

     d.  TARGET ACCOUNT 4 is used by an individual who was copied on emails with other TARGET ACCOUNTS as referenced above. For example, on July 13, 2014, a Company 7 email address sent an email to TARGET ACCOUNT 4 and to ████████████████████████ This email also copied TARGET ACCOUNT 2, TARGET ACCOUNT 3 and TARGET ACCOUNT 5.



e. TARGET ACCOUNT 5 is used is used by ████████████████ Law enforcement discovered a publically available ████████ for ██ in which he admits to being ████████████████. Subpoena returns for subscriber information from ████ showed that ██ used TARGET ACCOUNT 5 to register this ████ account. 2703(d) returns revealed that on or about April 22, 2019, TARGET ACCOUNT 5 received an email from ████████████ internet website refers to the company as ████ ████████████ On or about June 16, 2019, TARGET ACCOUNT 5 received an email from an address affiliated with ████████████ a company involved in the ████████████ Additionally, TARGET ACCOUNT 5 was copied on emails with other TARGET ACCOUNTS as referenced above. For example, on July 13, 2014, a Company 7 email address sent an email to TARGET ACCOUNT 4 and to ████████████This email also copied TARGET ACCOUNT 2, TARGET ACCOUNT 3 and TARGET ACCOUNT 5.

## BACKGROUND CONCERNING MICROSOFT'S ACCOUNTS

51. PROVIDER is the provider of the internet-based account identified as ████████████

52. The PROVIDER provides their subscribers internet-based accounts that allow them to send, receive, and store emails online. The PROVIDER's accounts are typically identified by a single username, which serves as the subscriber's default email address, but which can also function as a subscriber's username for the PROVIDER's other services, such as instant messages and remote photo or file storage.

53. Based on my training and experience, I know that the PROVIDER allows subscribers to obtain accounts by registering on the PROVIDER's website. During the

14

registration process, the PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate email address for backup purposes, a phone number, and in some cases a means of payment. The PROVIDER typically does not verify subscriber names. However, the PROVIDER does verify the email address or phone number provided.

54. Once a subscriber has registered an account, the PROVIDER provide email services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. The PROVIDER's subscribers can also use that same username or account in connection with other services provided by the PROVIDER.[1]

55. In general, user-generated content (such as email) that is written using, stored on, sent from, or sent to the PROVIDER's account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an email, the email can remain on the PROVIDER's servers indefinitely. Even if the

---

[1] Here, PROVIDER's other services include electronic communication and remote computing services such as Skype (voice calls, video calls, and SMS text messaging), Outlook Calendar (calendar and task), Office Online (cloud computing services for word processing, data processing, and presentations); OneDrive (online file storage); web browsing and search tools such as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers); Bing Maps (maps with driving directions and local business search) and other location services; online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications). Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

15

subscriber deletes the email, it may continue to exist on the PROVIDER's servers for a certain period of time.

56.     Thus, a subscriber's PROVIDER account can be used not only for email but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; and social networking.  Depending on user settings, user-generated content derived from many of these services is normally stored on the PROVIDER's servers until deleted by the subscriber.  Similar to emails, such user-generated content can remain on the PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on the PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on the PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

57.     Based on my training and experience, I know that providers such as the PROVIDER also collect and maintain information about their subscribers, including information about their use of the PROVIDER's services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such

16

as the PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as the PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER's services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

58. Based on my training and experience, I know that providers such as the PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by the PROVIDER in order to track what devices are using the PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

59.     Based on my training and experience, I know that providers such as the PROVIDER use cookies and similar technologies to track users visiting the PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to the PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as the PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

60.     Based on my training and experience, I know that the PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

61.     Based on my training and experience, I know that subscribers can communicate directly with the PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as the PROVIDER typically

18

retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

62. In summary, based on my training and experience in this context, I believe that the computers of the PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and un-retrieved email for the PROVIDER's subscribers), as well as PROVIDER-generated information about its subscribers and their use of the PROVIDER's services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide the PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

63. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the

19

account at a relevant time. Further, information maintained by the PROVIDER can show how and when the account was accessed or used. For example, providers such as the PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). [2]

## CONCLUSION

64.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.

---

[2] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on the PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July 26, 2019.

