# ATTACHMENT

# A

*Redacted Docket Materials*

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 19-sc-2229 |
| IINFORMATION ASSOCIATED WITH ONE ACCOUNT | ) | |
| STORED AT PREMISES CONTROLLED BY APPLIE INC | ) | |
| PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF | ) | |
| VIOLATION OF 18 U.S.C. 371 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 371, 18 U.S.C § 641 | conspiracy to commit any offense against the United States, or to defraud the United States, or any agency in any manner and for any purpose, theft of United States government property |

The application is based on these facts:
See attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date* ███████████████████ under 18 U.S.C. § 3103a, the basis of which is set forth ███████

████████████████████████

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 11/12/2019 _____

City and state: Washington, D.C.

_____
*Judge's signature*

U.S. Magistrate Judge G. Michael Harvey
*Printed name and title*

Case 1:22-sc-02229-MHA-SEALED Document 1-1 Filed 12/01/22 Page 3 of 101

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❒ Original          ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>IINFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT PREMISES CONTROLLED BY APPLIE INC<br>PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF<br>VIOLATION OF 18 U.S.C. 371 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  19-sc-2229 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

**YOU ARE COMMANDED** to execute this warrant on or before _____November 26, 2019_____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____U.S. Magistrate G. Michael Harvey_____.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____.

Date and time issued:   11/12/2019

City and state:   Washington, D.C.

_____
*Judge's signature*

U.S. Magistrate Judge G. Michael Harvey
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  19-sc-2229 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information associated with one account that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.  The account is identified by a DSID and email address as follows:

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**Particular Things to be Seized**

**I.     Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.     For the time period **April 17, 2019, until the present** the contents of all communications and related transactional records for all Apple services used by an Account subscriber/user (such as e-mail services, contact lists, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including, **iCLOUD records and updates,** including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies). This includes iMessage (instant messages); FaceTime (video calls); iCloud, a file hosting, storage, and sharing

1

SBU - Law Enforcement

service, which allows users to store, access, share, and synchronize data across various digital devices, for example iCloud Photo Library and My Photo Stream for images and videos, iCloud Drive for documents, including presentations and spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity apps), and iCloud Keychain (to store various usernames and passwords, credit card information, and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); shared drives and document retention (including Time Capsule services), and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications) records, including for all devices utilizing the iCloud service;

      b.     For the time period **April 17, 2019 until the present,** the contents of all other data and related transactional records for all Apple services used by an Account user (such as e-mail services, contact lists, address books, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including iCloud and **all services referenced in paragraph (a) above,** including any information generated, modified, or stored by user(s) or Apple in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

      c.     For the time period **April 17, 2019 until the present:** All records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

2

d.     For the time period **April 17, 2019until the present:** All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.     All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.     All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile

3

Station Equipment Identities ("IMEI"), mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN");

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any Apple account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period **April 17, 2019 until the present**:  All records of communications between Apple and any person regarding the Account, including contacts with support services and records of actions taken;

i.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.      The contents of all emails, notes, data, and electronic messages associated with the account, including stored or preserved copies of data, documents, emails and messages sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and

4

length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

  k.  The contents of all instant messages associated with the account **April 17, 2019 until the present**, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

  l.  The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

  m.  All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services

SBU - Law Enforcement

(including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

n.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

o.      All records pertaining to the types of service used, including application purchases, downloads, updates and backup records;

p.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken;

q.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).;

r.      All applications downloaded, used, or updated using Apple services, including iTunes and iCloud, including dates of acquisition, all updates, and any data associated with such applications which are in control of Apple;

Within **14 DAYS** of the issuance of this warrant, Apple shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



SBU - Law Enforcement

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 371 and 641, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the unlawful access, use, sale, or transmission of information belonging to the United States government, conspiracy to commit such offenses, and conspiracy to defraud the United States government by interfering with its lawful functions, including the functions of the Department of State and the Department of Homeland Security.

7

(f)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(g) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation; and

(h) Evidence that persons were involved in the theft, transport, or misappropriation of property or information owned by the United States;

(i)  Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crimes under investigation;

(j)  Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

(k) Evidence that persons have obstructed justice, deleted information, or provided false information to the U.S. government (to facilitate access to government information);

(l)  Address books, buddy lists and complete contact information of known associates.

(m)The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the theft, misappropriation, or transfer of U.S. property or information, including records that help reveal their whereabouts;

(n) evidence of user attribution showing who used, controlled, or owned the account at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

8

SBU - Law Enforcement

(o) identification of any electronic devices being associated with the account;

(p) passwords, encryption keys, and other devices that may be necessary to access any electronic device associated with the account; and

(q) records of, or information about, the account's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" and "data" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

SBU - Law Enforcement

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the Apple and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Apple that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

SBU - Law Enforcement

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.        all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.        such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.        the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.        the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____        _____
Date                                     Signature

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY APPLE INC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 371** | **SC No. 19-sc-2229** <br><br> **Filed Under Seal** |

*Reference:*     *USAO Ref. #* ███████████

*Subject Account:*     *DSID* ████████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with the above-listed Apple ID account ("SUBJECT ACCOUNT"), which is stored at premises controlled by Apple Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider headquartered at 1 Infinite Loop, Cupertino, CA. Apple also maintains a corporate office in the District of Columbia at 901 15th Street, N.W., Suite 1001. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including data and the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.    On ███████, your affiant sought a search warrant from PROVIDER for SUBJECT ACCOUNT.  That request was granted by the Honorable Deborah A. Robinson, case no. ████████ on that same date.  For the reasons set forth below, your affiant respectfully submits that there is probable cause to believe that there will be additional relevant evidence contained within the SUBJECT ACCOUNT for the time period of April 17, 2019 to the present.