HON. DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

21

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT MICROSOFT CORPORATION FOR<br>INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956<br>AND 50 U.S.C. § 1705 | )<br>)<br>)<br>)<br>)<br>)   Case No. 19-sc-1553 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 (See Attachment A, incorporated herein by reference.)

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705 | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[REDACTED]

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: 07/26/2019

Deborah A. Robinson
Digitally signed by Deborah A. Robinson
Date: 2019.07.26 21:11:15 -04'00'

*Judge's signature*

City and state: District of Columbia

Deborah A. Robinson, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❒ Original          ❒ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT MICROSOFT CORPORATION FOR<br>INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956<br>AND 50 U.S.C. § 1705 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  19-sc-1553 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Western_____ District of _____Washington_____
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705
  See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
  See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____August 9, 2019_____ *(not to exceed 14 days)*
  ❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Deborah A. Robinson_____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ❒ for _____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:     07/26/2019

Deborah A. Robinson

Digitally signed by Deborah A. Robinson
Date: 2019.07.26 21:12:04 -04'00'

*Judge's signature*

City and state:     District of Columbia

Deborah A. Robinson, U.S. Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  19-sc-1553 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

    This warrant applies to information which is associated with the account identified by

████████████████████ which is stored at premises controlled by Microsoft, an electronic

communications services provider and/or remote computing services provider in Redmond,

Washington.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.   **Information to be disclosed by Microsoft Corporation ("PROVIDER") to
     facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A:

a.   For the time period of January 1, 2014 to present:  The contents of all

communications and related transactional records for all PROVIDER services used by an

Account subscriber/user (such as email services, calendar services, file sharing or storage

services, photo sharing or storage services, remote computing services, instant messaging or chat

services, voice call services, or remote computing services), including but not limited to

incoming, outgoing, and draft emails, messages, calls, chats, and other electronic

communications; attachments to communications (including native files); source and destination

addresses and header or routing information for each communication (including originating IP

addresses of emails); the date, size, and length of each communication; and any user or device

identifiers linked to each communication (including cookies);[3]

---

[3] Here, PROVIDER's other services include: electronic communication and remote computing
services such as Skype (voice calls, video calls, and SMS text messaging), Outlook Calendar
(calendar and task), Office Online (cloud computing services for word processing, data
processing, and presentations); OneDrive (online file storage); web browsing and search tools
such as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers);
Bing Maps (maps with driving directions and local business search) and other location services;

b.      For the time period of January 1, 2014 to present:  The contents of all other data and related transactional records for all of PROVIDERS' services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including all services referenced in paragraph (a)), including any information generated, modified, or stored by user(s) or PROVIDERS in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period of January 1, 2014 to present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period of January 1, 2014 to present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications).   Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (Cloud Messaging ("GCM"));

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number),

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period of January 1, 2014 to present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

i.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.      The contents of all Microsoft OneDrive files associated with the account, and logs pertaining to use and access of those files, including Sheets, Docs, Slides, Forms, and Drawings; files stored by the account; files shared with or by the account and the account with or by whom the files were shared; the accounts or e-mail addresses associated with each file use or access; the date and time at which each file was stored, shared, accessed, or edited; and the size and type of each file; and

k.      For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

l.      Within **14** days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or email to the following:



4

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq.*, and 18 U.S.C. § 1956, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of violations of the above statutes; or (ii) communicated with the Account about matters relating to violations of the above statutes;

(c)  Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e)  Information that constitutes evidence concerning the amount and location of any U.S. dollar payments, monies, or funds transfers by any party located in ███ ███ any party acting on behalf of, or in the interest of, an entity associated with ███████████ designated entity, any entity or person in or related to ██████ transacting or communicating with entities or persons in ███

5

 or entities or persons acting for the benefit of ████████ including the ████████ and parties associated with ████████ and any front company for any of these above mentioned persons or entities;

(f) Evidence related to U.S. dollar transactions, banking, or financial information related to ████████, Company 1, Company 2, Company 3, Company 4, Company 5, Company 6, Company 7, and the government, representatives, or beneficiaries of ████████ any party located in ████████ ████████ any party acting on behalf of, or in the interest of, an entity associated with ████████ designated entity, any entity or person in or related to ████████ transacting or communicating with entities or persons in ████████ or entities or persons acting for the benefit of ████████ ████████ and any front company for any of these above mentioned persons or entities;