5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies, including the Department of Homeland Security (DHS) Office of Inspector General (DHS-OIG). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, I submit respectfully that there is probable cause to believe that violations of 18 U.S.C. § 371 (conspiracy to commit any offense against the United States, or to defraud the United States, or any agency in any manner and for any purpose) and 18 U.S.C. § 641 (theft of United States government property) have been committed by ████████████████████████ ████████████████████████████ and other unidentified individuals. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238.

8. In addition, the statutes setting forth the federal offenses under investigation, namely 18 U.S.C. § 371 (conspiracy to commit an offense or to defraud the United States) and 18

U.S.C. § 641 (theft of government property) may apply extraterritorially.  *See United States v.*
*Ayesh*, 702 F.3d 162, 165-66 (4th Cir. 2012) (extraterritorial application of 18 U.S.C. § 641 proper
in case charging foreign service national employed at U.S. embassy); *United States v. Cotten*, 471
F.2d 744, 751 (9th Cir. 1973) (finding extraterritorial application of 18 U.S.C. § 371 conspiracy to
violate 18 U.S.C. § 641 proper); *United States v. Finch*, No. 10-cr-333, 2010 WL 3938176, at *1-
4 (D. Haw. Sept. 30, 2010 (relying on *United States v. Bowman*, 260 U.S. 94 (1922) to approve
extraterritorial application of conspiracy to defraud the United States in violation of 18 U.S.C. §
371; rejecting argument that *Bowman* was overruled by a subsequent Supreme Court decision); *cf.*
*United States v. Al-Imam*, No. 17-cr-213, 2019 WL 1204882 (D.D.C. March 14, 2019) (CRC)
(analyzing extraterritorial application of criminal statutes).

## **PROBABLE CAUSE**

9.      Applications for refugee resettlement in the United States are processed and
adjudicated under the U.S. Refugee Admissions Program (USRAP), an interagency program
involving, among other federal agencies, the Department of State and Department of Homeland
Security (DHS).  Cases under the USRAP are tracked within the Worldwide Refugee
Admissions Processing System (WRAPS), a State Department database containing sensitive but
unclassified records and information.  During different periods of time, defendants ██████████
████████ were employed abroad by the U.S. Government and were able to access WRAPS
as part of their job responsibilities.

10.     Beginning at least in or about February 2016, and continuing until at least in or
about April 2019, in ███████████████████████████ and elsewhere,
the defendants knowingly and intentionally conspired to steal U.S. Government property—that
is, sensitive but unclassified U.S. Government records and information contained in WRAPS.

*See* 18 U.S.C. §§ 371, 641. The conspiracy focused on ███████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████ The defendants carried out this

conspiracy by, among other things, accessing WRAPS without authorization, downloading and

taking screenshots of records and information in the system, and transmitting the stolen records

and information to persons unauthorized to receive them.

11.     In so doing, the defendants also conspired to defraud the United States, that is,

they conspired to impair or obstruct a lawful government function using deceptive and dishonest

means. As explained in more detail below, it is a lawful government function of the State

Department and DHS, among other agencies, to █████████████████████████

████████ Moreover, it is a lawful government function of those agencies, in order to maintain

the integrity of ████████████████████ to ensure that the sensitive U.S. Government

records and information at issue in this investigation—that is, records and information in

WRAPS that were targeted for theft by the defendants—are kept confidential, non-public, and

not available to unauthorized persons. Through deceptive and dishonest means—including

unauthorized access to and use of WRAPS—the defendants conspired to impair and obstruct the

██████████████████████ and the confidentiality of those records and information.

12.     The conspiracy was directed by defendant ██████████████ and evidence

gathered as part of this investigation indicates that ████████████ likely used the stolen

records and information to ████████████████████████████████████

This conclusion is corroborated by evidence that ████████████ provided applicants with

██████████████████████████████████████████████████████████

5

## U.S. Refugee Admissions Program (USRAP)

13.     A refugee is defined under U.S. law as a person who is outside his or her country of origin and is unable or unwilling to return because of past persecution or a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group.

14.     The USRAP was created by the Executive Branch and authorized by Congress to facilitate the admission and resettlement of refugees in the United States.  At all times material to this affidavit—that is, beginning at least in or about February 2016 and continuing until at least in or about April 2019—applications to the United States for refugee resettlement were processed through the USRAP, which was overseen by the U.S. State Department's Bureau of Population, Refugees, and Migration (PRM), in cooperation with U.S. Citizenship and Immigration Services (USCIS), a component of DHS.  The U.S. Department of Health and Human Services (HHS), through its Office of Refugee Resettlement, also played a role in the USRAP by assisting and providing resources to resettled refugees.

15.     As a general matter, eligible refugee applicants fell within one of three broad categories, referred to as "priorities."  Priority 1 (P-1) included, among others individuals, those referred from the United Nations High Commissioner for Refugees; Priority 2 (P-2) covered groups of special humanitarian concern, often based on a group's ethnic, religious, or national identity; and Priority 3 (P-3) referred to applications for the purpose of family reunification.

16.     The Refugee Crisis in Iraq Act, signed into law in 2008, created a P-2 program of the USRAP, ███████████, which allowed certain Iraqis to apply directly to the USRAP for resettlement in the United States.  Eligible applicants included Iraqis who:  worked as

6

interpreters or translators for the U.S. Government or multinational forces; worked for the U.S. Government, its contractors, or grantees in Iraq; worked for U.S.-based media or nongovernmental organizations; or were a close relative of an eligible applicant.