(g) Evidence related to anti-money laundering controls, the Bank Secrecy Act, know your customer policies, and/or lists, names, persons, companies, and/or entities sanctioned or related to the Department of Treasury Office of Foreign Asset Control ("OFAC");

(h) Evidence related to front companies used by ████████ Company 1, Company 2, Company 3, Company 4, Company 5, Company 6, Company 7, and the government, representatives, or beneficiaries of ████████ including its practices, makeup, organizational structure, profits, and customers;

(i) Evidence related to sanctions, and practices undertaken to avoid sanctions;

6

(j)  the transportation or transmission of funds that have been derived from a criminal offense;

(k)  the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity;

(l)  Information that constitutes evidence concerning (i) the purchase, sale, and/or export of U.S.-origin goods from the United States without a required license; and (ii) the acquisition of goods from the United States and elsewhere to ████ (via third countries), as connected to a conspiracy to import U.S.-origin goods for delivery to end users in ████

(m) Records and information related to (i) preparatory steps taken in furtherance of the scheme, including internet searches for U.S.-origin goods and foreign-origin goods (connected to the conspiracy to import U.S.-origin goods) for importation to ████ (via third countries), inquiries of vendors or sellers of the same, and the like; (ii) purchases and sales such goods from vendors or online purchasing sites (*e.g.* eBay); (iii) methods of payment with respect to such purchases; (iv) shipping, delivery, and customs declarations with respect to such purchases; (v) financial records (to include bank records, wire transfers, checks, credit card statements, account information, and the like) with respect to such purchases; (vi) identities of buyers, sellers, and end users of such goods; (vii) planned use of such goods; and (viii) payments made by the end users of such goods.

7

(n) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

(o) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(p) The identity of the person(s) who created or used the Target Accounts or any associated user ID, including records that help reveal the whereabouts of such person(s)

(q) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(r) The identity of the person(s) who communicated with the Target Accounts or any associated user ID about matters relating to the laundering of funds to / from ███ ██████ U.S. sanctions, and assisting ████████████████ including records that help reveal their whereabouts.

### III.  Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                        Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 | **Case No. 19-sc-1553** <br><br> **Filed Under Seal** |

*Reference:*    ***USAO Ref. #*** ███████ ***Subject Accounts:*** ██████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Cindy R. Burnham, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information which is associated with ████████████████ (hereafter "TARGET ACCOUNT 5"), which is stored at premises controlled by Microsoft Corporation (hereafter "the PROVIDER"), an electronic communications services provider and/or remote computing services provider which is located in Redmond, Washington. I am concurrently seeking an affidavit in support of an application for a search warrant for information which is associated with ████████████████ (hereafter "TARGET ACCOUNT 1"), ████████████ (hereafter "TARGET ACCOUNT 2"), ████████████████ (hereafter "TARGET ACCOUNT 3"), and ██████████████████ (hereafter "TARGET ACCOUNT 4"). The affidavit for the related search warrant contains an identical probable cause section to this affidavit. These five email accounts are collectively the TARGET ACCOUNTS.

2.    The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require the PROVIDERS to disclose to

the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.



4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that evidence of violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*, and money laundering, 18 U.S.C. § 1956, will be discovered in the TARGET ACCOUNTS. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

2

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

7.      This investigation relates to violations of IEEPA and its implementing executive orders and regulations.  IEEPA, enacted in 1977, granted the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Under IEEPA, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

8.      Title 50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."

9.      Using the powers conferred by IEEPA, the President and Executive Branch departments have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S. goods.

10.      Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

3

11. On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

12. The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC.

13. The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States. See 31 C.F.R. § 560.410.

14. The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a).

15. The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203.

4

16.     Additionally, on August 6, 2018, the President, pursuant to IEEPA, issued Executive Order 13846, which, among other things, authorized the Secretary of State, in consultation with the secretaries of various other executive agencies, to impose sanctions on individuals who knowingly engage in a significant transaction for the purchase, acquisition, sale, transport, or marketing of oil or petroleum products from Iran.

17.     After this Executive Order was implemented, the Iranian Oil Minister, Bijan Namdar Zanganeh, said in an interview, "We have unofficial or unconventional sales, all of which are secret, because if they are made known America would immediately stop them."