17.     With some exceptions, refugee applications to the USRAP, including ███████ ██████, were initiated at one of several Resettlement Support Centers (RSCs), which were run by international or nongovernmental organizations located abroad and working pursuant to a contract with the State Department to process applications in specific geographic regions.  RSCs were responsible for, among other things, the initial processing of applications and screening of applicants for eligibility under the USRAP.

18.     The RSC Middle East and North Africa (MENA) was based in Amman, Jordan, and operated by the International Organization for Migration (IOM) under a contract with the State Department.  Processing of applications under ████████████████ was available at the RSC MENA, among other locations in the Middle East and North Africa.  The RSC Eurasia was based in Moscow, Russia, and also run by IOM under a contract with the State Department.

19.     USCIS was responsible for security checks and adjudication of all refugee applications.  The vetting of applicants included biographic and biometric checks against an array of immigration, law enforcement, and U.S. Intelligence Community (USIC) databases, as well as mandatory, in-person applicant interviews.  Often, USCIS's initial assessment of an application and applicant would trigger additional investigation, security checks, and interviews.

20.     To fulfill its responsibilities under the USRAP, USCIS maintained field offices located within U.S. embassies, including those in ██████████████  Within those field offices, USCIS, like many U.S. Government agencies operating abroad, commonly employed foreign nationals, known as "foreign service nationals" (FSNs) or "locally engaged staff" (LES).

21.     USCIS staff at international field offices were typically responsible for assisting with the processing and adjudication of refugee applications within their own geographic region. Occasionally, when there was a high volume of refugee applications in a particular region, USCIS staff, including FSNs/LES, would participate in a "circuit ride," in which the staff would travel to a region on a temporary basis to provide assistance.

22.     In or about 2018, USCIS began a phased effort to close its international field offices, consolidating USCIS international operations to offices within the United States. The

███████████████████████████████████████

### **Worldwide Refugee Admissions Processing System (WRAPS)**

*Records and Information in WRAPS and Limitations on Use*

23.     USRAP applications, or "cases," were tracked in WRAPS, which was managed by the Refugee Processing Center (RPC), a component of PRM located in the United States. WRAPS connected the multiple U.S. Government agencies and other entities comprising the USRAP, and it served as the information management system for the refugee application, adjudication, and resettlement process. Access to WRAPS was limited to authorized personnel, which included certain USCIS employees, including certain FSN/LES employees located at field offices abroad.

24.     For each USRAP case, WRAPS contained substantial information that was treated as confidential, including: personal identifying information of applicants and their family members; applicants' employment history, prior military service, and their accounts of persecution or fear of persecution; the results of security checks; questions and answers from USCIS interviews and proposed questions for future interviews; analyses of applicants' USRAP

8

eligibility; and assessments of applicants' credibility and any potential threat they posed to U.S. public safety or national security.  In addition to data that was entered into WRAPS, the system also allowed users to upload and download documents, such as refugee applications, employment verifications, and USCIS interview outlines.

25.      WRAPS records were tracked by case numbers, which included a prefix reflecting the location in which the case was initiated (and not the country of origin of the applicant).  For example, cases originating at the RSC in Jordan, regardless of the applicant's nationality, would have a case number such as "JO-12345," with the "JO" indicating that the application was initiated in Jordan.  Other abbreviations included IZ for Iraq and EG for Egypt.  To anonymize WRAPS case numbers in this affidavit, individual case numbers are uniquely identified as "Case 1," "Case 2," and so on.  All cases referenced in this affidavit include a JO, IZ, or EG prefix.

26.      WRAPS was governed by "Rules of Behavior," which users were required to read, understand, and sign, and which made clear that, among other things, WRAPS was "strictly for the purpose of refugee processing to support the [USRAP] only"; users "must never attempt to access information [they] are not authorized to access, which is not necessary for [them] to perform [their] job, or which is inappropriate or unnecessary to access"; and users "must never make a copy of sensitive information on a screen by taking a picture of it, capturing a screenshot, recording a video, or similar activities unless the image will remain on the WRAPS system and be stored in an appropriate location with access control."  In addition, every time a WRAPS user logged into the system, they were required to acknowledge that they were accessing a U.S. Government database containing sensitive information and that "WRAPS is strictly for the purpose of refugee processing to support the U.S. Refugee Admissions Program."

*WRAPS I and WRAPS II*

9

27.     The current version of WRAPS, known as "WRAPS II," was introduced in or around 2013, and it replaced an earlier, original version, known as "WRAPS I." WRAPS I remained operational, however, and, at least until in or about 2019, a user could access WRAPS I through a particular URL and could view or download the same information available in WRAPS II. If a user of WRAPS I needed to reset their password, however, the user would need to do that within WRAPS II.

28.     In contrast to WRAPS I, WRAPS II included an updated interface that displayed the name of the user who was logged into the system at that time; the WRAPS I display did not contain that information. Thus, a screenshot of the WRAPS II interface would capture the name of the user that is displayed on the screen, while a screenshot of WRAPS I would not. In addition, WRAPS II contained certain audit features that allowed for administrators to see when users had logged in or out of the system or had reset their password.

29.     In or around June 2019, in the course of this investigation, the RPC created a new audit feature that allowed administrators to identify, retrospectively, which cases and files a user had accessed in WRAPS I or WRAPS II, and when the user had accessed them. This feature was limited, however, in that it only provided information going back to on or about May 30, 2016.