## PROBABLE CAUSE

### I.     Background

18.     I know from maritime and vessel websites that ███████████████████ flagged large oil tanker capable of carrying ███████████████████████ of crude oil. Such vessels are required to use a tracking system known as the Automatic Identification System (AIS). AIS was developed in the 1990s as a maritime safety feature which exchanges vessel information electronically with other nearby ships. The system is used by marine navigation officers and other maritime authorities for collision avoidance, identification and vessel locational data. Shipboard AIS became a requirement based on the International Maritime Organization's International Convention for the Safety of Life at Sea on the vessels such as ████ ████ as of December 31, 2004.

19.     AIS acts like a transponder that transmits a ship's location information (based on GPS) via a VHF radio. AIS is a safety feature that notifies other vessels of a vessel's location. Oil tankers over a specified gross tonnage are required to keep AIS on when a tanker is at sea, partly

5

due to the environmental damage oil tankers can cause by oil spills. AIS also measures how deep a vessel sits on the water, which is known as its "draft."

20.     I know based on training and experience that many tankers operating on behalf of sanctioned entities turn this safety system off when engaged in illicit shipments. In particular, this is a common practice when doing business with ███████ which are both subject to strict United States sanctions.

███████████

21.     Publically available AIS data reveals that ███████ has made multiple calls to ████████████████████ which are located ████████████ and are used to load ██████ onto tankers.

22.     Shipping records revealed that from March through July 2017, ██████ was captained by ████████████ has publically maintained that he is employed with the ██████████████ since December 14, 2009. In July 2012, OFAC imposed sanctions on ██████ identifying ██████ as a ██████████ entity.

23.     Based on AIS data of ██████ including the draft information measuring how deep the ship sits on the water, there are at least three instances of ██████ loading petroleum products in ████ and multiple instances of smaller tankers engaging in ship-to-ship transfers with ████████ after it loaded ████████.

24.     For example, AIS data revealed that ████████ loitered at ████████████ ████████████████████ from on or about November 1 through on or about November 30, 2018. The tanker deactivated its AIS as it travelled towards ████████████ ████████ which is a location where oil tankers are known to load and unload petroleum. The

6

tanker's AIS remained off until December 15, 2018. When the AIS resumed functioning, the draft of █████ was consistent with oil being loaded while the AIS was turned off.

25. █████████ is an oil tanker capable of holding ███████ of crude oil, which is approximately half the capacity of the ███ AIS data and statements by ████████████ who worked with █ ████ confirmed that ███████ was co-located with ████████ on January 16, 2019 in ████████ and that on or about on January 16, 2019, ████████ conducted a ship-to-ship transfer with ██████

26. ██████████ is an oil tanker capable of holding ████████ of crude oil, which is approximately half the capacity of █ ████ This petroleum tanker has been on a publically available OFAC advisory for oil tankers that have engaged in ship-to-ship transfers of petroleum destined for ███ since March, 2019. AIS data and statements by ███████████ who worked with ████████ shows that ███████ was co-located with ███████ on January 22, 2019, in ████ and that on or about on January 22, 2019, ████████ conducted a ship-to-ship transfer with ███████ Shortly thereafter, ████████ engaged in another ship-to-ship transfer.

27. As to this voyage, ████████ filed and possessed documents which falsely sourced the oil as coming from ████ These shipping documents were forged as part of a scheme to conceal ██████████ of the oil.

28. Law enforcement obtained copies of documents provided by representatives of ██████ to shipping authorities. These documents specified the origin and quality of the oil. The Certificate of Quality and the Certificate of Origin, both dated December 12, 2018, stated

7

that ███████ received ██████ from ██████████████████ which AIS data shows to be false.

29.    The FBI subsequently interviewed ██████████████████████ ██████████████████████████████. According to the ██████████████████ tracks all outbound shipment of all types of ██████████████ ████████ handles all shipments of ████████ which are outbound from ████████

30.    ██████████ indicated that the above-identified Certificate of Quality and the Certificate of Origin were fraudulent. ██████████ based this conclusion on numerous factors, including the fact that the "██████████████ which was found on all of the documents, was fraudulent. ██████████ provided law enforcement with an example of a legitimate ██████████████ which appeared different from the stamp found on the ████████ documents.  In addition, ██████████████████ whose name was stamped on the documents, was not employed at ██████████████ Finally, ██████ records indicate the ██████ has never received a shipment of oil from ██████ or from the ██████████████

**Impounding of ████████**

31.    On July 4, 2019, ██████████████ assisted the authorities in ████████ to impound ████████ off the coast of ██████ for allegedly carrying oil to ██████ in violation of European Union sanctions.