*The Importance of Confidentiality of WRAPS Records and Information*

30.     In administering the USRAP, it was critically important that the State Department, DHS, and other agencies and employees involved in the USRAP ensure that sensitive U.S. Government records and information—including the records and information sought by the defendants—be kept confidential, non-public, and not available to unauthorized persons. This confidentiality permitted the agencies to administer the program fairly and lawfully, to protect the United States from threats to public safety and the national security, and,

consistent with U.S. and international law, to assist foreign persons fleeing persecution, including by resettling them in the United States.

31.     The theft or receipt of sensitive records or information in WRAPS by unauthorized persons creates a number of risks.  For example, if an applicant is provided confidential records or information from WRAPS regarding their own case—such as security check results, interview questions, or internal assessments of an applicant's credibility—that applicant could use the records or information to their advantage and potentially secure admission to the United States through the USRAP when that would not otherwise have occurred.  Such fraud increases the risk to public safety and national security of the United States.  Furthermore, because the number of refugee admissions to the United States are annually capped by the President in consultation with Congress, such an outcome would also likely preclude the admission of qualified refugee applicants who would otherwise be resettled in the United States.

### Subjects and the SUBJECT ACCOUNT



11





**Evidence Establishing the Conspiracy to Steal and to Defraud**



*Theft of Government Records and Information*

42.    Between in or around May 30, 2016, and late February 2019, based on WRAPS audit logs,

43.    Moreover, between October 2018 and February 2019 alone,



*Requests and Thefts in Early 2019*

45.     Evidence of the defendant's communications and conduct regarding certain WRAPS cases in early 2019 illustrate the nature and scope of the conspiracy and the role of each defendant.

46.     On or about January 8, 2019, ████████ and ████ exchanged messages about access to WRAPS.  ████ sent a message to ████████, ████████



47.     On or about January 9, 2019, ████████ sent a message to ████ via ████████ which was captured in the April 2019 search warrant on SUBJECT ACCOUNT,

48.     On or about January 10, 2019, [REDACTED] sent a message to [REDACTED] containing



*Targeting Particularly Sensitive Records and Information*

54.  ███████████ and ███████ requests for certain records and information

*A Case Study Indicating the Apparent Use of Stolen WRAPS Records and Information*







*Payments to* ████████

66.     Between in or around June 2017 and February 2019, ████████ sent ████████ payments through a U.S. financial services company, with a total value of approximately ████████

67.     Between in or around July 2017 and August 2017, ████ sent ████████ ██ payments through a U.S. financial services company, with a total value of approximately ████ ████████

*Attempts to Recruit Additional Conspirators with WRAPS Access*









**INFORMATION REGARDING APPLE ID AND iCLOUD**[2]

80.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

81.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

---

[2]     The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

24

a.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.  iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.  iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card

25

information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

82. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

83. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-

26

party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

84.     Once a subscriber has registered an account, Apple can provide multiple electronic services, including calendar and file sharing, iMessage (instant messages); FaceTime (video calls); iCloud, a file hosting, storage, and sharing service, which allows users to store, access, share, and synchronize data across various digital devices, for example iCloud Photo Library and My Photo Stream for images and videos, iCloud Drive for documents, including presentations and spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity apps), and iCloud Keychain (to store various usernames and passwords, credit card information, and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications).

85.     Depending on user settings, user-generated content derived from many of these services is normally stored on Apple's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on Apple servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Apple's servers for a certain period of time. Furthermore, an Apple subscriber can store: contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of

27

information on Apple servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created an Apple account may be found within such computer files and other information created or stored by the subscriber.

86.     Based on my training and experience, I know that providers such as Apple also collect and maintain information about their subscribers, including information about their use of services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as Apple also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as Apple typically collect and maintain location data related to subscriber's use of services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

87.     Based on my training and experience, I know that providers such as Apple also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Apple in order to track what devices are using Apple accounts and services. Examples of these

identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Apple accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Apple account.

88.     Apple also allows its subscribers to access its various services through an application that can be installed on and accessed via multiple cellular telephones and other mobile devices. This application is associated with the subscriber's Apple account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as Apple) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of Apple are likely to contain useful information that may

help to identify the specific device(s) used by a particular subscriber to access the subscriber's Apple account via the mobile application.

89.     Based on my training and experience, I know that providers such as Apple use cookies and similar technologies to track users visiting Apple's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Apple. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Apple may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Apple's account and determine the scope of criminal activity.

90.     Based on my training and experience, I know that Apple maintains records that can link different Apple accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Apple accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Apple account.

91.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means

of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

92.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

93.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an

Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

94.     Apple provides users with at least five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

95.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

96. Your affiant is aware that the iCloud backup will include data on phone calls and text messages, as well as the content of historic iMessages and other communications. iCloud also provides a feature that allows users of WhatsApp and other encrypted applications to store their communications on the iCloud account. As such, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

97. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

98. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan

to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

99. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services or the download of encrypted applications or software used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

100. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

101. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Erik Kenerson, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

102. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested

warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.



Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 and 41(d)(3) based on information communicated by telephone on this 12th day of November, 2019.