32.    On July 5, 2019, ██████████████ said the vessel was no longer listed in ██████████████ as of May 29, 2019. ██████████████ added that ██████ had been de-listed after receiving an alert indicating the ship had participated in or was linked to terrorism financing.

8



▇▇▇▇▇▇ **and its Contents**

33.     Days after ▇▇▇▇ was seized, ▇▇▇▇▇▇▇▇▇ spoke out against the action. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇ threatened to seize ▇▇▇▇▇▇ in response. ▇▇▇▇ was sanctioned by ▇▇▇▇▇▇▇▇▇ on or about April 15, 2019.

34.     On July 11, 2019, ▇▇▇▇▇▇▇▇▇▇ admitted in public statements that ▇▇▇▇ "had rented this ship ▇▇▇▇ and we ▇▇▇ carried the cargo."

35.     In addition, according to open-sources, immediately after ▇▇▇▇ detainment, ▇▇▇▇▇▇ summoned ▇▇▇▇▇▇▇▇ to voice its "very strong objection to the illegal and unacceptable seizure" of its ship. Law enforcement understands these statements were intended, in part, to claim ▇▇▇ ownership of the vessel and its oil.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

36.     On December 20, 2018, Company 1 received a wire, which transited through the United States, of ▇▇▇▇ from Company 3 in ▇▇▇▇▇ This payment referenced ▇▇▇▇ and an offshore oil rig.

37.     Company 1 is located at the same address in ▇▇▇▇▇ as an oil procurement company sanctioned by OFAC for shipping petroleum to ▇▇▇

38.     ▇▇▇▇▇ has no connection to ▇▇▇▇ and is a Jurisdiction of Primary Concern for Money Laundering according to the U.S. Department of State.

9

39.     Based on my training and experience, the companies involved with these transactions were being used as cutouts to avoid listing the ultimate senders and beneficiaries on these U.S. dollar transactions.

40.     On or about December 26, 2018, Company 2, which is based in ███████ wired ███████ to Company 3, which payment routed through the United States. This payment referenced ███████ and an offshore oil rig.

41.     Person 1 and Person 2 have an ownership interest in Company 3. Person 1 and Person 2 also have an ownership interest in Company 4, another ██████████████ company.  Between January 14 and 17, 2019, which was when ███████conducted the ship-to-ship transfers with ███████Company 4 received a wire from Company 5 of approximately ███████ which funds transited the U.S. financial system.

42.     On January 29, 2019, Company 5 also wired $███████ for ███████to transfer petroleum from ███████  The stated purpose of this payment was "Trade" which was the same instruction that Company 5 used when sending Company 4 funds on or about January 14, 2019.  These funds were similarly wired through the United States.

43.     Thus, at least ███████ traceable to ███████ illicit shipment of ███████ in December 2018 and subsequent ship-to-ship transfer of this petroleum in January 2019 illegally transited the U.S. financial system.

**Additional Connections to ███████**

44.     As noted above, after the seizure of ██████████████were forced to admit their previously secret ownership of the vessel.

45.     ███████ has a complex ownership structure. It is owned, managed, and crewed by separate companies that appear to be operating on behalf of other parties.

10

46. Publicly available sources of information show multiple different owners of the ▮▮▮▮. One such source revealed that it is owned by Company 6, which lists a P.O. Box for its address and is operated by ▮▮▮▮▮▮▮ of an oil company, which is part of an oil company that is headquartered in ▮▮▮▮.

47. Company 7, which is located in ▮▮▮▮▮▮▮▮▮▮▮▮▮ In 2016, Company 7 made at least six U.S. dollar payments that referenced ▮▮▮▮ totaling ▮▮▮▮ to a U.S. company.