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>IINFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT PREMISES CONTROLLED BY APPLIE INC<br>PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF<br>VIOLATION OF 18 U.S.C. 371 | )<br>)<br>)<br>)<br>)<br>)    Case No. 19-sc-2229 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

located in the _____ **Northern** _____ District of _____ **California** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 371, 18 U.S.C §<br>641 | conspiracy to commit any offense against the United States, or to defraud the<br>United States, or any agency in any manner and for any purpose, theft of United<br>States government property |

The application is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if mor...*
18 U.S.C. § 3103a, the basis of which is set forth on the

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 11/12/2019 _____

2019.11.12 14:47:53 -05'00'

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

U.S. Magistrate Judge G. Michael Harvey
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  19-sc-2229 |
| IINFORMATION ASSOCIATED WITH ONE ACCOUNT | ) | |
| STORED AT PREMISES CONTROLLED BY APPLIE INC | ) | |
| PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF | ) | |
| VIOLATION OF 18 U.S.C. 371 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

**YOU ARE COMMANDED** to execute this warrant on or before _____November 26, 2019_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____U.S. Magistrate G. Michael Harvey_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

2019.11.12 14:48:47 -05'00'

Date and time issued:   11/12/2019
*Judge's signature*

City and state:  Washington, D.C.          U.S. Magistrate Judge G. Michael Harvey
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  19-sc-2229 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

---

**Certification**

  I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with one account that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.  The account is identified by a DSID and email address as follows:

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**Particular Things to be Seized**

I.      **Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.      For the time period **April 17, 2019, until the present** the contents of all communications and related transactional records for all Apple services used by an Account subscriber/user (such as e-mail services, contact lists, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including, **iCLOUD records and updates,** including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies). This includes iMessage (instant messages); FaceTime (video calls); iCloud, a file hosting, storage, and sharing

1

SBU - Law Enforcement

service, which allows users to store, access, share, and synchronize data across various digital devices, for example iCloud Photo Library and My Photo Stream for images and videos, iCloud Drive for documents, including presentations and spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity apps), and iCloud Keychain (to store various usernames and passwords, credit card information, and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); shared drives and document retention (including Time Capsule services), and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications) records, including for all devices utilizing the iCloud service;

b.    For the time period **April 17, 2019until the present,** the contents of all other data and related transactional records for all Apple services used by an Account user (such as e-mail services, contact lists, address books, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including iCloud and **all services referenced in paragraph (a) above,** including any information generated, modified, or stored by user(s) or Apple in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.    For the time period **April 17, 2019 until the present:** All records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

2

d. For the time period **April 17, 2019until the present:** All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e. All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile

3

Station Equipment Identities ("IMEI"), mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN");

g.     Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any Apple account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.     For the time period **April 17, 2019 until the present**:     All records of communications between Apple and any person regarding the Account, including contacts with support services and records of actions taken;

i.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

j.     The contents of all emails, notes, data, and electronic messages associated with the account, including stored or preserved copies of data, documents, emails and messages sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and

4

length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

k.      The contents of all instant messages associated with the account **April 17, 2019 until the present**, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

l.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

m.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services

5

(including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

n.     All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

o.     All records pertaining to the types of service used, including application purchases, downloads, updates and backup records;

p.     All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken;

q.     All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).;

r.     All applications downloaded, used, or updated using Apple services, including iTunes and iCloud, including dates of acquisition, all updates, and any data associated with such applications which are in control of Apple;

Within **14 DAYS** of the issuance of this warrant, Apple shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



6

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 371 and 641, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c)  Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e)  Information that constitutes evidence concerning the unlawful access, use, sale, or transmission of information belonging to the United States government, conspiracy to commit such offenses, and conspiracy to defraud the United States government by interfering with its lawful functions, including the functions of the Department of State and the Department of Homeland Security.

SBU - Law Enforcement

(f)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(g) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation; and

(h) Evidence that persons were involved in the theft, transport, or misappropriation of property or information owned by the United States;

(i)  Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crimes under investigation;

(j)  Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

(k) Evidence that persons have obstructed justice, deleted information, or provided false information to the U.S. government (to facilitate access to government information);

(l)  Address books, buddy lists and complete contact information of known associates.

(m) The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the theft, misappropriation, or transfer of U.S. property or information, including records that help reveal their whereabouts;

(n) evidence of user attribution showing who used, controlled, or owned the account at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

8

(o) identification of any electronic devices being associated with the account;

(p) passwords, encryption keys, and other devices that may be necessary to access any electronic device associated with the account; and

(q) records of, or information about, the account's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" and "data" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

SBU - Law Enforcement

### III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by the Apple and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Apple that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

10

SBU - Law Enforcement

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC</u> <u>RECORDS PURSUANT TO FEDERAL RULES OF</u> <u>EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.     such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                                      Signature

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY APPLE INC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 371 | SC No. 19-sc-2229 <br><br> **Filed Under Seal** |

Reference:          USAO Ref. █████████████

Subject Account:   DSID ████████████████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ███████████████ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with the above-listed Apple ID account ("SUBJECT ACCOUNT"), which is stored at premises controlled by Apple Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider headquartered at 1 Infinite Loop, Cupertino, CA. Apple also maintains a corporate office in the District of Columbia at 901 15th Street, N.W., Suite 1001. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including data and the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

     2.     On April 17, 2019, your affiant sought a search warrant from PROVIDER for SUBJECT ACCOUNT.  That request was granted by the Honorable Deborah A. Robinson, case no. 19-sc-00853, on that same date.  For the reasons set forth below, your affiant respectfully submits that there is probable cause to believe that there will be additional relevant evidence contained within the SUBJECT ACCOUNT for the time period of April 17, 2019 to the present.



5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies, including the Department of Homeland Security (DHS) Office of Inspector General (DHS-OIG). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, I submit respectfully that there is probable cause to believe that violations of 18 U.S.C. § 371 (conspiracy to commit any offense against the United States, or to defraud the United States, or any agency in any manner and for any purpose) and 18 U.S.C. § 641 (theft of United States government property) have been committed by ████████████████████████████ ████████████████████████████ and other unidentified individuals. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238.