48. Company 7's accounting manager is also the accounting manager for a co-conspirator company that has publicly associated itself with ▮▮▮▮▮ OFAC imposed sanctions on ▮▮▮▮▮▮ on April 29, 2014, for providing support in connection with deceptive oil deals for ▮▮ and for assisting ▮▮ in selling oil in evasion of sanctions. ▮▮▮▮ ▮▮▮▮ arranged oil sales for ▮▮▮▮ and facilitated the circumvention of oil sanctions by disguising the oil's origin. ▮▮▮▮▮▮▮▮▮▮▮ is also ▮▮▮▮ of the co-conspirator company.

49. The parties failed to seek or obtain the requisite OFAC licenses for the above-described U.S.-dollar transactions.

**Target Accounts**

50. On June 25, 2019, this Court authorized a 2703(d) order for information associated with Target Accounts 1 and 5. ▮▮▮▮▮▮▮▮▮ On June 24, 2019, this Court authorized a Pen Register Trap and Trace (PRTT) for information associated with Target Accounts 1 and 5. ▮▮▮▮▮▮▮ Based on information obtained from prior subpoena returns, the 2703(d) returns, and from the PRTT,

11

and based on information obtained through the course of this investigation, there is probable

cause to believe that:

a. TARGET ACCOUNT 1 is used by ████████████████. Law

enforcement discovered a publically available ████████ for ███ in which he admits to

being ████████████ at Company 7 (which, as noted above, is the manager of ████████

█ and another company which is affiliated with ████████ As previously mentioned, the

████████ was designated by OFAC on April 29, 2014. Subpoena returns from ████████

revealed that ████ used TARGET ACCOUNT 1 to register this ████ account. Subsequent

2703(d) returns revealed that TARGET ACCOUNT 1 communicated with multiple email

addresses on the Company 7 domain and on ████████████████ For

example, on or about September 15 and 16, 2012, TARGET ACCOUNT 1 exchanged emails

with ████████████ This appears to the email address for an individual by the

name of ████████ Law enforcement located a publically available resume for ████████

in which he states that his work experience includes: ████████████████

████████████████████

████████ On or about January 7, 2013, TARGET ACCOUNT 1 communicated with

████████████ This account appears to be used by ████████ who was the

████████████████ at the time of this email, according to her

profile.

b. TARGET ACCOUNT 2 is used by an individual who exchanged several emails

with ████████ the individual associated with TARGET ACCOUNT 5. The vanity name

associated with TARGET ACCOUNT 2 is listed as '████████████ I know from

training and experience that ████████████ in the shipping industry oversee the

12

██████████████ of vessels under their charge, including docking, surveys, and inspections.
TARGET ACCOUNT 2 also exchanged multiple emails accounts on the Company 7 domain.
For example, on or about July 13, 2014, an email from a Company 7 email address sent an email
to TARGET ACCOUNT 2 and to ████████████████ (emphasis added). This
email also copied TARGET ACCOUNT 3, TARGET ACCOUNT 4 and TARGET ACCOUNT
5. ██████████████████████████████████████
██████████████████████████████ On or
about July 22, 2015, TARGET ACCOUNT 2 received an email from TARGET ACCOUNT 5,
copying two Company 7 email addresses.

      c.  TARGET ACCOUNT 3 is used by an individual who was copied on numerous
emails sent from the Company 7 domain. For example, on July 13, 2014, an email was sent from
a Company 7 email address to TARGET ACCOUNT 3, and to
█████████████████ which as noted above appears to be ███████████
██ email account.  This email also copied TARGET ACCOUNT 2, TARGET ACCOUNT 4 and
TARGET ACCOUNT 5. In addition, on September 29, 2014, TARGET ACCOUNT 3 received
an email from the Company 7 domain. TARGET ACCOUNT 5 was copied on this
communication as well.

      d.  TARGET ACCOUNT 4 is used by an individual who was copied on emails with
other TARGET ACCOUNTS as referenced above. For example, on July 13, 2014, a Company 7
email address sent an email to TARGET ACCOUNT 4 and to
█████████████████ This email also copied TARGET ACCOUNT 2, TARGET
ACCOUNT 3 and TARGET ACCOUNT 5.