8.      In addition, the statutes setting forth the federal offenses under investigation, namely 18 U.S.C. § 371 (conspiracy to commit an offense or to defraud the United States) and 18

U.S.C. § 641 (theft of government property) may apply extraterritorially.  *See United States v. Ayesh*, 702 F.3d 162, 165-66 (4th Cir. 2012) (extraterritorial application of 18 U.S.C. § 641 proper in case charging foreign service national employed at U.S. embassy); *United States v. Cotten*, 471 F.2d 744, 751 (9th Cir. 1973) (finding extraterritorial application of 18 U.S.C. § 371 conspiracy to violate 18 U.S.C. § 641 proper); *United States v. Finch*, No. 10-cr-333, 2010 WL 3938176, at *1-4 (D. Haw. Sept. 30, 2010 (relying on *United States v. Bowman*, 260 U.S. 94 (1922) to approve extraterritorial application of conspiracy to defraud the United States in violation of 18 U.S.C. § 371; rejecting argument that *Bowman* was overruled by a subsequent Supreme Court decision); *cf. United States v. Al-Imam*, No. 17-cr-213, 2019 WL 1204882 (D.D.C. March 14, 2019) (CRC) (analyzing extraterritorial application of criminal statutes).

## **PROBABLE CAUSE**

9.     Applications for refugee resettlement in the United States are processed and adjudicated under the U.S. Refugee Admissions Program (USRAP), an interagency program involving, among other federal agencies, the Department of State and Department of Homeland Security (DHS).  Cases under the USRAP are tracked within the Worldwide Refugee Admissions Processing System (WRAPS), a State Department database containing sensitive but unclassified records and information.  During different periods of time, defendants ███████ ██████ were employed abroad by the U.S. Government and were able to access WRAPS ████████████████████

10.     Beginning at least in or about February 2016, and continuing until at least in or about April 2019, in ████████████████████████, and elsewhere, the defendants knowingly and intentionally conspired to steal U.S. Government property—that is, sensitive but unclassified U.S. Government records and information contained in WRAPS.

4

*See* 18 U.S.C. §§ 371, 641.  The conspiracy focused on ███████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████  The defendants carried out this

conspiracy by, among other things, accessing WRAPS without authorization, downloading and

taking screenshots of records and information in the system, and transmitting the stolen records

and information to persons unauthorized to receive them.

      11.      In so doing, the defendants also conspired to defraud the United States, that is,

they conspired to impair or obstruct a lawful government function using deceptive and dishonest

means.  As explained in more detail below, it is a lawful government function of the State

Department and DHS, among other agencies, to administer the USRAP and the ███████████

█████████  Moreover, it is a lawful government function of those agencies, in order to maintain

the integrity of the USRAP and █████████████ to ensure that the sensitive U.S. Government

records and information at issue in this investigation—that is, records and information in

WRAPS that were targeted for theft by the defendants—are kept confidential, non-public, and

not available to unauthorized persons.  Through deceptive and dishonest means—including

unauthorized access to and use of WRAPS—the defendants conspired to impair and obstruct the

USRAP, ██████████████ and the confidentiality of those records and information.

      12.      The conspiracy was directed by defendant ██████████████, and evidence

gathered as part of this investigation indicates that ██████████ likely used the stolen

records and information to ████████████████████████████████████████

This conclusion is corroborated by evidence that █████████ provided applicants with

████████████████████████████████████████████████████

5

## U.S. Refugee Admissions Program (USRAP)

13.     A refugee is defined under U.S. law as a person who is outside his or her country of origin and is unable or unwilling to return because of past persecution or a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group.

14.     The USRAP was created by the Executive Branch and authorized by Congress to facilitate the admission and resettlement of refugees in the United States.  At all times material to this affidavit—that is, beginning at least in or about February 2016 and continuing until at least in or about April 2019—applications to the United States for refugee resettlement were processed through the USRAP, which was overseen by the U.S. State Department's Bureau of Population, Refugees, and Migration (PRM), in cooperation with U.S. Citizenship and Immigration Services (USCIS), a component of DHS.  The U.S. Department of Health and Human Services (HHS), through its Office of Refugee Resettlement, also played a role in the USRAP by assisting and providing resources to resettled refugees.

15.     As a general matter, eligible refugee applicants fell within one of three broad categories, referred to as "priorities."  Priority 1 (P-1) included, among others individuals, those referred from the United Nations High Commissioner for Refugees; Priority 2 (P-2) covered groups of special humanitarian concern, often based on a group's ethnic, religious, or national identity; and Priority 3 (P-3) referred to applications for the purpose of family reunification.

16.     The Refugee Crisis in Iraq Act, signed into law in 2008, created a P-2 program of the USRAP, the ███████████████, which allowed certain Iraqis to apply directly to the USRAP for resettlement in the United States.  Eligible applicants included Iraqis who:  worked as

6

interpreters or translators for the U.S. Government or multinational forces; worked for the U.S. Government, its contractors, or grantees in Iraq; worked for U.S.-based media or nongovernmental organizations; or were a close relative of an eligible applicant.

17.     With some exceptions, refugee applications to the USRAP, including the ████████ ████████, were initiated at one of several Resettlement Support Centers (RSCs), which were run by international or nongovernmental organizations located abroad and working pursuant to a contract with the State Department to process applications in specific geographic regions.  RSCs were responsible for, among other things, the initial processing of applications and screening of applicants for eligibility under the USRAP.

18.     The RSC Middle East and North Africa (MENA) was based in Amman, Jordan, and operated by the International Organization for Migration (IOM) under a contract with the State Department.  Processing of applications under the ████████████ was available at the RSC MENA, among other locations in the Middle East and North Africa.  The RSC Eurasia was based in Moscow, Russia, and also run by IOM under a contract with the State Department.