e.  TARGET ACCOUNT 5 is used is used by ███████████ Law enforcement discovered a publically available ██████ for ██ in which he admits to being ███████████ Subpoena returns for subscriber information from ████ showed that █ used TARGET ACCOUNT 5 to register this █████ account. 2703(d) returns revealed that on or about April 22, 2019, TARGET ACCOUNT 5 received an email from ██████████ internet website refers to the company as ██████ On or about June 16, 2019, TARGET ACCOUNT 5 received an email from an address affiliated with █████████ a company involved in the ██████ Additionally, TARGET ACCOUNT 5 was copied on emails with other TARGET ACCOUNTS as referenced above. For example, on July 13, 2014, a Company 7 email address sent an email to TARGET ACCOUNT 4 and to ███████████ This email also copied TARGET ACCOUNT 2, TARGET ACCOUNT 3 and TARGET ACCOUNT 5.

## BACKGROUND CONCERNING MICROSOFT'S ACCOUNTS

51.  PROVIDER is the provider of the internet-based account identified as

████████████

52.  The PROVIDER provides their subscribers internet-based accounts that allow them to send, receive, and store emails online.  The PROVIDER's accounts are typically identified by a single username, which serves as the subscriber's default email address, but which can also function as a subscriber's username for the PROVIDER's other services, such as instant messages and remote photo or file storage.

53.  Based on my training and experience, I know that the PROVIDER allows subscribers to obtain accounts by registering on the PROVIDER's website.  During the

14

registration process, the PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate email address for backup purposes, a phone number, and in some cases a means of payment. The PROVIDER typically does not verify subscriber names. However, the PROVIDER does verify the email address or phone number provided.

54. Once a subscriber has registered an account, the PROVIDER provide email services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. The PROVIDER's subscribers can also use that same username or account in connection with other services provided by the PROVIDER.[1]

55. In general, user-generated content (such as email) that is written using, stored on, sent from, or sent to the PROVIDER's account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an email, the email can remain on the PROVIDER's servers indefinitely. Even if the

---

[1] Here, PROVIDER's other services include electronic communication and remote computing services such as Skype (voice calls, video calls, and SMS text messaging), Outlook Calendar (calendar and task), Office Online (cloud computing services for word processing, data processing, and presentations); OneDrive (online file storage); web browsing and search tools such as Bing Search (internet searches), Microsoft Edge, and Internet Explorer (web browsers); Bing Maps (maps with driving directions and local business search) and other location services; online tracking and advertising tools such as Bing Ads (which facilitates targeted advertising); and Microsoft Store (which allows users to purchase and download digital content, e.g., applications). Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (*e.g.*, internet browsing history, software usage history, and other information).

subscriber deletes the email, it may continue to exist on the PROVIDER's servers for a certain period of time.

56. Thus, a subscriber's PROVIDER account can be used not only for email but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on the PROVIDER's servers until deleted by the subscriber. Similar to emails, such user-generated content can remain on the PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on the PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on the PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

57. Based on my training and experience, I know that providers such as the PROVIDER also collect and maintain information about their subscribers, including information about their use of the PROVIDER's services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such

16

as the PROVIDER also commonly have records of the Internet Protocol address ("IP address")
used to register the account and the IP addresses associated with other logins to the account.
Because every device that connects to the Internet must use an IP address, IP address information
can help to identify which devices were used to access the relevant account. Also, providers
such as the PROVIDER typically collect and maintain location data related to subscriber's use of
PROVIDER's services, including data derived from IP addresses and/or Global Positioning
System ("GPS") data.

58. Based on my training and experience, I know that providers such as the
PROVIDER also collect information relating to the devices used to access a subscriber's account
– such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be
identified in various ways. For example, some identifiers are assigned to a device by the
manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a
telephone carrier concerning a particular user account for cellular data or voice services, and
some identifiers are actually assigned by the PROVIDER in order to track what devices are using
the PROVIDER's accounts and services. Examples of these identifiers include unique
application number, hardware model, operating system version, Global Unique Identifier
("GUID"), device serial number, mobile network information, telephone number, Media Access
Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my
training and experience, I know that such identifiers may constitute evidence of the crimes under
investigation because they can be used (a) to find other PROVIDER accounts created or accessed
by the same device and likely belonging to the same user, (b) to find other types of accounts
linked to the same device and user, and (c) to determine whether a particular device recovered
during course of the investigation was used to access the PROVIDER account.