19.     USCIS was responsible for security checks and adjudication of all refugee applications.  The vetting of applicants included biographic and biometric checks against an array of immigration, law enforcement, and U.S. Intelligence Community (USIC) databases, as well as mandatory, in-person applicant interviews.  Often, USCIS's initial assessment of an application and applicant would trigger additional investigation, security checks, and interviews.

20.     To fulfill its responsibilities under the USRAP, USCIS maintained field offices located within U.S. embassies, including those in ████████████  Within those field offices, USCIS, like many U.S. Government agencies operating abroad, commonly employed foreign nationals, known as "foreign service nationals" (FSNs) or "locally engaged staff" (LES).

21.     USCIS staff at international field offices were typically responsible for assisting with the processing and adjudication of refugee applications within their own geographic region. Occasionally, when there was a high volume of refugee applications in a particular region, USCIS staff, including FSNs/LES, would participate in a "circuit ride," in which the staff would travel to a region on a temporary basis to provide assistance.

22.     In or about 2018, USCIS began a phased effort to close its international field offices, consolidating USCIS international operations to offices within the United States. ███

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

### Worldwide Refugee Admissions Processing System (WRAPS)

*Records and Information in WRAPS and Limitations on Use*

23.     USRAP applications, or "cases," were tracked in WRAPS, which was managed by the Refugee Processing Center (RPC), a component of PRM located in the United States. WRAPS connected the multiple U.S. Government agencies and other entities comprising the USRAP, and it served as the information management system for the refugee application, adjudication, and resettlement process.  Access to WRAPS was limited to authorized personnel, which included certain USCIS employees, including certain FSN/LES employees located at field offices abroad.

24.     For each USRAP case, WRAPS contained substantial information that was treated as confidential, including: personal identifying information of applicants and their family members; applicants' employment history, prior military service, and their accounts of persecution or fear of persecution; the results of security checks; questions and answers from USCIS interviews and proposed questions for future interviews; analyses of applicants' USRAP

8

eligibility; and assessments of applicants' credibility and any potential threat they posed to U.S.

public safety or national security. In addition to data that was entered into WRAPS, the system

also allowed users to upload and download documents, such as refugee applications,

employment verifications, and USCIS interview outlines.

25.    WRAPS records were tracked by case numbers, which included a prefix reflecting

the location in which the case was initiated (and not the country of origin of the applicant). For

example, cases originating at the RSC in Jordan, regardless of the applicant's nationality, would

have a case number such as "JO-12345," with the "JO" indicating that the application was

initiated in Jordan. Other abbreviations included IZ for Iraq and EG for Egypt. To anonymize

WRAPS case numbers in this affidavit, individual case numbers are uniquely identified as "Case

1," "Case 2," and so on. All cases referenced in this affidavit include a JO, IZ, or EG prefix.

26.    WRAPS was governed by "Rules of Behavior," which users were required to

read, understand, and sign, and which made clear that, among other things, WRAPS was "strictly

for the purpose of refugee processing to support the [USRAP] only"; users "must never attempt

to access information [they] are not authorized to access, which is not necessary for [them] to

perform [their] job, or which is inappropriate or unnecessary to access"; and users "must never

make a copy of sensitive information on a screen by taking a picture of it, capturing a screenshot,

recording a video, or similar activities unless the image will remain on the WRAPS system and

be stored in an appropriate location with access control." In addition, every time a WRAPS user

logged into the system, they were required to acknowledge that they were accessing a U.S.

Government database containing sensitive information and that "WRAPS is strictly for the

purpose of refugee processing to support the U.S. Refugee Admissions Program."

*WRAPS I and WRAPS II*

9

27.     The current version of WRAPS, known as "WRAPS II," was introduced in or around 2013, and it replaced an earlier, original version, known as "WRAPS I." WRAPS I remained operational, however, and, at least until in or about 2019, a user could access WRAPS I through a particular URL and could view or download the same information available in WRAPS II. If a user of WRAPS I needed to reset their password, however, the user would need to do that within WRAPS II.

28.     In contrast to WRAPS I, WRAPS II included an updated interface that displayed the name of the user who was logged into the system at that time; the WRAPS I display did not contain that information. Thus, a screenshot of the WRAPS II interface would capture the name of the user that is displayed on the screen, while a screenshot of WRAPS I would not. In addition, WRAPS II contained certain audit features that allowed for administrators to see when users had logged in or out of the system or had reset their password.

29.     In or around June 2019, in the course of this investigation, the RPC created a new audit feature that allowed administrators to identify, retrospectively, which cases and files a user had accessed in WRAPS I or WRAPS II, and when the user had accessed them. This feature was limited, however, in that it only provided information going back to on or about May 30, 2016.

*The Importance of Confidentiality of WRAPS Records and Information*

30.     In administering the USRAP, it was critically important that the State Department, DHS, and other agencies and employees involved in the USRAP ensure that sensitive U.S. Government records and information—including the records and information sought by the defendants—be kept confidential, non-public, and not available to unauthorized persons. This confidentiality permitted the agencies to administer the program fairly and lawfully, to protect the United States from threats to public safety and the national security, and,

consistent with U.S. and international law, to assist foreign persons fleeing persecution, including by resettling them in the United States.