17

59.     Based on my training and experience, I know that providers such as the
PROVIDER use cookies and similar technologies to track users visiting the PROVIDER's
webpages and using its products and services.  Basically, a "cookie" is a small file containing a
string of characters that a website attempts to place onto a user's computer.  When that computer
visits again, the website will recognize the cookie and thereby identify the same user who visited
before.  This sort of technology can be used to track users across multiple websites and online
services belonging to the PROVIDER.  More sophisticated cookie technology can be used to
identify users across devices and web browsers.  From training and experience, I know that
cookies and similar technology used by providers such as the PROVIDER may constitute
evidence of the criminal activity under investigation.  By linking various accounts, devices, and
online activity to the same user or users, cookies and linked information can help identify who
was using a PROVIDER account and determine the scope of criminal activity.

60.     Based on my training and experience, I know that the PROVIDER maintains
records that can link different PROVIDER accounts to one another, by virtue of common
identifiers, such as common email addresses, common telephone numbers, common device
identifiers, common computer cookies, and common names or addresses, that can show a single
person, or single group of persons, used multiple PROVIDER accounts.  Based on my training
and experience, I also know that evidence concerning the identity of such linked accounts can be
useful evidence in identifying the person or persons who have used a particular PROVIDER
account.

61.     Based on my training and experience, I know that subscribers can communicate
directly with the PROVIDER about issues relating to the account, such as technical problems,
billing inquiries, or complaints from other users.  Providers such as the PROVIDER typically

18

retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

62. In summary, based on my training and experience in this context, I believe that the computers of the PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and un-retrieved email for the PROVIDER's subscribers), as well as PROVIDER-generated information about its subscribers and their use of the PROVIDER's services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide the PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

63. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the

19

account at a relevant time. Further, information maintained by the PROVIDER can show how and when the account was accessed or used. For example, providers such as the PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). [2]

## **CONCLUSION**

64. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.

---

[2] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on the PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July 26, 2019.

# Deborah A. Robinson

Digitally signed by Deborah A. Robinson
Date: 2019.07.26 21:12:31 -04'00'

HON. DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>19-sc-1553 | Date and time warrant executed:<br>7/29/2019  11ᵉ Am | Copy of warrant and inventory left with:<br>Microsoft |
| Inventory made in the presence of ██████████████ | | |

Inventory of the property taken and name(s) of any person(s) seized:

Emails and attached files in email account

████████████████████

**Certification**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 7/30/2019

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information which is associated with the account identified by  which is stored at premises controlled by Microsoft, an electronic communications services provider and/or remote computing services provider in Redmond, Washington.

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT MICROSOFT CORPORATION FOR<br>INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956<br>AND 50 U.S.C. § 1705 | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 19-sc-1553 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 (See Attachment A, incorporated herein by reference.)
located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

     ☑ evidence of a crime;

     ☐ contraband, fruits of crime, or other items illegally possessed;

     ☐ property designed for use, intended for use, or used in committing a crime;

     ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705 | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

     See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

     ☑ Continued on the attached sheet.

     ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ ) is requested under
     18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

███████████████████

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: __07/26/2019__

Deborah A. Robinson    Digitally signed by Deborah A. Robinson
Date: 2019.07.26 21:11:15 -04'00'

*Judge's signature*

City and state: __District of Columbia__     Deborah A. Robinson, U.S. Magistrate Judge

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT MICROSOFT CORPORATION FOR<br>INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956<br>AND 50 U.S.C. § 1705 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   19-sc-1553 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the     Western     District of     Washington
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT MICROSOFT CORPORATION FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705
    See Attachment A, hereby incorporated by reference.

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
See Attachment B, hereby incorporated by reference.

      **YOU ARE COMMANDED** to execute this warrant on or before     August 9, 2019     *(not to exceed 14 days)*
   ☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Deborah A. Robinson     .
                                                               *(United States Magistrate Judge)*

   ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
     ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    07/26/2019

             Deborah A. Robinson       Digitally signed by Deborah A. Robinson<br>                                   Date: 2019.07.26 21:12:04 -04'00'
                                           *Judge's signature*

City and state:    District of Columbia                 Deborah A. Robinson, U.S. Magistrate Judge
                                                          *Printed name and title*