31.     The theft or receipt of sensitive records or information in WRAPS by unauthorized persons creates a number of risks.  For example, if an applicant is provided confidential records or information from WRAPS regarding their own case—such as security check results, interview questions, or internal assessments of an applicant's credibility—that applicant could use the records or information to their advantage and potentially secure admission to the United States through the USRAP when that would not otherwise have occurred.  Such fraud increases the risk to public safety and national security of the United States.  Furthermore, because the number of refugee admissions to the United States are annually capped by the President in consultation with Congress, such an outcome would also likely preclude the admission of qualified refugee applicants who would otherwise be resettled in the United States.

## Subjects and the SUBJECT ACCOUNT







**Evidence Establishing the Conspiracy to Steal and to Defraud**



*Theft of Government Records and Information*

42.     Between in or around May 30, 2016, and late February 2019, based on WRAPS audit logs,

43.     Moreover, between October 2018 and February 2019 alone,



*Requests and Thefts in Early 2019*

45.     Evidence of the defendant's communications and conduct regarding certain WRAPS cases in early 2019 illustrate the nature and scope of the conspiracy and the role of each defendant.

46.     On or about January 8, 2019, ███████ and ████ exchanged messages about access to WRAPS. ████ sent a message to ██████████. ███████████████



47.     On or about January 9, 2019, ████████ sent a message to ████ via ██████ which was captured in the April 2019 search warrant on SUBJECT ACCOUNT,



15

48. On or about January 10, 2019, ▉▉▉ sent a message to ▉▉▉▉▉ containing



*Targeting Particularly Sensitive Records and Information*

54. ███████████, and ███████ requests for certain records and information

demonstrate an intent to steal records and information from WRAPS that are particularly

sensitive. ████████████████████████████████████████████████████

*A Case Study Indicating the Apparent Use of Stolen WRAPS Records and Information*







*Payments to* ███████

66.     Between in or around June 2017 and February 2019, ██████████ sent ██████████ payments through a U.S. financial services company, with a total value of approximately ████████████

67.     Between in or around July 2017 and August 2017, ██████ sent ██████████ ██ payments through a U.S. financial services company, with a total value of approximately ████ ████████

*Attempts to Recruit Additional Conspirators with WRAPS Access*









## INFORMATION REGARDING APPLE ID AND iCLOUD[2]

80.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

81.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

---

[2]     The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card

25

information, and Wi-Fi network information synchronized across multiple Apple
devices.

e.  Game Center, Apple's social gaming network, allows users of Apple devices to
play and share games with each other.

f.  Find My iPhone allows owners of Apple devices to remotely identify and track the
location of, display a message on, and wipe the contents of those devices. Find My
Friends allows owners of Apple devices to share locations.

g.  Location Services allows apps and websites to use information from cellular, Wi-
Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a
user's approximate location.

h.  App Store and iTunes Store are used to purchase and download digital content. iOS
apps can be purchased and downloaded through App Store on iOS devices, or
through iTunes Store on desktop and laptop computers running either Microsoft
Windows or Mac OS. Additional digital content, including music, movies, and
television shows, can be purchased through iTunes Store on iOS devices and on
desktop and laptop computers running either Microsoft Windows or Mac OS.

82.    Apple services are accessed through the use of an "Apple ID," an account created
during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID
can be linked to multiple Apple services and devices, serving as a central authentication and
syncing mechanism.

83.    An Apple ID takes the form of the full email address submitted by the user to create
the account; it can later be changed. Users can submit an Apple-provided email address (often
ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-

26

party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

84.    Once a subscriber has registered an account, Apple can provide multiple electronic services, including calendar and file sharing, iMessage (instant messages); FaceTime (video calls); iCloud, a file hosting, storage, and sharing service, which allows users to store, access, share, and synchronize data across various digital devices, for example iCloud Photo Library and My Photo Stream for images and videos, iCloud Drive for documents, including presentations and spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity apps), and iCloud Keychain (to store various usernames and passwords, credit card information, and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications).

85.    Depending on user settings, user-generated content derived from many of these services is normally stored on Apple's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on Apple servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Apple's servers for a certain period of time. Furthermore, an Apple subscriber can store: contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of

information on Apple servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created an Apple account may be found within such computer files and other information created or stored by the subscriber.

86.     Based on my training and experience, I know that providers such as Apple also collect and maintain information about their subscribers, including information about their use of services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as Apple also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as Apple typically collect and maintain location data related to subscriber's use of services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

87.     Based on my training and experience, I know that providers such as Apple also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Apple in order to track what devices are using Apple accounts and services. Examples of these

identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Apple accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Apple account.

88.     Apple also allows its subscribers to access its various services through an application that can be installed on and accessed via multiple cellular telephones and other mobile devices. This application is associated with the subscriber's Apple account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as Apple) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of Apple are likely to contain useful information that may

29

help to identify the specific device(s) used by a particular subscriber to access the subscriber's Apple account via the mobile application.

89. Based on my training and experience, I know that providers such as Apple use cookies and similar technologies to track users visiting Apple's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Apple. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as Apple may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Apple's account and determine the scope of criminal activity.

90. Based on my training and experience, I know that Apple maintains records that can link different Apple accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Apple accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Apple account.

91. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means

of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

92.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

93.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an

31

Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

94.     Apple provides users with at least five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

95.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

96.     Your affiant is aware that the iCloud backup will include data on phone calls and text messages, as well as the content of historic iMessages and other communications. iCloud also provides a feature that allows users of WhatsApp and other encrypted applications to store their communications on the iCloud account. As such, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

97.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

98.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan

to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

99.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services or the download of encrypted applications or software used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

100.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

101.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Erik Kenerson, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

102.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested

warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.



Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 and 41(d)(3) based on information communicated by telephone on this 12th day of November, 2019.

2019.11.12
14:51:30 -05'00'

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE